NON-CONFIDENTIAL VERSION

2024-1258, 2024-1259

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

LINYI CHENGEN IMPORT AND EXPORT CO., LTD., CELTIC CO., LTD., JIAXING GSUN IMPORT & EXPORT CO., LTD., SUQIAN HOPEWAY INTERNATIONAL TRADE CO., LTD., ANHUI HODA WOOD CO., LTD., SHANGHAI FUTUWOOD TRADING CO., LTD., LINYI EVERGREEN WOOD CO., LTD., XUZHOU JIANGYANG WOOD INDUSTRIES CO., LTD., XUZHOU TIMBER INTERNATIONAL TRADE CO. LTD., LINYI SANFORTUNE WOOD CO., LTD., LINYI MINGZHU WOOD CO., LTD., XUZHOU ANDEFU WOOD CO., LTD., SUINING PENGXIANG WOOD CO., LTD., XUZHOU SHENGPING IMPORT AND EXPORT CO., LTD., XUZHOU PINLIN INTERNATIONAL TRADE CO. LTD., LINYI GLARY PLYWOOD CO., LTD., LINYI LINHAI WOOD CO., LTD., LINYI HENGSHENG WOOD INDUSTRY CO., LTD., SHANDONG QISHAN INTERNATIONAL TRADING CO., LTD., SUZHOU ORIENTAL DRAGON IMPORT AND EXPORT CO., LTD., LINYI HUASHENG YONGBIN WOOD CO., LTD., QINGDAO GOOD FAITH IMPORT AND EXPORT CO., LTD., LINYI JIAHE WOOD INDUSTRY CO., LTD., JIAXING HENGTONG WOOD CO., LTD., XUZHOU LONGYUAN WOOD INDUSTRY CO., LTD., FAR EAST AMERICAN, INC., ZHEJIANG DEHUA TB IMPORT & EXPORT CO., LTD., TARACA PACIFIC, INC., RICHMOND INTERNATIONAL FOREST PRODUCTS, LLC,

*Plaintiffs – Appellees*

HIGHLAND INDUSTRIES INC., JIASHAN DALIN WOOD INDUSTRY CO., LTD., HAPPY WOOD INDUSTRIAL GROUP CO., LTD., JIANGSU HIGH HOPE ARSER CO., LTD., SUQIAN YAORUN TRADE CO., LTD., YANGZHOU HANOV INTERNATIONAL CO., LTD., G.D. ENTERPRISE LTD., PIZHOU JIN SHENG YUAN INTERNATIONAL TRADE CO., LTD., XUZHOU SHUIWANGXING TRADING CO., LTD., COSCO STAR INTERNATIONAL CO., LTD., DEQING CHINA-AFRICA FOREIGN TRADE PORT CO., LTD., LINYI CITY DONGFANG JINXIN ECONOMIC & TRADE CO., LTD., FABUWOOD CABINETRY CORP., LINYI CITY SHENRUI INTERNATIONAL TRADE CO., LTD., JIANGSU QIANJIUREN INTERNATIONAL TRADING CO., LTD., QINGDAO TOP P&Q INTERNATIONAL CORP., CANUSA WOOD PRODUCTS LTD., HOLLAND SOUTHWEST INTERNATIONAL INC., LIBERTY WOODS INTERNATIONAL, INC., NORTHWEST HARDWOODS, INC., USPLY LLC,

SHANDONG DONGFANG BAYLEY WOOD CO., LTD., CONCANNON CORP.,

*Plaintiffs*

v.

UNITED STATES, COALITION FOR FAIR TRADE OF HARDWOOD PLYWOOD,

*Defendants – Appellants*

---

Appeal from the United States Court of International Trade in Case No. 1:18-cv-00002, Judge Jennifer Choe-Groves

---

## OPENING BRIEF OF DEFENDANT-APPELLANT COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD

Timothy C. Brightbill, Esq.
Maureen E. Thorson, Esq.
Jeffrey O. Frank, Esq.
Stephanie M. Bell, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

Dated: May 10, 2024

FORM 9. Certificate of Interest                                          Form 9 (p. 1)
                                                                          March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1258-1259

**Short Case Caption** Linyi Chengen Import and Export Co., Ltd. v. US

**Filing Party/Entity** Coalition for Fair Trade of Hardwood Plywood - Defendant-Appellant

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 12/28/2023                Signature:  /s/ Timothy C. Brightbill

                                Name:       Timothy C. Brightbill

FORM 9. Certificate of Interest

Form 9 (p. 2)<br>March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Coalition for Fair Trade of Hardwood Plywood | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| Adam M. Teslik | Jeffrey O. Frank | Usha Neelakantan |
| Derick G. Holt | Laura El-Sabaawi | |
| Elizabeth S. Lee | Cynthia C. Galvez | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# <u>TABLE OF CONTENTS</u>

**Page**

I. STATEMENT OF RELATED CASES ............................................................1

II. JURISDICTIONAL STATEMENT.............................................................1

III. STATEMENT OF THE ISSUES ...............................................................1

IV. STATEMENT OF THE CASE ..................................................................2

V. STATEMENT OF FACTS .........................................................................3

    A.    The Original Investigation ..............................................................3

    B.    The CIT's Repeated Remands...........................................................7

        1.    The First Remand Order and Remand Results ..........................8

        2.    The Second Remand Order and Results ...................................10

        3.    The Third Remand Order and Results ......................................12

        4.    The Fourth Remand Order and Results ....................................13

        5.    The Fifth Remand Order and Results ......................................14

VI. SUMMARY OF ARGUMENT.................................................................15

VII. ARGUMENT ..........................................................................................17

    A.    Standard of Review ........................................................................17

    B.    Commerce's Original Calculation of Chengen's Margin and the Separate Rate Should Be Reinstated ......................................17

    C.    Assuming Commerce's Original Treatment of Chengen is Not Reinstated or its Remand Treatment Further Remanded, the Court Should Reinstate the 57.36% Separate Rate .....................................................................................28

    D.    Commerce Erred in Excluding Certain Separate Rate Applicants from the Order................................................................37

VIII. CONCLUSION ......................................................................................39

## **CONFIDENTIAL MATERIAL OMITTED**

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The confidential material omitted from page 30 consists of specific weight-averaged percentages calculated from data supplied by the respondent parties during the investigation.

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bosun Tools Co. v. United States*,
    No. 2021-1930, 2022 U.S. App. LEXIS 624 (Fed. Cir. Jan. 10
    2022) ..................................................................................33, 34, 36

*Goodluck India Ltd. v. United States*,
    11 F.4th 1335 (Fed. Cir. 2021) ...................................................18, 23

*Micron Tech., Inc. v. United States*,
    243 F.3d 1301 (Fed. Cir. 2001) ..........................................................17

*PPG Indus., Inc. v. United States*,
    978 F.2d 1232 (Fed. Cir. 1992) ..........................................................17

*SeAH Steel Corp. v. United States*,
    659 F. Supp. 3d 1318 (Ct. Int'l Trade 2023) .....................................23

*Yangzhou Bestpak Gifts & Crafts Co v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) .....................................................33, 35

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................17

19 U.S.C. § 1673d(c)(5)(A) .........................................................7, 29, 36

19 U.S.C. § 1673d(c)(5)(B) ...............................................................13, 30

19 U.S.C. § 1677b(a)(1)................................................................................5

19 U.S.C. § 1677b(c) ....................................................................................5

19 U.S.C. § 1677b(c)(1)..............................................................................17

19 U.S.C. § 1677b(c)(3)..............................................................................17

19 U.S.C. § 1677e(d)(3)..............................................................................35

19 U.S.C. § 1677m(a) ...................................................................................4

19 U.S.C. § 1677m(i) ............................................................18

28 U.S.C. § 1295(a)(5) ..........................................................1

28 U.S.C. § 1581(c) ..............................................................1

Pub. L. No. 114-27, Title V, § 502 (2015) ............................35

**Regulations**

19 C.F.R. § 351.204(d) ..........................................................4

19 C.F.R. § 351.307 ............................................................18

**Administrative Materials**

*Fresh Garlic from the People's Republic of China*,
    71 Fed. Reg. 26,329 (Dep't Commerce May 4, 2006) ......................17

*Honey from the People's Republic of China*,
    71 Fed. Reg. 34,893 (Dep't Commerce June 16, 2006) ....................18

*Passenger Vehicle and Light Truck Tires From the Socialist Republic
    of Vietnam*, 86 Fed. Reg. 28,559 (Dep't Commerce May 27, 2021) .........38

**Other Authorities**

Statement of Administrative Action accompanying the Uruguay Round
    Agreements Act, H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in*
    1994 U.S.C.C.A.N. 4040 ...............................................13, 30, 34, 37

## I.     STATEMENT OF RELATED CASES

Counsel for Appellant the Coalition for Fair Trade in Hardwood Plywood ("the Coalition") is aware of no other appeal in or from the same civil action that has previously been before this or any other appellate court. Counsel for the Coalition is also unaware of any other action that would be affected by this Court's decision in the pending appeal.

## II.     JURISDICTIONAL STATEMENT

This is an appeal from the final judgment of the U.S. Court of International Trade ("CIT") in *Linyi Chengen Import and Export Co., Ltd. v. United States*, Consol. Ct. No. 18-00002. The CIT entered its final judgment on October 10, 2023. The CIT exercised jurisdiction pursuant to 28 U.S.C. § 1581(c). The Coalition filed its notice of appeal on December 8, 2023, within sixty days of the CIT's final judgment, making this appeal timely under Fed. Cir. R. 4.[1] This Court has jurisdiction under 28 U.S.C. § 1295(a)(5). This appeal is from a final judgment that disposes of all parties' claims.

## III.     STATEMENT OF THE ISSUES

This appeal raises the following issues:

---

[1]     Likewise, the U.S. Department of Justice ("the Government") filed its own appeal of the CIT's final judgment on the same day. This Court consolidated the Coalition's and DOJ's appeals by order dated December 23, 2023. *See* Order (Dec. 28, 2023), ECF No. 6.

(1)    Whether the original decision, made by the U.S. Department of Commerce ("Commerce") in an antidumping duty ("AD") investigation into Chinese hardwood plywood products, to calculate a mandatory respondent's AD margin based on surrogate values for the respondent's self-produced veneers rather than purchased logs was reasonable and otherwise in accordance with law, and should thus be reinstated;

(2)    To the extent that Commerce's original determination regarding the mandatory respondent's margin is not reinstated, whether the agency acted reasonably in determining the margin for separate rate applicants by averaging the zero and adverse margins calculated for the two mandatory respondents in the investigation; and

(3)    To the extent that Commerce's original determination regarding the mandatory respondent's margin and/or its determination on remand of the margin for separate rate applicants through an averaging of the mandatory respondents' margins are not reinstated, whether the agency erred in excluding two voluntary respondents from the AD order.

## IV.    <u>STATEMENT OF THE CASE</u>

This appeal arises from the CIT's final judgment in *Linyi Chengen Import and Export Co., Ltd. v. United States*, Consol. Ct. No. 18-00002, concerning Commerce's final determination in an AD investigation into Chinese hardwood

plywood. Before issuing the opinion reflecting its final judgment, the CIT issued five opinions remanding aspects of the agency's original final determination and subsequent remand redeterminations. The CIT's six opinions were published at 391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019), 433 F. Supp. 3d 1278 (Ct. Int'l Trade 2020), 487 F. Supp. 3d 1349 (Ct. Int'l Trade 2020), 539 F. Supp. 3d 1269 (Ct. Int'l Trade 2021), 609 F. Supp. 3d 1392 (Ct. Int'l Trade 2022), and 658 F. Supp. 3d 1347 (Ct. Int'l Trade 2023).

## V.    STATEMENT OF FACTS

### A.    The Original Investigation

Commerce initiated an AD investigation into Chinese hardwood plywood on December 8, 2016. Appx6865. Commerce selected two Chinese companies for individual examination in its review: Shandong Dongfang Bayley Wood Co., Ltd. ("Bayley") and Linyi Chengen Import and Export Co., Ltd. ("Chengen"). Appx6856. Certain other Chinese companies filed separate rate applications ("SRAs") in a bid to establish their right to a margin other than the China-wide rate.[2] Appx6871-6875. Seven of these companies filed requests to be treated as voluntary

---

[2]    In AD investigations involving non-market economies ("NMEs") such as China, Commerce presumes that all foreign producers are controlled by the government and are subjected to a single, China-wide rate, unless they can show their independence therefrom, thus qualifying for a separate rate. *See, e.g.*, Appx6871.

respondents. Appx6858.[3] Commerce declined to select a voluntary respondent, but two companies nonetheless voluntarily submitted complete responses to the agency's initial questionnaires. *See, e.g.*, Appx80.

Applying an adverse inference, Commerce found Bayley to be a member of the China-wide entity. Appx6875, Appx6879-6885; Appx8529-8532. Bayley appealed this treatment, but the CIT upheld it, and no party has appealed Bayley's treatment to this Court. *See, e.g.*, Appx15-19.

Chengen reported that its plywood was produced by an affiliate, in a process that started with raw logs; Chengen further stated that it was reporting the affiliate's "actual . . . consumption" of logs and other inputs based on its books and records, including "material purchase invoice{s}" and "warehouse-in and -out" tickets. Appx2795-2798, Appx2826-2827, and Appx2834; Appx3499 and Appx3451; Appx5079, Appx5083; Appx6870-6871. Based on Chengen's reporting, Commerce understood that Chengen's affiliate recorded the volume (in cubic meters) of its purchased logs consistently with suppliers' invoices as logs were received into its warehouse, and that these invoice-consistent volumes then flowed through to the

---

[3]     Companies not selected for individual investigation in an investigation may nonetheless voluntarily provide responses to Commerce's initial round of questionnaires, and Commerce may consider those responses just as it does the responses to the selected companies, though it is not required to do so if it would be unduly burdensome and/or inhibit timely completion of the investigation. *See* 19 U.S.C. § 1677m(a); 19 C.F.R. § 351.204(d).

affiliate's records of logs removed from inventory for use in plywood production. *See* Appx8540; *see also* Appx9065-9067. After determining the normal value ("NV")[4] of Chengen's plywood using surrogate values for logs consumed in production, Commerce preliminarily calculated a 0% margin for Chengen. Appx6870-6871; Appx6904.

During its subsequent verification of Chengen's questionnaire responses, however, Commerce then learned that Chengen's affiliate received no invoices from suppliers of poplar logs, its most significant raw material input. Appx8540-8542; Appx8386-8388. Instead of recording received log volumes consistently with supplier invoices, the affiliate calculated log volume using a conversion formula/table that took into account the length of the logs received into its warehouse and the diameter of the logs' narrowest end. Appx8540-8542; Appx8386-8388. These calculated values were then reflected in its warehouse-in and warehouse-out tickets. Appx8387-8388. Commerce's verifiers collected a copy of the formula/table that the affiliate used to calculate the log volumes reflected on its warehouse-in and warehouse-out tickets. *Id.*; *see also* Appx7671-7672.

---

[4]    Generally, NV is the above-cost price of goods sold in a respondent's home market. 19 U.S.C. § 1677b(a)(1). But in cases involving NMEs, Commerce determines NV based on surrogate, market-economy values for production inputs. *Id.* § 1677b(c).

In its case brief, the Coalition argued that Commerce should cease determining the NV for Chengen's plywood using surrogate values for logs, and instead rely on values for intermediate inputs produced from logs, such as veneers. Appx9622-9624. The Coalition argued that Chengen's reported log consumption was distorted because it was based on calculations that took into account only a log's length and narrowest diameter, and that had not been shown accurate in relation to irregularly shaped objects such as raw logs. Appx9633. In rebuttal, Chengen argued that its reported consumption of logs by volume was reliable, because it was based on calculations performed pursuant to a "Chinese National Standard." *See, e.g.*, Appx8478-8479.

In its final results, Commerce found that Chengen failed to appropriately substantiate its reported log consumption. Commerce found it significant that the company's log volume calculations only considered each log's length and narrowest end. Appx8540-8544. Commerce reasoned that even if the calculations relied on a set formula/table, and even if the formula/table were taken from or incorporated into a national standard, it was not clear that they provided cubic meter values reasonably corresponding to a log's actual volume. *Id.* Nor was it clear on what basis the formula/table had been derived or that they truly reflected a Chinese national standard. *Id.* Relying on surrogate values for intermediate inputs that Chengen self-produced from raw materials (*i.e.*, veneers), Commerce calculated a 183.36% final

dumping margin for Chengyen. Appx8992. It then applied this margin to separate rate applicants, as it was the only margin determined for a mandatory respondent that was neither zero/*de minimis* nor based on an adverse inference. *See id.*; *see also* 19 U.S.C. § 1673d(c)(5)(A).

Chengen filed ministerial error comments in which it argued, for the first time, that Commerce's final determination reflected a misunderstanding that stemmed from its verifiers' failure to collect the full text of the document from which the formula/table observed in the production facility were taken. Appx9004-9006, Appx9008-9009. Chengen enlarged on the assertion, touched upon in its rebuttal brief, that the formula/table were taken from a Chinese national standard; Chengen also claimed that the formula/table provided a "complicated" but accurate method for calculating the volume of irregularly shaped logs. Appx9004-9006, Appx9008-9009; Appx8478-8479. Chengen argued that its reported log volumes were also supported by its suppliers' "delivery sheets" (though it pointed to no such sheets on the record) as well as tax invoices that Chengen's affiliate provided to suppliers. Appx9006-9007; Appx7701-7722. Commerce did not alter the final results based on these comments. Appx9047-9048.

## B.    The CIT's Repeated Remands

Chengen appealed, as did certain separate rate applicants to which Chengen's margin was applied. *See, e.g.*, Appx8-9. The CIT ultimately issued five remand

orders before sustaining Commerce's fifth remand redetermination in a sixth opinion.

### 1.    The First Remand Order and Remand Results

The CIT first remanded Commerce's "finding that   Chengen's log consumption calculations were unreliable," citing "conflicting accounts between Commerce and Chengen regarding . . . the conversion table and formula" and concerns over whether the record contained third-party documents confirming Chengen's reported log consumption. Appx310-311; *see also* Appx11-12. On remand, Commerce continued to find that Chengen had failed to substantiate its reported log volume consumption. Appx312.

Commerce reiterated that until verification, it understood that Chengen reported log consumption based on volumes identified in invoices received from log suppliers. Appx313-317, Appx323-324, Appx327, Appx333-334, Appx348-349, Appx367. Only at verification did it learn that there were no such invoices for poplar logs, the main production input, and that Chengen calculated its reported log volumes based on a formula/table. Appx313-317, Appx323-324, Appx327, Appx333-334, Appx348-349, Appx367. While the verifiers observed a copy of the formula/table in Chengen's production facility and collected it as an exhibit to the verification report, Commerce explained that its verifiers declined to review or collect additional documentation allegedly relating to the table/formula, but that was

not observed in the production facility, on that basis that such documentation constituted new factual information. Appx370-373. Commerce also explained that because Chengen did not report using the formula/table prior to verification, the agency was unable to properly vet the formula/table's reliability or provenance. Appx330, Appx352-353, Appx367-369. Commerce explained that even if the formula/table corresponded to a national standard, they were complex and of unproven accuracy in determining the volume of irregularly shaped objects such as logs. Appx330-333. Accordingly, Commerce concluded that Chengen had not properly established the accuracy and reliability of its reported log consumption.

Commerce further explained that the record contained no third-party confirmation of the accuracy of Chengen's reported log volumes. Appx333-341. Chengen received no invoices from its poplar log suppliers, Appx333-334, Appx367, and while the CIT flagged supplier "delivery sheets" as third-party information potentially confirming that Chengen's volume calculations accurately reflected the volume of the logs delivered, there were no such sheets on the record. Appx335-337, Appx359. Rather, the "warehouse-in tickets" that the lower court equated with such sheets were Chengen-generated documents reflecting its log volume calculations; there was also no evidence that Chengen's log suppliers had confirmed the accuracy of the volumes recorded on these tickets. Appx335-337, Appx359.

Commerce likewise explained that tax invoices that Chengen prepared for its suppliers did not constitute third-party documents. Appx337-341, Appx357-360. Commerce also indicated that, in referencing the lack of third-party documentation confirming that Chengen's calculations accurately reflected actual log volume, the agency did not mean to imply that Chengen's reporting could only be accurate if confirmed by third parties. Rather, given how late in the proceeding it first learned of Chengen's formula/table-based methodology for deriving and reporting log consumption values, and the unproven accuracy of that methodology, Commerce reviewed the record to determine if the methodology's results were corroborated by third-party documents. *See, e.g.*, Appx362-363, Appx367. Finding no such corroborative third-party documentation, Commerce made no changes to Chengen's margin or that applied to separate rate companies. Appx369.

### 2.    <u>The Second Remand Order and Results</u>

The CIT remanded for a second time, finding it unreasonable for Commerce's verifiers not to have collected all the documentation that Chengen proffered regarding the formula and conversion table, regardless of whether that documentation was observed by the verifiers in the production facility. *See* Appx26; *see also* Appx370-373. The Court reasoned that such documentation constituted information that "would corroborate, support, or clarify" Chengen's reported log volumes, and was both "readily available and highly relevant." Appx27. The Court

therefore ordered the agency to accept the "complete and accurate Chinese National Standard used for volume conversion" onto the record. Appx28. The lower court also found it unreasonable for Commerce to have rejected Chengen's reported log volumes absent record evidence affirmatively contradicting Chengen's reporting. *Id.*

On remand, and under protest, Commerce accepted from Chengen a 12-page document that purported to be a 1984 Chinese national standard, before reverting to its initial determination of Chengen's margin based on its reported log consumption. Appx375-376, Appx382-383. While the Coalition pointed out that the document's prescribed method for calculating log volume reflected obvious errors and gaps, Commerce reasoned that these flaws were not relevant to logs of the length that Chengen used. Appx384-385, Appx393-394. In response to the Coalition's arguments that the document was at least 30 years old as of the investigation period and potentially outdated, and also did not contain any information supporting or explaining the basis for the formula/table it contained, Commerce reasoned that the CIT's remand order gave it no leeway to consider the age of the standard, whether it had been superseded, or the lack of documentation supporting the standard's calculation methodology. Appx393. Commerce found that the record did not otherwise support determining NV based on Chengen's veneer usage and did not support applying an adverse inference in determining the company's margin. Appx335-349.

11

Commerce then applied the highest margin included in the petition (114.72%), rather than Chengen's zero rate, to Bayley. Appx376. It determined the separate rate by averaging the 114.72% and zero rates. Appx376, Appx416; *see also* Appx8992. In doing so, Commerce explained that applying Chengen's zero margin to all companies that qualified for a separate rate would not reasonably reflect their likely dumping margins. Appx388, Appx417, Appx423. Commerce reasoned that while Chengen achieved a zero margin, both Bayley's lack of cooperation and information in the petition suggested that dumping by separate rate companies occurred during the investigation period. Appx422-423. Finally, responding to an issue raised by parties during the remand proceedings, Commerce declined to exclude from the order separate rate companies that had sought voluntary respondent status. Appx425-426.

### 3.    <u>The Third Remand Order and Results</u>

The CIT once again remanded. While it upheld Commerce's recalculation of Chengen's margin, the lower court rejected Commerce's determination of the separate rate. Appx35-40. The CIT found that Commerce could not cite Bayley's lack of cooperation as a reason not to assign Chengen's zero margin to all separate rate respondents. Appx39. The lower court also found that information in the petition suggesting that dumping had taken place during the investigation period was "untethered" from separate rate companies' actual dumping margins, and did not

provide credible evidence that their dumping margins differed from Chengen's zero rate. Appx39-40.

In the third remand proceedings, Commerce continued to assign the simple average of the 114.72% and zero rates to the separate rate companies. Appx432-433. Commerce noted that 19 U.S.C. § 1673d(c)(5)(B) provides that where all individually investigated respondents receive zero or adverse margins, it may average those margins to produce the separate rate. Appx442; *see also* 19 U.S.C. § 1673d(c)(5)(B); Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Doc. No. 103-316, vol. 1, at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201. Commerce explained that the statute accordingly supported its determination to base the separate rate on both mandatory respondents' margins and did not require the separate rate to reflect the separate rate companies' actual rates of dumping. Appx444-445. That said, Commerce noted that information contained in SRAs filed with the agency indicated that dumping occurred during the investigation period at an above-zero rate, further supporting its decision not to assign Chengen's zero margin to separate rate applicants. Appx443, Appx445-453.

### 4.    The Fourth Remand Order and Results

The CIT remanded for a fourth time. Appx50. The lower court found it reasonable for Commerce to decline to assign Chengen's zero margin to separate

rate companies, given record information indicating that separate rate companies sold plywood to the U.S. market at prices lower than those charged by Chengen. Appx47-48. Nonetheless, the CIT found that the separate rate must reflect separate rate companies' actual rates of dumping as closely as possible, and that the 57.36% simple average of Bayley's and Chengen's rates was neither reasonable nor supported by substantial record evidence. Appx49.

On remand, Commerce attempted to further support the 57.36% separate rate. The agency explained that the record was too limited to permit it to "determine with certainty whether any particular rate is an accurate estimate of the actual dumping margins" of separate rate companies. Appx494, Appx501-506, Appx518-519. Assessing the limited record evidence, including its review of data pertaining to a separate rate applicant whose selling prices formed the basis of the petition's highest estimated dumping margin, Commerce explained that it continued to view the 57.36% rate as reasonable and supported given the record. Appx521-525.

### 5.    The Fifth Remand Order and Results

The CIT ordered a fifth remand. Relying on this Court's decision in *Yangzhou Bestpak Gifts & Crafts Co v. United States*, 716 F.3d 1370 (Fed. Cir. 2013), the CIT found the 57.36% "unfair and unduly punitive." Appx61-63. The Court remanded with a statement advising the agency "to not submit the same rate of 57.36%." Appx63.

On remand, Commerce departed from the 57.36% rate, applying Chengen's 0% margin to the appealing separate rate companies, despite finding the 0% rate unrepresentative as applied to those companies. Appx550, Appx557-558. The agency then excluded from the order those separate rate companies that requested voluntary respondent status and submitted complete responses to the agency's initial questionnaires, citing *Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781 (Fed. Cir. 2020). Appx558. The CIT then affirmed Commerce's fifth remand results in its sixth opinion in the action. Appx82.

The Coalition and Commerce then appealed to this Court.

## VI.   **SUMMARY OF ARGUMENT**

This Court should reinstate Commerce's original determination of Chengen's margin based on surrogate values for intermediate inputs. Commerce reasonably determined that Chengen's reported consumption rate for input logs was unreliable, given information discovered at verification. Commerce also reasonably declined to collect at verification certain documentation that its verifiers did not observe in Chengen's affiliate's production facilities, but which the company proffered later during the verification.

For that matter, the additional documentation—which the CIT erroneously ordered Commerce to accept on remand—did not reasonably establish the accuracy or reliability of Chengen's reported log consumption rates. As such, should the Court

decline to simply reinstate Commerce's original determination of Chengen's margin and the consequent determination of the margin for separate rate companies, the Court should remand Commerce's evaluation of the additional documentation and second remand redetermination to calculate Chengen's rate based on raw material inputs further consideration.

Failing this, the Court should reinstate Commerce's second-through-fourth remand redeterminations of the separate rate at 57.36%. That rate is consistent with the statute and the SAA's "expected method" and is otherwise reasonable and supported on the record. While the lower court found otherwise, it did so primarily based on this Court's decision in *Bestpak*. *See* Appx60-64. But as explained below, there have been meaningful legal developments since *Bestpak* was issued that call into question its relevance. Further, the facts of the investigation at bar are meaningfully distinct from those of *Bestpak* and merit a distinct result.

Finally, Commerce did not adequately explain or support its decision, in its fifth and final remand results, to exclude from the order two Chinese exporters that requested voluntary respondent status. Thus, to the extent that the Court determines neither to reinstate Commerce's original final determination of Chengen's margin and consequent determination of the separate rate based on Chengen's above-*de minimis* margin, nor the agency's second-through-fourth remand redeterminations

of the separate rate as the average of Chengen's zero and Bayley's adverse rate (57.36%), the Court should remand these exclusions for further consideration.

## VII.  ARGUMENT

### A.  Standard of Review

The Court of Appeals for the Federal Circuit reviews decisions of the CIT *de novo*, replicating the CIT's review of the challenged agency determination. *See, e.g.*, *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1236 (Fed. Cir. 1992). The Court thus applies the same standard of review to agency determinations as the CIT. The Court will affirm Commerce's decisions where they are supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1307-08 (Fed. Cir. 2001).

### B.  Commerce's Original Calculation of Chengen's Margin and the Separate Rate Should Be Reinstated

When calculating AD margins in NME investigations, Commerce typically bases NV on surrogate values for the raw materials used in a respondent's manufacturing operations, rather than intermediate inputs that the respondent self-produces using these raw materials. *See* 19 U.S.C. § 1677b(c)(1) and (3). However, the agency will calculate NV based on intermediate inputs where a respondent cannot accurately account for its raw material consumption. *See* Issues and Decision Memorandum accompanying *Fresh Garlic from the People's Republic of China*, 71 Fed. Reg. 26,329 (Dep't Commerce May 4, 2006) (final results and partial rescission

17

of antidumping duty admin. rev. and final results of new shipper reviews) at cmt. 1; Issues and Decision Memorandum accompanying *Honey from the People's Republic of China*, 71 Fed. Reg. 34,893 (Dep't Commerce June 16, 2006) (final results and final rescission, in part, of antidumping duty admin. rev.) at cmt. 9.

Commerce must verify the information it relies on in AD investigations. 19 U.S.C. § 1677m(i); *see also* 19 C.F.R. § 351.307. "Verification represents a point of no return" whose purpose is to "test information provided by a party for accuracy and completeness." *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021). Accordingly, Commerce is not required to accept new data at verification, though it may choose to accept such information to the extent that it merely "corroborates, supports, or clarifies {factual} information already on the record," or makes a minor correction of that information. *See id.* at 1339; *see also* Appx6940.

From the outset of the investigation into Chinese hardwood plywood, the accuracy and completeness of Chengen's reported consumption of logs—its most important raw material—was "a primary focal point." Appx9075; Appx8540. The Coalition raised questions about the reliability of Chengen's reported log consumption rates early in Commerce's questionnaire process, and continuously advocated for use of the intermediate input methodology. Appx3424-3430; Appx6728; Appx6957-6965. As a result, Chengen was "on notice early on in the

investigation that," if the company's log consumption reporting was found incomplete or unreliable, "Commerce might apply the intermediate input methodology." Appx9075-9076.

In its initial questionnaire regarding Chengen's inputs into production and their consumption rates, Commerce asked the company to identify "all documents . . . generated/used/relied upon during production . . . ." Appx2797-98. In a supplemental questionnaire, Commerce asked the company to provide the documents underlying its calculation of inputs such as poplar logs, as well as "a detailed explanation and supporting documentation for how {it} records the purchase and consumption of each input in the normal course of business." Appx5079. Based on Chengen's responses, Commerce understood that Chengen reported "actual . . . consumption" of poplar logs, its most significant raw material input, based on its producing affiliate's records. Appx2795-2796; Appx8540; *see also* Appx314-316. Chengen identified the specific records at issue as consisting of "material purchase invoices," warehouse-in/out tickets, cost ledgers, etc. Appx2795-2798 and Appx2826-2838; Appx3451; Appx5079, Appx5083-5084, Appx5121-5125, Appx5128-5158, Appx5195-5196. Chengen did not describe any formulas, conversion tables, or standards used to derive or calculate the volume of logs used in its affiliate's production operations. Appx8540; *see also* Appx314-316.

Commerce preliminarily accepted Chengen's log consumption reporting as reliable but stated that it would continue to consider whether to employ its intermediate input methodology. Appx6870-6871. Then, at verification, Commerce made a discovery that "called into question the accuracy of Chengen's log purchase and consumption records, and its ability to substantiate such records." Appx8540. Specifically, Commerce learned that Chengen's affiliate received no invoices from suppliers of poplar logs, meaning that Chengen had no direct documentation of the volume of poplar logs that the affiliate purchased and used in production. Appx8540-8542; Appx8386-8388; Appx9065-9067.

In the absence of such direct documentation, company staff calculated log volume a "conversion table and conversion formula" that took into account the logs' length and the diameter of each log's smallest end.[5] Appx8540-8542; Appx8386-8388. These self-calculated volumes were then recorded on warehouse-in slips, and those volumes then flowed through to warehouse-out slips and to Chengen's log consumption reporting. Appx8540-8542; Appx8386-8388. Commerce's verifiers observed in the production facility the two-page formula/table that was used to calculate cubic meter log volumes, and collected a photocopy, but declined to collect additional information proffered later in the verification as relating to the

---

[5]     In the case of logs deemed "irregular," the average of the log's two end diameters was used. Appx8540; Appx8386.

formula/table. Appx8539-8544; Appx 370-373; Appx8386-8387 and Appx7671-7672.

Commerce calculated Chengen's final margin using the intermediate input methodology. Appx8540-8542. Commerce reasoned that its understanding of Chengen's reported log consumption was substantially changed at verification. *Id.* Whereas Commerce had previously believed the reporting reflected actual log volumes identified on direct purchase documentation, the reporting was instead based on Chengen's own calculations made pursuant to a previously undisclosed formula/table. *Id.*; *see also* Appx316. Commerce questioned whether the formula/table were taken, as Chengen argued, from a "Chinese national standard," but its core objection was that the formula/table had not been demonstrated to produce results accurately reflecting the actual cubic meter volume of irregularly shaped objects such as logs. Appx8541-8542. And by failing to disclose the use of the formula/table until verification—three months after the preliminary results—Chengen left Commerce unable to properly investigate that issue. *Id.*

Based on its observations at verification, Commerce was reasonably concerned that there was "imprecision" inherent in Chengen's records and the resulting log consumption reporting. *See id.* Commerce also observed that the record did not contain any documentation indicating that the calculated volumes reasonably reflected the actual cubic meter volumes of the poplar logs used in Chengen's

21

affiliate's facilities. The affiliate received no invoices from poplar log suppliers, the volumes recorded in its warehouse-in/out tickets and materials ledgers reflected the affiliate's calculations based on the formula/table, and certain documents that Chengen cited in its ministerial error comments as third-party support for its affiliate's calculations were not present on the record or were self-generated and again only reflected the affiliate's calculations. Appx9006-9007; Appx9047-9048; Appx333-341.

The lower Court erred in rejecting Commerce's use of the intermediate input methodology, as well as in requiring Commerce to accept additional documentation from Chengen on remand. Chengen was on notice early in the investigation regarding the importance of fully documenting the basis for its log consumption reporting, was repeatedly asked to identify all documents that it relied on in its operations, and was required to fully explain and document the methodology by which it recorded and reported raw material input consumption. *See* discussion *supra* at 4-5, 18-19. Yet it chose not to disclose or describe its use of a formula/table to calculate the volume of logs used in its production operations, leaving it for Commerce to discover the issue at verification, well after the preliminary results were issued. By choosing not to provide this information at the appropriate time, Chengen not only left the record bereft of requested information, it foreclosed the agency from probing the formula/table and the degree to which calculated values

based on them reasonably approximated actual log volumes. Additionally, the record that Chengen had built did not include any third-party documents confirming the accuracy of the calculations (such as suppliers' invoices or "delivery sheets"). *See, e.g.*, Appx333-341. Given the late discovery of Chengen's reliance on self-generated calculations of log volumes, and the state of the record as of the final results, Commerce acted reasonably in concluding that Chengen's log consumption reporting was not verified as reliable. Its determination in this regard, and consequent use of the intermediate input methodology, should be reinstated.

Moreover, Commerce did not abuse its discretion in refusing to accept the 12-page document that Chengen asserted was the source of the formula/table observed in its production facilities. While Commerce may, in its discretion, accept at verification data that merely "corroborates, supports, or clarifies factual information already on the record," or makes a minor correction to such information, it is not required to do so. *Goodluck India*, 11 F.4th at 1339, 1343-44 (finding that Commerce was not required to accept allegedly corrective data at verification). Nor is Commerce required to accept wholly new data, particularly where the respondent had the opportunity to provide it earlier. *See, e.g.*, Appx6940 (explaining that "verification is not intended to be an opportunity for submission of new factual information"); *SeAH Steel Corp. v. United States*, 659 F. Supp. 3d 1318, 1323-27 (Ct. Int'l Trade 2023) (finding no error where Commerce rejected, as untimely,

information presented at verification regarding the respondent's previously undisclosed use of a subsidy program).

Notably, and as explained above, despite Commerce's clear requests for information regarding its intake and consumption of raw materials, Chengen left the agency wholly unaware that Chengen's reported log volumes were derived from a formula/table, rather than reflecting the quantities recorded on supplier invoices. *See, e.g.*, Appx347-350. This was not a minor issue, given the importance of accurate log consumption reporting to the agency's calculations, and the intense focus on that reporting across the proceeding. Appx350-351. What Commerce discovered at verification regarding Chengen's log consumption reporting was itself unanticipated information that was not prefigured in the record. *See, e.g.*, Appx367 (explaining that, prior to verification, Commerce "did not know at all that the {factors of production} reported by Chengen were calculated by Chengen using a formula," rather than being "based on material purchase invoices."). As such, Commerce reasonably treated the additional documentation that Chengen sought to provide after the verifiers' plant tour not as making a minor correction to information in the pre-verification record, or providing incidental support for such information, but as wholly new data. Appx329-333, Appx347-350.

But even if one were to accept the CIT's erroneous view that Commerce was required to collect, the full, twelve-page document from which Chengen asserted

that the table/formula observed in its facilities were sourced, that document does not resolve the problems that Commerce articulated in rejecting Chengen's log consumption reporting. Appx9436; Appx9004-9006, Appx9008-9009; Appx319; Appx9047-9048. Although the document has a cover page identifying it as a 1984 Chinese national standard, the remaining pages beyond the formula/table collected by the verifiers are simply (1) continuations of the table that cover logs of lengths longer than those used by Chengen, (2) a brief appendix regarding calculation of the volume of logs longer than those covered by the table, and (3) references to the "Ministry of Forestry" and the "Standard Timber Measurement Group" as having prepared the document. Appx9436. There is no underlying identification or explanation of the assumptions built into the formula/table, or any information on the basis for their derivation. *Id.* For that matter, the full document refers to at least one other standard, not on the record, that has to be followed when taking the measurements required to perform calculations in accordance with the formula/table. *Id.*

As the agency noted in its second remand results, issued after the lower court required Commerce to accept the full document, "it is not clear how" the full document "significantly alters the record of this investigation." Appx383. It remains that, by failing to disclose its reliance on the table in its questionnaire responses, Chengen "deprived" the agency of the opportunity to probe the formula/table and

the reliability of calculations based on it. Appx328-333, Appx347-351, Appx368. Indeed, the full document only underscores Commerce's concern that the formula/table did not provide inherently or obviously correct calculations of log volume. Appx328-333, Appx347-351, Appx368.

Pertinently for this appeal, the lower court did not simply require Commerce to accept the document in its entirety onto the record. Appx27. The lower court also found it unreasonable for Commerce to have rejected Chengen's reported log volumes absent record evidence affirmatively contradicting Chengen's reporting. Appx28. On remand, Commerce interpreted the court's findings as requiring it to treat Chengen's records, which reflected its calculations pursuant to the formula/table, as accurately reflecting the volumes of logs used in the company's production. Appx383, Appx392-393. Commerce then concluded that while the twelve-page document included "blatant errors" and "illogical information," Chengen's calculations nonetheless accurately reflected the actual volume of logs used in its productions. Appx384-385. Commerce's only explanation for this conclusion, beyond perceiving the lower court as having required it, was that the "obvious anomalies" in the twelve-page document "d{id} not necessarily apply" to logs of the lengths and diameters that Chengen used and/or were typographical. Appx384-385, Appx394. Commerce then recalculated Chengen's NV, and its margin, based on its reported log consumption. Appx392.

This determination does not reasonably comport with the standard of review. Here, the lower court took a very specific, particular view of the record, and failed to recognize that the distinct view that Commerce took in the final results was reasonable. Commerce's second remand results compounded the lower court's error, relying on calculations performed pursuant to a thirty-year old document that Commerce found ridden with anomalies. Appx393. The basis upon which the formula/table were derived remained unknown, and it was unclear that they reflected current standards given their age. Appx392-393. Nor were parties given a fair opportunity to submit documentation to rebut the standard. Appx392 (quoting its observation in the first remand results that interested parties were deprived of the opportunity to submit factual information to rebut Chengen's claims as to the nature of the formula and accuracy of the conversion table); Appx9449 (confirming that Commerce did not permit submission of information to rebut the twelve-page document on remand).

In sum, Commerce's original determination of Chengen's margin using the intermediate input methodology should be reinstated. The agency reasonably determined that Chengen's log consumption reporting was unreliable in light of the unanticipated information it learned at verification regarding the basis for that reporting, and Chengen's failure to provide that information at the appropriate time. Commerce should not have been required to accept additional information from

27

Chengen beyond what it collected at verification, and should also not have been required to treat the additional documentation as "complete and accurate." Appx28.

To the extent that the Court chooses not to directly reinstate the agency's original decision, it should remand Commerce's second remand recalculation of Chengen's margin for further consideration. Commerce's decision to accept Chengen's log consumption reporting as reliable and accurate is not adequately explained or supported, given Commerce's own expressed concerns over the validity of reporting based on a formula/table of uncertain basis and questionable results, taken from a thirty-year-old document that contains numerous errors.

## C.    Assuming Commerce's Original Treatment of Chengen is Not Reinstated or its Remand Treatment Further Remanded, the Court Should Reinstate the 57.36% Separate Rate

In cases involving NMEs such as China, Commerce presumes that all foreign producers/exporters are government-controlled, and thus subject to a single, China-wide rate, unless they adequately demonstrate independence from such control. Appx6871. To the extent that Commerce requests information from an entity or company subject to an antidumping duty investigation, but does not receive a response—or the response reflects a failure to cooperate to the best of the entity/company's ability—Commerce will fill in the gap using the available record evidence, and may apply inferences adverse to the relevant entities/companies in doing so. Appx6877-6878.

Here, Commerce selected Chengen and Bayley for individual examination, while requiring other companies to submit SRAs to demonstrate their independence from government control. Appx6856, Appx6871. Commerce found that Chengen successfully rebutted the presumption of government control, as did approximately 80 companies not selected for individual examination, *i.e.*, the separate rate companies. Appx6871-6873. However, after determining that Bayley failed to fully identify its affiliates in its questionnaire responses, Commerce found that Bayley had failed to rebut the presumption, and then, separately, applied an adverse inference to determine the company's margin. Appx6875, Appx6879-6885. Specifically, Commerce applied a 114.72% margin derived from the petition, which it then also applied to other companies that failed to rebut the presumption of government control, and to the China-wide entity as a whole. Appx6878-6879, Appx6885-6886.

In its original final determination, Commerce calculated a 183.36% final dumping margin for Chengyen. Appx8992. It then applied this margin to companies that were not individually examined but that were found independent of government control, as Chengen's the only margin determined for a mandatory respondent that was neither zero/*de minimis* nor based on an adverse inference. *See id.*; *see also* 19 U.S.C. § 1673d(c)(5)(A). As noted above, the Court should reinstate the agency's

BUSINESS PROPRIETARY      NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

original final determination of Chengen's margin and the corresponding 183.36%
separate rate.

That said, should the Court choose not to do so, then it should reinstate the
agency's redetermination of the separate rate in the agency's second-fourth remand
results. In those results, given Chengen's zero margin and Bayley's adverse margin,
the agency looked to 19 U.S.C. § 1673d(c)(5)(B). Appx388-389, Appx417,
Appx423. That provision, in concert with the SAA accompanying the Uruguay
Round Agreements Act, indicates that where all mandatory respondents' margins
are zero and/or based on the facts available, Commerce is expected to weight-
average their margins. 19 U.S.C. § 1673d(c)(5)(B); SAA at 873, 1994 U.S.C.C.A.N.
at 4201. Where that is not feasible or would result in a margin "not . . . reasonably
reflective of potential dumping margins for non-investigated {companies},
Commerce may use other reasonable methods." SAA at 873, 1994 U.S.C.C.A.N. at
4201.

Commerce determined the separate rate in the second-fourth remands as the
simple average of the margin for Chengen and the China-wide entity, which included
Bayley. Appx388-389, Appx417, Appx423.[6] Commerce explained that the statute

---

[6]      The Coalition notes that, based on their responses to Commerce's
questionnaires regarding the quantity and value of hardwood plywood exported
during the investigation period, the weighted average of Bayley and Chengen's
margins would have been [number]%, on a weight/volume basis, and [number]%, on a
value basis. Appx1384.

and SAA explicitly contemplate the inclusion of adverse rates in the separate rate. Appx417-418. Commerce also explained that this Court has repeatedly found that the mandatory respondents in an investigation are collectively presumed representative of companies not selected for individual examination, such that their averaged margins produce a facially reasonable rate for those companies. Appx421-422. Commerce noted that the petition, SRAs filed in the investigation, and information submitted in response to questionnaires issued during the remand proceedings also suggested dumping by separate rate companies, such that simply applying Chengen's zero margin would not be appropriate. *Id.*; *see also* Appx502-503, Appx523-525.

Commerce also found that this data corroborated the relevance and accuracy of the dumping rates in the petition as to separate rate companies, although neither the statute nor the SAA require Commerce to determine a separate rate that reflects the NVs and U.S. prices for each of the 80 non-investigated separate rate companies, *i.e.*, their actual dumping behavior. *See, e.g.*, Appx502-503, Appx526-527; Appx444-445, Appx448-449; Appx420-421; Appx6871-6873. Specifically, Commerce noted that the dumping margins in the petition were based on price quotes from a Chinese plywood exporter that subsequently filed an SRA and was granted a separate rate. *See, e.g.*, Appx421-422. The record also contained a commercial invoice reflecting actual U.S. sales from the same exporter, further

corroborating the petition rates. Too, one of the price quotes concerned a particular plywood product that was also sold by Chengen, but for significantly more than the price quoted in the petition. Appx446-447.

Beyond this, Commerce noted distinctions between Chengen's selling practices and those of a significant number of the separate rate companies. For example, Chengen only sold plywood produced by its affiliate, where most of the 40 separate rate companies that were party to the litigation were resellers of plywood produced by as many as 35 unaffiliated manufacturers. Appx447-448. Commerce also observed that each of the SRAs filed by the litigating separate rate companies contained at least one commercial invoice for a U.S. sale during the investigation period. Appx448-449. Comparing these invoices against data from Chengen, Commerce determined that the invoices indicated that the SRA companies (1) sold similar products to Chengen but at lower prices, (2) sold products wholly unlike Chengen's, or (3) both, indicating that Chengen's zero margin alone was not reasonably representative of their potential dumping margins. Appx450-452; *see also* Appx477-479.

Commerce's use of the simple average of the two mandatory respondents' margins was reasonable and supported by substantial record evidence, as confirmed

by the logic of this Court's decision in *Bosun Tools Co. v. United States*.[7] There, this Court considered Commerce's determination of the separate rate, in an antidumping duty administrative review, based on the simple average of the China-wide rate applied to a mandatory respondent as an adverse inference and the zero rate calculated for the remaining mandatory respondent. *See Bosun Tools Co. v. United States*, No. 2021-1930, 2022 U.S. App. LEXIS 624, at *6 (Fed. Cir. Jan. 10, 2022). The Court found it reasonable for Commerce to base the separate rate partially on a mandatory respondent's adverse margin, and appeared to find it insignificant that the relevant mandatory respondent received a rate equal to that assigned to the China-wide entity. *Id.* at *6-11 (repeatedly referring to the mandatory respondent as having received the "AFA China-wide rate").[8]

The Court also glossed and distinguished its 2013 decision in *Yangzhou Bestpak*, in which it remanded Commerce's determination of the separate rate in an antidumping duty investigation based on the simple average of the "AFA China-wide rate" assigned to a mandatory respondent and the zero margin calculated for the remaining mandatory respondent. *Id.* at *10-11; *see also Bestpak*, 716 F.3d at

---

[7]     *Bosun* was issued as a non-precedential opinion. However, as indicated by the Committee Notes on Federal Rule of Appellate Procedure 32.1, such opinions may be cited for their persuasive value.

[8]     The respondent was found to have rebutted the presumption of government control, but nonetheless was assigned the same rate as a member of the China-wide entity would have received.

1375, 1378-80. The *Bosun* Court explained that the rejection of the separate rate in *Bestpak* was animated by the record in that investigation, which was "so thin" as to prevent the 120% separate rate there from being reasonable "as applied." *Bosun* at *10-11. Here, however, Commerce cited substantial record evidence in support of its determination that the 57.36% simple average of Chengen and Bayley's rates reasonably reflected the separate rate companies' "potential" rates of dumping. *See* discussion *supra* at 30-32; *see also* SAA at 873, 1994 U.S.C.C.A.N. at 4201.

The *Bosun* Court further explained that, after *Bestpak* was decided, this Court issued opinions in which it clarified that the mandatory respondents are presumed, under the statute, representative of the non-investigated companies, and otherwise confirming that the agency is meant to determine the separate rate by averaging the rates for the mandatory respondents. *Bosun* at *10-11 (citing *Changzhou Hawd*, 848 F.3d 1006 and *Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016)). Here, consistently with these cases and with the "expected method" provided for in the SAA, Commerce's 57.36% rate reflected the margins for both mandatory respondents. *See, e.g.*, SAA at 873, 1994 U.S.C.C.A.N. at 4201; *see also* note 6, *supra*.

Notably, after *Bestpak* was decided, statutory changes were also made with respect to the application of adverse inferences. The *Bestpak* Court cited *Gallant Ocean (Thailand) Co. v. United States*, 603 F.3d 1319, 1323-25 (Fed. Cir. 2010) in

rejecting Commerce's 120% separate rate. *See Bestpak*, 716 F.3d at 1379-80. The *Gallant Ocean* Court found that adverse rates must "reflect commercial reality" and constitute a "reasonably accurate estimate" of the actual dumping rates of the companies to which the adverse rates are imputed. *See id.* But subsequently—and before the initiation of the investigation on appeal here—Congress amended the statutory provision for adverse inferences to clarify that Commerce is under no obligation to ensure—"for any {} purpose"—that the adverse rate reflects "commercial reality" or the rate that would have been calculated in the absence of the adverse inference. 19 U.S.C. § 1677e(d)(3); *see also* Pub. L. No. 114-27, Title V, § 502 (2015). Yet Congress has not altered 19 U.S.C. § 1673d(c)(5)(B) or otherwise indicated that it no longer expects Commerce to use the "expected method," even though that method clearly contemplates imputation, in whole or in part, of an adverse rate to non-investigated companies. The legal calculus underpinning *Bestpak* has been meaningfully altered by these developments.

Too, the mandatory respondent that received the adverse rate in *Bestpak* did not respond to any of the agency's mandatory respondent questionnaires or even file an SRA; as such, Commerce understood very early in the investigation that the respondent was uncooperative and yet made no attempt to select a replacement mandatory respondent. *Bestpak*, 716 F.3d at 1374, 1380. The *Bestpak* Court found this troublesome, *id.*, but the facts at bar differ considerably. In this investigation,

Bayley timely filed both an SRA claiming independence from government control and responses to the agency's initial questionnaires. *See* Appx6856-6858; *see also* Appx2088. Commerce only determined that the company had failed to fully identify all affiliated parties in the June 16, 2017 preliminary results, after considering information filed by the parties well into the investigation, as well as information that came to light in the companion countervailing duty investigation. *See* Appx6879-6885.

Finally, Bayley's failure to rebut the presumption of government control does not invalidate Commerce's separate rate determination. Notably, consistent with the logic of Commerce's practice regarding adverse rates, had Bayley been found uncooperative but independent from government control, it would have received the very same rate that it received here. *See* Appx8523.[9] There is no substantive difference, in other words, between the separate rate as affirmed in *Bosun* and the separate rate here.

In sum, should this Court determine not to reinstate Commerce's original final determination (or otherwise remand for further consideration of that determination and/or the remand determination to recalculate Chengen's rate based

---

[9]    For that matter, the China-wide rate in Commerce's original final determination was the same as Chengen's calculated margin, and was also the margin applied to separate rate companies pursuant to 19 U.S.C. § 1673d(c)(5)(A). *See* Appx8523-8524.

on raw material inputs), it should reinstate Commerce's determination of the separate rate at 57.36%. That rate is consistent with the expected method and is otherwise reasonable and supported on the record. While the lower court found otherwise, it did so primarily based on this Court's decision in *Bestpak*. Appx60-64. But as explained above, there have been meaningful legal developments since *Bestpak* was issued that call into question its relevance. Further, the facts here are distinct from those of *Bestpak* and merit a distinct result.

### D.    Commerce Erred in Excluding Certain Separate Rate Applicants from the Order

As explained above, Commerce applied Chengen's zero percent margin to all separate rate respondents in its fifth remand result, notwithstanding the "expected method" and record evidence indicating that separate rate applicants had dumped at an above-zero rate during the investigation period. Appx550, Appx557-558; *see also* SAA at 873, 1994 U.S.C.C.A.N. at 4201. Citing *Changzhou Hawd*, it also excluded from its less-than-fair-value determination two separate rate applicants that had sought voluntary respondent status and submitted responses to the agency's initial questionnaires. Appx558, Appx566-569.

This exclusion was inadequately explained and supported. In its comments on the draft results of the fifth remand (and in subsequent comments filed with the CIT), the Coalition pointed out that Commerce declined in a post-*Changzhou Hawd* investigation to exclude companies situated identically with the excluded companies

here, *i.e.*, companies that were assigned a zero margin as separate rate applicants and that submitted voluntary responses to the agency's initial questionnaires but which were not granted voluntary respondent status. Appx9635-9638; *see also* Appx9789-9790. In explaining its decision to retain such respondents within the scope of its less-than-fair-value determination in the tire case, Commerce noted that the actual behavior of voluntary respondents in many cases differs from that of mandatory respondents and that, while voluntarily submitting responses certainly involves effort, that effort does not itself indicate that the voluntary respondents' dumping behavior mirrors that of the mandatory respondents. *See* Issues and Decision Memorandum accompanying *Passenger Vehicle and Light Truck Tires From the Socialist Republic of Vietnam*, 86 Fed. Reg. 28,559 (Dep't Commerce May 27, 2021) (final determination of sales at less than fair value) at 17-24.

Rather than explain why the case at bar merited a distinct result, Commerce simply noted that the International Trade Commission had made a final negative injury determination in the tires case, with the result that Commerce's inclusion of the voluntary respondents companies within the scope of the less than fair value determination was never subjected to judicial review. That observation, however, is beside the point. Appx566-569. Likewise, while the agency compared the two companies it excluded here with other companies that submitted requests for voluntary respondent status but submitted no questionnaire responses, that

comparison sheds no light on why the agency treated the two companies that it excluded here distinctly from the companies that voluntarily submitted responses in the tires case. Appx569-570. The agency's failure to provide any substantive basis for treating the companies here distinctly is all the more troublesome given the agency's conclusion that separate rate companies—a group that includes the two excluded applicants for voluntary respondent status here —were dumping at above-*de minimis* margins. *See* Appx557-558, Appx564.

In any event, the agency has yet to adequately explain or support its decision to exclude from the order the two questionnaire-submitting companies that requested voluntary respondent status. Thus, to the extent that the Court determines neither to reinstate Commerce's original final determination of Chengen's margin and consequent determination of the separate rate based on Chengen's above-*de minimis* margin, nor the agency's second-fourth remand redeterminations of the separate rate as the average of Chengen's zero and Bayley's adverse rate (57.36%), the Court should remand these exclusions for further consideration.

## VIII. <u>CONCLUSION</u>

For the reasons detailed above, this Court should reinstate Commerce's original final determination of the antidumping duty margin for Chengen and separate rate respondents in the investigation into Chinese hardwood plywood. In the alternative, the Court should remand the agency's second remand

redetermination of Chengen's margin based on its reported log consumption for further consideration, to the extent that the Court determines not to reinstate Commerce's original final determination of Chengen's margin or to remand the agency's calculation of that margin based on logs rather than intermediate inputs, the Court should nonetheless reinstate the agency's determination of the separate rate as the simple average of Chengen's zero margin on remand and Bayley's adverse rate. Finally, should the Court determine to leave intact both Commerce's second remand redetermination of Chengen's margin based on log inputs and the fifth remand redetermination of the separate rate at zero, the Court should remand Commerce's decision to exclude two voluntary respondents from the order.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Maureen E. Thorson, Esq.
Jeffrey O. Frank, Esq.
Stephanie M. Bell, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

Dated: May 10, 2024

# ADDENDUM

$5000 bond amount, the stay will terminate and Mavis will comply with this Order within fourteen days of the termination of the stay.

Mavis's motion [70] to strike is denied as moot.

IT IS SO ORDERED this 10th day of July, 2019.



**LINYI CHENGEN IMPORT
AND EXPORT CO.,
LTD., Plaintiff,**

**and**

**Celtic Co., Ltd. et al., Consolidated
Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Coalition for Fair Trade in Hardwood
Plywood, Defendant-Intervenor.**

**Slip Op. 19-67
Consol. Court No. 18-00002**

United States Court of International
Trade.

June 3, 2019

**Background:** Exporters commenced multiple actions challenging United States Department of Commerce's final determination in antidumping duty investigation of hardwood plywood products from the People's Republic of China, in which Commerce found that the subject merchandise was being sold for less than fair value. After the cases were consolidated, export-ers moved for judgment on the agency record.

**Holdings:** The Court of International Trade, Jennifer Choe-Groves, J., held that:

(1) Commerce's final determination was arbitrary and capricious in light of perceived inconsistencies in the record;

(2) substantial evidence supported Commerce's decision to apply adverse inference to facts available for importer's failure to disclose the full extent of its affiliation with one of its customers as required by initial questionnaire;

(3) Commerce was not required to verify exporter's initial questionnaire responses before making final determination;

(4) Commerce complied with its obligation to provide exporter with opportunity to remedy its failure to disclose all affiliation information in initial questionnaire; and

(5) Commerce's decision to disregard exporter's proffered information regarding affiliated company after exporter failed to include all affiliation information in response to questionnaires was not arbitrary or capricious.

Final determination sustained in part and remanded in part.

**1. Customs Duties ⚖84(7)**

"Substantial evidence," as would support a final determination of the Department of Commerce, means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

See publication Words and Phrases for other judicial constructions and definitions.

**2. Administrative Law and Procedure**
⟐1743

An agency acts in an arbitrary and capricious manner if it entirely fails to consider an important aspect of the problem, offers an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

**3. Customs Duties ⟐21.5(3)**

Department of Commerce's final determination in antidumping duty investigation of hardwood plywood products from China, in which Commerce found the subject merchandise was being sold for less than fair value, was arbitrary and capricious in light of perceived inconsistencies in the record; final determination critiqued multiple aspects of importer's calculation of its log supply but failed to explain how exporter's verification report and related exhibits supported Commerce's conclusion that exporter's log consumption calculations were unreliable.

**4. Customs Duties ⟐21.5(5)**

Although the Department of Commerce has discretion to determine which evidence is the best available information in an antidumping duty investigation, Commerce's findings must be reasonable and supported by substantial evidence on the record.

**5. Customs Duties ⟐84(6)**

In reviewing a final determination in an antidumping duty investigation, the Court of International Trade examines the information used by the Department of Commerce by inquiring whether a reasonable mind could conclude that Commerce chose the best available information.

**6. Customs Duties ⟐21.5(5)**

Tariff Act provision, stating that if necessary information is not available on

the record or if respondent fails to provide such information, then the agency should use the facts otherwise available in reaching its determination, applies whether or not any party has failed to cooperate fully with the agency in its inquiry; on the other hand, Tariff Act provision, allowing Department of Commerce to use adverse inference in selecting among facts otherwise available when an interested party failed to cooperate, applies only when the Department makes a separate determination that the respondent failed to cooperate by not acting to the best of its ability. 19 U.S.C.A. § 1677e(b)(1)(A); Tariff Act of 1930 § 776, 19 U.S.C.A. §§ 1677e(a)(1), 1677e(a)(2)(B).

**7. Customs Duties ⟐21.5(5)**

When determining whether a respondent in an antidumping duty investigation has complied to the best of its ability with requests for information, as used to determine whether an adverse inference to available facts is warranted, the Department of Commerce assesses whether the respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in the investigation; this finding requires both an objective and subjective showing. 19 U.S.C.A. § 1677e(b)(1)(A).

**8. Customs Duties ⟐21.5(5)**

When determining whether a respondent in an antidumping duty investigation has complied to the best of its ability with requests for information, as used to determine whether an adverse inference to available facts is warranted, the Department of Commerce must determine objectively that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. 19 U.S.C.A. § 1677e(b)(1)(A).

**9. Customs Duties ⚖21.5(5)**

When determining whether a respondent in an antidumping duty investigation has complied to the best of its ability with requests for information, as used to determine whether an adverse inference to available facts is warranted, the Department of Commerce must demonstrate subjectively that the respondent's failure to fully respond is the result of the respondent's lack of cooperation in either: failing to keep and maintain all required records, or failing to put forth its maximum efforts to investigate and obtain the requested information from its records. 19 U.S.C.A. § 1677e(b)(1)(A).

**10. Customs Duties ⚖21.5(5)**

Adverse inferences to available facts in an antidumping duty investigation are not warranted merely from a respondent's failure to respond, but rather in instances when the Department of Commerce reasonably expected that more forthcoming responses should have been made. 19 U.S.C.A. § 1677e(b)(1)(A).

**11. Customs Duties ⚖21.5(5)**

The statutory trigger for Department of Commerce's consideration of an adverse inference to available facts in an antidumping duty investigation is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent. 19 U.S.C.A. § 1677e(b)(1)(A).

**12. Customs Duties ⚖21.5(5)**

The Department of Commerce may rely on information derived from the petition, a final determination in an antidumping duty investigation, a previous administrative review, or any other information placed on the record when making an adverse inference to available facts for a respondent's failure to comply with the best of its ability with requests for information. 19 U.S.C.A. § 1677e(b)(1)(A); Tar-

iff Act of 1930 § 776, 19 U.S.C.A. § 1677e(b)(2); 19 C.F.R. § 351.308(c).

**13. Customs Duties ⚖21.5(5)**

Respondents in an antidumping duty investigation should be forthcoming with information, regardless of their views on relevancy, in the event the agency finds differently. 19 U.S.C.A. § 1677e(b)(1)(A).

**14. Customs Duties ⚖21.5(3)**

Substantial evidence supported Department of Commerce's decision to apply adverse inference to available facts for importer's failure to disclose the full extent of its affiliation with one of its customers as required by initial questionnaire in antidumping duty investigation of hardwood plywood products from China; although importer attempted to argue that the documents referred to a different company than the one at issue in the investigation, Commerce examined business registration documents and found that importer failed to provide available attachments showing that president of both companies was same person. 19 U.S.C.A. § 1677e(b)(1)(A).

**15. Customs Duties ⚖21.5(5)**

Department of Commerce was not required to verify exporter's initial questionnaire responses before making final determination in antidumping duty investigation of hardwood plywood products from China, since Commerce did not rely upon the questionnaire responses. Tariff Act of 1930 § 782, 19 U.S.C.A. § 1677m(i)(1); 19 C.F.R. § 351.307.

**16. Customs Duties ⚖21.5(5)**

Department of Commerce satisfies its obligations to provide a respondent with an opportunity to remedy a deficient response to a request for information in an antidumping duty investigation when it issues a supplemental questionnaire specifically pointing out and requesting clarification of

the party's deficient responses. Tariff Act of 1930 § 782, 19 U.S.C.A. § 1677m(d).

**17. Customs Duties ⊝21.5(5)**

Department of Commerce complied with its obligation to provide exporter with opportunity to remedy its failure to disclose all affiliation information in initial questionnaire in antidumping duty investigation of hardwood plywood products from China, where Commerce issued first supplemental questionnaire. Tariff Act of 1930 §§ 771, 782, 19 U.S.C.A. §§ 1677(33)(A), 1677m(d).

**18. Customs Duties ⊝21.5(3)**

Department of Commerce's decision to disregard exporter's proffered information regarding affiliated company after exporter failed to include all affiliation information in response to questionnaires in antidumping duty investigation of hardwood plywood products from China was not arbitrary or capricious; Commerce requested all affiliation information from exporter in initial questionnaire and supplemental questionnaire and exporter withheld necessary information that was requested by not reporting its affiliate. Tariff Act of 1930 § 771, 19 U.S.C.A. § 1677(33)(A).

———

Gregory S. Menegaz and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff Linyi Chengen Import and Export Co., Ltd., Consolidated Plaintiffs Celtic Co., Ltd., Jiaxing Gsun Import & Export Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Anhui Hoda Wood Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Linyi Evergreen Wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Timber International Trade Co. Ltd., Linyi Sanfortune Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Xuzhou Andefu Wood Co., Ltd., Suining Pengxiang Wood Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., Xuzhou Pinlin International Trade Co. Ltd., Linyi Glary Plywood Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Shandong Qishan International Trading Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Far East American, Inc., and Shandong Dongfang Bayley Wood Co., Ltd., and Plaintiff-Intervenors Celtic Co., Ltd., Jiaxing Gsun Import & Export Co., Ltd., Anhui Hoda Wood Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shandong Qishan International Trading Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu Wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd. With them on the brief was J. Kevin Horgan. John J. Kenkel also appeared.

Jeffrey S. Neeley and Stephen W. Brophy, Husch Blackwell LLP, of Washing-

ton, D.C., for Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co., Ltd., Highland Industries Inc., Jiashan Dalin Wood Industry Co., Ltd., Happy Wood Industrial Group Co., Ltd., Jiangsu High Hope Arser Co., Ltd., Suqian Yaorun Trade Co., Ltd., Yangzhou Hanov International Co., Ltd., G.D. Enterprise Limited, Deqing China-Africa Foreign Trade Port Co., Ltd., Pizhou Jin Sheng Yuan International Trade Co., Ltd., Xuzhou Shuiwangxing Trading Co., Ltd., Cosco Star International Co., Ltd., Linyi City Dongfang Jinxin Economic & Trade Co., Ltd., Linyi City Shenrui International Trade Co., Ltd., Jiangsu Qianjiuren International Trading Co., Ltd., and Qingdao Top P & Q International Corp.

Jill A. Cramer and Yuzhe PengLing, Mowry & Grimson, PLLC, of Washington, D.C., argued for Consolidated Plaintiffs and Plaintiff-Intervenors Taraca Pacific, Inc., Canusa Wood Products Ltd., Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, USPLY LLC, and Concannon Corporation. With them on the briefs was Jeffrey S. Grimson. Bryan P. Cenko, James C. Beaty, Kristin H. Mowry, and Sarah M. Wyss also appeared.

Sonia M. Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel were Jessica R. DiPietro and Nikki Kalbing, Attorneys, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Stephanie M. Bell, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Coalition for Fair Trade of Hardwood Plywood. With her on the brief were Timothy C. Brightbill, Jeffrey O. Frank, and Elizabeth S. Lee. Adam M. Teslik, Cynthia C. Galvez, Derick G. Holt, Laura El-Sabaawi, Maureen E. Thorson, Tessa V. Capeloto, and Usha Neelakantan also appeared.

## OPINION AND ORDER

Jennifer Choe-Groves, Judge

Choe-Groves, Judge: This action arises from the U.S. Department of Commerce's ("Department" or "Commerce") final determination in the antidumping duty investigation of certain hardwood plywood products from the People's Republic of China ("China"), in which Commerce found that the subject merchandise is being sold for less than fair value. See Certain Hardwood Plywood Products From the People's Republic of China, 82 Fed. Reg. 53,460 (Dep't Commerce Nov. 16, 2017) (final determination of sales at less than fair value, and final affirmative determination of critical circumstances, in part), as amended, 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) (amended determination of sales at less than fair value and antidumping duty order) (collectively, "Final Determination"); see also Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Certain Hardwood Plywood Products from People's Republic of China, PD 871, bar code 3639791-01 (Nov. 16, 2017) ("Final IDM"). For the following reasons, the court sustains in part and remands in part the Final Determination.

## ISSUES PRESENTED

The court reviews the following issues:
1. Whether Commerce's actions regarding the administrative record were arbitrary and capricious;

2. Whether Commerce's application of the intermediate input methodology was supported by substantial evidence;

3. Whether Commerce's valuation of veneer inputs was supported by substantial evidence;

4. Whether Commerce must recalculate the antidumping margins assigned to Consolidated Plaintiffs and other separate rate respondents;

5. Whether Commerce's determination to apply AFA to Bayley was supported by substantial evidence and in accordance with the law;

6. Whether Commerce's determination not to verify certain submissions is in accordance with the law; and

7. Whether Commerce's actions regarding Bayley's affiliation with Company D is in accordance with the law and not arbitrary and capricious.

## PROCEDURAL HISTORY

Commerce initiated an antidumping investigation on hardwood plywood products from China on December 8, 2016, at the request of Petitioner Coalition for Fair Trade in Hardwood Plywood ("Coalition"). See Certain Hardwood Plywood Products From the People's Republic of China, 81 Fed. Reg. 91,125 (Dep't Commerce Dec. 16, 2016) (initiation of less-than-fair-value investigation) ("Initiation Notice"). The period of investigation was from April 1, 2016 through September 30, 2016. See id. at 91,126. Commerce selected Shandong Dongfang Bayley Wood Co., Ltd. ("Bayley") and Linyi Chengen Import and Export Co., Ltd. ("Linyi Chengen") as mandatory respondents. See Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Hardwood Ply-

wood Products from the People's Republic of China, PD 734, bar code 3582552-01 (June 16, 2017) ("Prelim. IDM").

Commerce published its preliminary determination on June 23, 2017. See Certain Hardwood Plywood Products From the People's Republic of China, 82 Fed. Reg. 28,629 (Dep't Commerce June 23, 2017) (preliminary affirmative determination of sales at less than fair value, preliminary affirmative determination of critical circumstances, in part), as amended, 82 Fed. Reg. 32,683 (Dep't Commerce July 17, 2017) (amended preliminary determination of sales at less than fair value) (collectively, "Preliminary Determination"). Commerce preliminarily calculated a zero or de minimis dumping margin for Linyi Chengen. See Preliminary Determination, 82 Fed. Reg. at 28,637. With respect to Bayley, the Department preliminarily determined that application of facts available with an adverse inference ("AFA") was warranted based on Bayley's failure to cooperate. See Prelim. IDM at 7. Specifically, Commerce found that Bayley allegedly failed to disclose information regarding four affiliated companies, see id. at 21, and assigned an AFA rate of 114.72% to Bayley. See Preliminary Determination, 82 Fed. Reg. at 28,637. Because of the preliminary application of AFA to Bayley, the Department decided not to verify Bayley's information. See id. at 28,637. Commerce preliminarily calculated a weighted-average dumping margin of 57.36% for all companies eligible for a separate rate. See id.

Petitioners urged Commerce to depart from its normal practice and utilize its intermediate input methodology in calculating Linyi Chengen's factors of production in preliminary comments. See Prelim. IDM at 16; see also Petitioners' Resubmission of Comments on Chengen's Questionnaire Responses at 15, PD 696, bar code 3576089-01 (May 30, 2017). In applying the

intermediate input methodology, Commerce would value core and face veneers as opposed to logs. See Prelim. IDM at 16. Linyi Chengen argued against using the methodology. See Prelim. IDM at 16; see also [Linyi] Chengen & Bayley Pre-Preliminary Comments at 1, PD 637, bar code 3573393-01 (May 17, 2017); [Linyi] Chengen Rebuttal Comments at 1–7, PD 405, bar code 3555234-01 (Mar. 27, 2017). Commerce stated that its "general practice for integrated firms is to value all factors used in each stage of production." See Prelim. IDM at 16. Commerce found, based on questionnaire responses and supporting documentation filed by Linyi Chengen, that Linyi Chengen demonstrated that "it is an integrated producer which begins its manufacture of hardwood plywood with the purchase of logs." Prelim. IDM at 16. Commerce did not "find the record meets the limited exceptions for applying the intermediate input methodology" at the time. Id. at 17.

Commerce conducted verification for Linyi Chengen in September 2017. See [Linyi] Chengen Verification Report, PD 834, bar code 3624132-01 (Sept. 29, 2017).

The Department received administrative case briefs and rebuttal briefs from Bayley, Linyi Chengen, and the Coalition from August through October 2017. See Final IDM at 2–3. Commerce rejected Linyi Chengen's initial submission as an "untimely filed written argument" and as containing "untimely filed new factual information" under 19 C.F.R. § 351.302(d). See Dep't Rejection Ltr., PD 887, bar code 3644833-01 (Nov. 27, 2017). Linyi Chengen resubmitted its brief with the information redacted, which Commerce accepted as a part of the record. See [Linyi] Chengen Refiled Rebuttal Brief, PD 849, bar code 3631855-01 (Oct. 20, 2017).

Commerce issued its Final Determination on November 16, 2017. See Certain Hardwood Plywood Products From the People's Republic of China, 82 Fed. Reg. 53,460 (Dep't Commerce Nov. 16, 2017) (final determination of sales at less than fair value, and final affirmative determination of critical circumstances, in part). Based on its analysis of the comments received and findings at verification, the Department applied the intermediate input methodology instead of its general practice of valuing all factors consumed by a respondent in each stage of production to generate a unit of the subject merchandise. See Final IDM at 7. Before verification, the Department understood that Linyi Chengen's documents, such as its raw material ledgers, inventory movement worksheets, warehouse-out slips, and accounting vouchers, supported the quantity of logs that Linyi Chengen purchased and consumed during the period of investigation. See id. at 24. Commerce considered Linyi Chengen's reporting of the log quantity to be "imprecise" based on observations made at verification, such as how the suppliers marked and measured the log diameter, how the production manager verified the log supply through spot checks, and whether Linyi Chengen used the Chinese National Standard conversion table. See id. When describing the intermediate input methodology, Commerce stated:

> In some cases, a respondent may report factors used to produce an intermediate input that accounts for an insignificant share of total output. When the potential increase in accuracy to the overall calculation that results from valuing each of the [factors of production] is outweighed by the resources, time, and burden such an analysis would place on all parties to the proceeding, the Department has valued the intermediate input directly using a [surrogate value]. Also, there are circumstances in which valuing the [fac-

tors of production] used to yield an intermediate product would lead to an inaccurate result because the Department would not be able to account for a significant cost element adequately in the overall factors buildup. In this situation, the Department would also value the intermediate product directly.

Final IDM at 23 (footnotes omitted). As a result of applying its intermediate input methodology, Commerce assigned a dumping margin rate of 183.36% for Linyi Chengen. See id. The Department then applied Linyi Chengen's rate to the separate rate respondents. See id. The Department continued to apply total adverse facts available to Bayley and calculated a weighted-average dumping margin of 183.36%. See id. at 7–8. The Department stated that because its general practice is to use the highest calculated dumping margin of any respondent, i.e., Linyi Chengen's weighted-average dumping margin, the margin rate of 183.36% was appropriate for Bayley. See id. The Department also used Linyi Chengen's margin for the separate rate respondents. See id. at 7.

Linyi Chengen submitted ministerial error allegations, contesting Commerce's use of its intermediate input methodology. See Chengen Ministerial Error Allegation, PD 884, bar code 3643402-01 (Nov. 20, 2017). Linyi Chengen alleged in its submission that Commerce improperly resorted to the intermediate input methodology in the Final Determination based on inadvertent errors, including Commerce's characterization of documents reviewed and events that occurred at verification. See id. at 2–8 ("[T]he final decision is clearly at odds with the Department's *own* verification report (including the understanding of its *own* verifiers) on the most important facts of this case."). Commerce considered Linyi Chengen's ministerial error allegations and rejected them as not constituting ministerial errors within the meaning of its regu-

lation. See Dep't Ministerial Error Memorandum at 5, PD 891, bar code 3649811-01 (Dec. 8, 2017). Commerce identified other ministerial errors and published an amended final determination on January 4, 2018. See Certain Hardwood Plywood Products From the People's Republic of China, 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) (amended final determination of sales at less than fair value, and antidumping duty order).

Plaintiffs and Consolidated Plaintiffs commenced multiple actions in the court to contest Commerce's final determination. The court consolidated cases on May 30, 2018. See Order, May 30, 2018, ECF No. 30. Before the court are five Rule 56.2 motions for judgment on the agency record.

Plaintiff Linyi Chengen submitted a Rule 56.2 motion for judgment on the agency record. See Pl.'s Mot. J. Agency R., July 13, 2018, ECF No. 32; see also Pl.'s Rule 56.2 Mem. Supp. Mot. J. Agency R., July 13, 2018, ECF No. 32-2 ("Linyi Chengen's Br."). Linyi Chengen raises three issues: (1) whether Commerce acted arbitrarily and capriciously in its handling of the record; (2) whether Commerce's determination that Linyi Chengen's books and records did not adequately capture the volume of its log inputs, which led to Commerce's application of the intermediate input methodology, is supported by substantial evidence; and (3) whether Commerce's valuation of veneer inputs is supported by substantial evidence and constitutes the best available information. See Linyi Chengen's Br. 5.

Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co., Ltd., Highland Industries, Inc., Jiashan Dalin Wood Industry Co., Ltd., Happy Wood Industrial Group Co., Ltd., Jiangsu High Hope Arser Co., Ltd., Suqian Yaorun Trade Co., Ltd.,

Yangzhou Hanov International Co., Ltd., G.D. Enterprise Limited., Deqing China-Africa Foreign Trade Port Co., Ltd., Pizhou Jin Sheng Yuan International Trade Co., Ltd., Xuzhou Shuiwangxing Trading Co., Ltd., Cosco Star International Co., Ltd., Linyi City Dongfang Jinxin Economic and Trade Co., Ltd., Linyi City Shenrui International Trade Co., Ltd., Jiangsu Qianjiuren International Trading Co., Ltd., and Qingdao Top P & Q International Corp. (collectively, "Zhejiang Dehua et al.") filed a single Rule 56.2 motion for judgment on the agency record. See Mot. J. Agency R. Consol. Pls. Zhejiang Dehua TB Imp. & Exp. Co., Ltd., et al., July 20, 2018, ECF No. 33; see also Mem. Supp. Rule 56.2 Mot. J. Agency R. Consol. Pls. Zhejiang Dehua TB Imp. & Exp. Co. Ltd., et al., July 20, 2018, ECF No. 33 ("Zhejiang Dehua's Br."). The motion adopts Linyi Chengen's arguments and asserts that Commerce should recalculate the final dumping margin assigned to the separate rate companies based on a revision of Linyi Chengen's calculated dumping margin. See Zhejiang Dehua's Br. 1.

Consolidated Plaintiffs Celtic Co., Ltd., Anhui Hoda Wood Co., Ltd., Far East American, Inc., Jiaxing Gsun Import and Export Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Shandong Qishan International Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd. (collectively, "Separate Rate Plaintiffs") filed a single Rule 56.2 motion for judgment on the agency record. See Consol. Separate Rate Pls.' Rule 56.2 Mot. J. Agency R., July 20, 2018, ECF No. 34; see also Consol. Separate Rate Pls.' Rule 56.2 Mem. Supp. Mot. J. Agency R., July 20, 2018, ECF No. 34-2 ("Separate Rate Pls.' Br."). The Separate Rate Plaintiffs support and incorporate Linyi Chengen's arguments, and ask that any reductions to Linyi Chengen's dumping margin as a result of this litigation be reflected in a new margin for separate rate companies. See Separate Rate Pls.' Br. 4.

Bayley filed a Rule 56.2 motion, contesting various findings made by Commerce with respect to the investigation into Bayley. See Consol. Pl. Shandong Dongfang Bayley Wood Co., Ltd. Mot. J. Agency R., July 20, 2018, ECF No. 36; see also Consol. Pl. Shandong Dongfang Bayley Wood Co., Ltd. Rule 56.2 Mem. Supp. Mot. J. Agency R., July 20, 2018, ECF No. 36-1 ("Bayley's Br.").

Taraca Pacific filed a Rule 56.2 motion on behalf of itself, Canusa Wood Products Ltd., Concannon Corp. DBA Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPly LLC. See Rule 56.2 Mot. J. Agency R. Consol. Pls. Taraca Pacific, Inc., Canusa Wood Products Ltd., Concannon Corp. DBA Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc. Richmond International

Forest Products, LLC & USPly LLC, July 20, 2018, ECF No. 35; see also Mem. P. & A. Supp. Rule 56.2 Mot. J. Agency R. Consol. Pls. Taraca Pacific, Inc., Canusa Wood Products Ltd., Concannon Corp. DBA Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc. Richmond International Forest Products, LLC & USPly LLC, July 20, 2018, ECF No. 35-1 ("Taraca Pacific's Br."). Taraca Pacific adopts and incorporates by reference the briefs filed by Linyi Chengen and Bayley. See Taraca Pacific's Br. 1. Taraca Pacific argues additionally that Linyi Chengen's weighted-average dumping margin amounts to an AFA rate because Commerce calculated it based on substituted facts. See id. at 3. Because Commerce typically excludes AFA rates from its calculation of a separate rate, Taraca Pacific contends that Commerce's assignment of a separate rate in this investigation based on Linyi Chengen's rate is improper. See id.

This court held oral argument on March 27, 2019. See Oral Argument, Mar. 27, 2019, ECF No. 79.

## JURISDICTION AND STANDARD OF REVIEW

[1] The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) (2012)[1] and 28 U.S.C. § 1581(c), which grant the court the authority to review actions contesting the final results of an administrative review of an antidumping duty order. The court will uphold Commerce's determinations, findings, or conclusions unless they are unsupported by substantial evidence on the record, or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." A.L. Patterson, Inc. v. United States, 585 Fed. Appx. 778, 781–82 (Fed. Cir. 2014) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

[2] The court will uphold also Commerce's determinations unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(ii). An agency acted in an arbitrary and capricious manner if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); see also Al. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

## ANALYSIS

The Parties filed five separate Rule 56.2 motions for judgment on the agency record. The court will address each motion, and the issues contained within, in turn.

### I. Linyi Chengen's Rule 56.2 Motion for Judgment on the Agency Record

Linyi Chengen, one of the mandatory respondents in this investigation, contests

---

**1.** All further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code. All further citations to the U.S. Code are to the 2012 edition, with exceptions. All further citations to 19 U.S.C. § 1677b(e) are to the 2015 version, as amended pursuant to The Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, 129 Stat. 362 (2015). All citations to the Code of Federal Regulations are to the 2017 edition.

three aspects of Commerce's findings and actions in this investigation: (A) Commerce's handling of the record evidence; (B) Commerce's use of the intermediate input methodology to value Linyi Chengen's log inputs; and (C) Commerce's selection of the veneer input surrogate values.

## A. Commerce's Handling of Record Evidence

[3] Commerce "made observations" at verification "that called into question the accuracy of [Linyi] Chengen's log purchase and consumption records, and its ability to substantiate such records." Final IDM at 24. These observations include Commerce's finding that Linyi Chengen's "reporting of the log quantity is imprecise" because Linyi Chengen spot-checks to confirm the accuracy of measurements for log deliveries and uses the diameter of the small end of the log and its length to calculate the logs' volume. Id. at 24–25. Commerce also took issue with Linyi Chengen's claims that the formula it uses to measure log volume is the Chinese National Standard, which was allegedly provided at verification. See id. at 25. Commerce observed further that Linyi Chengen was unable to provide supplier invoices for its purchases of poplar log, which is Linyi Chengen's "most significant input." Id. at 24–25.

Linyi Chengen contends that Commerce mishandled the administrative record and acted in an arbitrary and capricious manner. See Linyi Chengen's Br. 13. Linyi Chengen argues that Commerce "made several factual misrepresentations" in the Final Determination, "which in turn became the basis for applying" Commerce's intermediate input methodology. Id. These alleged factual misrepresentations "contradict findings in the verification report and ignore observations and information provided at verification." Id. Specifically, Li-

nyi Chengen takes issue with (1) Commerce's rejection of Linyi Chengen's method of spot-checking to confirm the accuracy of measurements for log deliveries, even though that is the exact same method that Commerce's representatives used at verification; (2) Commerce's finding that Linyi Chengen's conversion table and formula are "inherently imprecise" because they rely only on the diameter of the smaller end of the log and its length; (3) Commerce's conclusion that "there is no evidence that the conversion table and formula" that Linyi Chengen relies upon is the Chinese National Standard; and (4) Commerce's finding that Linyi Chengen's reported log consumption is unreliable because it cannot be cross-checked with supplier invoices. See id. 13–23. Linyi Chengen argues that it attempted to correct these alleged errors that first appeared in the Final Determination, but Commerce acted arbitrarily in refusing to accept the corrections. See id. at 24.

Defendant counters that "[a]ny variance between [Linyi] Chengen's interpretation of the verification report and Commerce's Final Determination does not constitute arbitrary and capricious handling of record evidence, but rather reflects Commerce's weighing of the evidence." Def.'s Resp. 43. Defendant notes further that "the fact that the verification report did not specifically identify concerns about [Linyi] Chengen's spot[-]checking methodology does not mean that the report confirmed its accuracy." Id. Although it is true that a reweighing of the evidence is improper at this stage of the proceedings, see Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1376–77 (Fed. Cir. 2015), the law clearly requires Commerce to explain the basis for its decisions. See, e.g., Motor Vehicle Mfrs. Ass'n., 463 U.S. at 43, 103 S.Ct. 2856 (An agency's action is arbitrary and capricious if it offers "an explanation

for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009) ("[W]hile its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."). Commerce's Final Determination critiques multiple aspects of Linyi Chengen's calculations of its log supply, but fails to explain how the record, particularly the verification report and related exhibits, supports Commerce's conclusion that Linyi Chengen's log consumption calculations were unreliable.

For instance, Commerce determined that Linyi Chengen's method to measure its logs and its conversion table and formula were problematic. See Final IDM at 24–25. Commerce stated that the company's calculations were "inherently imprecise," and doubted whether the conversion table and formula used was the Chinese National Standard, as Linyi Chengen claimed. See id. at 25 ("[T]here is no evidence on the record that supports [Linyi] Chengen's claim that the conversion table and formula used by [Linyi] Chengen elicits the log's actual volume, or that this conversion table and formula is the Chinese National [S]tandard."). The conversion table and formula on the record is partially translated. The eleven Chinese characters at the top of the document allegedly state that it is the Chinese National Standard, but the characters are not translated. See Verification Exhibit 26, at 9, CD 628, bar code 3622212-27 (Sept. 22, 2017); see also Linyi Chengen's Br. 19. Linyi Chengen claims that the first page of this original document was the title page and had a translated title describing the document as the Chinese National Standard. See Linyi Chengen's Br. 19–20. Commerce's verifiers allegedly detached the title page and ac-

cepted only the second page with the conversion table and formula. The court is troubled by the varying accounts of events at verification presented by the Parties.

Commerce found also that it was "unable to cross-check [Linyi] Chengen's reported consumption of poplar against any third-party sources (e.g., supplier invoices)." Final IDM at 25. The Final Determination does not address the delivery sheets provided by suppliers ("warehouse-in tickets") or the copies of invoices provided by Linyi Chengen to its suppliers for official value-added tax purposes. See [Linyi] Chengen Verification Exhibit 26, at 9, 32–53, CD 628, bar code 3622212-27 (Sept. 22, 2017) (titled "Poplar Log Cost Package Part 1"). There is no explanation on the record as to why Commerce found these documents to be insufficient for the purposes of calculating Linyi Chengen's consumption of poplar logs.

The court concludes that Commerce's Final Determination is arbitrary and capricious in light of perceived inconsistencies on the record. The court remands the Final Determination for further proceedings consistent with this opinion.

**B.  Intermediate Input Methodology**

Pursuant to the Tariff Act, Commerce may determine that a foreign country "does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). In antidumping proceedings involving nonmarket economy countries, such as China, Commerce calculates normal value based on the factors of production used to produce the subject merchandise and other costs and expenses. Id. § 1677b(c)(1). Commerce typically must examine the "quantities of raw materials employed" by a company in reviewing fac-

tors of production to calculate normal value. See id. at § 1677b(c)(3)(B).

In the Preliminary Determination, Commerce calculated Linyi Chengen's normal value by applying a surrogate value to the individual factors of production used to produce the subject merchandise, which in this case was logs. Commerce changed its calculation for the Final Determination and instead decided to utilize its intermediate input methodology to value Linyi Chengen's factors of production. Under the intermediate input methodology, Commerce calculated Linyi Chengen's normal value by applying a surrogate value to an intermediate input, which in this case was veneers.

Commerce rarely applies its immediate input methodology and has done so only in limited circumstances. See, e.g., Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 68 Fed. Reg. 498 (Dep't Commerce Jan. 31, 2003) (notice of final antidumping duty determination of sales at less than fair value and affirmative critical circumstances), and accompanying Issues and Decision Memorandum, at Comment 3 (applying the intermediate input methodology due to problems with upstream data from respondents, such as misreported or unreported factors of production); Honey from the People's Republic of China, 71 Fed. Reg. 34,893 (Dep't Commerce June 16, 2006) (final results and final rescission of antidumping duty administrative review), and accompanying Issues and Decision Memorandum, at Comment 9 (valuing the raw honey consumed as opposed to the factors of production used to produce the raw honey because of respondent's inability to accurately record and substantiate the complete costs associated with production); Fresh Garlic from the People's Republic of China, 71 Fed. Reg. 26,329 (Dep't Commerce May 4, 2006) (final results and partial rescission of antidumping duty ad-

ministrative review and final results of new shipper reviews), and accompanying Issues and Decision Memorandum, at Comment 1 (resorting to the intermediate input methodology because respondents were unable to record accurately and substantiate the costs of growing garlic). Commerce has utilized this methodology when the factors of production for the intermediate input accounts for an insignificant share of the total output, and the burden associated with calculating each factor of production outweighs the potential increase of calculation accuracy. See Final IDM at 23. Commerce has applied this methodology also when valuing the factors of production associated with producing the intermediate input would result in inaccurate calculations because Commerce is not able to value a significant cost in the overall factors buildup. See id.

Linyi Chengen argues that Commerce's determination that Linyi Chengen's log volume reporting was "imprecise" is not supported by substantial evidence on the record. See Linyi Chengen's Br. 26–34. Linyi Chengen contends that because Commerce's finding regarding Linyi Chengen's log volume reporting is unsupported by substantial evidence, Commerce had no reason to resort to the intermediate input methodology. See id. As stated above, the court is remanding the Final Determination for Commerce to reconsider its finding regarding Linyi Chengen's log volume reporting. Because Commerce's findings are subject to change on remand, the court will not rule on this issue at this juncture.

**C. Veneer Input Surrogate Values**

Commerce chose Romania as the primary surrogate country for this investigation in the Preliminary Determination. See Prelim. IDM at 16. Linyi Chengen supported Commerce's use of Romanian wood log surrogate values. See Linyi Chengen's Br. 35. Commerce continued to find that

Romania was the appropriate primary surrogate country in the Final Determination, but because it decided to apply the intermediate input methodology, Commerce utilized the Romanian surrogate value for beech veneer. Linyi Chengen contests Commerce's selection of Romanian beech veneer and argues that the value of beech veneer is "illogically priced and less specific to the input." Linyi Chengen's Br. 35.

When valuing a respondent's factors of production in proceedings involving non-market economy countries, Commerce shall use the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." 19 U.S.C. § 1677b(c)(1)(B). To the extent possible, Commerce uses factors of production from market economy countries that are: "(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Commerce's regulatory preference is to "value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2). Commerce's methodology for selecting the best available information evaluates data sources based upon their: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; (4) representativeness of a broad market average; and (5) public availability. See Imp. Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (Mar. 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (last visited June 3, 2019).

[4, 5] Although Commerce has discretion to determine which evidence is the "best available information," Commerce's findings must be reasonable and supported by substantial evidence on the record. See

Qingdao Sea-Line Trading Co., 766 F.3d at 1386; Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001). The court examines the information used by the Department by inquiring "whether a reasonable mind could conclude that Commerce chose the best available information." Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

Because Commerce's Final Determination is subject to change on remand, including the application of the intermediate input methodology, the court reserves its decision on this issue.

## II. Separate Rate Respondents' Rule 56.2 Motions for Judgment on the Agency Record

Commerce assigned a separate weighted average dumping margin to every company that was not individually examined in the investigation. Commerce based the separate rate on Linyi Chengen's weighted-average dumping margin. The Separate Rate Respondents each filed their own Rule 56.2 motions for judgment on the agency record. See Mot. J. Agency R. Consol. Pls. Zhejiang Dehua TB Imp. & Exp. Co., Ltd., et al., July 20, 2018, ECF No. 33; Consol. Separate Rate Pls.' Rule 56.2 Mot. J. Agency R., July 20, 2018, ECF No. 34; Rule 56.2 Mot. J. Agency R. Consol. Pls. Taraca Pacific, Inc., Canusa Wood Products Ltd., Concannon Corp. DBA Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc. Richmond International Forest Products, LLC & USPly LLC, July 20, 2018, ECF No. 35. The Separate Rate Respondents adopt Linyi Chengen's Rule 56.2 motion in full and contend that any changes to Linyi Chengen's weighted aver-

age dumping margin as a result of this litigation requires Commerce to recalculate the rate applied to the Separate Rate Respondents. Because the court remands the <u>Final Determination</u> with respect to Commerce's calculation of Linyi Chengen's rate, as stated above, the court grants the Separate Rate Respondents' Rule 56.2 motions for judgment on the agency record. Commerce is instructed on remand to reconsider the rate applied to the Separate Rate Respondents based on any changes to Linyi Chengen's margin on remand.

## III.  Bayley's Rule 56.2 Motion for Judgment on the Agency Record
### A.  Commerce's Application of AFA to Bayley

**[6]**  Section 776 of the Tariff Act provides that if "necessary information is not available on the record" or if a respondent "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," then the agency shall "use the facts otherwise available in reaching" its determination. 19 U.S.C. § 1677e(a)(1), (a)(2)(B). If the Department finds further that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" from the agency, then the Department "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." <u>Id.</u> § 1677e(b)(1)(A). The U.S. Court of Appeals for the Federal Circuit has interpreted these two subsections to have different purposes. See <u>Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States</u>, 753 F.3d 1227, 1232 (Fed. Cir. 2014). Subsection (a) applies "whether or not any party has failed to cooperate fully with the agency in its inquiry." <u>Id.</u> (citing <u>Zhejiang DunAn Hetian Metal Co. v. United States</u>, 652 F.3d 1333, 1346 (Fed. Cir. 2011)). On the other hand, subsection (b)

applies only when the Department makes a separate determination that the respondent failed to cooperate "by not acting to the best of its ability." <u>Id.</u> (quoting <u>Zhejiang DunAn Hetian Metal Co.</u>, 652 F.3d at 1346).

**[7–11]**  When determining whether a respondent has complied to the "best of its ability," Commerce "assess[es] whether [a] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." <u>Nippon Steel v. United States</u>, 337 F.3d 1373, 1382 (Fed. Cir. 2003). This finding requires both an objective and subjective showing. <u>Id.</u> Commerce must determine objectively "that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations." <u>Id.</u> (citing <u>Ta Chen Stainless Steel Pipe, Inc. v. United States</u>, 298 F.3d 1330, 1336 (Fed. Cir. 2002)). Next, Commerce must demonstrate subjectively that the respondent's "failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records." <u>Id.</u> at 1382–83. Adverse inferences are not warranted "merely from a failure to respond," but rather in instances when the Department reasonably expected that "more forthcoming responses should have been made." <u>Id.</u> at 1383. "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." <u>Id.</u>

**[12, 13]**  Commerce may rely on information derived from the petition, a final determination in the investigation, a previ-

ous administrative review, or any other information placed on the record when making an adverse inference. See 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c). Respondents should be forthcoming with information, regardless of their views on relevancy, in the event the agency finds differently. See POSCO v. United States, 42 CIT ——, ——, 296 F. Supp. 3d 1320, 1340–41 (2018) (citing Essar Steel Ltd. v. United States, 34 C.I.T. 1057, 1073, 721 F. Supp. 2d 1285, 1299 (2010)).

### B.  Commerce's Affiliation Determination

[14]  Commerce found that Bayley "failed to cooperate by not acting to the best of its ability to comply" with the Department's requests for information by not disclosing the full extent of its affiliations as required by the initial questionnaire. Final IDM at 13; see also Prelim. IDM at 25–31; Dep't Initial Antidumping Questionnaire at A-12, PD 149, bar code 3535284-01 (Jan. 9, 2017) (instructing the companies to provide affiliation information). Bayley contends that the Department's application of AFA because of its alleged affiliation with one of its customers, Shelter Forest International Acquisition Inc. ("Shelter" or "SFIA"), is unsupported by substantial evidence. See Bayley's Br. 14–16. Bayley contends that Commerce relied on (1) inconclusive information that Petitioner placed on the record from an antidumping investigation on hardwood plywood that took place in 2012 ("Plywood I")[2], (2) discredited information from a cached webpage, and (3) conjecture on the relationship between two U.S. companies. Id. at 3.

Bayley attempted to rebut the evidence Petitioner placed on the record by arguing that SFIA is not the same company as that operating in 2012. See Prelim. IDM at 27; see also Bayley Rebuttal to Petitioners' March 20, 2017 Comments on Bayley Questionnaire at 7, PD 446, bar code 3559726-01 (Apr. 3, 2017). Bayley stated that the Plywood I documents refer to Shelter Forest International, Inc. ("SFII"), which is a different company than that at issue in this investigation. See Prelim. IDM at 27; see also Bayley Rebuttal to Petitioners' March 20, 2017 Comments on Bayley Questionnaire at 4, PD 446, bar code 3559726-01 (Apr. 3, 2017). Bayley placed each company's business registration with the Oregon Secretary of State on the record, arguing that the two companies are different because the registrations show two different companies with two different addresses. See Prelim. IDM at 28. Commerce made a "full examination of the business registration documents that are publicly available" and found that Bayley failed to provide available attachments showing that the president of both Shelter companies is the same person, supporting a finding of affiliation. See Prelim. IDM at 28–29; see also Dep't Memorandum re: Shelter International Corporate Documents, PD 736, bar code 3582562-01 (June 16, 2017).

The court finds that it was reasonable for Commerce to suspect that Bayley failed to provide Commerce with information at the outset of the investigation, based on the evidence on the record. After investigating Bayley's rebuttal evidence further, Commerce found substantial evidence that Bayley and Shelter are affiliated. The court concludes that Commerce's decision to apply AFA was reasonable. See

---

**2.**  See Hardwood Plywood from China, 78 Fed. Reg. 76,857 (Int'l Trade Comm. Dec. 19, 2013) (determinations).

Nippon Steel, 337 F.3d at 1383 (holding that "intentional conduct, such as deliberate concealment or inaccurate reporting" shows a failure to cooperate); Essar Steel Ltd. v. United States, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (finding that "[p]roviding false information and failing to produce key documents unequivocally" shows that respondent "did not put forth its maximum effort"); Maverick Tube Corp. v. United States, 857 F.3d 1353, 1360 (Fed. Cir. 2017) (concluding that substantial evidence supports Commerce's decision to apply AFA where respondent failed to provide information requested by Commerce and "never claimed that it was unable to provide" the information). The court concludes that Commerce's decision to apply AFA to Bayley for failure to disclose the full extent of its affiliations is supported by substantial evidence.

## C. Commerce's Decision to Not Verify Bayley's Questionnaire Responses

Commerce "shall verify all information relied upon in making a final determination in an investigation." 19 U.S.C. § 1677m(i)(1); see also 19 C.F.R. § 351.307(b). At verification, Commerce employees "will request access to all files, records, and personnel which the Secretary considers relevant to factual information submitted of: [ ] producers, exporters, or importers." 19 C.F.R. § 351.307. Commerce need not consider information submitted by an interested party if the information "is so incomplete that it cannot serve as a reliable basis for reaching the applicable determination." 19 U.S.C. § 1677m(e)(3).

[15] Bayley contends that Commerce should have verified its questionnaire responses. See Bayley's Br. 30. Bayley contends also that Commerce should have verified the evidence Petitioner put on the record, including the documents from Plywood I, the cached website information,

and Bayley's alleged affiliations with other Chinese producers, once Bayley denied any affiliation with Shelter. See id. This is incorrect. Because Commerce did not rely upon Bayley's questionnaires, it did not need to verify them. The evidence that Petitioner placed on the record was not their own and therefore there were no "files, records, and personnel" that Commerce could request from Petitioner to verify it. Commerce considered the evidence to find it was reasonable to suspect Bayley's responses were "so incomplete" as to not "serve as a reliable basis for reaching the applicable determination." Bayley had the burden to rebut this presumption and it was not able to do so. The court concludes that Commerce's decision not to verify both Bayley's questionnaire responses and the evidence the Petitioner put on the record is in accordance with the law.

## D. Commerce's Failure to Issue an Additional Questionnaire to Bayley

[16] If Commerce "determines that a response to a request for information ... does not comply with the request," Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d). Commerce "satisf[ies] its obligations under section 1677m(d) when it issue[s] a supplemental questionnaire specifically pointing out and requesting clarification of [the party's] deficient responses." NSK Ltd. v. United States, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007). "[N]othing in the [language of the statute] compels Commerce to treat intentionally incomplete data as a 'deficiency' and then to give a party that has intentionally submitted incomplete data an opportunity to 'remedy' as well as to 'explain.'" Papierfabrik August Koehler SE

v. United States, 843 F.3d 1373, 1384 (Fed. Cir. 2016), cert. denied, —— U.S. ——, 138 S. Ct. 555, 199 L.Ed.2d 436 (2017).

During the investigation, Commerce's initial questionnaire requested that Bayley report all affiliated and cross-owned companies. See Dep't Initial Antidumping Questionnaire at A-12, PD 149, bar code 3535284-01 (Jan. 9, 2017). Bayley reported that it was partially-owned by Person A and majority-owned by Person B, a husband and wife. See Prelim. IDM at 25. Bayley originally did not list Company D as an affiliate. See id. at 30; see also Bayley Section A Questionnaire Response at 14, PD 307, bar code 3543235-01 (Feb. 13, 2017). Commerce discovered that Bayley failed to report an additional affiliate, Company D, based on publicly available information in the companion countervailing duty investigation. See Prelim. IDM at 30. Company D manufacturers an input used in hardwood plywood production and is wholly-owned by Person C, the father-in-law of Person A and father of Person B. See id. Bayley argued that it reported all suppliers in this investigation, but Commerce concluded that it did "not change the fact that Company D represents an affiliate that should have been reported. By not reporting Company D on the record of this investigation, Bayley withheld necessary information that was requested." Final IDM at 15.

[17]  Bayley contends that Commerce's (1) refusal to consider Company D's questionnaire response; (2) refusal to issue Bayley a supplemental questionnaire; and (3) refusal to consider the information Bayley offered to clarify its lack of affiliations, are not in accordance with the law. See Bayley's Br. 29–43. The record evidence establishes that Bayley intentionally submitted incomplete information to Commerce regarding its affiliations because it did not report Company D as an affiliated company. See 19 U.S.C. § 1677(33)(A) (pro-

viding that "the following persons shall be considered to be 'affiliated' or 'affiliated persons': [m]embers of a family, including . . . lineal descendants."). The court finds that Commerce's conclusion that Bayley provided incomplete information was reasonable because under United States law, Bayley should have provided information about the affiliated relationship of Person C and Person B who are lineal descendants. Commerce satisfied its burden under section 1677m(d) both to inform Bayley that Bayley's affiliation response was deficient and to allow Bayley to correct its response after Commerce issued the first supplemental questionnaire. See NSK Ltd., 481 F.3d at 1360 n.1. Bayley contends also that Commerce must provide a party with an opportunity to remedy or explain a deficiency "regardless of whether the Department, the respondent, or any other party first brings such a deficiency to the Department's" attention. Bayley's Br. 33; see also 19 U.S.C. § 1677m(d). Bayley relies on China Kingdom Import & Export Co. Ltd v. United States, 31 C.I.T. 1329, 507 F. Supp. 2d 1337 (2007), as support for this proposition. Commerce applied AFA for failure to comply after Bayley did not include all affiliation information in response to the initial questionnaire and first supplemental questionnaire and it therefore did not need to consider Bayley's submission regarding Company D.

[18]  Bayley contends further that Commerce's disregard of Bayley's proffered information regarding Company D is arbitrary and capricious. See Bayley's Br. 41–43. Commerce addressed Bayley's argument that it reported all suppliers in this antidumping investigation as opposed to the parallel countervailing duty investigation and noted that "this does not change the fact that Company D represents an affiliate that should have been reported. By not reporting Company D on the record of this investigation, Bayley has withheld necessary information that was

requested." Final IDM at 15. Commerce requested information from Bayley, which Bayley withheld at the outset. It was reasonable for Commerce to rebuff Bayley's later attempts because of Bayley's failure to cooperate and comply with Commerce's requests, and the court finds that Commerce's decision here was not arbitrary and capricious.

## CONCLUSION

For the aforementioned reasons, the court concludes that:

1. Commerce's actions regarding the administrative record were arbitrary and capricious;

2. Commerce's application of the intermediate methodology is reserved for remand;

3. Commerce's valuation of veneer inputs is reserved for remand;

4. Commerce's calculation of the antidumping margins assigned to Consolidated Plaintiffs and other separate rate respondents should be reconsidered on remand based on any changes to Linyi Chengen's margin on remand;

5. Commerce's determination to apply AFA to Bayley regarding an alleged affiliation with one of its customers was supported by substantial evidence and in accordance with the law;

6. Commerce's decision not to conduct verification on Bayley is supported by substantial evidence and in accordance with the law; and

7. Commerce's actions regarding Bayley's affiliation with Company D is in accordance with the law and not arbitrary and capricious.

Commerce's <u>Final Determination</u> is sustained in part and remanded in part. Accordingly, it is hereby

**ORDERED** that Commerce's <u>Final Determination</u> is remanded for further proceedings consistent with this opinion; and it is further

**ORDERED** that Commerce shall file the remand redetermination on or before August 2, 2019; and it is further

**ORDERED** that Commerce shall file the administrative record on the remand redetermination on or before August 16, 2019; and it is further

**ORDERED** that the Parties shall file comments in opposition to the remand redetermination on or before September 3, 2019; and it is further

**ORDERED** that the Parties shall file comments in support of the remand redetermination on or before October 3, 2019; and it is further

**ORDERED** that the joint appendix on the remand redetermination shall be filed on or before October 17, 2019.



**TAI-AO ALUMINIUM (TAISHAN) CO., LTD. and Taal America Ltd., Plaintiffs,**

**and**

**Regal Ideas Inc., Consolidated Plaintiff,**

v.

**UNITED STATES, Defendant,**

**and**

**The Aluminum Extrusions Fair Trade Committee, Defendant-Intervenor.**

**Slip Op. 19-70**

**Consol. Court No. 17-00216**

United States Court of International Trade.

June 7, 2019

**Background:** Importers filed suit challenging Department of Commerce's deter-

**LINYI CHENGEN IMPORT
AND EXPORT CO.,
LTD., Plaintiff,**

**and**

**Celtic Co., Ltd., et al., Consolidated
Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Coalition for Fair Trade in Hardwood
Plywood, Defendant-Intervenor.**

**Slip Op. 20-22
Consol. Court No. 18-00002**

United States Court of International
Trade.

February 20, 2020

**Background:** Exporters filed multiple actions challenging Department of Commerce's final affirmative determination in antidumping duty investigation of hardwood plywood products from People's Republic of China, finding that subject merchandise was being sold for less than fair value. After consolidation, Court of International Trade, Jennifer Choe-Groves, J., 391 F.Supp.3d 1283, sustained in part and remanded in part. On remand, the Department of Commerce issued remand results.

**Holdings:** The Court of International Trade, Choe-Groves, J., held that:

(1) rejection of 10 pages out of 12-page document was unreasonable, and

(2) third-party confirmation requirement for documentation was unsupported by substantial evidence and contrary to law.

Remanded.

**1. Customs Duties** ⟐84(6)

In addition to substantial evidence, Court of International Trade reviews antidumping determinations made on remand for compliance with the court's remand order. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties** ⟐21.5(5)

Generally, Department of Commerce examines the record at verification to test the accuracy of information collected during the antidumping duty investigation.

**3. Customs Duties** ⟐21.5(5)

Department of Commerce has developed a practice of accepting new facts at verification in an antidumping duty investigation when: (1) the need for that information was not evident previously, (2) the information makes minor corrections to information already on the record, or (3) the information corroborates, supports, or clarifies information already on the record.

**4. Customs Duties** ⟐21.5(5)

Department of Commerce's explanation for accepting only two pages consisting of conversion table out of 12-page Chinese National Standard for calculating volume of purchased logs while rejecting remaining 10 pages as improper new factual information was unreasonable, in antidumping duty investigation of hardwood plywood products from China; Commerce later faulted exporter for failing to show that it applied Chinese National Standard to calculate log volumes, but by rejecting remaining pages, Commerce missed opportunity to accept readily available and highly relevant evidence to corroborate, support, or clarify importer's log volumes pursuant to Commerce's past practices at verification.

### 5. Customs Duties ⚖21.5(5)

Department of Commerce's determination that exporter's documentation in support of its log volumes was unreliable for lack of independent third-party confirmation was unsupported by substantial evidence and otherwise contrary to law, in antidumping duty investigation of hardwood plywood products from China, since Commerce cited no authority to support third-party confirmation requirement, and Commerce identified no record evidence questioning accuracy and completeness of exporter's documentation that was maintained as part of its regular course of business and after third party had audited exporter's financial statements.

———————

Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, D.C., for Plaintiff Linyi Chengen Import and Export Co., Ltd., and Consolidated Plaintiffs Celtic Co., Ltd., Jiaxing Gsun Import & Export Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Anhui Hoda Wood Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Linyi Evergreen Wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Timber International Trade Co. Ltd., Linyi Sanfortune Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Xuzhou Andefu Wood Co., Ltd., Suining Pengxiang Wood Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., Xuzhou Pinlin International Trade Co. Ltd., Linyi Glary Plywood Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Shandong Qishan International Trading Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Qingdao Good Faith Import and Ex-

port Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Far East American, Inc., and Shandong Dongfang Bayley Wood Co., Ltd., and Plaintiff-Intervenors Celtic Co., Ltd., Jiaxing Gsun Import & Export Co., Ltd., Anhui Hoda Wood Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shandong Qishan International Trading Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu Wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd. With him on the brief were J. Kevin Horgan and Alexandra H. Salzman.

Jeffrey S. Neeley and Stephen W. Brophy, Husch Blackwell LLP, of Washington, D.C., for Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co., Ltd., Highland Industries, Inc., Jiashan Dalin Wood Industry Co., Ltd., Happy Wood Industrial Group Co., Ltd., Jiangsu High Hope Arser Co., Ltd., Suqian Yaorun Trade Co., Ltd., Yangzhou Hanov International Co., Ltd., G.D. Enterprise Limited, Deqing China-Africa Foreign Trade Port Co., Ltd., Pizhou Jin Sheng Yuan International Trade Co., Ltd., Xuzhou Shuiwangxing Trading Co., Ltd.,

Cosco Star International Co., Ltd., Linyi City Dongfang Jinxin Economic & Trade Co., Ltd., Linyi City Shenrui International Trade Co., Ltd., Jiangsu Qianjiuren International Trading Co., Ltd., and Qingdao Top P&Q International Corp.

Jeffrey S. Grimson, Mowry & Grimson, PLLC, of Washington, D.C., for Consolidated Plaintiffs Taraca Pacific, Inc., Canusa Wood Products Ltd., Concannon Corporation d/b/a Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and US Ply LLC. With him on the brief were Jill A. Cramer and Bryan P. Cenko.

Sonia M. Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel was Nikki Kalbing, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Timothy C. Brightbill, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Coalition for Fair Trade in Hardwood Plywood. With him on the brief were Jeffrey O. Frank, Stephanie M. Bell, and Elizabeth Lee.

## OPINION AND ORDER

Choe-Groves, Judge:

At the center of this case is a discrepancy over one document – apparently during verification, the Department of Commerce ("Commerce") requested that Plaintiff Li-

nyi Chengen Import and Export Co., Ltd. ("Linyi Chengen") provide a copy of the Chinese National Standard used to calculate the volume of purchased logs. Linyi Chengen attempted to provide a 12-page document representing the Chinese National Standard used for log volume, but Commerce accepted only a two-page excerpt of that document into evidence containing a conversion table. Apparently the two-page excerpt contained a phrase written in Chinese identifying the conversion table as the Chinese National Standard, without an English translation. Commerce agreed that the two-page conversion table excerpt was relevant to Linyi Chengen's manner of calculating log volumes reported in its questionnaire responses, but Commerce rejected the remaining pages as prohibited new factual information. Linyi Chengen alleges that the two pages are only one portion taken out of context of a larger 12-page document and notes that the 10 additional pages include the cover page identifying the document in English as the Chinese National Standard, the document requested by Commerce. The controversy in this case centers around Commerce's subsequent findings that Linyi Chengen provided incomplete information regarding volume calculations, conversions, and formulas, and that Linyi Chengen failed to establish that it applied the Chinese National Standard in calculating its log volumes. Thus, the question before the court is whether Commerce's conclusion is supported by substantial evidence that Linyi Chengen failed to apply the Chinese National Standard, when Commerce itself prevented Linyi Chengen from submitting a complete document that could provide relevant factual information. For the following reasons, the court concludes that Commerce's determination is not supported by substantial evidence and

remands for further proceedings consistent with this opinion.

This case involves a challenge to Commerce's final affirmative determination in the antidumping duty investigation of certain hardwood plywood products from the People's Republic of China. See Certain Hardwood Plywood Products From the People's Republic of China, 82 Fed. Reg. 53,460 (Dep't Commerce Nov. 16, 2017) (final determination of sales at less than fair value, and final affirmative determination of critical circumstances, in part), PR 882, as amended, 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) (amended determination of sales at less than fair value and antidumping duty order), PR 894 (collectively, "Final Determination"); see also Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Certain Hardwood Plywood Products from People's Republic of China, PR 871 (Nov. 16, 2017) ("Final IDM"); Certain Hardwood Plywood Products From the People's Republic of China, 82 Fed. Reg. 28,629 (Dep't Commerce June 23, 2017) (preliminary affirmative determination of sales at less than fair value, preliminary affirmative determination of critical circumstances, in part), as amended, 82 Fed. Reg. 32,683 (Dep't Commerce July 17, 2017) (amended preliminary determination of sales at less than fair value) (collectively, "Preliminary Determination").

Before the court are Commerce's remand results filed in response to the court's opinion and order in Linyi Chengen Import and Export Co., Ltd. v. United States, 43 CIT ——, 391 F. Supp. 3d 1283 (2019) ("Linyi Chengen"), Final Results of Redetermination Pursuant to Court Remand, ECF No. 89-1 ("Remand Results"), and Plaintiffs' Linyi Chengen Import and Export Co., Ltd., Shandong Dongfang Bayley Wood Co., Ltd., and the Separate Rate Plaintiffs' Motion for Leave to File Reply Comments, ECF No. 101.[1] The court decides the matter on the parties' written submissions and denies the motion seeking leave to file reply comments.[2]

## I.  BACKGROUND

The court assumes familiarity with the underlying facts and procedural history of this case as set forth in Linyi Chengen, 391 F. Supp. 3d at 1287–92.

---

**1.** Linyi Chengen moved on behalf of Consolidated Plaintiffs Celtic Co., Ltd., Anhui Hoda Wood Co., Ltd., Far East American, Inc., Jiaxing Gsun Import and Export Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Shandong Qishan International Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu Wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd.,

Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd. (collectively, "Separate Rate Plaintiffs").

**2.** The court has broad discretion to manage its docket and deny a party's request to file reply comments after remand. USCIT R. 56.2(h)(6); see Amado v. Microsoft Corp., 517 F.3d 1353, 1358 (Fed. Cir. 2008) ("District courts . . . are afforded broad discretion to control and manage their dockets, including the authority to decide the order in which they hear and decide issues pending before them." (citations omitted)).

In the Preliminary Determination, Commerce declined Defendant-Intervenor's request to value Linyi Chengen's poplar log inputs using its intermediate input methodology and assigned Linyi Chengen a zero or *de minimis* dumping margin and a 57.36% dumping margin as to the separate rate companies. 82 Fed. Reg. at 28,637. In the Final Determination, Commerce changed course and applied its intermediate input methodology to value Linyi Chengen's log inputs. 82 Fed. Reg. at 53,-461; Final IDM at 23 (valuing veneers as the input used to produce hardwood plywood). Linyi Chengen's margin calculation changed from 0% to a final dumping margin calculation of 183.36%. Final Determination, 82 Fed. Reg. at 53,462. Commerce then applied Linyi Chengen's rate to the separate rate respondents. Id.

Commerce used its intermediate input methodology after concluding that Linyi Chengen's log volume reporting methods were "inherently imprecise." Final IDM at 25, 27 (noting that applying the intermediate input methodology to veneers instead of logs will yield a more accurate calculation). Commerce contended that Linyi Chengen had not shown that the conversion table and formula used to calculate log volume were the Chinese National Standard or that use of the conversion table and formula yielded accurate reported log volume. Id. at 25. Commerce also noted that it was unable to cross-check Linyi Chengen's reported log consumption against any third-party sources, such as supplier invoices. Id.

The court remanded the case for Commerce to reconsider how Linyi Chengen's log consumption calculations were unreliable when the record reflected conflicting accounts at verification as to whether the conversion table and formula Linyi Chen-

gen used to compute its log consumption volume were the Chinese National Standard. Linyi Chengen, 391 F. Supp. 3d at 1294. Because Commerce applied Linyi Chengen's 183.36% dumping margin to the non-examined companies, the court also directed Commerce to reconsider the rates applied to the separate rate companies if Commerce changed Linyi Chengen's margin on remand. Linyi Chengen, 391 F. Supp. 3d at 1301; Final Determination, 82 Fed. Reg. at 53,462.

On remand, Commerce faulted Linyi Chengen again for failing to build an adequate administrative record, found that Linyi Chengen was unable to report and substantiate its log volume factors of production accurately, and reapplied the intermediate input methodology. Remand Results at 60; Final IDM at 23. Commerce made no changes to the 183.36% dumping margin applied to Linyi Chengen and the separate rate companies. Remand Results at 60.

Commerce continued to find that Linyi Chengen's log volumes were unreliable because of a lack of record evidence showing that the conversion table and formula are the Chinese National Standard or that the table and formula elicit accurate log volumes. Id. at 24. Commerce reasoned that it disregarded Linyi Chengen's log consumption data because Linyi Chengen provided no third-party documentation supporting those reported log volumes. Id. at 15–32, 60. Commerce found that the value-added tax ("VAT") invoices and warehouse-in tickets that Linyi Chengen provided lacked third-party confirmation against which Commerce could cross-check Linyi Chengen's reported log volumes. Id. at 25–26, 45–54.

After the court issued Linyi Chengen, Commerce appended an extra-record dec-

laration to the Remand Results. Id., Analyst Decl., Attachment to Remand Results. In the analyst declaration, Commerce purports to explain how the verification team handled the conversion table and formula exhibit. Id.

Plaintiffs Linyi Chengen,[3] Taraca Pacific, Inc. ("Taraca"),[4] and Zhejiang Dehua TB Import & Export Co., Ltd. ("Dehua TB")[5] filed comments opposing the Remand Results. Dehua TB Cmts. on Remand Redetermination, ECF No. 93 ("Dehua TB Cmts."); Taraca's Cmts. on Final Remand Redetermination, ECF No. 94 ("Taraca Cmts."); Linyi Chengen Cmts. on Remand Redetermination, ECF No. 95. Defendant United States ("Defendant") and Defendant-Intervenor Coalition for Fair Trade in Hardwood Plywood ("Defendant-Intervenor") filed comments in support of the Remand Results. Def.'s Resp. to Cmts. on Remand Redetermination, ECF No. 97 ("Def. Resp."); Def.-Intervenor's Cmts. in Resp. to Remand Redetermination, ECF No. 100 ("Def.-Int. Resp.").

## II. JURISDICTION AND STANDARD OF REVIEW

[1] The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C.

§ 1581(c). The court will uphold Commerce's antidumping determination, including redeterminations made on remand, unless the findings are unsupported by substantial record evidence, or are otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i). The court also reviews determinations made on remand for compliance with the court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT ——, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## III. DISCUSSION

Linyi Chengen and Taraca argue that Commerce erred in finding the conversion table and formula unreliable because Commerce rejected a document showing that the conversion table and formula are the Chinese National Standard and that use of the table and formula yield accurate log volume calculations. Linyi Chengen Cmts. 1–10, 23–30; Taraca Cmts. at 4–8.[6] Linyi Chengen avers also that Commerce ignored third-party documentation, such as VAT invoices and warehouse-in tickets, that substantiated its reported log consumption. Linyi Chengen Cmts. at 10; Taraca Cmts. at 9–12 (arguing that the third-

**3.** Comments were filed collectively on behalf of Chengen and the Separate Rate Plaintiffs.

**4.** Comments were filed collectively on behalf of Taraca, Canusa Wood Products Ltd., Concannon Corp. d/b/a Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPly LLC.

**5.** Comments were filed collectively on behalf of Dehua TB, Highland Industries, Inc., Jiashan Dalin Wood Industry Co., Ltd., Happy Wood Industrial Group Co., Ltd., Jiangsu High Hope Arser Co., Ltd., Suqian Yaorun Trade Co., Ltd., Yangzhou Hanov International

al Co., Ltd., G.D. Enterprise Limited., Deqing China-Africa Foreign Trade Port Co., Ltd., Pizhou Jin Sheng Yuan International Trade Co., Ltd., Xuzhou Shuiwangxing Trading Co., Ltd., Cosco Star International Co., Ltd., Linyi City Dongfang Jinxin Economic and Trade Co., Ltd., Linyi City Shenrui International Trade Co., Ltd., Jiangsu Qianjiuren International Trading Co., Ltd., and Qingdao Top P&Q International Corp.

**6.** Dehua TB joins in and incorporates by reference Chengen's comments and asserts that any change Commerce makes to Chengen's margin calculation should be applied to the Separate Rate Plaintiffs. Dehua TB Cmts. at 1–2.

party confirmation requirement has no support in the law and facts on the record). Defendant responds that it was proper for Commerce to reject the 10 pages of the Chinese National Standard document because Linyi Chengen developed an inadequate administrative record and should have provided the document before verification. Def.'s Resp. at 8–23. Defendant asserts also that it was reasonable for Commerce to conclude that the record evidence Linyi Chengen put forth substantiating its log volume did not constitute proper third-party documentation because Commerce could not cross-check the reported log volume figures against independently-generated documents. Id. at 23–29; Def.-Int. Resp. at 11.

### A.  Handling of Record Evidence at Verification

Linyi Chengen argues that Commerce erred in using the intermediate input methodology because at verification, Commerce accepted only a portion of the document containing the entirety of the Chinese National Standard. Linyi Chengen Cmts. 1–10; Taraca Cmts. at 4–8 (The removal of the pages identifying the document in English as the Chinese National Standard "is also the single most important decision that catapulted Linyi Chengen's antidumping margin from de minimis at the preliminary determination to the punitive final antidumping margin."). Defendant responds that Commerce appropriately rejected the documents as to the provenance and function of the conversion table and formula at verification as prohibited new facts. Def. Resp. at 8, 16–18.

[2, 3]  Generally, Commerce examines the record at verification to test the accuracy of information collected during the investigation. Tianjin Machinery Imp. & Exp. Corp. v. United States, 28 CIT 1635, 1644 (2004), aff'd, 146 Fed. App'x 493 (Fed. Cir. 2005). Yet, Commerce has developed a practice of accepting new facts at verification when: "(1) the need for that information was not evident previously, (2) the information makes minor corrections to information already on the record, or (3) the information corroborates, supports, or clarifies information already on the record." TMK IPSCO v. United States, 40 CIT ——, 179 F. Supp. 3d 1328, 1354 n.34 (2016) (citation omitted) (emphasis added).

[4]  The question in this case is whether it was reasonable for Commerce to deem only two pages (the "conversion table") of a document as relevant while rejecting the remaining pages of the whole 12-page Chinese National Standard document as improper new factual information, particularly when Commerce later faulted Linyi Chengen for failing to show that it applied the Chinese National Standard in its volume calculations. At oral argument, Linyi Chengen averred that it provided to Commerce "a partially translated 12-page log standard, and [Commerce] [tore] off the cover page, which is the full translation." Oral Arg. Tr. 10:25–11:19, ECF No. 80 (noting that the two pages Commerce retained as a verification exhibit contained the untranslated "11-character Chinese standard [located] on one line at the top of the page").

The court finds Commerce's explanation to be unreasonable for rejecting the 12-page complete document representing the entirety of the Chinese National Standard. See Remand Results at 43 ("[T]he cover page and additional pages that purportedly explain the provenance and methodology underlying the conversion table and formula were new factual information that [Linyi] Chengen should have submitted

prior to verification and were information that Linyi Chengen sought . . . to submit to the verifiers."). The court finds that the 12-page complete document should be construed instead as information corroborating, supporting, or clarifying information already on the record (regarding Linyi Chengen's method of calculating log volumes) that should be accepted pursuant to Commerce's past practices at verification, rather than viewing the pages as prohibited new factual information. The remaining pages provide context for understanding whether the conversion table for log volume in the initial two pages are part of the Chinese National Standard contained in the complete 12-page document. By rejecting the additional information, Commerce missed an opportunity to accept evidence that would corroborate, support, or clarify the log volumes reported in the questionnaire responses, as well as provide context as to whether Linyi Chengen applied the Chinese National Standard. See TMK IP-SCO, 179 F. Sup. 3d at 1354 n.34. It strains logic that Commerce would accept two pages of the conversion table, yet would reject additional pages of the same document that would clarify "the provenance and accuracy of conversion table and formula" used to calculate log volumes. Remand Results at 11; see Mid Continent Steel & Wire, Inc. v. United States, 941 F.3d 530, 544–45 (Fed. Cir. 2019) ("Practical considerations might play a role in the reasonableness of Commerce's choice. It might be reasonable to avoid methods that demand information that cannot practically be obtained in reliable form. On the other hand, it can be unreasonable for an agency to refuse to obtain readily available, highly relevant information." (citation omitted)). Similarly, the court concludes that it was unreasonable for Commerce to refuse to consider the entirety of the docu-

ment purporting to be the Chinese National Standard, when the document is readily available and highly relevant.

The court remands for a second time and instructs that Commerce accept the additional pages representing the entire 12-page document, including the cover page and other pages that were previously rejected at verification, in order to provide a more complete record on which to base Commerce's reasoning. Because Linyi Chengen's log volume was an integral factor of production used in calculating the dumping margin, Commerce should reconsider modifying Linyi Chengen's margin and the rate assigned to the Separate Rate Plaintiffs. See Final IDM at 25 (noting that log consumption is "[Linyi] Chengen's most significant input[ ]").

## B. Third-Party Documentation Requirement

[5] Linyi Chengen and Taraca argue that Linyi Chengen provided ample and reliable record evidence that met Commerce's third-party confirmation requirement. Linyi Chengen Cmts. at 10–17, Taraca Cmts. at 10–12. Defendant counters that Commerce was correct in finding Linyi Chengen's evidence, such as VAT invoices and warehouse materials, unreliable because Linyi Chengen alone produced, possessed, and maintained the documents. Def.'s Resp. at 23–29 (Commerce has a "strong preference" that respondents provide information from "independent sources that are not subject to its investigations or reviews[.]").

Commerce found insufficient record support of Linyi Chengen's log volumes because Commerce could not cross-check the reported log volumes against independent, third-party sources. Remand Results at 26,

53–54 ("[T]he need for third-party confirmation of [Linyi] Chengen's log consumption is appropriate ... because the accuracy of the methodology by which [Linyi] Chengen calculates its log volume is a question at issue in this proceeding."). Commerce's imposition of a third-party confirmation requirement lacks a basis in law and fact.

First, Commerce cites no authority to specifically support its imposition of the third-party confirmation requirement. There does not appear to be a legal basis for requiring that Linyi Chengen must confirm its log consumption by an independent third-party source, and thus the court concludes that Commerce's requirement on this issue is contrary to the law.

Second, the evidence on the record does not support Commerce's conclusion that Linyi Chengen could "manipulat[e] or alter[ ]" documents under its control, such as the VAT invoices, because the invoices are generated on pre-approved Chinese government forms provided by the Chinese tax authority. Id. at 25–26, 49–51. Commerce identified no record evidence questioning the accuracy and completeness of the VAT invoices when Linyi Chengen maintained the invoices as part of its regular course of business. See Verification Report at 8, 20–21, PR 834. Commerce has cited no evidence on the record as a basis to doubt the accuracy of the VAT invoices when a third party audited Linyi Chengen's financial statements. Commerce dismissed the relevance of the audited financial statements because "it is unclear how [Linyi] Chengen's auditors and the [Chinese] tax authority would validate the quantities reported to Commerce." Remand Results at 51; Linyi Chengen Section A Questionnaire Resp., PR 306, CR 242, Ex. A-3 (2015 Audited Financial

Statement). During verification, Commerce reviewed Linyi Chengen's reported per-unit consumption amounts of "poplar log[ ] [and] wood log" and found "[n]o discrepancies" when it traced the consumption of raw material inputs, as well as "the purchase quantities and values of poplar log[.]" See Linyi Chengen's Verification Report at 20–21 ("Using the source documents from [Linyi] Chengen['s] ... accounting and data collection systems, we traced the material inputs from source documents to the accounting vouchers used to record source documents in the general ledger, to the appropriate inventory and production accounts in the general ledger. We observed no discrepancies."). In light of Commerce's statement that there were no discrepancies, the court concludes that Commerce's continued finding that Linyi Chengen's documentation was unreliable for lack of third-party confirmation is unsupported by substantial evidence and otherwise contrary to law.

## IV.  CONCLUSION

For the foregoing reasons, the court remands the matter for Commerce to reconsider its application of the intermediate input methodology and to accept the previously-rejected documents that Linyi Chengen presented at verification representing the complete and accurate Chinese National Standard used for volume conversion. If Commerce makes changes to Linyi Chengen's margin on remand, Commerce should make appropriate adjustments to the separate rates of the other parties before the court in this action. Accordingly, is hereby

**ORDERED** that Linyi Chengen's Motion for Leave to File Reply Comments, ECF No. 101, is denied; and it is further

**ORDERED** that the Remand Results are remanded to Commerce for a second determination; and it is further

**ORDERED** that this case will proceed per the following schedule as to the second remand redetermination:

1. Commerce must file the second remand redetermination by April 20, 2020;

2. Commerce must file the administrative record by May 4, 2020;

3. Comments in opposition must be filed by June 3, 2020;

4. Comments in support must be filed by July 6, 2020; and

5. The joint appendix must be filed by July 20, 2020.



**BIO-LAB, INC. et al., Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Juancheng Kangtai Chemical Co., Ltd. and Heze Huayi Chemical Co., Ltd., Defendant-Intervenors.**

**Slip Op. 20-24**
**Court No. 18-00051**

United States Court of International Trade.

February 26, 2020

**Background:** Domestic producers filed action challenging Department of Commerce's final determination in administrative review of antidumping duty order covering chlorinated isocyanurates from People's Republic of China. The Court of International Trade, Claire R. Kelly, J., 392 F.Supp.3d 1264, sustained in part and remanded in part. On remand, the Department of Commerce issued remand redetermination.

**Holdings:** The Court of International Trade, Kelly, J., held that substantial evidence supported export price determination.

Sustained.

**1. Customs Duties ⟷84(6)**

In addition to substantial evidence, the results of an antidumping redetermination pursuant to remand from the Court of International Trade are also reviewed for compliance with the court's remand order. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties ⟷21.5(3)**

In determining whether a principal-agent relationship exists between an exporter and a purchaser, as would indicate that exporter controlled purchaser such that they were affiliated and resulting in determining a constructed export price (EP) in order to calculate the exporter's dumping margin, no bright line test exists, and Department of Commerce will consider the totality of the circumstances. Tariff Act of 1930 §§ 731, 771, 19 U.S.C.A. §§ 1673, 1677(33)(G), 1677a(b).

**3. Customs Duties ⟷21.5(3)**

To determine whether a principal-agent relationship exists between exporter and purchaser, such that they are affiliated and resulting in determining a constructed

3. Comments in opposition to the second remand results shall be filed on or before April 9, 2021;

4. Comments in support of the second remand results shall be filed on or before May 7, 2021; and

5. The joint appendix shall be filed on or before May 21, 2021.



**LINYI CHENGEN IMPORT AND EXPORT CO., LTD., Plaintiff,**

**and**

**Celtic Co., Ltd., et al., Consolidated Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Coalition for Fair Trade of Hardwood Plywood, Defendant-Intervenor.**

**Slip Op. 20-183**
**Consol. Court No. 18-00002**

United States Court of International Trade.

December 21, 2020

**Background:** Foreign exporters brought actions against United States government, challenging final affirmative determination by Department of Commerce in antidumping duty investigation of hardwood and decorative plywood and certain veneered panels from People's Republic of China (PRC). Following consolidation of actions, the Court of International Trade, Jennifer Choe-Groves, J., 391 F.Supp.3d 1283, remanded for Department to reconsider dumping margins calculated for mandatory respondent and non-examined parties. On remand, Department maintained its calculations, after which the Court of International Trade, 433 F.Supp.3d 1278, again remanded for reconsideration. On second remand, Department revised margins.

**Holdings:** The Court of International Trade, Jennifer Choe-Groves, J., held that:

(1) substantial evidence supported mandatory respondent's revised margin, but

(2) substantial evidence did not support non-examined parties' revised margin.

Sustained in part and remanded in part.

**1. Customs Duties ⬡84(6)**

The Court of International Trade reviews determinations made by the Department of Commerce on remand for compliance with the Court's remand order.

**2. Customs Duties ⬡21.5(3)**

Substantial evidence supported 0% dumping margin calculated by Department of Commerce for foreign producer, in antidumping duty investigation of hardwood and decorative plywood and certain veneered panels from People's Republic of China (PRC); Department applied its normal, rather than intermediate-input, methodology to calculate producer's normal value because Department had no questions about accuracy or validity of producer's factors of production, as Department had verified accuracy of producer's log-volume conversion table, reported factors of production with related financial statements, reported log volumes, and relevant log-to-veneer volume conversion. Tariff Act of 1930 §§ 516A, 773, 19 U.S.C.A. §§ 1516a(b)(1)(B)(i), 1677b(c).

**3. Customs Duties ⬡21.5(3)**

Substantial evidence did not support 57.36% all-others dumping margin calculat-

ed by Department of Commerce for non-examined parties, in antidumping duty investigation of hardwood and decorative plywood and certain veneered panels from People's Republic of China (PRC); Department calculated dumping margin by averaging 0% and 114.72% dumping margins calculated for investigation's two mandatory respondents, but Department did not offer any citations to record evidence supporting its assertion that 114.72% respondent's designation as PRC-wide entity supported conclusion that 0% rate was not reasonably reflective of non-examined parties' potential dumping margins, and dumping margins alleged in petition for investigation were untethered from non-examined parties' actual dumping margins. Tariff Act of 1930 §§ 516A, 731, 735, 776, 19 U.S.C.A. §§ 1516a(b)(1)(B)(i), 1673, 1673d, 1677e.

**4. Customs Duties ⊷21.5(3)**

To depart from the expected method for determining the all-others rate in antidumping administrative proceedings where the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero, de minimis, or determined entirely pursuant to facts available—the expected method being to weight-average those margins—the Department of Commerce must determine that the expected method is not feasible or would not be reasonably reflective of the potential dumping margins for non-investigated exporters or producers based on substantial evidence. Tariff Act of 1930 §§ 731, 735, 776, 19 U.S.C.A. §§ 1673, 1673d(c)(5), 1677e.

**5. Customs Duties ⊷21.5(3)**

The Tariff Act exception under which the Department of Commerce may depart from the expected method for determining the all-others rate in antidumping administrative proceedings where the estimated weighted average dumping margins estab-

lished for all exporters and producers individually investigated are zero, de minimis, or determined entirely pursuant to facts available—the expected method being to weight-average those margins—applies expressly to market economy proceedings but also extends to non-market economy proceedings. Tariff Act of 1930 §§ 731, 735, 776, 19 U.S.C.A. §§ 1673, 1673d(c)(5), 1677e.

**6. Customs Duties ⊷21.5(3)**

Mere assertions by the Department of Commerce without substantial evidence do not serve the Tariff Act's purpose of calculating dumping margins as accurately as possible. Tariff Act of 1930 § 303 et seq., 19 U.S.C.A. § 1303 et seq.

———————

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, D.C., for Plaintiff Linyi Chengen Import and Export Co., Ltd., Consolidated Plaintiffs Far East American, Inc. and Shandong Dongfang Bayley Wood Co., Ltd., and Consolidated Plaintiffs and Plaintiff-Intervenors Celtic Co., Ltd., Jiaxing Gsun Import & Export Co., Ltd., Anhui Hoda Wood Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shandong Qishan International Trading Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu Wood

Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd.

Jeffrey S. Neeley and Stephen W. Brophy, Husch Blackwell LLP, of Washington, D.C., for Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co., Ltd., Highland Industries Inc., Jiashan Dalin Wood Industry Co., Ltd., Happy Wood Industrial Group Co., Ltd., Jiangsu High Hope Arser Co., Ltd., Suqian Yaorun International Trade Co., Ltd., Yangzhou Hanov International Co., Ltd., G.D. Enterprise Limited, Deqing China-Africa Foreign Trade Port Co., Ltd., Pizhou Jin Sheng Yuan International Trade Co., Ltd., Xuzhou Shuiwangxing Trading Co., Ltd., Cosco Star International Co., Ltd., Linyi City Dongfang Jinxin Economic & Trade Co., Ltd., Linyi City Shenrui International Trade Co., Ltd., Jiangsu Qianjiuren International Trading Co., Ltd., and Qingdao Top P&Q International Corp.

Jeffrey S. Grimson and Jill A. Cramer, Mowry & Grimson, PLLC, of Washington, D.C., for Consolidated Plaintiffs Taraca Pacific, Inc., Canusa Wood Products, Ltd., Concannon Corporation d/b/a Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPLY, LLC.

Sonia M. Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Ethan P. Davis, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel was Savannah Rose Maxwell, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Timothy C. Brightbill, Jeffrey O. Frank, Stephanie M. Bell, and Elizabeth S. Lee, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Coalition for Fair Trade of Hardwood Plywood.

## OPINION AND ORDER

CHOE-GROVES, Judge:

This action concerns the import of hardwood and decorative plywood and certain veneered panels into the United States from the People's Republic of China ("China"), subject to the final affirmative determination in an antidumping duty investigation by the U.S. Department of Commerce ("Commerce"). See Certain Hardwood Plywood Products from the People's Republic of China, 82 Fed. Reg. 53,460 (Dep't Commerce Nov. 16, 2017) (final determination of sales at less than fair value), PR 882, as amended, 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) (amended final determination of sales at less than fair value), PR 894 (collectively, "Final Determination"); see also Issues and Decision Mem. for the Final Determination of the Antidumping Duty Investigation of Certain Hardwood Plywood Products from People's Republic of China, ECF No. 25-7, PR 871 (Nov. 6, 2017) ("Final IDM").

Before the court are the Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 113-1, 114-1 ("Second Remand Results"), which the court ordered in Linyi Chengen Import & Export Co. v. United States, 44 CIT ——, 433 F. Supp. 3d 1278 (2020) ("Linyi Chengen II"). Plaintiff Linyi Chengen Import & Export Co. ("Linyi Chengen" or "Plaintiff") filed comments in support of the Second Remand Results. Pl.'s Resp. Comments in Supp. Second Remand Redetermination,

ECF No. 125 ("Pl. Cmts."). Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co. ("Dehua TB"), Celtic Co. ("Celtic"), and Taraca Pacific, Inc. ("Taraca") each filed comments in opposition to the Second Remand Results. Shandong Dongfang Bayley Wood Co. ("Bayley"), a Consolidated Plaintiff and mandatory respondent, did not file comments in response to the Second Remand Results. See Final IDM at 2.

Dehua TB filed comments collectively on behalf of itself and Highland Industries, Inc., Jiashan Dalin Wood Industry Co., Happy Wood Industrial Group Co., Jiangsu High Hope Arser Co., Suqian Yaorun Trade Co., Yangzhou Hanov International Co., G.D. Enterprise, Ltd., Deqing China-Africa Foreign Trade Port Co., Pizhou Jin Sheng Yuan International Trade Co., Xuzhou Shuiwangxing Trading Co., Cosco Star International Co., Linyi City Dongfang Jinxin Economic & Trade Co., Linyi City Shenrui International Trade Co., Jiangsu Qianjiuren International Trading Co., and Qingdao Top P&Q International Corp. Comments in Opp'n to Remand Redetermination on Behalf of Consolidated Pls. Zhejiang Dehua TB Import & Export Co., ECF Nos. 116, 117 ("Dehua TB Cmts.").

Celtic filed comments collectively on behalf of itself and Anhui Hoda Wood Co., Far East American, Inc., Jiaxing Gsun Import & Export Co., Jiaxing Hengtong Wood Co., Linyi Evergreen Wood Co., Linyi Glary Plywood Co., Linyi Jiahe Wood Industry Co., Linyi Linhai Wood Co., Linyi Hengsheng Wood Industry Co., Linyi Huasheng Yongbin Wood Co., Linyi Mingzhu Wood Co., Linyi Sanfortune Wood Co., Qingdao Good Faith Import & Export Co., Shanghai Futuwood Trading Co., Shandong Qishan International Trading Co., Suining Pengxiang Wood Co., Suqian Hopeway International Trade Co., Suzhou

Oriental Dragon Import & Export Co., Xuzhou Andefu Wood Co., Xuzhou Jiangyang Wood Industries Co., Xuzhou Longyuan Wood Industry Co., Xuzhou Pinlin International Trade Co., Xuzhou Shengping Import & Export Co., and Xuzhou Timber International Trade Co. Consolidated Separate Rate Pls.' Comments in Opp'n to Second Remand Redetermination, ECF No. 118 ("Celtic Cmts.").

Taraca filed comments collectively on behalf of itself and Canusa Wood Products, Ltd., Concannon Corp. d/b/a Concannon Lumber Co., Fabuwood Cabinetry Corp., Holland Southwest International, Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPLY, LLC. Consolidated Pls. Taraca Pacific, Inc., Canusa Wood Products, Ltd., Concannon Corp. d/b/a Concannon Lumber Co., Fabuwood Cabinetry Corp., Holland Southwest International, Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPLY, LLC Comments on Final Remand Redetermination, ECF No. 119 ("Taraca Cmts.").

The court refers collectively to the non-examined parties that filed Dehua TB Cmts., Celtic Cmts., and Taraca Cmts. as "Separate Rate Plaintiffs." The court also refers collectively to the non-examined parties that filed separate rate applications in the preliminary proceedings and were assigned the all-others separate rate as "separate rate respondents." See Final IDM at 2–3; Second Remand Results at 3, 49.

Defendant-Intervenor Coalition for Fair Trade of Hardwood Plywood ("Defendant-Intervenor") filed comments and reply comments in opposition to the Second Remand Results. Def.-Interv. Coal. Fair Trade Hardwood Plywood's Comments in Opp'n to Remand Redetermination, ECF

Nos. 121, 122, 123 ("Def.-Interv. Cmts."); Def.-Interv. Coal. Fair Trade Hardwood Plywood's Resp. to Comments in Opp'n to Remand Redetermination, ECF No. 127 ("Def.-Interv. Reply Cmts."). Defendant United States ("Defendant") filed a reply to all comments in opposition to the Second Remand Results. Def.'s Resp. to Comments on Remand Redetermination, ECF Nos. 128, 129 ("Def. Resp.").

For the reasons discussed below, the court sustains in part and remands in part Commerce's Second Remand Results.

## ISSUES PRESENTED

The court reviews the following issues:

1. Whether Commerce's revised dumping margin for Linyi Chengen is supported by substantial evidence; and

2. Whether Commerce's revised dumping margin for the Separate Rate Plaintiffs is supported by substantial evidence.

## BACKGROUND

The court assumes familiarity with the underlying facts and procedural history of this case as set forth in Linyi Chengen Import & Export Co. v. United States, 43 CIT ——, ——, 391 F. Supp. 3d 1283, 1287–92 (2019) ("Linyi Chengen I") and Linyi Chengen II, 433 F. Supp. 3d at 1280–84.

In the Final Determination, Commerce applied its intermediate input methodology to value Linyi Chengen's log inputs after determining that Linyi Chengen's log volume reporting methods were inherently imprecise. 82 Fed. Reg. at 53,461; Final IDM at 23, 25 (valuing veneers, instead of logs, as the input used to produce hardwood plywood). Commerce stated that it was unable to verify Linyi Chengen's reported log consumption against any third-party sources, such as supplier invoices. Final IDM at 25. Based on Commerce's application of the intermediate input methodology, Linyi Chengen's margin calculation changed from 0% to a final dumping margin calculation of 183.36%. Final Determination, 82 Fed. Reg. at 53,462. Commerce applied Linyi Chengen's rate to the Separate Rate Plaintiffs. Id.; Final IDM at 48. The court remanded the Final Determination for Commerce to reconsider the accuracy of Linyi Chengen's log consumption calculations. Linyi Chengen I, 391 F. Supp. 3d at 1294. Because Commerce applied Linyi Chengen's 183.36% dumping margin to the Separate Rate Plaintiffs, the court also directed Commerce to reconsider the rates applied to the Separate Rate Plaintiffs if Commerce changed Linyi Chengen's margin on remand. Id. at 1297.

Commerce continued to determine on remand that Linyi Chengen's log volumes were unreliable because the record failed to show that the conversion table and formula used by Linyi Chengen reflected the Chinese National Standard and failed to demonstrate accurate log volumes. Final Results of Redetermination Pursuant to Court Remand at 24, ECF Nos. 88-1, 89-1 ("Remand Results"). Commerce disregarded Linyi Chengen's log consumption data based on Linyi Chengen's purported failure to provide third-party documentation supporting its reported log volumes, even though Commerce rejected the documents offered by Linyi Chengen at verification. Id. at 24–32, 60. Commerce determined that it could not verify the accuracy of Linyi Chengen's reported log volumes because the value-added tax invoices and warehouse-in tickets provided by Linyi Chengen could not be confirmed by third-party documentation. Id. at 25–26, 49–54. The court again remanded for Commerce to reconsider its application of the intermediate input methodology and to accept the log volume conversion documents pre-

sented by Linyi Chengen at verification. Linyi Chengen II, 433 F. Supp. 3d at 1286. The court directed Commerce to make appropriate adjustments to the rate applied to the Separate Rate Plaintiffs if Commerce changed Linyi Chengen's margins. Id.

Commerce accepted Linyi Chengen's verification documents on second remand and determined that Linyi Chengen's reported log volumes were accurate. Second Remand Results at 10. Commerce refrained from applying the intermediate input methodology to calculate Linyi Chengen's dumping margins and instead applied its normal methodology to value all factors of production used in each stage of production. Id. at 26. Because Commerce determined that Linyi Chengen's reported log volumes were accurate, Commerce did not apply adverse facts available ("AFA") to Linyi Chengen. Id. at 40. Commerce revised Linyi Chengen's dumping margin from 183.36% to 0%. Id. at 8. Commerce determined that the other mandatory respondent, Bayley, was a China-wide entity and imposed a revised rate of 114.72%. Id. at 15. Commerce recalculated the Separate Rate Plaintiffs' dumping margin by averaging Linyi Chengen's 0% rate and Bayley's 114.72% rate. Id. at 16. The Separate Rate Plaintiffs were assigned a revised dumping margin rate of 57.36%. Id.

## JURISDICTION AND STANDARD OF REVIEW

[1] The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c). The court will uphold Commerce's antidumping determinations unless they are unsupported by substantial evidence on the record, or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i). The court also reviews determinations made on remand for compliance with the court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT ——, ——, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### A. Commerce's Revised Dumping Margin for Linyi Chengen

[2] The first issue considered by the court is whether Commerce's revised dumping margin for Linyi Chengen is supported by substantial evidence. Defendant-Intervenor contends that Commerce's determination of Linyi Chengen's revised dumping margin is not supported by substantial evidence because Linyi Chengen's reported log volumes are inaccurate and Commerce should have used the intermediate input methodology. Def.-Interv. Cmts. at 2–24. Defendant-Intervenor argues that Commerce should have applied AFA to Linyi Chengen. Id. at 25–27. Defendant defends Commerce's revision of Linyi Chengen's dumping margin by citing the accuracy of Linyi Chengen's reported log volumes and Commerce's determination that the facts do not merit the use of the intermediate input methodology. Def. Resp. at 9–10; see also Second Remand Results at 26.

In antidumping proceedings involving non-market economy countries, Commerce calculates normal value based on the factors of production used to produce the subject merchandise and other costs and expenses. 19 U.S.C. § 1677b(c)(1). Commerce examines the quantities of raw materials employed by a company in its review of factors of production to calculate normal value. See id. § 1677b(c)(3)(B). Under certain circumstances, Commerce will modify its standard factors of production methodology and may choose to apply a surrogate value to an intermediate input instead of the individual factors of produc-

tion used to produce that intermediate input. See Final IDM at 23. Commerce rarely applies this intermediate input methodology unless there are questions about the accuracy and validity of reported factors of production. See id. at 23–24. Commerce has used the intermediate input methodology: (1) when a "respondent may report factors used to produce an intermediate input that accounts for an insignificant share of the total output," (2) when the burden associated with calculating each factor outweighs the potential increase of calculation accuracy, or (3) when valuing the factors of production associated with producing the intermediate input would result in inaccurate calculations because Commerce is unable to value a significant cost in the overall factors buildup. Final IDM at 23; see, e.g., Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 68 Fed. Reg. 4986–93 (Dep't Commerce Jan. 31, 2003) (applying the intermediate input methodology due to problems with upstream data from respondents, such as misreported or unreported factors of production); Honey from the People's Republic of China, 71 Fed. Reg. 34,893 (Dep't Commerce June 16, 2006) (valuing the raw honey consumed as opposed to the factors of production used to produce the raw honey because of respondent's inability to accurately record and substantiate the complete costs associated with production); Fresh Garlic from the People's Republic of China, 71 Fed. Reg. 26,329 (Dep't Commerce May 4, 2006) (resorting to the intermediate input methodology because respondents were unable to record accurately and substantiate the costs of growing garlic).

On second remand, Commerce verified the reliability of Linyi Chengen's conversion table and the accuracy of Linyi Chengen's reported factors of production and financial statements based on a review of the record. Second Remand Results at 27–29. Commerce rejected purported discrepancies raised by Defendant-Intervenor and verified the overall accuracy of Linyi Chengen's reported log volumes, including Linyi Chengen's log-to-veneer conversion and reported grade of veneers. Id. at 29–36. Commerce determined that minor typographical errors in Linyi Chengen's conversion table did not impact the reliability of the table overall. Id. at 21. After Commerce replaced the obvious typographical errors in the conversion table with the expected sequence, Commerce verified that the formula produced correct results. Id. Commerce determined that the conversion table reflected a correct application of the Chinese National Standard formula to Linyi Chengen's reported log volumes and factors of production. Id.

Commerce verified Linyi Chengen's reported factors of production by reviewing numerous business documents placed on the record by Linyi Chengen. Id. at 27–28. Commerce also verified Linyi Chengen's cost of goods sold by confirming consistent audited financial statements and log value accounting. Id. at 28–29. Commerce determined based on its review of the record that Linyi Chengen's log-to-veneer volume conversion was accurate because it reflected Linyi Chengen's core veneer production, which allowed for cracks, holes, stains, and knots, and yielded more veneer per log. Id. at 27–30. Commerce determined that even though Linyi Chengen did not record its grade of veneers consumed, the practice did not give Linyi Chengen any productive benefit because the surrogate value used did not account for grades of veneers. Id. at 32–35. After reviewing Linyi Chengen's factors of production and confirming their accuracy, Commerce determined that Linyi Chengen's reported log volumes represented the accurate volume of logs purchased and consumed by Linyi Chengen. Id. at 10. Commerce deter-

mined that the facts did not merit a departure from Commerce's normal methodology. Id. at 38. Commerce revised Linyi Chengen's dumping margin to 0% after using the normal methodology in lieu of the intermediate input methodology. Id. at 16.

The court observes that Commerce supported its determination and application of the chosen methodology by verifying the accuracy of Linyi Chengen's conversion table, reported factors of production with related financial statements, reported log volumes, and relevant log-to-veneer volume conversion, and by addressing minor discrepancies raised by Defendant-Intervenor. Because Commerce had no questions about the accuracy or validity of Linyi Chengen's factors of production, it was reasonable for Commerce to apply its normal methodology to calculate Linyi Chengen's normal value instead of the intermediate input methodology. See 19 U.S.C. § 1677b(c)(3)(B). The court sustains Commerce's revised dumping margin for Linyi Chengen as reasonable and supported by substantial evidence.

**B. Commerce's Revised Dumping Margin for the Separate Rate Plaintiffs**

[3] The second issue considered by the court is whether Commerce's revised dumping margin for the Separate Rate Plaintiffs is supported by substantial evidence. The Separate Rate Plaintiffs argue that Commerce erred by averaging Linyi Chengen's de minimis dumping margin and Bayley's China-wide entity dumping margin. Dehua TB Cmts. at 3–11; Celtic Cmts. at 2–5; Taraca Cmts. at 2–11. Defendant maintains that Commerce applied an average of Linyi Chengen's and Bayley's rates properly because the exception in 19 U.S.C. § 1673d(c)(5)(B) allows Commerce to use "any reasonable method" to calcu-late the all-others separate rate. Def. Resp. at 17; see also Second Remand Results at 14–15, 43.

[4, 5] Commerce is authorized by statute to calculate and impose a dumping margin on imported subject merchandise after determining it is sold in the United States at less than fair value. 19 U.S.C. § 1673. Under § 1673d(c)(5)(A), Commerce determines an all-others rate assigned to non-examined companies by calculating the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely on the basis of facts available, including adverse facts available. Id. § 1673d(c)(5)(A); see Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1351 (Fed. Cir. 2016). If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis, or are determined entirely under 19 U.S.C. § 1677e, Commerce may invoke an exception to establish a separate rate for exporters and producers not individually investigated. 19 U.S.C. § 1673d(c)(5)(B). The Statement of Administrative Action provides guidance that when the dumping margins for all individually examined respondents are determined entirely on the basis of the facts available or are zero or de minimis, the "expected method" of determining the all-others rate is to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available. Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201. Commerce may depart from the "expected method" and use "any reasonable method," but only if Commerce

reasonably concludes that the expected method is not feasible or results in an average that would not be reasonably reflective of potential dumping margins. See 19 U.S.C. § 1673d(c)(5)(B); Navneet Publ'ns (India) Ltd. v. United States, 38 CIT ——, ——, 999 F. Supp. 2d 1354, 1358 (2014) ("[T]he following hierarchy [is applied] when calculating all-others rates— (1) the '[g]eneral rule' set forth in § 1673d(c)(5)(A), (2) the alternative 'expected method' under § 1673d(c)(5)(B), and (3) any other reasonable method when the 'expected method' is not feasible or does not reasonably reflect potential dumping margins."); see also SAA at 873, reprinted in 1994 U.S.C.C.A.N. at 4201; Albemarle Corp., 821 F.3d at 1351–52 (quoting SAA at 873, reprinted in 1994 U.S.C.C.A.N. at 4201). Commerce must determine that the expected method is not feasible or would not be reasonably reflective of the potential dumping margins for non-investigated exporters or producers based on substantial evidence. Albemarle Corp., 821 F.3d at 1352–53; see also Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006, 1012 (Fed. Cir. 2017). The exception in 19 U.S.C. § 1673d(c)(5)(B) applies expressly to market economy proceedings but has been extended to non-market economy proceedings as well. Albemarle Corp., 821 F.3d at 1352 n.6; see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1374 (Fed. Cir. 2013) ("Bestpak").

On second remand, Commerce noted that "because there are no calculated rates for individually-investigated respondents other than zero or rates based on total AFA, we have applied the simple average of the revised AFA rate of 114.72[%] and the [0%] rate calculated for [Linyi] Chengen as a reasonable method to determine the rate assigned to the producer/exporter combinations that are party to this litigation and that have been found to be eligi-

ble for a separate rate." Second Remand Results at 44. To justify its departure from the expected method, Commerce stated that the expected method of weight-averaging the zero and de minimis margins and margins determined pursuant to the facts available (i.e., using the 0% rate assigned to Linyi Chengen) would not be reasonably reflective of the potential dumping margins for the Separate Rate Plaintiffs. Id.

Commerce attempted to identify several facts supporting its methodology of departing from the expected method. First, Commerce explained that the mandatory respondents in this investigation, Linyi Chengen and Bayley, were not representative of the Separate Rate Plaintiffs because Bayley was ultimately determined to be a China-wide entity due to Bayley's failure to provide essential information regarding Bayley's ownership and management during the investigation. See id. at 48–49. After noting Bayley's designation as a China-wide entity, Commerce stated that, "[b]ased on that conclusion, we cannot presume that [Linyi] Chengen's rate, who is only one of two mandatory respondents in this investigation, is reasonably reflective of the potential dumping margins for the non-investigated companies." Id. at 49.

Second, Commerce asserted that "additional record evidence indicates that affirmative dumping potentially existed during the [period of investigation], such that the 0% rate calculated for [Linyi] Chengen would not be representative of the estimated dumping margins for the non-investigated companies." Id. Commerce cited evidence of actual price quotes for subject merchandise exported from China to United States customers during the period of investigation by an exporter other than Linyi Chengen, which was alleged in the Petition. Id. Commerce determined that based on the margins of 114.72% and

104.06% contained in the Petition, "record evidence demonstrates that potential dumping by the separate rate companies existed during the [period of investigation] far in excess of the 0% rate calculated for [Linyi] Chengen." Id. Commerce determined that Linyi Chengen's 0% dumping margin would not reflect the potential dumping margins of the Separate Rate Plaintiffs because the record did not support a de minimis rate for Bayley and a "cursory analysis indicate[d] that Bayley's reported data [were] widely divergent from [Linyi] Chengen's data." Id. at 50.

Commerce is required to support its departure from the expected method by demonstrating that Linyi Chengen's 0% dumping margin rate would not be reasonably reflective of the Separate Rate Plaintiffs' potential dumping margins based on substantial evidence. Albemarle Corp., 821 F.3d at 1352–53; see also Changzhou Hawd, 848 F.3d at 1012.

With respect to the first purported fact asserted by Commerce, that Bayley's designation as a China-wide entity supports the conclusion that Linyi Chengen's 0% rate is not reasonably reflective of the potential dumping margins for the non-investigated companies, the court notes that Commerce's assertion is merely that, a bald assertion without any citations to evidence on the record. Commerce merely concluded, without any evidentiary support, that Bayley's lack of cooperation and designation as a China-wide entity led to the logical conclusion that the Separate Rate Plaintiffs' potential dumping margin rate was different than Linyi Chengen's dumping rate of 0%. Commerce failed to provide any evidence showing how the Separate Rate Plaintiffs' potential dumping margin was different than Linyi Chengen's dumping margin. Commerce also failed to provide any evidence showing what the Separate Rate Plaintiffs' poten-

tial dumping margin might be. As noted in Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370 (Fed. Cir. 2013), Commerce creates its own problems when it selects only two mandatory respondents and has minimal information on the record to support its assertions regarding the potential dumping margins of separate rate respondents. Bestpak, 716 F.3d at 1376–79 (citing Yangzhou Bestpak Gifts & Crafts Co. v. United States, 35 CIT 948, 955 n.4, 783 F.Supp.2d 1343 (2011)) ("Commerce put itself in a precarious situation when it selected only two mandatory respondents.").

With respect to the second purported fact asserted by Commerce, that the margins of 114.72% and 104.06% contained in the Petition were record evidence demonstrating that potential dumping by the separate rate companies existed during the period of investigation far in excess of the 0% rate calculated for Linyi Chengen, this is the only evidentiary assertion in the Second Remand Results. Plaintiffs argue that Bayley's AFA rate of 114.72% was not based on economic reality or the company's actual sales or factors of production and is "simply an estimated rate from the petition that is totally unconnected to Bayley's actual antidumping margin." Dehua TB Cmts. at 8. In addition, Plaintiffs assert that Commerce's "reasoning has nothing to do with the record facts concerning the separate rate companies themselves." Celtic Cmts. at 5. The court finds that the margins of 114.72% and 104.06% contained in the Petition do not provide support for the assertion that the Separate Rate Plaintiffs' dumping margins are different than Linyi Chengen's 0% rate because the margins in the Petition are "untethered" to the actual dumping margins of the Separate Rate Plaintiffs. See Bestpak, 716 F.3d at 1379. Commerce cited no credible economic evidence on the record showing that the Separate Rate Plaintiffs' dumping margins

are different than Linyi Chengen's 0% rate or connecting the Separate Rate Plaintiffs' dumping margins with the rate of 57.36% that was derived from the average of Linyi Chengen's 0% rate and Bayley's AFA rate of 114.72%.

[6] The court concludes that Commerce's explanations, without citations to any credible record documents, do not rise to the level of substantial evidence required to support Commerce's departure from the expected method and apply the "any reasonable method" exception in 19 U.S.C. § 1673d(c)(5)(B). Commerce's mere assertions without substantial evidence do not serve the purpose of calculating dumping margins as accurately as possible. Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990). The court remands the Second Remand Results for Commerce to provide more evidence, or otherwise change its determination in accordance with this opinion.

## CONCLUSION

For the reasons set forth above, the court sustains Commerce's Second Remand Results with respect to Commerce's revised dumping margin for Linyi Chengen, and remands Commerce's determination of the dumping margin for the Separate Rate Plaintiffs.

Accordingly, it is hereby

**ORDERED** that the Second Remand Results are remanded to Commerce to provide more evidence, or otherwise change its determination regarding the dumping margin for the Separate Rate Plaintiffs; and it is further

**ORDERED** that Commerce shall afford the parties at least twelve (12) business days to comment on the draft third remand results; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1) Commerce shall file the third remand results on or before February 5, 2021;

(2) Commerce shall file the administrative record on or before February 19, 2021;

(3) Comments in opposition to the third remand results shall be filed on or before March 19, 2021;

(4) Comments in support of the third remand results shall be filed on or before April 16, 2021; and

(5) The joint appendix shall be filed on or before April 30, 2021.



**CALGON CARBON CORPORATION and Cabot Norit Americas, Inc., Plaintiffs,**

**and**

**Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al., Consolidated Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al., Defendant-Intervenors.**

Slip Op. 20-187
Consol. Court No. 18-00232

United States Court of International Trade.

December 21, 2020

**Background:** Importers filed suit challenging Department of Commerce's final

generally, Cost Memo. The revised rate also adequately accounts for the Elque Group's small company status under 19 U.S.C. § 1677m(c)(2) and does not penalize the Elque Group for failing to provide information it did not possess. See Calcutta I, 495 F. Supp. 3d at 1335 (citing Tung Fong Indus. Co. v. U.S., 28 CIT 459, 476–77, 318 F. Supp. 2d 1321, 1335–36 (2004)). The Remand Results thus comply with Commerce's legal obligations, as ordered by the court in Calcutta I, and are supported by substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, Commerce's Remand Results are sustained. Judgment will enter accordingly in favor of the Defendant.

**SO ORDERED**.



**LINYI CHENGEN IMPORT AND EXPORT CO., LTD., Plaintiff,**

**and**

**Celtic Co., Ltd., et al., Consolidated Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Coalition for Fair Trade of Hardwood Plywood, Defendant-Intervenor.**

**Slip Op. 21-127**
**Consol. Court No. 18-00002**

United States Court of International Trade.

September 24, 2021

**Background:** Foreign exporters filed suits challenging final affirmative determi-

nation by Department of Commerce in antidumping duty investigation of hardwood, decorative plywood, and veneered panels from People's Republic of China. Following consolidation, the Court of International Trade, Jennifer Choe-Groves, J., 391 F.Supp.3d 1283, remanded, subsequently, 433 F.Supp.3d 1278, remanded for second time, and 487 F.Supp.3d 1349, remanded for third time. On remand, Department of Commerce issued third remand redetermination.

**Holdings:** The Court of International Trade, Choe-Groves, J., held that:

(1) departure from expected method for calculating all-others separate rate was supported by substantial evidence, but

(2) method for calculating all-others separate rate was not supported by substantial evidence.

Remanded.

**1. Customs Duties ⬅84(6)**

In addition to substantial evidence, Court of International Trade also reviews antidumping determinations made on remand for compliance with the court's remand order. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties ⬅21.5(3)**

In an antidumping investigation, Department of Commerce may depart from the expected method of determining the all-others rate and use any reasonable method if Commerce reasonably concludes that the expected method is not feasible or results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers. Tariff Act of 1930 § 735, 19 U.S.C.A. § 1673d(c)(5)(B).

**3. Customs Duties ⟜21.5(3)**

In an antidumping investigation, Department of Commerce must determine that the expected method of determining the all-others rate is not feasible or would not be reasonably reflective of the potential dumping margins for non-investigated exporters or producers based on substantial evidence. Tariff Act of 1930 § 735, 19 U.S.C.A. § 1673d(c)(5)(B).

**4. Customs Duties ⟜21.5(3)**

Department of Commerce's decision, in final affirmative determination for antidumping duty investigation of hardwood, decorative plywood, and veneered panels from China, to depart from expected method of calculating all-others separate rate, was supported by substantial evidence including Commerce's determination that mandatory respondent's 0% dumping margin would not be reasonably reflective of separate rate respondents' potential dumping margins in light of comparability of petition price quote to price from petition separate rate application, differences between mandatory respondent's and separate rate respondents' pricing and cost structures, and commercial invoices showing disparities between selling activities of mandatory respondent and separate rate respondents. Tariff Act of 1930 § 735, 19 U.S.C.A. § 1673d(c)(5)(B).

**5. Customs Duties ⟜21.5(3)**

Department of Commerce's decision, in final affirmative determination for antidumping duty investigation of hardwood, decorative plywood, and veneered panels from China, to apply "any reasonable method," within meaning of antidumping statute, to calculate all-others separate rate by applying simple average of cooperating mandatory respondent's 0% rate with uncooperative mandatory respondent's 114.72% rate based on adverse facts available (AFA), was not supported by

substantial evidence; Commerce cited as record evidence only one commercial invoice showing 20% difference between prices of petition separate rate application and cooperating mandatory respondent, so separate rate of 57.36% assigned to voluntary, cooperating separate rate respondents was unreasonable and unsupported. Tariff Act of 1930 §§ 516A, 735, 19 U.S.C.A. §§ 1516a(b)(1)(B)(i), 1673d(c)(5)(B).

See publication Words and Phrases for other judicial constructions and definitions.

**6. Customs Duties ⟜21.5(3)**

Department of Commerce is required to assign dumping margins as accurately as possible.

———

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, D.C., for Plaintiff Linyi Chengen Import and Export Co., Ltd., Consolidated Plaintiffs Far East American, Inc. and Shandong Dongfang Bayley Wood Co., Ltd., and Consolidated Plaintiffs and Plaintiff-Intervenors Celtic Co., Ltd., Jiaxing Gsun Import & Export Co., Ltd., Anhui Hoda Wood Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shandong Qishan International Trading Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu Wood

Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd.

Jeffrey S. Neeley and Stephen W. Brophy, Husch Blackwell LLP, of Washington, D.C., for Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co., Ltd., Highland Industries Inc., Jiashan Dalin Wood Industry Co., Ltd., Happy Wood Industrial Group Co., Ltd., Jiangsu High Hope Arser Co., Ltd., Suqian Yaorun Trade Co., Ltd., Yangzhou Hanov International Co., Ltd., G.D. Enterprise Limited, Deqing China-Africa Foreign Trade Port Co., Ltd., Pizhou Jin Sheng Yuan International Trade Co., Ltd., Xuzhou Shuiwangxing Trading Co., Ltd., Cosco Star International Co., Ltd., Linyi City Dongfang Jinxin Economic & Trade Co., Ltd., Linyi City Shenrui International Trade Co., Ltd., Jiangsu Qianjiuren International Trading Co., Ltd., and Qingdao Top P&Q International Corp.

Jeffrey S. Grimson and Jill A. Cramer, Mowry & Grimson, PLLC, of Washington, D.C., for Consolidated Plaintiffs Taraca Pacific, Inc., Canusa Wood Products, Ltd., Concannon Corporation d/b/a Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPLY LLC.

Sonia M. Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel was Savannah Rose Maxwell, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Timothy C. Brightbill, Jeffrey O. Frank, Stephanie M. Bell, and Elizabeth S. Lee, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Coalition for Fair Trade of Hardwood Plywood.

## OPINION AND ORDER

CHOE-GROVES, Judge:

This action concerns the import of hardwood and decorative plywood and certain veneered panels into the United States from the People's Republic of China ("China"), subject to the final affirmative determination in an antidumping duty investigation by the U.S. Department of Commerce ("Commerce"). See Certain Hardwood Plywood Products from the People's Republic of China, 82 Fed. Reg. 53,460 (Dep't of Commerce Nov. 16, 2017) (final determination of sales at less than fair value), as amended, 83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018) (amended final determination of sales at less than fair value), (collectively, "Final Determination"); see also Issues and Decision Mem. for the Final Determination of the Antidumping Duty Investigation of Certain Hardwood Plywood Products from People's Republic of China, ECF No. 25-7 ("Final IDM").

Before the Court are the Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 143-1, 144-1 ("Third Remand Determination"), which the Court ordered in Linyi Chengen Import & Export Co. v. United States ("Linyi Chengen III"), 44 CIT ——, 487 F. Supp. 3d 1349 (2020). Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co. ("Dehua TB"), Taraca Pacific, Inc. ("Taraca"), and Celtic Co. ("Celtic") each filed comments in opposition to the Third Remand Determination. Plaintiff Linyi Chengen Import &

Export Co. ("Linyi Chengen"), a mandatory respondent, and Consolidated Plaintiff Shandong Dongfang Bayley Wood Co. ("Bayley"), a mandatory respondent, did not file comments in response to the Third Remand Determination.

Dehua TB filed comments collectively on behalf of itself and Highland Industries, Inc., Jiashan Dalin Wood Industry Co., Happy Wood Industrial Group Co., Jiangsu High Hope Arser Co., Suqian Yaorun Trade Co., Yangzhou Hanov International Co., G.D. Enterprise Ltd., Deqing China-Africa Foreign Trade Port Co., Pizhou Jin Sheng Yuan International Trade Co., Xuzhou Shuiwangxing Trading Co., Cosco Star International Co., Linyi City Dongfang Jinxin Economic & Trade Co., Linyi City Shenrui International Trade Co., Jiangsu Qianjiuren International Trading Co., and Qingdao Top P&Q International Corp. Comments Opp'n Third Remand Redetermination Behalf Consol. Pls. [Dehua TB] et al., ECF Nos. 162, 163 ("the Dehua TB Comments" or "Dehua TB Cmts.").

Taraca filed comments collectively on behalf of itself and Canusa Wood Products, Ltd., Concannon Corp. d/b/a Concannon Lumber Co., Fabuwood Cabinetry Corp., Holland Southwest International, Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPLY LLC. Consol. Pls. [Taraca], Canusa Wood Products Ltd., Concannon Corp. [d/b/a] Concannon Lumber Co., Fabuwood Cabinetry Corp., Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, & USPLY LLC Comments Opp'n Third Remand Redetermination, ECF Nos. 164, 165 ("the Taraca Comments" or "Taraca Cmts.").

Celtic filed comments collectively on behalf of itself and Anhui Hoda Wood Co.,

Far East American, Inc., Jiaxing Gsun Import & Export Co., Jiaxing Hengtong Wood Co., Linyi Evergreen Wood Co., Linyi Glary Plywood Co., Linyi Jiahe Wood Industry Co., Linyi Linhai Wood Co., Linyi Hengsheng Wood Industry Co., Linyi Huasheng Yongbin Wood Co., Linyi Mingzhu Wood Co., Linyi Sanfortune Wood Co., Qingdao Good Faith Import & Export Co., Shanghai Futuwood Trading Co., Shandong Qishan International Trading Co., Suining Pengxiang Wood Co., Suqian Hopeway International Trade Co., Suzhou Oriental Dragon Import & Export Co., Xuzhou Andefu Wood Co., Xuzhou Jiangyang Wood Industries Co., Xuzhou Longyuan Wood Industry Co., Xuzhou Pinlin International Trade Co., Xuzhou Shengping Import & Export Co., and Xuzhou Timber International Trade Co. Consol. Separate Rate Pls.' Comments Opp'n Third Remand Redetermination, ECF Nos. 166, 167 ("the Celtic Comments" or "Celtic Cmts.").

The Court refers collectively to the non-examined parties that filed the Dehua TB Comments, the Taraca Comments, and the Celtic Comments as the "Separate Rate Plaintiffs."

Defendant-Intervenor Coalition for Fair Trade of Hardwood Plywood ("Defendant-Intervenor") filed comments in support of the Third Remand Determination. [Def.-Intervenor]'s Comments in Supp. of Commerce's Remand Redetermination, ECF Nos. 195, 198 ("Def.-Interv.'s Cmts."). Defendant United States ("Defendant") responded to all filed comments. Def.'s Resp. Comments Remand Redetermination, ECF Nos. 196, 197 ("Def.'s Resp.").

The Court reviews whether Commerce's separate rate for the non-examined companies that were granted separate rate status, including Separate Rate Plaintiffs, ("all-others separate rate") is supported by substantial evidence. For the reasons dis-

LINYI CHENGEN IMPORT AND EXPORT v. UNITED STATES **1273**
Cite as 539 F.Supp.3d 1269 (CIT 2021)

cussed below, the Court holds that the all-others separate rate is not supported by substantial evidence and remands Commerce's Third Remand Determination.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the Third Remand Determination. See Linyi Chengen Imp. & Exp. Co. v. United States, 43 CIT ——, ——, 391 F. Supp. 3d 1283, 1287–92 (2019); Linyi Chengen Imp. & Exp. Co. v. United States, 44 CIT ——, ——, 433 F. Supp. 3d 1278, 1280–84 (2020); Linyi Chengen III, 44 CIT at ——, 487 F. Supp. 3d at 1353–59.

Commerce initiated an antidumping investigation after reviewing an antidumping duty petition ("Petition") submitted by Defendant-Intervenor. See Certain Hardwood Plywood Products from the People's Republic of China, 81 Fed. Reg. 91,125 (Dep't of Commerce Dec. 16, 2016) (initiation of less-than-fair-value investigation). The Petition contained price quotes, i.e., "two offers for sale for hardwood plywood produced in [China] from a Chinese exporter," as the basis for its estimated dumping margins ranging from 104.06% to 114.72%. See id. at 91,128–29.

Commerce accepted applications from exporters and producers seeking to obtain separate rate status in the investigation ("separate rate applications") to avoid the country-wide dumping margin because the investigation involved products from China, a non-market economy. See id. at 91,129. A company must provide the commercial invoice for the first sale to an unaffiliated party in the United States during the period of investigation with its separate rate application. Third Remand Determination at 21. Commerce assigned the all-others separate rate to the companies that were not individually examined but demonstrated their eligibility for separate rate status ("separate rate respondents"). Final Determination, 82 Fed. Reg. at 53,462. Commerce selected Bayley and Linyi Chengen as the only mandatory respondents in the investigation. See Decision Mem. Prelim. Determination Antidumping Duty Investigation of Certain Hardwood Plywood Products from the People's Republic of China (June 16, 2017) ("Prelim. DM") at 4, PR 734.[1]

In Linyi Chengen III, the Court sustained Commerce's determination, under protest, that Linyi Chengen's dumping margin was 0%. See Linyi Chengen III, 44 CIT at ——, 487 F. Supp. 3d at 1356; Final Results of Redetermination Pursuant to Court Remand at 3, ECF Nos. 113-1, 114-1. Commerce explained that assigning Linyi Chengen's 0% rate as the all-others separate rate would not be reasonably reflective of the potential or actual dumping margins of the separate rate respondents—referring to the theoretical dumping margin of each of the separate rate respondents if they had been individually investigated. See Linyi Chengen III, 44 CIT at ——, 487 F. Supp. 3d at 1357. Commerce determined the all-others separate rate of 57.36% on second remand by applying a simple average of Bayley's 114.72% Adverse Facts Available ("AFA") China-wide entity rate and Linyi Chengen's 0% rate. Id. at ——, 487 F. Supp. 3d at 1354, 1357. The Court concluded that Commerce did not support with substantial evidence its departure from the expected method and its determination of the all-others separate rate of 57.36%, and remanded for Commerce to reconsider or provide additional evidence. Id. at ——, 487 F. Supp. 3d at 1358–59.

---

1. Citations to the administrative record reflect the public record ("PR") document numbers.

In calculating the all-others separate rate on third remand, Commerce again departed from the expected method. Third Remand Determination at 24. Commerce applied "any reasonable method" and again calculated the all-others separate rate of 57.36% by using the simple average of Linyi Chengen's 0% with Bayley's AFA rate of 114.72%. Id. at 24–25.

## JURISDICTION AND STANDARD OF REVIEW

[1] The U.S. Court of International Trade has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c). The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i). The Court also reviews determinations made on remand for compliance with the Court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT ——, ——, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.  Legal Framework

Commerce is authorized by statute to calculate and impose a dumping margin on imported subject merchandise after determining it is sold in the United States at less than fair value. 19 U.S.C. § 1673. The statute authorizes Commerce to determine an estimated weighted average dumping margin for each individually examined exporter and producer and one all-others rate for non-examined companies. Id. § 1673d(c)(1)(B). The U.S. Court of Appeals for the Federal Circuit has upheld Commerce's reliance on the method for determining the estimated all-others rate in § 1673d(c)(5) "in determining the separate rate for exporters and producers from nonmarket economies that demonstrate

their independence from the government but that are not individually investigated." Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006, 1011 (Fed. Cir. 2017) (citation omitted).

The general rule under the statute for calculating the all-others rate is to weight-average the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely on the basis of facts available, including adverse facts available. 19 U.S.C. § 1673d(c)(5)(A). If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis, or are determined entirely under 19 U.S.C. § 1677e, Commerce may invoke an exception to the general rule. Id. § 1673d(c)(5)(B). The Statement of Administrative Action provides guidance that when the dumping margins for all individually examined respondents are determined entirely on the basis of the facts available or are zero or de minimis, the "expected method" of determining the all-others rate is to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available. Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201.

[2, 3]  Commerce may depart from the "expected method" and use "any reasonable method" if Commerce reasonably concludes that the expected method is not feasible or results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers. See 19 U.S.C. § 1673d(c)(5)(B); Navneet Publ'ns (India)

Ltd. v. United States, 38 CIT ——, ——, 999 F. Supp. 2d 1354, 1358 (2014) ("[T]he following hierarchy [is applied] when calculating all-others rates—(1) the '[g]eneral rule' set forth in § 1673d(c)(5)(A), (2) the alternative 'expected method' under § 1673d(c)(5)(B), and (3) any other reasonable method when the 'expected method' is not feasible or does not reasonably reflect potential dumping margins."); see also SAA at 873, reprinted in 1994 U.S.C.C.A.N. at 4201; Albemarle Corp. & Subsidiaries v. U.S., 821 F.3d 1345, 1351–52 (Fed. Cir. 2016) (quoting SAA at 873, reprinted in 1994 U.S.C.C.A.N. at 4201). Commerce must determine that the expected method is not feasible or would not be reasonably reflective of the potential dumping margins for non-investigated exporters or producers based on substantial evidence. Albemarle Corp., 821 F.3d at 1352–53; see also Changzhou Hawd Flooring, 848 F.3d at 1012.

## II. The All-Others Separate Rate is Unsupported by Substantial Evidence

### A. Commerce's Departure from the Expected Method

[4] Commerce is required to support with substantial evidence its departure from the expected method based on its determination that Linyi Chengen's 0% dumping margin would not be reasonably reflective of the separate rate respondents' potential dumping margins. See Albemarle Corp., 821 F.3d at 1352–53; see also Changzhou Hawd Flooring, 848 F.3d at 1012.

On third remand, Commerce determined that departure from the expected method of calculating the all-others separate rate was warranted because Linyi Chengen's 0% rate would not be reflective of the potential dumping margins of the Separate Rate Plaintiffs. Third Remand Determina-

tion at 13. First, Commerce compared the two price quotes from a Chinese exporter in the Petition to the commercial invoice in that same Chinese exporter's separate rate application ("Petition Separate Rate Application") and determined that the price on the commercial invoice was "almost identical" to one of the price quotes in the Petition. Id. at 18. Commerce inferred that the dumping margin range in the Petition was "supported by actual prices at which plywood was sold by a cooperating separate rate respondent in [the] investigation during the [period of investigation]" and was representative of the dumping selling behavior of the separate rate respondents during the period of review. Id. at 17–18. Commerce noted that Linyi Chengen sold the same product for almost 20% higher than the price quoted in the Petition. Id. at 18–19.

Commerce also explained that Linyi Chengen exported merchandise produced by its affiliated producer and none of the Separate Rate Plaintiffs shared Linyi Chengen's selling and cost structure. Id. at 19. Of the forty Separate Rate Plaintiffs, fifteen companies export merchandise that is self-produced and twenty-five companies resell merchandise that is purchased from unaffiliated producers. Id. at 19–20. Commerce explained that the twenty-five resellers had different cost structures and exporter-to-producer combinations than Linyi Chengen and there were "too many possible, unknown variables . . . to definitively state the extent of the operational differences" between those twenty-five companies and Linyi Chengen. Id.

In addition, Commerce analyzed commercial invoices from each of the separate rate applications submitted by the Separate Rate Plaintiffs. Id. at 21. Based on the data provided in the separate rate applications, Commerce noted that half of the Separate Rate Plaintiffs "sold plywood at

prices lower than [Linyi] Chengen's average price, [eighteen] of which also identified the [same] species of plywood as [Linyi Chengen]." Id. at 23–24. Commerce concluded that "these fact patterns indicate[d] that the likelihood of these sales being made at dumped prices is significantly greater than at the price at which [Linyi] Chengen sold its product . . . during the [period of investigation]." Id. at 24. Commerce determined that based on the record, "the selling activities, in both prices and products, of the Separate Rate Plaintiffs [were] dissimilar to [Linyi] Chengen's" and indicated that Linyi Chengen's 0% dumping margin was not "necessarily representative of the estimated weighted-average dumping margin that would apply to the Separate Rate Plaintiffs." Id.

Commerce supported its determination that Linyi Chengen's dumping margin would not be reasonably reflective of the Separate Rate Plaintiffs' potential dumping margins by analyzing economic evidence on the record showing differences between Linyi Chengen's and the Separate Rate Plaintiffs' selling and cost structure and pricing during the period of investigation. While the Court notes that Commerce acknowledged the sparse record, the Court concludes that Commerce has reasonably supported its determination to depart from the expected method because the Separate Rate Plaintiffs' potential dumping margins would not be represented by Linyi Chengen's 0% dumping margin in light of evidence reviewed by Commerce, including the comparability of a Petition price quote to a price from the Petition Separate Rate Application, differences between Linyi Chengen's and the Separate Rate Plaintiffs' pricing and cost structures, and commercial invoices showing disparities between the Separate Rate Plaintiffs' and Linyi Chengen's selling activities. Thus, the Court sustains Commerce's departure from the expected method.

**B. Commerce's Application of "Any Reasonable Method"**

[5] After determining that departure from the expected method was appropriate, Commerce used "any reasonable method" under 19 U.S.C. § 1673d(c)(5)(B) to calculate the all-others separate rate of 57.36% by applying the simple average of Linyi Chengen's 0% rate with Bayley's 114.72% AFA rate. Id. at 25.

The Separate Rate Plaintiffs challenge Commerce's determination on numerous grounds, including Commerce's use of the estimated dumping margin from the Petition as highly speculative and not based on any company's actual data. Dehua TB Cmts. at 4–5; Taraca Cmts. at 15–19 (incorporating by reference the Celtic Comments and the Dehua TB Comments); Celtic Cmts. at 3–4. The Separate Rate Plaintiffs assert that the price on a single commercial invoice included in the Petition Separate Rate Application has "no rational bearing" on the representativeness of the Petition margin. Celtic Cmts. at 3–4; see also Dehua TB Cmts. at 4–5; Taraca Cmts. at 15–19. The Separate Rate Plaintiffs also dispute Commerce's comparison of Linyi Chengen's pricing data to the Petition Separate Rate Application's single commercial invoice price and the other Separate Rate Plaintiffs' single commercial invoice prices. Celtic Cmts. at 4; see also Dehua TB Cmts. at 4–6; Taraca Cmts. at 18–19. The Separate Rate Plaintiffs argue that the evidence of a single commercial invoice price does not support the application of a dumping margin of 57.36% to the Separate Rate Plaintiffs. Celtic Cmts. at 4; Dehua TB Cmts. at 4–6; Taraca Cmts. at 15. The Separate Rate Plaintiffs assert that the presence of a single sale with a lower price than Linyi Chengen's lowest sales price does not indicate that the company would

be dumping overall, much less at a rate of 57.36%. Celtic Cmts. at 5; Dehua TB Cmts. at 4–6; Taraca Cmts. at 18–19. Defendant-Intervenor avers that Commerce's calculation was reasonable and supported by substantial evidence. See Def.-Interv.'s Cmts. at 8. Defendant defends Commerce's determination as supported by substantial evidence and urges the Court to sustain Commerce's "any reasonable method" used in the Third Remand Determination. See Def.'s Resp. at 9–23.

One substantiated and calculated basis, Linyi Chengen's dumping margin, was available on the record for Commerce's consideration for its all-others separate rate remand determination because Commerce selected only two mandatory respondents, which resulted in the 0% rate for Linyi Chengen and an AFA China-wide entity rate of 114.72%. Third Remand Determination at 13. As discussed above, Commerce explained and the Court sustains Commerce's determination that Linyi Chengen's 0% rate would not be representative of the separate rate respondents' actual dumping margins.

Commerce noted the lack of information on the record from which to calculate the actual dumping margins for the Separate Rate Plaintiffs. Id. at 17. Commerce determined that the estimated dumping margins in the Petition were representative of the selling behavior of the separate rate respondents. Id. Commerce cited one commercial invoice from the Petition Separate Rate Application as record evidence showing a single sale of products similar to products sold by Linyi Chengen, noting that the price of the single sale was "almost identical" to one of the price quotes used to calculate the estimated dumping margins in the Petition. Id. at 18. While recognizing the lack of "necessary information to determine the transaction-specific dumping margin of this particular sale,"

Commerce found "it reasonable to infer . . . that this sale would have had a transaction-specific dumping margin in the range of the Petition rates." Id. at 17–18. Commerce explained that Linyi Chengen sold the same products at prices almost 20% higher than the price shown on the invoice from the Petition Separate Rate Application, and inferred that "the likelihood of the products sold by the Petition [Separate Rate Application] Exporter being made at dumped prices is significantly greater than at the price sold by [Linyi] Chengen during the [period of investigation]." Id. at 18–19. Commerce concluded, based on its review of the commercial invoice, that the approximately 20% difference between the prices of the Petition Separate Rate Application and Linyi Chengen supported Commerce's application of a 57.36% rate to the Separate Rate Plaintiffs. Id. at 18–19, 25.

[6] Commerce must support with substantial evidence its application of a 57.36% all-others separate rate. See 19 U.S.C. § 1516a(b)(1)(B)(i). The Court notes Commerce's acknowledgment that the record provides no opportunity for Commerce to know or to calculate the actual dumping margins of the Separate Rate Plaintiffs. See Third Remand Determination at 16. Nonetheless, Commerce is still required to assign dumping margins as accurately as possible. Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Commerce created its own problems when it selected only two mandatory respondents, which resulted in sparse information on the record to support its assertions regarding the potential dumping margins of the separate rate respondents. See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1376–79 (Fed. Cir. 2013) (citing Yangzhou Bestpak Gifts & Crafts Co. v. United States, 35 C.I.T. 948, 955 n.4, 783 F.Supp.2d 1343

(2011) ("Commerce put itself in a precarious situation when it selected only two mandatory respondents."). Because Commerce cited as record evidence only one commercial invoice showing an approximately 20% price difference, the Court concludes that Commerce's 57.36% separate rate assigned to the voluntary, cooperating Separate Rate Plaintiffs is not reasonable and is unsupported by substantial evidence.

### CONCLUSION

For the foregoing reasons, the Court remands Commerce's <u>Third Remand Determination</u>.

Accordingly, it is hereby

**ORDERED** that the <u>Third Remand Determination</u> is remanded for Commerce to reconsider the all-others separate rate consistent with this opinion; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1) Commerce shall file the fourth remand determination on or before October 27, 2021;

(2) Commerce shall file the administrative record on or before November 10, 2021;

(3) Comments in opposition to the fourth remand determination shall be filed on or before December 15, 2021;

(4) Comments in support of the fourth remand determination shall be filed on or before January 19, 2022; and

(5) The joint appendix shall be filed on or before February 2, 2022.



**QINGDAO SENTURY TIRE CO., LTD., Sentury Tire USA Inc., Sentury (Hong Kong) Trading Co., Limited, Plaintiffs,**

**and**

**Pirelli Tyre Co., Ltd., Pirelli Tyre S.p.A., and Pirelli Tire LLC, Consolidated Plaintiffs,**

**v.**

**UNITED STATES, Defendant.**

**Slip Op. 21-128**
**Consol. Court No. 18-00079**

United States Court of International Trade.

September 24, 2021

**Background:** Exporters filed suit challenging final results of Department of Commerce's administrative review of antidumping duty order covering passenger vehicle and light truck tires (PVLT) from People's Republic of China. The Court of International Trade, Jennifer Choe-Groves, J., 415 F.Supp.3d 1303, sustained in part and remanded in part, and, 487 F.Supp.3d 1335, sustained in part and remanded for second time. On second remand, Department of Commerce issued final results of redetermination.

**Holdings:** The Court of International Trade, Choe-Groves, J., held that:

(1) denial of separate rate status to exporter prior to its acquisition was unreasonable, but

(2) removal of downward adjustment to export price comported with antidumping statute.

Sustained in part and remanded in part.

the date of this Opinion and Order; it is further

**ORDERED** that, within 14 days of the date of filing of Customs' remand results, Customs must file an index and copies of any new administrative record documents; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Customs files its remand results with the court.



**LINYI CHENGEN IMPORT AND EXPORT CO., LTD., Plaintiff,**

**and**

**Celtic Co., Ltd., et al., Consolidated Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Coalition for Fair Trade of Hardwood Plywood, Defendant-Intervenor.**

Slip Op. 22-150

Consol. Court No. 18-00002

United States Court of International Trade.

December 21, 2022

**Background:** Foreign exporters filed suits challenging final affirmative determination by Department of Commerce in antidumping duty investigation of hardwood, decorative plywood, and veneered panels from People's Republic of China. Following consolidation, the Court of International Trade, Jennifer Choe-Groves, J., 391 F.Supp.3d 1283, remanded and, subsequently, 433 F.Supp.3d 1278, remanded for second time, 487 F.Supp.3d 1349, remanded for third time, and 539 F.Supp.3d 1269, remanded for fourth time. On remand, Department of Commerce issued fourth remand redetermination.

**Holdings:** The Court of International Trade, Choe-Groves, J., held that assignment of all-others separate rate was unfair and unduly punitive.

Remanded.

**1. Customs Duties** ⟜84(6)

In addition to substantial evidence, Court of International Trade reviews antidumping determinations made on remand for compliance with the court's remand order. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties** ⟜21.5(1)

While Department of Commerce is permitted to use various methodologies, it is possible for the application of a particular methodology to be unreasonable in a given antidumping case.

**3. Customs Duties** ⟜21.5(1)

Antidumping law is intended to calculate antidumping duties on a fair and equitable basis.

**4. Customs Duties** ⟜21.5(1)

The purpose of the antidumping statute is to incentivize respondents to cooperate, and not to impose punitive, aberrational, or uncorroborated dumping margins. Tariff Act of 1930 § 776, 19 U.S.C.A. § 1677e.

**5. Customs Duties** ⟜21.5(5)

Department of Commerce is not permitted to consider only information that

supports its antidumping determination while ignoring other relevant information to the contrary.

**6. Customs Duties ⬡21.5(5)**

Department of Commerce's fourth remand redetermination, in antidumping duty investigation of hardwood, decorative plywood, and veneered panels from China, assigning to fully cooperating separate rate respondents all-others separate rate margin almost 60 times higher than only investigated respondent, and half of adverse facts available (AFA) rate for uncooperative respondents, was unreasonable as unfair and unduly punitive; Commerce created its own problem of scarcity of information, by selecting only two mandatory respondents and then failing to replace one respondent that refused to cooperate, so Commerce was not permitted to use scarcity of data to justify its determination or to claim constraint on resources prevented further examination, while ignoring potentially contrary evidence. Tariff Act of 1930 § 735, 19 U.S.C.A. § 1673d(c)(5)(B).

**7. Customs Duties ⬡84(7)**

A speculative dumping margin using the average of a de minimis rate and an adverse facts available (AFA) rate cannot be upheld based on weak record evidence, particularly when Department of Commerce itself created the scarcity of evidence.

**8. Customs Duties ⬡21.5(5)**

Department of Commerce is not permitted to create a scarcity of information, to use that scarcity as justification for its antidumping determination, and to claim that a constraint on resources prevents further examination, while ignoring potentially contrary evidence on the record.

———————

Gregory S. Menegaz, Alexandra H. Salzman, James K. Horgan, and John J. Kenkel, deKieffer & Horgan, PLLC, of Washington, D.C., for Plaintiff Linyi Chengen Import and Export Co., Ltd., Consolidated Plaintiffs Far East American, Inc. and Shandong Dongfang Bayley Wood Co., Ltd., and Consolidated Plaintiffs and Plaintiff-Intervenors Celtic Co., Ltd., Jiaxing Gsun Import & Export Co., Ltd., Anhui Hoda Wood Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shandong Qishan International Trading Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu Wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd.

Jeffrey S. Neeley, Nithya Nagarajan, and Stephen W. Brophy, Husch Blackwell LLP, of Washington, D.C., for Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co., Ltd., Highland Industries Inc., Jiashan Dalin Wood Industry Co., Ltd., Happy Wood Industrial Group Co., Ltd., Jiangsu High Hope Arser Co., Ltd., Suqian Yaorun Trade Co., Ltd., Yangzhou Hanov International Co., Ltd., G.D. Enterprise Limited, Deqing China-Africa Foreign Trade Port Co., Ltd., Pizhou Jin Sheng Yuan International Trade Co., Ltd., Xuzhou Shuiwangxing Trading Co., Ltd., Cosco Star International Co., Ltd., Linyi

City Dongfang Jinxin Economic & Trade Co., Ltd., Linyi City Shenrui International Trade Co., Ltd., Jiangsu Qianjiuren International Trading Co., Ltd., and Qingdao Top P&Q International Corp.

Jeffrey S. Grimson, Bryan P. Cenko, Jill A. Cramer, Kristin H. Mowry, and Sarah M. Wyss, Mowry & Grimson, PLLC, of Washington, D.C., for Consolidated Plaintiffs Taraca Pacific, Inc., Canusa Wood Products, Ltd., Concannon Corporation d/b/a Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., and Richmond International Forest Products, LLC, and USPLY LLC.

Sonia M. Orfield, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel were Nikki Kalbing, Attorney, and Savannah R. Maxwell, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Timothy C. Brightbill, Adam M. Teslik, Derick G. Holt, Elizabeth S. Lee, Jeffrey O. Frank, Laura El-Sabaawi, Maureen E. Thorson, Stephanie M. Bell, and Tessa V. Capeloto, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Coalition for Fair Trade of Hardwood Plywood.

## OPINION AND ORDER

CHOE-GROVES, Judge:

This action concerns the import of hardwood and decorative plywood and certain veneered panels into the United States from the People's Republic of China ("China"), subject to the final affirmative determination in an antidumping duty investigation by the U.S. Department of Commerce ("Commerce"). See Certain Hardwood Plywood Products from the People's Republic of China, 82 Fed. Reg. 53,460 (Dep't of Commerce Nov. 16, 2017) (final determination of sales at less than fair value), as amended, 83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018) (amended final determination of sales at less than fair value) (collectively "Final Determination"); see also Issues and Decision Mem. for the Final Determination of the Antidumping Duty Investigation of Certain Hardwood Plywood Products from People's Republic of China ("Final IDM"), ECF No. 25-7.

Before the Court are the Final Results of Redetermination Pursuant to Court Remand ("Fourth Remand Determination"), ECF Nos. 205-1, 206-1, which the Court ordered in Linyi Chengen Import & Export Co. v. United States ("Linyi Chengen IV"), 45 CIT ——, 539 F. Supp. 3d 1269 (2021). Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co. ("Dehua TB"), Taraca Pacific, Inc. ("Taraca"), and Celtic Co. ("Celtic") filed comments in opposition to the Fourth Remand Determination. Plaintiff Linyi Chengen Import & Export Co. ("Linyi Chengen"), and Consolidated Plaintiff Shandong Dongfang Bayley Wood Co. ("Bayley"), both mandatory respondents, did not file comments in response to the Fourth Remand Determination.

Dehua TB filed comments collectively on behalf of itself and Highland Industries, Inc., Jiashan Dalin Wood Industry Co., Happy Wood Industrial Group Co., Jiangsu High Hope Arser Co., Suqian Yaorun Trade Co., Yangzhou Hanov International Co., G.D. Enterprise Ltd., Deqing China-Africa Foreign Trade Port Co., Pizhou Jin Sheng Yuan International Trade Co., Xuzhou Shuiwangxing Trading Co., Cosco Star International Co., Linyi City Dong-

fang Jinxin Economic & Trade Co., Linyi City Shenrui International Trade Co., Jiangsu Qianjiuren International Trading Co., and Qingdao Top P&Q International Corp. Comments Opp'n Third Remand Redetermination Behalf Consol. Pls. [Dehua TB] et al. ("the Dehua TB Comments" or "Dehua TB Cmts."), ECF No. 208.

Taraca filed comments collectively on behalf of itself and Canusa Wood Products, Ltd., Concannon Corp. d/b/a Concannon Lumber Co., Fabuwood Cabinetry Corp., Holland Southwest International, Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPLY LLC. Consol. Pls. [Taraca], Canusa Wood Products Ltd., Concannon Corp. [d/b/a] Concannon Lumber Co., Fabuwood Cabinetry Corp., Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, & USPLY LLC Comments Opp'n Third Remand Redetermination ("the Taraca Comments" or "Taraca Cmts."), ECF No. 209.

Celtic filed comments collectively on behalf of itself and Anhui Hoda Wood Co., Far East American, Inc., Jiaxing Gsun Import & Export Co., Jiaxing Hengtong Wood Co., Linyi Evergreen Wood Co., Linyi Glary Plywood Co., Linyi Jiahe Wood Industry Co., Linyi Linhai Wood Co., Linyi Hengsheng Wood Industry Co., Linyi Huasheng Yongbin Wood Co., Linyi Mingzhu Wood Co., Linyi Sanfortune Wood Co., Qingdao Good Faith Import & Export Co., Shanghai Futuwood Trading Co., Shandong Qishan International Trading Co., Suining Pengxiang Wood Co., Suqian Hopeway International Trade Co., Suzhou Oriental Dragon Import & Export Co., Xuzhou Andefu Wood Co., Xuzhou Jiangyang Wood Industries Co., Xuzhou Longyuan Wood Industry Co., Xuzhou Pinlin International Trade Co., Xuzhou Shengping Import & Export Co., and Xuzhou Timber International Trade Co. Consol. Separate Rate Pls.' Comments Opp'n Fourth Remand Redetermination ("the Celtic Comments" or "Celtic Cmts."), ECF Nos. 210, 211.

The Court refers collectively to the non-examined parties that filed the Dehua TB Comments, the Taraca Comments, and the Celtic Comments as the "Separate Rate Plaintiffs."

Defendant United States ("Defendant") responded to the Dehua TB Comments, the Taraca Comments, and the Celtic Comments. Def.'s Resp. Comments Remand Redetermination ("Def.'s Resp."), ECF Nos. 214, 215. Defendant-Intervenor Coalition for Fair Trade of Hardwood Plywood ("Defendant-Intervenor") filed comments in support of the Fourth Remand Determination. [Def.-Intervenor]'s Comments Supp. Commerce's Remand Redetermination ("Def.-Interv.'s Cmts."), ECF Nos. 213, 216.

The Court reviews whether Commerce's separate rate for the non-examined companies that were granted separate rate status ("all-others separate rate") is supported by substantial evidence. For the reasons discussed below, the Court holds that the all-others separate rate is not supported by substantial evidence and remands Commerce's Fourth Remand Determination.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the Fourth Remand Determination. See Linyi Chengen Imp. & Exp. Co. v. United States, 43 CIT ——, ——, 391 F. Supp. 3d 1283, 1287–92 (2019); Linyi Chengen Imp. & Exp. Co. v. United States, 44 CIT ——, ——, 433 F. Supp. 3d

1278, 1280–84 (2020); Linyi Chengen Imp. & Exp. Co. v. United States ("Linyi Chengen III"), 44 CIT ——, ——, 487 F. Supp. 3d 1349, 1351–54 (2020); Linyi Chengen IV, 45 CIT at ——, 539 F. Supp. 3d at 1271–1274.

Commerce initiated an antidumping investigation after reviewing an antidumping duty petition ("Petition") submitted by Defendant-Intervenor. See Certain Hardwood Plywood Products from the People's Republic of China, 81 Fed. Reg. 91,125 (Dep't of Commerce Dec. 16, 2016) (initiation of less-than-fair-value investigation). The Petition contained price quotes, i.e., "two offers for sale for hardwood plywood produced in [China] from a Chinese exporter," as the basis for its estimated dumping margins ranging from 104.06% to 114.72%. See id. at 91,128–29.

Commerce accepted applications from exporters and producers seeking to obtain separate rate status in the investigation ("separate rate applications") to avoid the country-wide dumping margin because the investigation involved products from China, a non-market economy. See id. at 91,129. Commerce assigned the all-others separate rate to the companies that were not individually examined but demonstrated their eligibility for separate rate status ("separate rate respondents"). Final Determination, 82 Fed. Reg. at 53,462. Commerce selected Bayley and Linyi Chengen as the only mandatory respondents in the investigation. See Decision Mem. Prelim. Determination Antidumping Duty Investigation of Certain Hardwood Plywood Products from the People's Republic of China (June 16, 2017) ("Prelim. DM") at 4, PR 734.[1]

In Linyi Chengen III, 44 CIT ——, ——, 487 F. Supp. 3d 1349, 1356 (2020), the Court sustained as reasonable and supported by substantial evidence Commerce's determination that Linyi Chengen's dumping margin was 0%. Id. at 1356. The Court also concluded that Commerce did not support with substantial evidence its departure from the expected method and its determination of the all-others separate rate of 57.36% by using the simple average of Linyi Chengen's 0% rate and Bayley's adverse facts available ("AFA") rate of 114.72% and remanded the case for Commerce to reconsider or provide additional evidence. Id. at 1355–59.

In Linyi Chengen IV, 45 CIT ——, ——, 539 F. Supp. 3d 1269, 1276 (2021), the Court concluded that Commerce reasonably supported its determination to depart from the expected method in determining the all-others separate rate because Linyi Chengen's 0% rate would not be reflective of the potential dumping margins. Id. at 1276. Commerce based its determination on the evidence reviewed, including the comparability of a Petition price quote to a price from the Petition Separate Rate Application, differences between Linyi Chengen's and the Separate Rate Plaintiffs' pricing and cost structures, and commercial invoices showing disparities between the Separate Rate Plaintiffs' and Linyi Chengen's selling activities. Id. Commerce again applied "any reasonable method" and calculated the all-others separate rate of 57.36% by using the simple average of Linyi Chengen's 0% rate and Bayley's AFA rate of 114.72%. Id. This Court again concluded that Commerce's application of the 57.36% all-others separate rate to the Separate Rate Plaintiffs was not reasonable and was unsupported by substantial evidence. Id. at 1278. This Court noted that when applying "any reasonable method," Commerce is still required to assign dumping margins as accurately as possible that are supported by substantial evidence,

---

1. Citations to the administrative record reflect the public record ("PR") document numbers.

and that Commerce cited as record evidence only one commercial invoice showing an approximately 20% price difference between the prices of the Petition Separate Rate Application and Linyi Chengen. Id. at 1277–78. Because Commerce's determination was not reasonable and was unsupported by substantial evidence, the Court remanded Commerce's determination. Id.

In the Fourth Remand Determination, Commerce assigned the same 57.36% all-others separate rate to the Separate Rate Plaintiffs, again taking the arithmetic average of the highest possible AFA rate and Linyi Chengen's 0% rate. Fourth Remand Determination at 9. The Court again finds Commerce's determination to be unsupported by substantial evidence.

## JURISDICTION AND STANDARD OF REVIEW

[1] The U.S. Court of International Trade has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c). The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i). The Court reviews determinations made on remand for compliance with the Court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT ——, ——, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I. Legal Framework

Commerce is authorized by statute to calculate and impose a dumping margin on imported subject merchandise after determining that it is sold in the United States at less than fair value. 19 U.S.C. § 1673. Commerce determines an estimated weighted average dumping margin for each individually examined exporter and producer and one all-others separate rate for non-examined companies. 19 U.S.C. § 1673d(c)(1)(B). The Court of Appeals for the Federal Circuit has upheld Commerce's reliance on this method for determining the estimated all-others separate rate in § 1673d(c)(5) when "determining the separate rate for exporters and producers from nonmarket economies that demonstrate their independence from the government but that are not individually investigated." Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006, 1011 (Fed. Cir. 2017) (citing Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1348 (Fed. Cir. 2016)).

The general rule for calculating the all-others separate rate is to weight-average the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely on the basis of facts available, including adverse facts available. 19 U.S.C. § 1673d(c)(5)(A). If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis, or are determined entirely under 19 U.S.C. § 1677e (i.e., determinations on basis of facts available), Commerce may invoke an exception to the general rule. Id. § 1673d(c)(5)(B). The Statement of Administrative Action provides further guidance, instructing that when the dumping margins for all individually examined respondents are determined entirely on the basis of the facts available or are zero or de minimis, the "expected method" of determining the all-others separate rate is to weight-average the margins determined pursuant to the facts available and the zero and de minimis margins, provided that volume data is available. Uruguay Round Agreements Act, Statement of Administrative Action

**1398**    **609 FEDERAL SUPPLEMENT, 3d SERIES**

("SAA"), H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201.

Commerce may depart from the "expected method" and use "any reasonable method" if it reasonably concludes that the expected method is not feasible or results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers. See 19 U.S.C. § 1673d(c)(5)(B); Navneet Publications (India) Ltd. v. United States, 38 CIT ——, ——, 999 F. Supp. 2d 1354, 1358 (2014) ("[T]he following hierarchy [is applied] when calculating all-others rates—(1) the '[g]eneral rule' set forth in § 1673d(c)(5)(A), (2) the alternative 'expected method' under § 1673d(c)(5)(B), and (3) any other reasonable method when the 'expected method' is not feasible or does not reasonably reflect potential dumping margins"); see also SAA at 873, reprinted in 1994 U.S.C.C.A.N. at 4201; Albemarle Corp., 821 F.3d at 1351–52 (quoting SAA at 873, reprinted in 1994 U.S.C.C.A.N. at 4201). Any reasonable method may include averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated. 19 U.S.C. § 1673d(c)(5)(B).

[2] While Commerce is permitted to use various methodologies, "it is possible for the application of a particular methodology to be unreasonable in a given case." Yangzhou Bestpak Gifts & Crafts Co. v. United States ("Yangzhou Bestpak"), 716 F.3d 1370, 1378 (Fed. Cir. 2013) (quoting Thai Pineapple Canning Indus. Corp. v. United States, 273 F. 3d 1077, 1085 (Fed. Cir. 2001)). In this case, the Court analyzes whether Commerce's methodology is reasonable as applied and supported by substantial evidence.

**II.  The Parties' Contentions**

The Separate Rate Plaintiffs challenge Commerce's Fourth Remand Determination on numerous grounds. The Celtic Comments challenge Commerce's Fourth Remand Determination by arguing that Commerce failed to calculate a margin that is reasonably reflective of the Separate Rate Plaintiffs' potential dumping margin. Celtic Cmts. at 2. The Celtic Comments assert that Commerce's examination of additional invoices in a supplemental questionnaire on fourth remand was flawed because the new documents reflect purchases of plywood in China from the Separate Rate Petitioner's own suppliers, rather than from additional sales of subject merchandise to the United States. Id. at 3. The Celtic Comments state that the price at which the Petition Separate Rate Application exporter bought plywood in China was not relevant to Commerce's inquiry of the U.S. sales price, and the sales price was actually higher than the price at which the products were bought. Id. The Celtic Comments note that the invoice was not the only evidence of a sale of the specific plywood in the supplement questionnaire, which contained another invoice showing higher sales prices. Id. The Celtic Comments argue that Commerce cited only two invoices showing lower sales prices than Linyi Chengen's sale of a similar product, while ignoring other invoices on the record that show sales of similar products at higher prices than Linyi Chengen's sale. Id. at 3. The Celtic Comments contend that other information on the record that could have been considered by Commerce includes full questionnaires submitted voluntarily by Jiangyang Wood, showing sales prices that range below and above the sales prices of Linyi Chengen. Id. at 7–8. The Celtic Comments assert also that Commerce ignored relevant sales data of Bayley, who placed a full U.S. sales database on the record. Id. at 8. In addition, the Celtic Comments contend that Com-

merce ignored sales data on the record from numerous Separate Rate Plaintiffs that show sales prices in the range of or higher than Linyi Chengen's sales prices. Id.

The Taraca Comments challenge Commerce's assertion that the only alternative rates on the record are those rates listed in the Petition. Taraca Cmts. at 5–6. The Taraca Comments assert that Commerce ignored evidence on the record, specifically the Separate Rate Applications containing commercial invoices of over 100 companies that Commerce determined were separate from the China-wide entity. Id. at 6. The Taraca Comments contend that many of the sales invoices of the Separate Rate Plaintiffs show pricing higher than Linyi Chengen's prices. Id. The Taraca Comments note that Commerce recognized that there is no basis to choose between the two Petition rates of 114.72% and 104.06% because both are for similar subject merchandise. Id. The Taraca Comments contend that Commerce unreasonably chose the highest potential Petition rate between a choice of the higher AFA rate of 114.72% and the lower Petition rate of 104.06%, particularly in light of information on the record consisting of invoices from forty Separate Rate Plaintiffs showing a variety of prices, some that were higher than Linyi Chengen's price. Id. The Taraca Comments criticize Commerce for claiming that the record provides no opportunity for Commerce to know or calculate the actual dumping margins of the Separate Rate Plaintiffs and for only relying on the rates listed in the Petition, while ignoring alternate evidence on the record of prices from the Separate Rate Plaintiffs. Id. at 5–6.

The Dehua Comments argue similarly that Commerce complained of a limited record, which is "of Commerce's own making." Dehua TB at 3. The Dehua Com-

ments contend that the information cited by Commerce is flawed, unreasonable, and does not provide substantial support for Commerce's remand determination. Id. at 4–6.

The Government argues that Commerce's Fourth Remand Determination is supported by substantial evidence because on remand Commerce reexamined the record and identified additional evidence of commercial invoices that support Commerce's determination to rely on the Petition rate. Def.'s Resp. at 7–8. The Government contends that several reasons support Commerce's Fourth Remand Determination.

First, the Government contends that Commerce's reliance on the Petition rate is supported by the price quote that forms the basis of the Petition rate and the invoice that corroborates that exporter's selling practices. Id. at 8. Commerce explained that "comparing prices between two companies selling comparable goods is a reasonable analysis to conduct in the antidumping context, where price comparisons form the basis of all calculated rates." Id. (quoting the Fourth Remand Determination at 29). The Government contends that this price comparison "sufficiently tethers the actual selling activities of separate rate recipients … to the margins in the petition[,]" because it indicates that sales were made at even lower prices than those that resulted in the Petition rates during the period of investigation. Id. at 8–9. The Government asserts that Commerce analyzed additional invoices for plywood purchased by the Petition Separate Rate Exporter from each of its suppliers. Id. at 9. The Government contends that the Petition Separate Rate Exporter "sold plywood to the United States during the period of investigation at even lower rates than the prices identified in the petition."

Id. (citing Fourth Remand Determination at 32).

Second, the Government contends that Commerce reconsidered the 57.36% all-others separate rate applied to the Separate Rate Plaintiffs and provided a reasonable explanation of why it declined to use an alternative method for calculating the rate. Id. at 11. The Government argues that after the Court sustained Commerce's decision to calculate the separate rate using any reasonable method, Commerce investigated the other rates on the record of this investigation. The Government contends that the Court should sustain Commerce's determination because Commerce explained that: (1) the record does not provide any opportunity for Commerce to know or calculate the actual dumping margins of the Separate Rate Plaintiffs, (2) the only rates on the record of the review were the China-wide entity rate of 114.72%, and Linyi Chengen's 0% rate, and (3) the limited record information indicates that the selling behavior varied during the period of investigation. Id. at 11–13. The Government asserts that Commerce's determination is reasonable because the simple average of the two available rates most accurately represents the variance in potential dumping margins. Id.

The Government argues that Commerce was reasonable by selecting the higher of the two potential rates between 104.06% and 114.72% because "both of the petition rates begin with the pricing established by the Petition [Separate Rate] Exporter . . . [and] both of these rates are representative of the dumping behavior of the Separate Rate Plaintiffs." Id. at 13 (citing the Fourth Remand Determination at 12). The Government contends that because both of the potential rates were for in-scope plywood products, Commerce had no basis to choose between them. Id. The Government argues that Commerce was reasonable in

determining that applying the average of the Petition rates (109.39%) would require it to ignore record evidence suggesting that separate rate companies had potential dumping margins at levels equal to, or in excess of the highest Petition rate of 114.72%. Id. at 14. The Government asserts that "Commerce explained that although Chengen's rate alone 'would not be representative of the separate rate respondents' actual dumping margins,' neither would either of petition rates alone be the most appropriate rate[.]" Id. (quoting the Fourth Remand Determination at 31). The Government argues that the Court should sustain Commerce's determination because by averaging Linyi Chengen's 0% rate with the China-wide entity rate based on the highest Petition rate, Commerce calculated the most accurate all-others separate rate for those Separate Rate Plaintiffs whose dumping more closely resembled the levels of the Petition Separate Rate Exporter and those whose dumping more closely resembled Linyi Chengen. Id.

Third, the Government contends that despite the Court's skepticism regarding the single invoice discussed at length in Linyi Chengen IV, which showed an approximately 20% price difference between the price at which Linyi Chengen sold the same product as the Petition Separate Rate Exporter, the price differential alone is not indicative of the potential dumping margin. Id. at 15. The Government asserts that because a margin must be calculated by reference to a U.S. price and normal value (i.e., the arithmetic difference between the normal value and the U.S. sales price), the Petition Separate Rate Exporter's own company-specific normal value is not on the record in this investigation. Id. The Government argues that absent a company-specific normal value, the price comparison merely shows that the Separate Rate Exporters priced their products at potentially much lower levels than the

pricing level for Linyi Chengen's U.S. plywood exports. Id. Thus, the Government asserts that this single commercial invoice is not a good proxy for the Separate Rate Plaintiffs' rate because it does not inform Commerce as to the Separate Rate Plaintiffs' normal values.

Defendant-Intervenor argues that Commerce's margin calculation for the Separate Rate Plaintiffs is reasonable, fully explained, and based on substantial evidence. Defendant-Intervenor contends that because (1) there are only three calculated rates on the record (Linyi Chengen's 0% rate, and the 104.06% and 114.72% margins calculated in the petition), (2) the Court has already sustained Commerce's finding that Linyi Chengen's 0% rate would not reasonably reflect the Separate Rate Plaintiffs' potential dumping, (3) the 20% selling price differential between Linyi Chengen and the Petition Separate Rate Exporter alone is not indicative of the potential dumping differentials, and (4) given Commerce's explanation that there was variance in the separate rate companies' dumping margins, with some separate rate companies having potential dumping margins up to the highest rate calculated in the Petition (114.72%), the simple average of the highest potential AFA rate calculated in the Petition and Linyi Chengen's 0% rate most reasonably reflects the variance in potential dumping margins. Def.-Interv.'s Cmts. at 6–7.

## III. Analysis

[3–5] Antidumping law is intended to calculate antidumping duties on a fair and equitable basis. U.S. Steel Group v. United States, 225 F.3d 1284, 1290 (Fed. Cir. 2000) (citing Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994)). The purpose of 19 U.S.C. § 1677e is to incentivize respondents to cooperate, and not to impose punitive, aberrational, or uncorroborated margins. F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000). As the court noted in Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370 (Fed. Cir. 2013), Commerce is not permitted to consider only information that supports its determination while ignoring other relevant information to the contrary. See generally Yangzhou Bestpak, 716 F.3d 1370.

Yangzhou Bestpak is instructive here. Commerce calculated the all-others separate rate margin of Yangzhou Bestpak Gifts & Crafts Co. ("Bestpak") by using the simple average of an AFA rate and a de minimis rate, similar to the facts in this case. Id. at 1372. In Yangzhou Bestpak, Commerce selected the two largest exporters, Ningbo Jintian Import & Export Co., Ltd. ("Jintian") and Yama Ribbons & Bows Co., Ltd. ("Yama"), as mandatory respondents for individual investigation. Id. Commerce received responses from Yama, but not from Jintian. Id. No other exporter requested voluntary investigation, and Commerce did not select a replacement mandatory respondent for Jintian, despite Commerce's past practice of selecting a replacement respondent when a mandatory respondent did not comply. Id. Thus, Commerce's investigation only involved one participant. Commerce assigned a de minimis dumping margin to Yama, and an AFA China-wide entity rate of 247.65% to Jintian due to its failure to cooperate in the investigation. Id. Commerce calculated Bestpak's all-others separate rate using the simple average of Yama's de minimis rate and Jintian's AFA China-wide entity rate, resulting in a 123.83% all-others separate rate margin. Id. The U.S. Court of International Trade remanded, noting that the calculated separate rate was "exceptionally larger than the rate calculated

for the lone cooperative mandatory respondent." Id.

On remand, Commerce reviewed the administrative record and compared the estimated average unit values ("AUVs") calculated from information provided by Jintian, Yama, and Bestpak in their Q&V questionnaire responses. Id. An estimated AUV "is a ratio calculated by dividing a respondent's total value of sales by its total quantity of sales[.]" Id. Using AUVs as a proxy for dumping margins, Commerce determined that Bestpak's AUVs fell between Yama's (de minimis margin) and Jintian's (AFA margin), and thus "a 'simple average of Jintian and Yama's estimated AUVs' equaled a rate which was 'very close' to Bestpak's 'estimated AUV.'" Id. (internal citation omitted). Commerce argued that the simple average of the two investigated companies' margins reasonably reflected Bestpak's potential dumping margin. Id. The U.S. Court of International Trade sustained Commerce's separate rate determination, noting that though the determination "may [have been] unfortunate and even frustrating, ... it [was] not unreasonable on this limited administrative record." Id. at 1377 (quoting Yangzhou Bestpak Gifts & Crafts Co., Ltd., v. United States, 36 CIT 475, 483, 825 F. Supp. 2d 1346, 1353 (2012)).

On appeal, the Court of Appeals for the Federal Circuit held that substantial evidence did not support Commerce's all-others separate rate calculation and vacated and remanded accordingly. Id. The Court of Appeals for the Federal Circuit reasoned that:

> [W]hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case.... This court finds that this case presents that situation.... Although Commerce may be permitted to use a

simple averaging methodology to calculate the separate rate, the circumstances of this case renders a simple average of a de minimis and AFA Chinawide rate unreasonable as applied. Similarly, a review of the administrative record reveals a lack of substantial evidence showing that such a determination reflects economic reality.

Id. at 1378. In addition to concluding that Commerce's selected calculation method was unreasonable as applied, the Yangzhou Bestpak Court held that "[t]his court does not find Commerce's late attempt to backfill with these AUV estimates, untethered to the three respondents' actual dumping margins, as amounting to substantial evidence." Id. at 1379. The Court of Appeals for the Federal Circuit concluded that even "[w]hile Bestpak's estimated AUV aligned with a simple average of Jintian's and Yama's estimated AUVs, Commerce's inference that their dumping margins paralleled that same correlation is speculative." Id. The Court stated that it was unfair and perhaps punitive to assign a fully cooperating separate rate respondent a margin that was one half of the Chinawide entity rate—a rate reserved for those entities presumed to be under foreign government control. Id. Notably, the Court of Appeals for the Federal Circuit criticized Commerce's own actions of identifying only two significant exporters for review and failing to replace Jintian after it became clear that Jintian was unresponsive to Commerce's requests, leading to a situation of Commerce's own making with one de minimis and one AFA rate. The Court of Appeals for the Federal Circuit also rejected Commerce's claim that time constraints precluded it from investigating more thoroughly, and the Yangzhou Bestpak Court ultimately found "no support in this court's precedents or the statute's plain text for the proposition that limited resources or statutory time constraints can

override fairness and accuracy." Id. (citing SNR Roulements v. United States, 402 F.3d 1358, 1363 (Fed. Cir. 2005)).

[6, 7]  Following the principles established in Yangzhou Bestpak, this Court concludes that Commerce's determination is unreasonable as applied and not supported by substantial evidence. As in Yangzhou Bestpak, here Commerce selected only two mandatory respondents and failed to replace Bayley after it became clear that Bayley would not cooperate with Commerce's investigation, a practice that the Court of Appeals for the Federal Circuit has frowned upon. See Yangzhou Bestpak, 716 F.3d 1370; but cf. Prestressed Concrete Steel Wire Strand from the People's Republic of China, 74 Fed. Reg. 61,104 (Dep't of Commerce Nov. 23, 2009) (Commerce added a new mandatory respondent when it became clear that one respondent was uncooperative). As the Court noted in Linyi Chengen IV, Commerce created its own problem when it selected only two mandatory respondents, which resulted in sparse information on the record to support its assertions regarding the potential dumping margins of the separate rate respondents. Linyi Chengen IV, 539 F. Supp. 3d at 1277–78. A speculative dumping margin using the average of a de minimis rate and an AFA rate cannot be upheld based on weak record evidence, particularly when Commerce itself created the scarcity of evidence. See Bosun Tools Co. v. United States, No. 2021-1930, 2022 WL 94172, at 4* (comparing Yangzhou Bestpak where "the record was 'so thin' that Commerce could not have reasonably 'found evidence to support [its] determination[,]'" while in Bosun Tools "in contrast, there was no such lack of data").

Commerce in this case simply averaged the de minimis and the AFA rate to determine the 57.36% all-others separate rate, which is half of the AFA rate. See Fourth Remand Determination. Using only two data points, Commerce reasoned that because the "limited record information available indicat[ed] that selling behavior varied during the [period of investigation][,]" the simple average of the two available rates most reasonably reflected the potential variance in dumping margins amongst the separate rate companies. Id. at 11. The Court observes that the all-others separate rate assigned to the fully cooperating Separate Rate Plaintiffs is nearly 60 times higher than that of the sole investigated respondent, Linyi Chengen. Similar to Yangzhou Bestpak, this Court concludes that an all-others separate rate applied to fully cooperating respondents that is 60 times higher than the only calculated de minimis rate and is half of the AFA rate seems unfair and unduly punitive.

[8]  With respect to the Government's argument that Commerce supported its determination by citing additional invoices from the Petition Separate Rate Applicant China Friend, Fourth Remand Determination at 31; Def.'s Resp. at 9–10; Petition SRA Exporter, Supplemental SRA Questionnaire Response (May 19, 2017) ("Supplemental Questionnaire"), PR 654–655, the Court disagrees that the invoices in the Supplemental Questionnaire support Commerce's determination that 57.36% is a reasonably accurate all-others separate rate and reflects the variation in prices during the period of investigation. Commerce determined that the Supplemental Questionnaire invoices indicate that "the Petition [Separate Rate] Exporter made sales of significant quantities of identical plywood at potential dumping rates higher than the Petition rates throughout the [period of investigation][.]" Fourth Remand Determination at 33. The Court notes that while Commerce concluded that variances

in the selling behavior of the separate rate companies *only* implies dumping levels in excess of the highest Petition rate of 114.72%, Commerce ignored other potentially contrary record evidence, including potential evidence that the Petition SRA Exporter sold the same plywood for prices higher than the price upon which the Petition rate is based. See Celtic Cmts. at 3; see Supplemental Questionnaire at Ex. S-5. The Court is persuaded by the Separate Rate Plaintiffs' argument that Commerce failed to review other potentially contradictory evidence on the record, including for example, record evidence showing that Separate Rate Plaintiff Jiangyang Wood had a higher weighted average sales price than Linyi Chengen, whose rate was determined to be 0%. Celtic Cmts. at 8; see Jiangyang Wood, Section C Questionnaire (February 28, 2017) ("Jiangyang Questionnaire"), PR 351; see also Chengen, Supplemental Questionnaire Response (May 15, 2017) ("Chengen Questionnaire"), PR 623. The Separate Rate Plaintiffs also cite additional contrary record evidence, such as Bayley's full U.S. sales database, Celtic Cmts. at 8; the Separate Rate Applications containing commercial invoices of over 100 companies who were determined by Commerce to be separate from the China-wide entity, Taraca Cmts. at 6; and invoices from 40 Separate Rate Plaintiffs showing a variety of prices, some that were higher than Linyi Chengen's price, id. The Court does not purport to reweigh the evidence, but emphasizes these examples to illustrate that Commerce is not permitted to create a scarcity of information, to use that scarcity as justification for its determination, and to claim that a constraint on resources prevents further examination, while ignoring potentially contrary evidence on the record.

The Court concludes that Commerce's determination to assign to fully cooperating separate rate respondents an all-others separate rate margin almost 60 times higher than the only investigated respondent, and half of the AFA rate for uncooperative respondents, is unreasonable as applied because it is unfair and unduly punitive. The Court also concludes that because Commerce selectively analyzed the invoice data while ignoring other potentially contrary record evidence, Commerce's determination is not supported by substantial evidence.

The Court has concluded in three separate opinions, including this one, that the all-others separate rate of 57.36% is unreasonable as applied and not supported by substantial evidence. The Court advises that Commerce should not submit the same 57.36% rate again for review by this Court without new, substantial evidence in support. The Court reminds the Government that the rules of the U.S. Court of International Trade require the just and speedy determination of every action and proceeding, and submitting the same unreasonable-as-applied, punitive all-others separate rate yet again would not be in the spirit of reaching a just and speedy resolution to this case. See Rule 1, Rules of U.S. Court of International Trade. On the fifth remand in this case, Commerce might choose to examine whether other evidence on the record supports a lower rate after the applicable rates are averaged. The Court advises Commerce to not submit the same rate of 57.36% for the fourth time, which could likely result in yet another remand based on being unreasonable as applied to fully cooperating respondents if still based on a scarcity of record evidence.

## CONCLUSION

For the foregoing reasons, the Court remands the Fourth Remand Determination.

Accordingly, it is hereby

COLUMBIA ALUMINUM PRODUCTS, LLC v. U.S.    **1405**
*Cite as 609 F.Supp.3d 1405 (CIT 2022)*

**ORDERED** that the <u>Fourth Remand Determination</u> is remanded for Commerce to reconsider the all-others separate rate consistent with this opinion; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1) Commerce shall file the fifth remand determination on or before March 17, 2023;

(2) Commerce shall file the administrative record on or before March 31, 2023;

(3) Comments in opposition to the fifth remand determination shall be filed on or before April 28, 2023;

(4) Comments in support of the fifth remand determination shall be filed on or before May 26, 2023; and

(5) The joint appendix shall be filed on or before June 23, 2023.



**COLUMBIA ALUMINUM PRODUCTS, LLC, et al., Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Endura Products, Inc., Defendant-Intervenor.**

**Slip Op. 22-156**
**Consolidated Court No. 19-00185**

United States Court of International Trade.

December 23, 2022

**Background:** Importer brought action contesting two related decisions by Customs and Border Protection (CBP) in investigative proceedings under Enforce and Protect Act concluding that certain door thresholds imported from Vietnam evaded antidumping and countervailing duty orders on aluminum extrusions from China. Domestic producer brought separate action contesting CBP's final administrative determination which narrowed scope of its evasion determination. Actions were consolidated, and domestic importer intervened in importer's action as a defendant. Importer and domestic producer moved for judgment on agency record, and CBP moved for voluntary remand and for extension of time to file response to motions for judgment on agency record.

**Holdings:** The Court of International Trade, Timothy C. Stanceu, J., held that remand to CBP for reconsideration of decisions based solely on change in precedent on which decisions relied was not warranted.

Motion to remand denied; motion to extend time granted.

**Customs Duties** ⚷84(8.1)

Remand to Customs and Border Protection (CBP) for reconsideration of decisions that certain door thresholds imported from Vietnam evaded antidumping and countervailing duty orders on aluminum extrusions from China based solely on change in precedent on which decisions relied was not warranted; such limited remand would not advance progress of challenges to CBP decisions by importer and domestic producer, as physical characteristics of subject door thresholds did not appear to differ from those of importer's door thresholds previously found to be outside scope of antidumping and countervailing duty orders and CBP would have opportunity to address any impact from change in precedent in its responses to

LINYI CHENGEN IMPORT AND EXPORT v. UNITED STATES    **1347**
Cite as 658 F.Supp.3d 1347 (CIT 2023)

**ORDERED** that defendants explain their position as to Document Category 2 within 30 days of this order. Defendants' supplemental explanation should not exceed 1,000 words and should address the aforementioned apparent inconsistency.

**ORDERED** that plaintiff respond to defendants' supplemental explanation within 21 days. Plaintiff's response to defendants' explanation should not exceed 1,000 words.



**LINYI CHENGEN IMPORT
AND EXPORT CO.,
LTD., Plaintiff,**

**and**

**Celtic Co., Ltd., et al., Consolidated
Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Coalition for Fair Trade in Hardwood
Plywood, Defendant-Intervenor.**

**Slip Op. 23-147**

**Consol. Court No. 18-00002**

United States Court of International
Trade.

October 10, 2023

**Background:** Foreign exporters filed suits challenging final affirmative determination by Department of Commerce in antidumping duty investigation of hardwood, decorative plywood, and veneered panels from People's Republic of China. Following consolidation, the Court of International Trade, Jennifer Choe-Groves, J., 391 F.Supp.3d 1283, remanded and, subsequently, 433 F.Supp.3d 1278, remanded for second time, 487 F.Supp.3d 1349, remanded for third time, 539 F.Supp.3d 1269, remanded for fourth time, and 609

F.Supp.3d 1392, remanded for fifth time. On remand, Department of Commerce issued fifth remand redetermination.

**Holdings:** The Court of International Trade, Choe-Groves, J., held that:

(1) all-others separate antidumping duty rate was supported by substantial evidence;

(2) decision not to reopen record on remand was not arbitrary and capricious;

(3) exclusion from antidumping duty order of voluntary applicants who submitted timely full questionnaire responses was reasonable; and

(4) in matter of first impression, inclusion in antidumping duty order of voluntary applicants who failed to submit timely full questionnaire responses was reasonable.

Sustained.

**1. Customs Duties ⚖84(6)**

Court of International Trade reviews antidumping determinations made on remand for compliance with the court's remand order.

**2. Customs Duties ⚖21.5(1)**

While Department of Commerce is permitted to use various methodologies for calculating antidumping duties, it is possible for the application of a particular methodology to be unreasonable in a given case. Tariff Act of 1930 § 735, 19 U.S.C.A. §§ 1673d(c)(5)(A), 1673d(c)(5)(B).

**3. Customs Duties ⚖21.5(1)**

Separate rate calculations for non-mandatory, cooperating separate rate respondents to an antidumping duty investigation must bear some relationship to the respondents' actual dumping margins despite a thin administrative record. Tariff Act of 1930 § 735, 19 U.S.C.A. §§ 1673d(c)(5)(A), 1673d(c)(5)(B).

**4. Customs Duties ⚌21.5(1)**

A speculative dumping margin using the average of a de minimis rate and an adverse facts available (AFA) rate cannot be upheld based on weak record evidence, particularly when Department of Commerce itself created the scarcity of evidence.   Tariff Act of 1930 § 776, 19 U.S.C.A. § 1677e.

**5. Customs Duties ⚌21.5(1)**

Department of Commerce's decision, in fifth remand redetermination for antidumping investigation of hardwood, decorative plywood, and veneered panels from China, to assign one mandatory respondent's 0% dumping margin rate as all-others separate rate to non-examined exporters, was supported by substantial evidence including Commerce's explanation that it considered six options for all-others separate rate and rejected four proposed options based on analysis of economic evidence showing differences between mandatory respondent and separate rate exporters such as their selling, cost structure, and pricing that could not be adequately addressed by four proposed rates, and remand order instructed Commerce not to resubmit 57.36% unreasonable rate, so Commerce selected 0% as only remaining rate.   Tariff Act of 1930 § 735, 19 U.S.C.A. § 1673d(c)(5)(B).

**6. Customs Duties ⚌84(6)**

Court of International Trade will uphold the agency's antidumping determination if the agency has examined the relevant data, articulated a satisfactory explanation, and accounted for detracting evidence.

**7. Customs Duties ⚌84(8.1)**

Judicial compulsion to reopen the record on remand in an antidumping investigation is limited to unusual circumstances, such as fraud or record inaccuracies.

**8. Customs Duties ⚌21.5(5)**

Department of Commerce's decision not to reopen record, in fifth remand of antidumping investigation of hardwood, decorative plywood, and veneered panels from China, was not arbitrary and capricious, even though paucity of record was Commerce's own making due to its selection of only two mandatory respondents to investigation, since there was no evidence of fraud or inaccuracies in record that would justify opening record after nearly six years of litigating foreign exporters' challenge to results of investigation.

**9. Customs Duties ⚌21.5(1)**

Department of Commerce's decision, in fifth remand redetermination for antidumping investigation of hardwood, decorative plywood, and veneered panels from China, to exclude from antidumping duty order voluntary applicants who submitted timely full questionnaire responses in requesting voluntary respondent treatment, was supported by reasonable justification, since Commerce explained that those applicants supported their voluntary respondent requests with hundreds of pages of questionnaire responses and supporting documentation, thereby providing same information that mandatory respondents submitted by same deadline that would allow Commerce to select them as voluntary respondents, if Commerce had chosen to select any voluntary respondents for investigation.   Tariff Act of 1930 § 782, 19 U.S.C.A. § 1677m(a).

**10. Customs Duties ⚌21.5(1)**

Department of Commerce's decision, in fifth remand redetermination for antidumping investigation of hardwood, decorative plywood, and veneered panels from China, to exclude from antidumping duty order voluntary applicants who failed to submit in their requests for voluntary respondent treatment full questionnaire re-

sponses as was expected of mandatory respondents, was reasonable, since voluntary applicants that did not submit full questionnaire responses could not be selected as voluntary respondents due to incomplete and untimely information filed by same deadline as mandatory respondents, and instead, applicants only submitted cursory two-page request for voluntary respondent treatment. Tariff Act of 1930 § 782, 19 U.S.C.A. § 1677m(a).

———————

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, D.C., for Plaintiff Linyi Chengen Import and Export Co., Ltd., Consolidated Plaintiffs Far East American, Inc. and Shandong Dongfang Bayley Wood Co., Ltd., and Consolidated Plaintiffs and Plaintiff-Intervenors Celtic Co., Ltd., Jiaxing Gsun Import & Export Co., Ltd., Anhui Hoda Wood Co., Ltd., Jiaxing Hengtong Wood Co., Ltd., Linyi Evergreen Wood Co., Ltd., Linyi Glary Plywood Co., Ltd., Linyi Hengsheng Wood Industry Co., Ltd., Linyi Huasheng Yongbin Wood Co., Ltd., Linyi Jiahe Wood Industry Co., Ltd., Linyi Linhai Wood Co., Ltd., Linyi Mingzhu Wood Co., Ltd., Linyi Sanfortune Wood Co., Ltd., Qingdao Good Faith Import and Export Co., Ltd., Shandong Qishan International Trading Co., Ltd., Shanghai Futuwood Trading Co., Ltd., Suining Pengxiang Wood Co., Ltd., Suqian Hopeway International Trade Co., Ltd., Suzhou Oriental Dragon Import and Export Co., Ltd., Xuzhou Andefu Wood Co., Ltd., Xuzhou Jiangyang Wood Industries Co., Ltd., Xuzhou Longyuan Wood Industry Co., Ltd., Xuzhou Pinlin International Trade Co., Ltd., Xuzhou Shengping Import and Export Co., Ltd., and Xuzhou Timber International Trade Co., Ltd.

Jeffrey S. Neeley and Stephen W. Brophy, Husch Blackwell LLP, of Washington, D.C., for Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co., Ltd., Highland Industries Inc., Jiashan Dalin Wood Industry Co., Ltd., Happy Wood Industrial Group Co., Ltd., Jiangsu High Hope Arser Co., Ltd., Suqian Yaorun Trade Co., Ltd., Yangzhou Hanov International Co., Ltd., G.D. Enterprise Limited, Deqing China-Africa Foreign Trade Port Co., Ltd., Pizhou Jin Sheng Yuan International Trade Co., Ltd., Xuzhou Shuiwangxing Trading Co., Ltd., Cosco Star International Co., Ltd., Linyi City Dongfang Jinxin Economic & Trade Co., Ltd., Linyi City Shenrui International Trade Co., Ltd., Jiangsu Qianjiuren International Trading Co., Ltd., and Qingdao Top P&Q International Corp.

Jeffrey S. Grimson and Jill A. Cramer, Mowry & Grimson, PLLC, of Washington, D.C., for Consolidated Plaintiffs Taraca Pacific, Inc., Canusa Wood Products, Ltd., Concannon Corporation d/b/a Concannon Lumber Company, Fabuwood Cabinetry Corporation, Holland Southwest International Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPLY LLC.

Tara K. Hogan, Assistant Director, and Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director. Of counsel was Savannah R. Maxwell, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Timothy C. Brightbill, Jeffrey O. Frank, Stephanie M. Bell, and Elizabeth S. Lee, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Coalition for Fair Trade in Hardwood Plywood.

## OPINION AND ORDER

Choe-Groves, Judge:

In the Court's sixth opinion in this litigation that has spanned nearly six years, the Court finally sustains Commerce's determinations concerning the import of hardwood and decorative plywood and certain veneered panels into the United States from the People's Republic of China ("China"), subject to the final affirmative determination in an antidumping duty investigation by the U.S. Department of Commerce ("Commerce"), including an issue of first impression regarding the inclusion of certain voluntary-review firms in an antidumping duty order. See Certain Hardwood Plywood Products from the People's Republic of China, 82 Fed. Reg. 53,460 (Dep't of Commerce Nov. 16, 2017) (final determination of sales at less than fair value, and final affirmative determination of critical circumstances, in part), as amended, 83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018) (amended final determination of sales at less than fair value and antidumping order) ("Order") (collectively, "Final Determination"): see also Issues and Decision Mem. for the Final Determination of the Antidumping Duty Investigation of Certain Hardwood Plywood Products from People's Republic of China ("Final IDM"), ECF No. 25-7.

Before the Court are the Final Results of Redetermination Pursuant to Court Remand ("Fifth Remand Redetermination"). ECF No. 221-1, which the Court ordered in Linyi Chengen Imp. & Exp. Co. v. United States ("Linyi Chengen V"), 46 CIT ——, 609 F. Supp. 3d 1392 (2022). Plaintiff Linyi Chengen Import & Export Co. ("Linyi Chengen") did not file comments in response to the Fifth Remand Redetermination. Consolidated Plaintiffs Zhejiang Dehua TB Import & Export Co. ("Dehua TB"), Taraca Pacific, Inc. ("Taraca"), and Celtic Co. ("Celtic") filed their comments in support of the Fifth Remand Redetermination.

Dehua TB filed comments collectively on behalf of itself and Highland Industries, Inc., Jiashan Dalin Wood Industry Co., Happy Wood Industrial Group Co., Jiangsu High Hope Arser Co., Suqian Yaorun Trade Co., Yangzhou Hanov International Co., G.D. Enterprise Ltd., Deqing China-Africa Foreign Trade Port Co., Pizhou Jin Sheng Yuan International Trade Co., Xuzhou Shuiwangxing Trading Co., Cosco Star International Co., Linyi City Dongfang Jinxin Economic & Trade Co., Linyi City Shenrui International Trade Co., Jiangsu Qianjiuren International Trading Co., and Qingdao Top P&Q International Corp. Cmts. Supp. Remand Determination Behalf Consol. Pls. [Dehua TB et al.] ("the Dehua TB Comments" or "Dehua TB's Cmts."), ECF No. 226.

Taraca filed comments collectively on behalf of itself and Canusa Wood Products, Ltd., Concannon Corp. d/b/a Concannon Lumber Co., Fabuwood Cabinetry Corp., Holland Southwest International, Inc., Liberty Woods International, Inc., Northwest Hardwoods, Inc., Richmond International Forest Products, LLC, and USPLY LLC. Consol. Pls.' [Taraca et al.] Cmts. Supp. Fifth Remand Redetermination ("the Taraca Comments" or "Taraca's Cmts."), ECF No. 229.

Celtic filed comments collectively on behalf of itself and Anhui Hoda Wood Co., Far East American, Inc., Jiaxing Gsun Import & Export Co., Jiaxing Hengtong Wood Co., Linyi Evergreen Wood Co., Linyi Glary Plywood Co., Linyi Jiahe Wood Industry Co., Linyi Linhai Wood Co., Linyi Hengsheng Wood Industry Co., Linyi Huasheng Yongbin Wood Co., Linyi Mingzhu Wood Co., Linyi Sanfortune Wood Co., Qingdao Good Faith Import & Export Co., Shanghai Futuwood Trading Co., Shandong Qishan International Trading Co.,

Suining Pengxiang Wood Co., Suqian Hopeway International Trade Co., Suzhou Oriental Dragon Import & Export Co., Xuzhou Andefu Wood Co., Xuzhou Jiangyang Wood Industries Co., Xuzhou Longyuan Wood Industry Co., Xuzhou Pinlin International Trade Co, Xuzhou Shengping Import & Export Co., and Xuzhou Timber International Trade Co. Consol. Separate Rate Pls.' Reply Cmts. Supp. Fifth Remand Redetermination ("the Celtic Comments" or "Celtic's Cmts."), ECF Nos. 230, 231.

The Court refers collectively to the non-examined parties that filed the Dehua TB Comments, the Taraca Comments, and the Celtic Comments as the "Separate Rate Plaintiffs."

Consolidated Plaintiffs Linyi Sanfortune Wood Co., Ltd. ("Sanfortune Wood") and Xuzhou Longyuan Wood Industry Co., Ltd. ("Longyuan Wood") filed separate comments in opposition to the Fifth Remand Redetermination. [Sanfortune Wood's and Longyuan Wood's] Cmts. Opp'n Fifth Remand Redetermination ("Sanfortune Wood's and Longyuan Wood's Cmts."), ECF No. 223.

Defendant United States ("Defendant") filed its comments in support of the Fifth Remand Redetermination. Def.'s Cmts. Supp. Remand Redetermination ("Def.'s Cmts."), ECF No. 227.

Defendant-Intervenor Coalition for Fair Trade in Hardwood Plywood ("Defendant-Intervenor" or "the Coalition") filed comments in opposition to and in support of the Fifth Remand Redetermination. [Def.-Interv.'s] Cmts. Opp'n Commerce's Fifth Remand Redetermination ("Def.-Interv.'s Opp'n Cmts."), ECF No. 224; [Def.-Interv.'s] Cmts. Supp. Commerce's Fifth Remand Redetermination ("Def.-Interv.'s Supp. Cmts."), ECF No. 228.

After oral argument was held on July 12, 2023, the Court invited the Parties to file post-oral argument letters addressing the issue of reopening the record. Oral Argument (July 12, 2023), ECF No. 237; Order (July 13, 2023), ECF No. 238. Plaintiff, Defendant-Intervenor, and Consolidated Plaintiffs Dehua TB, Taraca, and Celtic filed their post-oral argument letters. [Consol. Pls. Dehua TB's] Resp. Court's Invitation Submit Post-Argument Letter ("Dehua TB's Suppl. Letter"), ECF No. 240; [Pl.'s and Consol. Pls. Celtic's] Post Oral Argument Letter ("Celtic's Suppl. Letter"), ECF No. 241; [Consol. Pls. Taraca's] Resp. Court's Invitation Submit Post-Argument Letter ("Taraca's Suppl. Letter"), ECF No. 242; Def.-Interv.'s Suppl. Cmts. ("Def.-Interv.'s Suppl. Letter"), ECF No. 243. Defendant did not file a post-oral argument letter. Sanfortune Wood and Longyuan Wood did not file separate post-argument letters but were included in Celtic's post-argument letter. See Celtic's Suppl. Letter, at 1 n.1.

For the reasons discussed below, the Court sustains Commerce's Fifth Remand Redetermination.

## ISSUES PRESENTED

The Court reviews the following issues:

1. Whether Commerce's separate rate for the non-examined companies that were granted separate rate status is in accordance with law; and

2. Whether Commerce's determinations to exclude Dehua TB and Jiangyang Wood from the Order and to include Sanfortune Wood and Longyuan Wood in the Order are in accordance with law.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the Fifth Remand Redetermination. See Linyi Chengen Imp. & Exp. Co. v. United States ("Linyi Chen-

gen I"), 43 CIT ——, ——, 391 F. Supp. 3d 1283, 1288-92 (2019); Linyi Chengen Imp. & Exp. Co. v. United States ("Linyi Chengen II"), 44 CIT ——, ——, 433 F. Supp. 3d 1278, 1281-83 (2020); Linyi Chengen Imp. & Exp. Co. v. United States ("Linyi Chengen III"), 44 CIT ——, ——, 487 F. Supp. 3d 1349, 1353-54 (2020); Linyi Chengen Imp. & Exp. Co. v. United States ("Linyi Chengen IV"), 45 CIT ——, ——, 539 F. Supp. 3d 1269, 1273-74 (2021); Linyi Chengen V, 46 CIT at ——, 609 F. Supp. 3d at 1395-97.

Commerce initiated an antidumping investigation after reviewing an antidumping duty petition submitted by Defendant-Intervenor. See Certain Hardwood Plywood Products from the People's Republic of China, 81 Fed. Reg. 91,125 (Dep't of Commerce Dec. 16, 2016) (initiation of less-than-fair-value investigation); Def.-Interv.'s Pets. Imposition Antidumping Countervailing Duties ("Petition") (Nov. 18, 2016), PR 1-9, CR 1. The Petition contained price quotes, i.e., "two offers for sale for hardwood plywood produced in [China] from a Chinese exporter," as the basis for its estimated dumping margins ranging from 104.06% to 114.72%. See id. at 91,128-29. Commerce accepted applications from exporters and producers seeking to obtain separate rate status in the investigation ("separate rate applications") to avoid the country-wide dumping margin because the investigation involved products from China, a non-market economy. See id. at 91,129.

In the Preliminary Determination, Commerce selected Consolidated Plaintiff Shandong Dongfang Bayley Wood ("Bayley") and Linyi Chengen as the only mandatory respondents in the investigation. See Certain Hardwood Plywood Products from the People's Republic of China, 82 Fed. Reg. 28,629 (Dep't of Commerce June 23, 2017) (preliminary affirmative determination of sales at less than fair value, preliminary affirmative determination of critical circumstances, in part), as amended, 82 Fed. Reg. 32,683 (Dep't of Commerce July 17, 2017) (amended preliminary determination of sales at less than fair value) (collectively, "Preliminary Determination"); see also Decision Mem. Prelim. Determination Antidumping Duty Investigation of Certain Hardwood Plywood Products from the People's Republic of China ("Prelim. DM") at 4, PR 734.[1] Seven companies filed requests for treatment as voluntary respondents, but Commerce did not select any voluntary respondents. See Prelim. DM at 4; Final IDM at 34-37; Selection of Voluntary Respondent Mem. (Apr. 4, 2017), PR 451.

In the Final Determination, Commerce applied its intermediate input methodology to value Linyi Chengen's log inputs after determining that Linyi Chengen's log volume reporting methods were inherently imprecise. Final Determination, 82 Fed. Reg. at 53,461; Final IDM at 23, 25 (valuing veneers, instead of logs, as the input used to produce hardwood plywood). Commerce stated that it was unable to verify Linyi Chengen's reported log consumption against any third-party sources, such as supplier invoices. Final IDM at 25. Based on Commerce's application of the intermediate input methodology, Commerce calculated a dumping margin rate of 183.36% for Linyi Chengen. Final Determination, 82 Fed. Reg. at 53,462. Commerce applied Linyi Chengen's margin of 183.36% as the separate rate for the non-examined companies that were granted separate rate status ("all-others separate rate"), which was

---

1. Citations are to the public record ("PR"), confidential record ("CR"), public fifth remand record ("PRR"), and confidential fifth remand record ("CRR") document numbers filed in this case. ECF Nos. 52, 53, 103, 104, 130, 131, 199, 200, 217, 218, 234, 235.

assigned to the Separate Rate Plaintiffs. Id.; Final IDM at 48.

In Linyi Chengen I, this Court upheld the application of adverse facts available against Bayley and remanded with respect to Commerce's calculation of Linyi Chengen's dumping margin rate, instructing Commerce to reconsider the accuracy of Linyi Chengen's log consumption calculations and the all-others separate rate applied to the Separate Rate Plaintiffs based on any changes to Linyi Chengen's margin on remand. Linyi Chengen I, 43 CIT at ——, 391 F. Supp. 3d at 1297.

In Linyi Chengen II, this Court remanded for Commerce to accept documents offered by Linyi Chengen in order to provide a more complete record on which to base Commerce's reasoning. Linyi Chengen II, 44 CIT at ——, 433 F. Supp. 3d at 1285. The Court noted in Linyi Chengen II that Commerce should reconsider its application of the intermediate input methodology, accept the previously rejected documents that Linyi Chengen presented at verification, and make appropriate adjustments to the separate rates of other parties if Commerce made changes to Linyi Chengen's dumping margin on remand. Id. at ——, 433 F. Supp. 3d at 1286.

In the Second Remand Redetermination, Commerce accepted Linyi Chengen's verification documents, determined that Linyi Chengen's reported log volumes were accurate, and did not apply the intermediate input methodology to calculate Linyi Chengen's dumping margins. Linyi Chengen III, 44 CIT at ——, 487 F. Supp. 3d at 1354; see also Final Results of Redetermination Pursuant to Court Remand Order [for Slip Op. 20-22] ("Second Remand Redetermination"), ECF No. 113-1, 114-1. Commerce applied its normal methodology to value all factors of production used in each stage of production, did not apply adverse facts available to Linyi Chengen, and revised Linyi Chengen's dumping

margin from 183.36% to 0%. 44 CIT at ——, 487 F. Supp. 3d at 1356. Commerce applied adverse facts available to Bayley after determining that it was a China-wide entity and imposed an adverse facts available dumping margin rate ("AFA dumping margin rate" or "AFA rate") of 114.72% for Bayley. Id. Commerce recalculated the Separate Rate Plaintiffs' dumping margin rate by averaging Linyi Chengen's 0% rate and Bayley's 114.72% AFA rate, resulting in a revised dumping margin of 57.36% for the Separate Rate Plaintiffs. Id. at ——, 487 F. Supp. 3d at 1354.

In Linyi Chengen III, the Court sustained as reasonable and supported by substantial evidence Commerce's determination that Linyi Chengen's dumping margin was 0%, but remanded for Commerce to reconsider the all-others separate rate of 57.36%. See id. at ——, 487 F. Supp. 3d at 1359. This Court relied on Yangzhou Bestpak Gifts & Crafts Co. v. United States ("Yangzhou Bestpak"), 716 F.3d 1370 (Fed. Cir. 2013), holding that Commerce's determination of the all-others separate rate of 57.36% for the voluntary, fully cooperating Separate Rate Plaintiffs by using the simple average of Linyi Chengen's 0% rate and Bayley's AFA rate of 114.72% was unreasonable as applied, and remanded for Commerce to reconsider or provide additional evidence. Id. at ——, 487 F. Supp. 3d at 1358-59. The Court noted that Commerce created its own problem when it selected only two mandatory respondents, which resulted in minimal information on the record to support its assertions regarding the potential dumping margins of the Separate Rate Plaintiffs. Id. at ——, 487 F. Supp. 3d at 1358. The Court also found that the margins of 114.72% and 104.06% contained in the Petition did not provide support for the assertion that the Separate Rate Plaintiffs' dumping margins are different than Linyi Chengen's 0% rate because the mar-

gins in the Petition are "untethered" to the actual dumping margins of the Separate Rate Plaintiffs. Id. The Court concluded that Commerce failed to cite any credible economic evidence on the record showing that the Separate Rate Plaintiffs' dumping margins are different than Linyi Chengen's 0% rate or connecting the Separate Rate Plaintiffs' dumping margins with the rate of 57.36% that was derived from the average of Linyi Chengen's 0% and Bayley's AFA rate of 114.72%. Id. at ——, 487 F. Supp. 3d at 1359.

In the Third Remand Redetermination, Commerce again applied "any reasonable method" and calculated the all-others separate rate of 57.36% by using the simple average of Linyi Chengen's 0% rate and Bayley's AFA rate of 114.72%. Linyi Chengen IV, 45 CIT at ——, 539 F. Supp. 3d at 1276; see also Final Results of Redetermination to Court Remand Order [for Slip Op. 20-183] ("Third Remand Redetermination"), ECF No. 143-1, 144-1. Commerce reviewed a single commercial invoice and determined that the approximately 20% difference between the prices of the Petition Separate Rate Application and Linyi Chengen supported Commerce's application of a 57.36% all-others separate rate to the Separate Rate Plaintiffs. 45 CIT at ——, 539 F. Supp. 3d at 1277.

In Linyi Chengen IV, the Court concluded that Commerce reasonably supported its determination to depart from the expected method in determining the all-others separate rate because Linyi Chengen's 0% rate would not be reflective of the potential dumping margins, but remanded for Commerce to reconsider the all-others separate rate of 57.36%. Id. at ——, 539 F. Supp. 3d at 1276. The Court again relied on Yangzhou Bestpak and concluded that the 57.36% rate, based on the simple average of Linyi Chengen's 0% and Bayley's AFA rate of 114.72%, applied to the voluntary, fully cooperating Separate Rate

Plaintiffs was unreasonable as applied. Id. at ——, 539 F. Supp. 3d at 1277-78. The Court noted that Commerce was still required to assign dumping margins as accurately as possible, and that Commerce cited as record evidence only one commercial invoice showing the price difference of 20% between the prices of the Petition Separate Rate Application and Linyi Chengen. Id. This Court stated that Commerce acknowledged that the record provided no opportunity for Commerce to know or to calculate the actual dumping margins of the Separate Rate Plaintiffs. Id. The only substantiated and calculated basis for a dumping margin on the record was Linyi Chengen's 0% margin. Id. The Court remanded again because Commerce cited as record evidence only one commercial invoice showing an approximately 20% price difference, and concluded that Commerce's 57.36% all-others separate rate assigned to the voluntary, fully cooperating Separate Rate Plaintiffs was not reasonable or supported by substantial evidence. Id.

In the Fourth Remand Redetermination, Commerce applied "any reasonable method" and again calculated the all-others separate rate of 57.36% by using the simple average of Linyi Chengen's 0% rate and Bayley's AFA rate of 114.72%. Linyi Chengen V, 46 CIT at ——, 609 F. Supp. 3d at 1397; see also Final Results of Redetermination Pursuant to Court Remand Order [for Slip Op. 21-127] ("Fourth Remand Redetermination"), ECF No. 205-1, 206-1.

In Linyi Chengen V, the Court remanded for Commerce to reconsider its calculation of an all-others separate rate of 57.36%. 46 CIT at ——, 609 F. Supp. 3d at 1404. The Court again relied on Yangzhou Bestpak. in which Commerce calculated the all-others separate rate margin of Yangzhou Bestpak Gifts & Crafts Co. ("Bestpak") by using the simple average of an AFA rate and a de minimis rate, simi-

lar to the facts in this case. Id. at ——, 609 F. Supp. 3d at 1401-02. This Court found similarities between this case and Yangzhou Bestpak, in which the U.S. Court of Appeals for the Federal Circuit ("CAFC") held that substantial evidence did not support Commerce's all-others separate rate calculation and that the simple averaging of an AFA rate and a *de minimis* rate were unreasonable as applied to fully cooperating separate rate respondents. Id. at ——, 609 F. Supp. 3d at 1402. This Court noted that the CAFC found in Yangzhou Bestpak that it was unfair and perhaps punitive to assign a fully cooperating separate rate respondent a margin that was one half of the China-wide entity rate—a rate reserved for those entities presumed to be under foreign government control. Id. This Court also stated that the CAFC in Yangzhou Bestpak rejected Commerce's claim that time constraints precluded it from investigating more thoroughly, and the CAFC found no statutory or caselaw support for the proposition that limited resources or statutory time constraints can override fairness and accuracy. Id. at ——, 609 F. Supp. 3d at 1402-03. This Court concluded that the separate rate assigned to the voluntary, fully cooperating Separate Rate Plaintiffs was unreasonable as applied because it was one half of the AFA rate, making it unfair and unduly punitive, and the Court instructed Commerce to reconsider the all-others separate rate consistent with its opinion, including whether other evidence on the record supported a lower rate. Id. at ——, 609 F. Supp. 3d at 1403-04. The Court also concluded that because Commerce selectively analyzed the invoice data while ignoring other potentially contrary record evidence, Commerce's determination was not supported by substantial evidence. Id. at ——, 609 F. Supp. 3d at 1404. The Court advised Commerce to not submit the same 57.36% all-others separate rate for review without new, substantial evidence in support, as

this rate was unreasonable as applied to fully cooperating respondents. Id.

In the Fifth Remand Redetermination, Commerce assigned Linyi Chengen's antidumping duty margin of 0% to the Separate Rate Plaintiffs under protest and explained that Commerce would exclude from the Order voluntary applicants who submitted all initial responses, while including in the Order voluntary applicants who failed to submit all initial responses on time. Fifth Remand Redetermination at 21-22.

## JURISDICTION AND STANDARD OF REVIEW

[1] The U.S. Court of International Trade has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final results of an administrative review of an antidumping duty order. The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). The Court reviews determinations made on remand for compliance with the Court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I. Legal Framework

Commerce is authorized by statute to calculate and impose a dumping margin on imported subject merchandise after determining that it is sold in the United States at less than fair value. 19 U.S.C. § 1673. Commerce determines an estimated weighted average dumping margin for each individually examined exporter and producer and one all-others separate rate

for non-examined companies. 19 U.S.C. § 1673d(c)(1)(B). The CAFC has upheld Commerce's reliance on this method for determining the estimated all-others separate rate in § 1673d(c)(5) when "determining the separate rate for exporters and producers from [non-market] economies that demonstrate their independence from the government but that are not individually investigated." Changzhou Hawd Flooring Co. v. United States ("Changzhou Hawd IV"), 848 F.3d 1006, 1011-12 (Fed. Cir. 2017) (citing Albemarle Corp. & Subsidiaries v. United States ("Albemarle Corp."). 821 F.3d 1345, 1348 (Fed. Cir. 2016)).

The general statutory rule for calculating the all-others separate rate is to weight-average the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely on the basis of facts available, including adverse facts available. 19 U.S.C. § 1673d(c)(5)(A). If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis, or are determined entirely under 19 U.S.C. § 1677e, Commerce may invoke an exception to the general rule. Id. § 1673d(c)(5)(B).

The Statement of Administrative Action provides guidance that when the dumping margins for all individually examined respondents are determined entirely on the basis of the facts available or are zero or de minimis, the "expected method" of determining the all-others separate rate is to weight-average the margins determined pursuant to the facts available and the zero and de minimis margins, provided that volume data is available. Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No.

103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201.

Commerce may depart from the "expected method" and use "any reasonable method" if it reasonably concludes that the expected method is not feasible or results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers. See 19 U.S.C. § 1673d(c)(5)(B); Navneet Publ'ns (India) Ltd. v. United States, 38 CIT ——, ——, 999 F. Supp. 2d 1354, 1358 (2014) ("[T]he following hierarchy [is applied] when calculating all-others rates— (1) the '[g]eneral rule' set forth in [19 U.S.C.] § 1673d(c)(5)(A), (2) the alternative 'expected method' under [19 U.S.C.] § 1673d(c)(5)(B), and (3) any other reasonable method when the 'expected method' is not feasible or does not reasonably reflect potential dumping margins."); see also SAA at 873, reprinted in 1994 U.S.C.C.A.N. at 4201; Albemarle Corp., 821 F.3d at 1351-52 (quoting SAA at 873, reprinted in 1994 U.S.C.C.A.N. at 4201). Any reasonable method may include averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated. 19 U.S.C. § 1673d(c)(5)(B).

[2–4]  While Commerce is permitted to use various methodologies, "it is possible for the application of a particular methodology to be unreasonable in a given case." Yangzhou Bestpak, 716 F.3d at 1378 (quoting Thai Pineapple Canning Indus. Corp. v. United States, 273 F.3d 1077, 1085 (Fed. Cir. 2001)). Separate rate calculations for non-mandatory, cooperating separate rate respondents must bear some relationship to the respondents' actual dumping margins despite a thin record. See generally id. at 1379-80; see also F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("[T]he purpose of [19 U.S.C.

§ 1677e] is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."). A speculative dumping margin using the average of a *de minimis* rate and an AFA rate cannot be upheld based on weak record evidence, particularly when Commerce itself created the scarcity of evidence. See Bosun Tools Co. v. United States ("Bosun Tools"). No. 2021-1930, 2022 WL 94172, at *4 (Fed. Cir. 2022) (comparing Yangzhou Bestpak where "the record was 'so thin' that Commerce could not have reasonably 'found evidence to support [its] determination'" to Bosun Tools where "in contrast, there was no such lack of data").

## II. The All-Others Separate Rate

Defendant-Intervenor argues that Commerce's determination to assign Linyi Chengen's rate of 0% to the Separate Rate Plaintiffs should be remanded because it is not supported by substantial evidence or otherwise in accordance with law, and requests that the Court remand for Commerce to either reopen the record or issue a determination that is consistent with the Court's prior rulings. Def.-Interv.'s Opp'n Cmts. at 6-11; Def.-Interv.'s Suppl. Letter at 2.

Consolidated Plaintiffs assert that Commerce's determination to assign the Separate Rate Plaintiffs a 0% margin rate is reasonable and that the Court should not order Commerce to reopen the record on remand to collect additional information to recalculate a separate rate above zero.[2] See Dehua TB's Cmts. at 1-7; Taraca's Cmts. at 2-6; Celtic's Cmts. at 2-7; Dehua

TB's Suppl. Letter; Taraca's Suppl. Letter; Celtic's Suppl. Letter.

Defendant contends that Commerce's calculation of the separate rate is in accordance with the Court's remand order. Def.'s Cmts. at 6-10. Defendant did not file a post-argument letter regarding the issue of re-opening the record.

### A. Alternative Margin Calculation Options

[5] Commerce had at least six alternatives to consider in determining the dumping margin for the Separate Rate Plaintiffs: 0%, 57.36%, and four additional options proposed by Defendant-Intervenor during the fifth remand. Commerce considered all of these options and ultimately selected 0% in the Fifth Remand Redetermination, explaining that, "[a]fter weighing all options and considering the views of the Court, we find, under protest, that assigning the rate calculated for [Linyi Chengen], *i.e.*, zero percent, is the only remaining alternative on the record." Fifth Remand Redetermination at 2.

Defendant-Intervenor contends that Commerce ignored other viable alternatives, arguing that Commerce failed to evaluate the alternative options because there is "no rational connection between the facts found (*i.e.*, the Coalition's methodologies are less preferable than the 57.36[%]) and the choices made (*i.e.*, assigning [Linyi] Chengen's [0%] margin)." Def.-Interv.'s Opp'n Cmts. at 8-11; see also Petitioner, Cmts. Draft Results Redetermination (Mar. 1, 2023) ("Coalition's Comments on Draft Results") at 6-11, PRR 7, CRR 1. Defendant-Intervenor claims that

---

**2.** Consolidated Plaintiffs Dehua TB and Taraca also incorporate by reference the arguments of the other Parties in support of Commerce's determination to assign a zero margin to Separate Rate Plaintiffs. See Dehua TB's Cmts. at 8 ("Consolidated Plaintiffs join in and incorporate by reference the ar-

guments of the other parties in support of Commerce's [Fifth] Remand Redetermination."); Taraca's Cmts. at 7 ("Taraca et al. also hereby adopt and incorporate by reference the comments being filed on the Fifth Remand Redetermination regarding the recalculation of the separate rate.").

Commerce did not address whether these methodologies constituted "reasonable methods" but only explained why these alternatives are less preferable than the 57.36% margin. Def.-Interv.'s Opp'n Cmts. at 8-11. Defendant-Intervenor challenges Commerce's rejection of the fourth alternative option as a "fallacy," arguing that Commerce relied in part on Plaintiff's data in rejecting this option, yet it ultimately relied on Plaintiff's data to apply a margin. Id. at 9-10.

Commerce considered the four alternatives proposed by Defendant-Intervenor in the Coalition's Comments on Draft Results, but determined that the 0% rate calculated for Linyi Chengen was the only remaining alternative on the record. Fifth Remand Redetermination at 15-16. This Court previously concluded that a calculation of the all-others separate rate of 57.36% assigned to the voluntary, fully cooperating Separate Rate Plaintiffs was unreasonable as applied pursuant to Yangzhou Bestpak.

Defendant-Intervenor's proposed alternatives result in margins that are neither 0% nor 57.36%. The first option proposed by Defendant-Intervenor suggests that Commerce should calculate normal value with a simple average of the Petition normal value and Linyi Chengen's normal value, and U.S. price with "weight-average unit values" ("AUVs") reported in quantity and value ("Q&V") submissions from all separate applicants, adjusted by the weighted selling expense adjustments reported by Linyi Chengen, for a margin of 10.06%. Coalition's Comments on Draft Results at 8-10.

The second option proposed by Defendant-Intervenor suggests that Commerce should calculate normal value based on the Petition normal value only and U.S. price based on Q&V AUVs, without selling expense adjustments, for a margin of 57.08%. Id. at 10.

The third option proposed by Defendant-Intervenor suggests that Commerce should weight-average the "bookend margins" by assigning a 0% rate to separate rate applicants with a Q&V AUV above Linyi Chengen's weighted average sale price, and the Petition margin of 114.72% to separate rate applicants with Q&V AUVs below Linyi Chengen's weighted average sale price, for a margin of 44.15%. Id. at 10-11.

The fourth option proposed by Defendant-Intervenor suggests that Commerce should calculate normal value based on product-specific normal values for Linyi Chengen and from the Petition, and U.S. price based on sales documentation provided by all separate rate applicants with two sub-options: (1) Commerce should match specific products with product-specific normal values for Linyi Chengen and the Petition when there are specific products; and (2) Commerce should use an average of the matching models for normal value from Linyi Chengen and the Petition for when there are products that include some, but not all, matching details, for a margin of 10.52%. Id.

Commerce explained that, "[a]lthough we appreciate the [Coalition's] creative attempts to determine other methodologies to calculate a separate rate, we disagree that these methodologies are more appropriate than the 57.36% margin, which we maintain is the appropriate alternative to the accurate margin calculated in the underlying investigation." Fifth Remand Redetermination at 15. Commerce stated that a methodology relying on Q&V AUVs as the basis for U.S. price is not superior to the methodologies that it applied in the Third Remand Redetermination and the Fourth Remand Redetermination. Id.; see Third Remand Redetermination; Fourth Remand Redetermination. Commerce acknowledged that Q&V data provide a glob-

al average view of a company's selling behavior, but rejected such methodology because such data do not consider product mix, which can be significant in some cases. <u>Fifth Remand Redetermination</u> at 5. Commerce stated that in prior remand determinations, it compared the Petition data and the separate rate applicants' actual selling behavior during the period of investigation and intentionally compared prices and costs for products that could be identified as identical products due to significant differences in pricing behaviors with such products. <u>Id.</u>; <u>see Third Remand Redetermination</u>; <u>Fourth Remand Redetermination</u>.

Even though the fourth option addressed the specificity issue (matching similar products to the corresponding normal values), Commerce rejected the fourth option because the proposed methodology did not consider the differences between Plaintiff's and the Separate Rate Plaintiffs' companies. <u>Fifth Remand Redetermination</u> at 15-16. Commerce explained that due to differences between these two types of companies, such as a difference in cost structure, the comparisons between the selling price of these companies and normal value based on Plaintiffs data would be unreliable and likely unrepresentative of the Separate Rate Plaintiffs' potential dumping. <u>Id.</u> Commerce stated that Plaintiffs selling behavior would not be reflective of the Separate Rate Plaintiffs', and in turn, not reflective of the Separate Rate Plaintiffs' estimated dumping margin during the period of investigation. <u>Id.</u>

[6] The Court concludes that Commerce properly considered and rejected Defendant-Intervenor's proposed alternatives because Commerce articulated its reasons for rejecting the methodologies based on Q&V data and its review of record evidence. The Court will uphold the agency's determination if the agency has examined the relevant data, articulated a satisfactory explanation, and accounted for detracting evidence. <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.</u>, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In the fifth remand, Commerce explained that it considered six possibilities for the all-others separate rate: the 0% rate, the 57.36% rate, and the four alternative rates proposed by Defendant-Intervenor. Commerce articulated its reasons for rejecting the four options proposed by Defendant-Intervenor based on Commerce's analysis of economic evidence on the record showing differences between Linyi Chengen and the Separate Rate Plaintiffs, such as their selling, cost structure, and pricing that could not be adequately addressed by Defendant-Intervenor's proposed methodologies. This Court in <u>Linyi V</u> instructed Commerce to not resubmit the unreasonable as applied 57.36% rate without new evidence in Commerce's <u>Fifth Remand Redetermination</u>. <u>Linyi V</u>, 46 CIT at ——, 609 F. Supp. 3d at 1404. Commerce could not cite new evidence in support of its 57.36% rate, and thus determined that the 0% rate was the only remaining option available to Commerce.

Accordingly, because Commerce articulated its reasoning sufficiently, the Court sustains Commerce's determination to assign an antidumping duty margin rate of 0% to the Separate Rate Plaintiffs.

### B. Reopening the Record

Defendant-Intervenor requests that the Court direct Commerce to either calculate a margin other than 0% or 57.36%, or to remand with a request that Commerce reopen the administrative record to calculate a margin other than 0% or 57.36%. Def.-Interv.'s Suppl. Letter at 1-5. Defendant-Intervenor contends that remand is appropriate for Commerce to reopen the

record to collect additional information to calculate a different separate rate. Id. at 6.

Plaintiff and Consolidated Plaintiffs assert that the Court should not require Commerce to reopen the record. See Dehua TB's Suppl. Letter; Celtic's Suppl. Letter; Taraca's Suppl. Letter. Consolidated Plaintiffs Dehua TB and Celtic also raise the issues of fairness, finality, and judicial economy if Commerce were to reopen the record for a sixth remand redetermination. Dehua TB's Suppl. Letter at 4; Celtic's Suppl. Letter at 5-6.

[7, 8]  Judicial compulsion to reopen the record is limited to unusual circumstances, such as fraud or record inaccuracies. Essar Steel Ltd. v. United States, 678 F.3d 1268, 1277-78 (Fed. Cir. 2012); see Home Prods. Int'l, Inc. v. United States, 633 F.3d 1369, 1376, 1381 (Fed. Cir. 2011); Gold East Paper (Jiangsu) Co. v. United States, 38 CIT ——, ——, 991 F. Supp. 2d 1357, 1361-65 (2014); Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1377 (Fed. Cir. 2012). This case does not present facts such as fraud or inaccuracies in the record that fall under the limited exceptions to justify the Court remanding for Commerce to reopen the record. Although the Court has noted several times that the paucity of the record is Commerce's own making due to its selection of only two mandatory respondents, similar to the facts in Yangzhou Bestpak, the Court concludes that Commerce's decision to not reopen the record at this time after nearly six years of litigation is not arbitrary and capricious. The Court will not remand to request Commerce to reopen or supplement the record.

### III.  Exclusion and Inclusion of Voluntary Applicant Firms

Commerce determined that voluntary applicant firms (or voluntary-review firms) who submitted timely complete responses would be excluded from the Order, but firms who submitted only incomplete voluntary applicant requests without full responses would continue to be included in the Order. See Fifth Remand Redetermination at 18-21.

Defendant-Intervenor challenges Commerce's determination to exclude Jiangyang Wood and Dehua TB (voluntary applicant firms who submitted full responses) from the Order but supports Commerce's determination to include Sanfortune Wood and Longyuan Wood (voluntary applicant firms who submitted shorter two-page requests) in the Order. Def.-Interv.'s Opp'n Cmts. at 11-16; Def.-Interv.'s Supp. Cmts. at 2-6. Defendant-Intervenor contends that Jiangyang Wood, Dehua TB, Sanfortune Wood, and Longyuan Wood should all be included in the Order based on the CAFC's holding in Changzhou Hawd Flooring Co. v. United States ("Changzhou Hawd VI"), 947 F.3d 781, 790 (Fed. Cir. 2020), and Commerce's administrative determination in Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam, 86 Fed. Reg. 28,559 (Dep't of Commerce May 27, 2021) (final affirmative determination of sales at less than fair value), and accompanying Issues and Decision Memorandum. Id. Sanfortune Wood and Longyuan Wood argue that they should be excluded from the Order, but do not challenge Commerce's exclusion of Jiangyang Wood and Dehua TB from the Order. Sanfortune Wood's and Longyuan Wood's Cmts. at 1. Defendant asserts that Commerce correctly proposed to exclude certain companies from the Order. Def.'s Cmts. at 10-14. Consolidated Plaintiffs neither challenge Commerce's exclusion of Jiangyang Wood and Dehua TB from the Order nor comment on the inclusion of Sanfortune Wood and Longyuan Wood in the Order. See Dehua TB's Cmts. at 7; Celtic's Cmts. at 7-11; Taraca's Cmts. at 6-7. Consolidated Plaintiff Dehua TB incorporates by reference the arguments

of the other Parties in support of Commerce's determination to exclude Dehua TB and Jiangyang Wood. See Dehua TB's Cmts. at 8.

## A. Commerce's Exclusion Regulation

Commerce has provided that it will exclude from an affirmative final determination "any exporter or producer for which [Commerce] determines an individual weighted-average dumping margin . . . of zero or *de minimis*." 19 C.F.R. § 351.204(e)(1); see also 19 U.S.C. § 1673d(a)(4) ("In making a determination under this subsection, the administering authority shall disregard any weighted average dumping margin that is *de minimis* as defined in section 1673b(b)(3) of this title"). The CAFC has stated that "it is clear that individually reviewed firms with *de minimis* dumping margins must be excluded from all obligations under an antidumping duty order, [but] the statute does not speak with any clarity to conferring the same benefit on non-individually reviewed firms assigned a *de minimis* dumping margin or zero rate." Changzhou Hawd VI, 947 F.3d at 790; see also Changzhou Hawd Flooring Co. v. United States ("Changzhou Hawd V"), 42 CIT ——, ——, 324 F. Supp. 3d 1317, 1325-26 (2018), aff'd, 947 F.3d 781 (Fed. Cir. 2020) (finding the statutory language ambiguous when discussing "whether that [0%] 'all-others rate,' 19 U.S.C. §§ 1673d(c)(1)(B)(i)(II), 1673d(c)(5), constitutes 'any' *de minimis* weighted average dumping margin that Commerce must 'disregard' pursuant to 19 U.S.C. § 1673d(a)(4)").

The Court finds guidance in Changzhou Hawd V, which explained:

> What does give the court pause, however, is Commerce's application of the exclusion regulation to the Voluntary Applicants. Given the history of the exclusion regulation in which concerns about limiting exclusion to selected/mandatory respondents were miti-

gated through the availability of voluntary examination, there is an inherent arbitrariness in Commerce (1) issuing a blanket refusal to entertain voluntary examination requests, and (2) subsequently denying exclusion to the Voluntary Applicants that were assigned a "representative" separate rate of zero (which again, is just a proxy for the individual weighted average dumping margins Commerce should theoretically calculate for all respondents).

Changzhou Hawd V, 42 CIT at ——, 324 F. Supp. 3d at 1326-27. The court reasoned that:

> Commerce's application of its exclusion regulation to the Voluntary Applicants it assigned "representative" [0%] margins has two insurmountable problems. The first is Commerce's refusal to conduct any voluntary examinations, preventing the Voluntary Applicants from demonstrating directly their own evidence of fair trading. The second is Commerce's continuing assumption or inference that Voluntary Applicants denied individual examination and ultimately assigned a "representative" [0%] margin were nevertheless unfairly trading, precluding exclusion. The court questions how a reasonable mind could maintain such an assumption or inference against the Voluntary Applicants.

Id. at ——, 324 F. Supp. 3d at 1327.

The CAFC affirmed the conclusion that Commerce did not adequately support its determination to include voluntary applicants in the Order but provided two caveats to its ruling:

> [First,] we say nothing about [the U.S. Court of International Trade's] reversal of Commerce rather than remand for further explanation . . . [and second,] we understand [the court's decision to exclude voluntary-review firms from the antidumping duty order] as not going

beyond holding that Commerce has not in this proceeding provided a sufficient rationale for continuing to include the voluntary-review firms in the [antidumping duty order], and we rely on that understanding in affirming the [court's] judgment. It remains open to Commerce in the future, should the issue arise, to address this issue more fully than it has done in this investigation. We do not prejudge the reasonableness of any justification Commerce might yet articulate for deciding to include voluntary-review firms in an antidumping-duty order.

Changzhou Hawd VI, 947 F.3d at 794. Commerce interpreted the Changzhou Hawd VI holding to allow Commerce to determine its position on when to grant exclusions to voluntary-review firms. See Fifth Remand Redetermination at 18-19 ("[Changzhou Hawd VI] does not compel Commerce to exclude all companies that requested voluntary status but that it would review any further explanation provided by Commerce at that time.").

## B. Analysis

Commerce distinguished between the two types of voluntary applicants in the fifth remand—Dehua TB and Jiangyang Wood, who submitted requests for voluntary respondent treatment with hundreds of pages of questionnaire responses and supporting documentation, and Sanfortune Wood and Longyuan Wood, who submitted two-page requests with no questionnaire responses or supporting documentation. Fifth Remand Redetermination at 20; see Jiangyang Wood's Sec. A Resp. (Feb. 13, 2017), PR 308-10, CR 245-47; Jiangyang Wood's Sec. C Resp. (Feb. 28, 2017), PR 351, CR 289-92; Jiangyang Wood's Sec. D Resp. (Feb. 28, 2017), PR 352, CR 293-304; Longyuan Wood Letter, "Request for Treatment as Mandatory Respondent or Request for Voluntary Respondent Treatment as an Alternative" (Dec. 9, 2016), PR 44; Sanfortune Wood Letter, "Request for Treatment as Mandatory Respondent or Request for Voluntary Respondent Treatment as an Alternative" (Dec. 9, 2016), PR 43.[3] Commerce explained that Jiangyang Wood and Dehua TB should be excluded from the Order because they met the first requirement to be considered for voluntary respondent status under 19 U.S.C. § 1677m(a), filing the same information expected from mandatory respondents by the same deadline. Fifth Remand Redetermination at 19-20. In contrast, Commerce noted that Sanfortune Wood's and Longyuan Wood's two-page requests were "virtually identical in content and required no commitment or effort on behalf of these companies" and were not certified, compared to the "hundreds of pages of questionnaire responses and supporting documentation, as well as sales and factor of production databases" from Jiangyang Wood and Dehua TB. Id. at 20. Commerce reasoned that:

> [T]here is a significant difference between those companies that merely submit a brief statement requesting to be selected as a voluntary respondent and those companies that provide complete questionnaire responses by the deadlines established for the mandatory respondents, such that Commerce has the information before it to potentially select them as voluntary respondents and still complete the investigation without undue delay.

Id. at 20-21.

Pursuant to 19 U.S.C. § 1677m(a), upon limiting the number of respondents under 19 U.S.C. § 1677f-1(c), Commerce "shall

---

3. Dehua TB's responses to Sections A, C, and D were not included in the administrative record.

establish an . . . individual weighted average dumping margin for [a company] not initially selected for individual examination" if: (1) the company seeking individual examination submits "*the information requested from exporters or producers selected for examination*" by the same deadlines that apply to the selected respondents; and (2) the number of such companies is not so large to burden or delay investigation of the individually examined companies. See 19 U.S.C. § 1677m(a) (emphasis added). A voluntary respondent accepted for individual examination is subject to the same requirements as a company initially selected by Commerce for individual examination under 19 U.S.C. § 1677f-1(c)(2) or 19 U.S.C. § 1677f-1(e)(2)(A), including the requirements of 19 U.S.C. § 1677m(a). See 19 C.F.R. § 351.204(d)(2).

The Court agrees with Defendant's argument that, "[c]rucially, the relevant portion of the statute only applies to a party 'who submits to the administering authority the information requested from exporters or producers selected for examination.'" Def.'s Cmts. at 13 (citing 19 U.S.C. § 1677m(a)). The Court also finds the Coalition's argument persuasive when it states that:

> Indeed, even if Commerce had selected voluntary respondents, [Sanfortune Wood and Longyuan Wood] would not have been eligible to be selected as they did not satisfy the requirements to be treated as a voluntary respondent. . . . In other words, even if Commerce had accepted companies as voluntary respondents and calculated individual margins for these companies, no such margins would have been calculated for [Sanfortune Wood and Longyuan Wood],

Def.-Interv.'s Supp. Cmts. at 3 (citing Fifth Remand Redetermination at 19-20 (explaining that a company must submit responses to the questionnaires by the deadline established for the mandatory respondents to be considered for voluntary respondent status)).

This case involves the situation contemplated by the CAFC in Changzhou Hawd VI when the court stated that:

> It remains open to Commerce in the future, should the issue arise, to address this issue more fully than it has done in this investigation. We do not prejudge the reasonableness of any justification Commerce might yet articulate for deciding to include voluntary-review firms in an antidumping-duty order.

Changzhou Hawd VI, 947 F.3d at 794.

[9] The Court concludes that Commerce's distinction between the voluntary applicants based on whether "full questionnaire responses" were submitted in accordance with 19 U.S.C. § 1677m(a) is a reasonable justification to exclude from the Order the voluntary applicants who submitted timely full questionnaire responses because they submitted the same information required of mandatory respondents by the same deadline that would allow Commerce to select them as voluntary respondents, if Commerce had chosen to select any voluntary respondents in this case.

[10] In an issue of first impression before the U.S. Court of International Trade, the Court also concludes that Commerce's determination to include in the Order voluntary applicants who failed to submit the full responses expected of mandatory respondents under 19 U.S.C. § 1677m(a) is reasonable because those voluntary applicants could not be selected as voluntary respondents due to incomplete and untimely information filed. In a case such as this, when voluntary applicants submit only a two-page request for voluntary respondent treatment without timely submitting any of the information required of mandatory respondents pursuant to 19 U.S.C. § 1677m(a), the Court concludes that it is reasonable for Commerce to include those

voluntary applicants in the Order. By submitting only a cursory request for voluntary respondent treatment without satisfying the statutory criteria under 19 U.S.C. § 1677m(a), those voluntary applicants would not be eligible for individually calculated margins even if they had been selected by Commerce as voluntary respondents. Sanfortune Wood and Longyuan Wood argue that they were not given a chance to directly demonstrate their own evidence of fair trading because Commerce refused to conduct voluntary examinations, but they did not satisfy the statutory criteria by filing timely information required of mandatory respondents that would enable them to prove their fair trading if selected as voluntary respondents. See Sanfortune Wood's and Longyuan Wood's Cmts. at 4.

The Court concludes that Commerce provided a reasonable explanation to justify its exclusion from the Order the voluntary applicants who submitted timely requests for voluntary respondent treatment with hundreds of pages of questionnaire responses and supporting documentation, providing the same information that mandatory respondents submitted by the same deadline in accordance with 19 U.S.C. § 1677m(a). The Court also holds that Commerce was reasonable in continuing to include those voluntary applicants in the Order who did not submit timely information providing the same information that mandatory respondents submitted by the same deadline in accordance with 19 U.S.C. § 1677m(a).

### CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Court sustains Commerce's all-others separate rate assigned to the Separate Rate Plaintiffs; and it is further

**ORDERED** that the Court sustains Commerce's determination to exclude De-

hua TB and Jiangyang Wood from the Order; and it is further

**ORDERED** that the Court sustains Commerce's determination to include Sanfortune Wood and Longyuan Wood in the Order; and it is further

**ORDERED** that the Court sustains Commerce's Fifth Remand Redetermination.

Judgment shall issue accordingly.



RISEN ENERGY CO., LTD., Plaintiff,

JA Solar Technology Yanghou Co. Ltd., et al., Consolidated Plaintiffs,

v.

UNITED STATES, Defendant.

Slip Op. 23-148
Consol. Court No. 22-00231

United States Court of International Trade.

October 11, 2023

**Background:** Foreign exporters filed suit challenging final determination of Department of Commerce in eighth administrative review of countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules, in other words, solar cells from People's Republic of China.

**Holdings:** The Court of International Trade, Jane A. Restani, J., held that:

(1) voluntary remand would be granted for reconsideration of application of adverse facts available (AFA) for one exporter;

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **LINYI CHENGEN IMPORT AND EXPORT CO., LTD.,** | |
| Plaintiff, | |
| and | |
| **CELTIC CO., LTD., ET AL.,** | |
| Consolidated Plaintiffs, | **Before: Jennifer Choe-Groves, Judge** |
| v. | **Consol. Court No. 18-00002** |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD,** | |
| Defendant-Intervenor. | |

## JUDGMENT

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. Department of Commerce's final determination in <u>Certain Hardwood Plywood Products from the People's Republic of China</u>, 83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018) (amended final determination of sales at less than fair value, and antidumping duty order), <u>as amended</u>, Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 88-1, 89-1; Final Results of Redetermination Pursuant to Court Remand, ECF No. 113-1, 114-1; Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 143-1, 144-1; Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 205-1,

206-1; and Final Results of Redetermination Pursuant to Court Remand, ECF No. 221-1, is

sustained and judgment is entered for Defendant.


           /s/ Jennifer Choe-Groves

          Jennifer Choe-Groves, Judge


Dated:    October 10, 2023

        New York, New York

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1258, 2024-1259

**Short Case Caption:** Linyi Chengen Import and Export Co., Ltd. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes ___8,595___ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __05/10/2024__

Signature: _/s/ Timothy C. Brightbill_

Name: _Timothy C. Brightbill_

Save for Filing