IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

Nos. 2024-1258, 2024-1259

LINYI CHENGEN IMPORT AND EXPORT CO., LTD., et al.,
Plaintiffs-Appellees,

v.

UNITED STATES, COALITION FOR
FAIR TRADE OF HARDWOOD PLYWOOD
Defendants-Appellants.

Appeals from the United States Court of International Trade in Nos. 1:18-cv-
00002-JCG, 1:18-cv-00011-JCG, 1:18-cv-00017-JCG, 1:18-cv-00018-JCG, 1:18-
cv-00019-JCG, Judge Jennifer Choe-Groves

OPENING BRIEF FOR DEFENDANT-APPELLANT UNITED STATES

OF COUNSEL:

SAVANNAH MAXWELL
Attorney
Office of the Chief Counsel
  for Trade Enforcement and
Compliance

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC  20044
Tel.: (202) 305-7568
Fax: (202) 514-8624
Attorneys for Defendant

May 10, 2024

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF RELATED CASES ...................................................1

STATEMENT OF JURISDICTON ......................................................1

INTRODUCTION ............................................................................2

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF THE CASE..............................................................4

       1.     Nature Of The Case .........................................................4

  II.    Legal Framework For Antidumping Duty Proceedings .......................5

      A.    Commerce's Investigation May Lead To The Issuance Of An Antidumping Duty Order............................................................ 5

      B.    Commerce's Verification Process ...............................................6

      C.    Commerce's Use Of The Intermediate Input Methodology...... 8

      D.    Commerce's Separate Rate Methodology ............................... 10

  III.    Administrative Proceedings ................................................. 12

      A.    Commerce's Initial Proceedings And Preliminary Determination............................................................. 12

      B.    Commerce Discovers Information At Verification Calling Into Question Chengen's Log Data ...................................15

      C.    Post-Verification Administrative Proceedings ....................... 17

          1.     Chengen's Case Briefing................................................ 17

i

2.     Final Determination ....................................................... 18

3.     Chengen's Belated Attempts To Submit More Untimely Information ...................................................20

IV.     Trial Court Proceedings .................................................... 22

A.     First Remand Order And Remand Results ..............................23

B.     Second Remand Order And Remand Results ..........................27

C.     Third Remand Order And Remand Results .............................30

D.     Fourth Remand Order And Remand Results ...........................32

E.     Fifth Remand Order And Remand Results ..............................34

F.     Final Opinion And Judgment..................................................35

SUMMARY OF THE ARGUMENT ...................................................... 36

ARGUMENT ............................................................................................ 37

I.     Standard Of Review ........................................................................37

II.     The Trial Court Erroneously Considered Extra-Record Information And Exceeded Its Authority By Requiring Commerce To Put The Information On The Record ............................................... 38

A.     Commerce's Procedures For Collecting Factual Information And Submission Of Argument................................. 39

B.     The Trial Court Should Not Have Accepted Extra-Record, Untimely Submitted Information That Commerce Had Lawfully Declined To Consider................................ 40

C.     The Court Erred By Ordering Commerce To Reopen The Record And Deeming The New Record Information Complete And Accurate ...........................................................47

ii

III.    The Trial Court Erred In Holding Unlawful Commerce's Reasonable Methodological Choice To Apply The Intermediate Input Methodology Based, In Part, On The Inability To Corroborate Poplar Log Purchases ......................................................................51

IV.    Commerce's Calculation Of The 57.36 Percent Separate Rate Was Lawful And Supported By Substantial Evidence ............................55

CONCLUSION ....................................................................................64

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Am. Alloys, Inc. v. United States*,
    30 F.3d 1469 (Fed. Cir. 1994) ........................................................46

*Am. Silicon Techs v. United States.*,
    261 F.3d 1371 (Fed. Cir. 2001) ...................................................60

*Bosun Tools Co., Ltd. v. United States*,
    No. 2021-1929, 2022 WL 94172 (Fed. Cir. 2022).......................................63

*Consol. Bearings Co. v. United States*,
    348 F.3d 997 (Fed. Cir. 2003) ........................................................45

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938).......................................................60

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012) ........................................ 47, 48, 49

*F. Ili De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000) ........................................................53

*Fine Furniture (Shanghai) Ltd. v. United States*,
    865 F. Supp. 2d 1254 (Ct. Int'l Trade 2012).................................................53

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ........................................................37

*Ghigi 1870 S.p.A. v. United States*,
    547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021).................................................7

*Goodluck India Ltd. v. United States*,
    11 F.4th 1335 (Fed. Cir. 2021) ........................................... passim

*JBF RAK LLC v. United States*,
    790 F.3d 1358 (Fed. Cir. 2015) ...................................................52

iv

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*,
    28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) .................................................52

*Linyi Chengen Import and Export Co., Ltd. v. United States*,
    391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) .................................................4

*Linyi Chengen Import and Export Co., Ltd. v. United States*,
    433 F. Supp. 3d 1278 (Ct. Int'l Trade 2020) .................................................4

*Linyi Chengen Import and Export Co., Ltd. v. United States*,
    487 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) .................................................4

*Linyi Chengen Import and Export Co., Ltd. v. United States*,
    539 F. Supp. 3d 1269 (Ct. Int'l Trade 2021) .................................................4

*Linyi Chengen Import and Export Co., Ltd. v. United States*,
    609 F. Supp. 3d 1392 (Ct. Int'l Trade 2022) .................................................4

*Linyi Chengen Import and Export Co., Ltd. v. United States*,
    658 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) .................................................5

*M S Int'l, Inc. v. United States*,
    32 F.4th 1145 (Fed. Cir. 2022) ...................................................................44

*Matsushita Elec. Indus. Co., Ltd v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) ...................................................................50

*Micron Tech., Inc. v. U.S.*,
    117 F.3d 1386 (Fed. Circ. 1997) ............................................................7, 46

*Ozdemir Boru San. ve Tic. Ltd. Sti. v. United States*,
    273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) .................................................7

*Papierfabrik August Koehler SE v. United States*,
    843 F.3d 1373 (Fed. Cir. 2016) ...................................................................45

*PSC VSMPO-Avisma Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012) ...................................................................49

*QVD Food Co., Ltd. v. United States*,
  658 F.3d 1318 (Fed. Cir. 2011) ....................................................40

*Reiner Brach GmbH & Co. KG v. United States*,
  206 F. Supp. 2d 1323 (Ct. Int'l Trade 2002)................................44

*Sandvik Steel Co. v. United States*,
  164 F.3d 596 (Fed. Cir. 1998) .....................................................40

*Shakeproof Assembly Components v. United States*,
  268 F.3d 1376 (Fed. Cir. 2001) .....................................................8

*Shelter Forest Int'l Acquisition v. United States*,
  497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021)................................45

*Shenzhen Xinboda Industrial Co., Ltd. v. United States*,
  456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020)..............................8, 9

*Sigma Corp. v. United States*,
  117 F. 3d 1401 (Fed. Cir. 1997) ...................................................11

*Ticaret A.S. v. United States*,
  61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015).....................................7

*Timken U.S. Corp. v. United States*,
  434 F.3d 1345 (Fed. Cir. 2006) ....................................................44

*TMK IPSCO v. United States*,
  179 F. Supp. 3d 1328 (Ct. Int'l Trade 2016)................................46

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
  716 F.3d 1370 (Fed. Cir. 2013) ................................... 11, 62, 63, 64

*Zenith Elecs. Corp. v. United States*,
  988 F.2d 1573 (Fed. Cir. 1993) ....................................................48

*Zhejiang Machinery Import & Export Corp. v. United States*,
  65 F.4th 1364 (Fed. Cir. 2023) .....................................................11

vi

*Zhengzhou Harmoni Spice Co. v. United States*,
    33 Ct. Int'l Trade 453, 617 F. Supp. 2d 1281 (2009) ..................................8

## **STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(I) ....................................................................37

19 U.S.C. § 1516a(b)(2)(A) ......................................................................40

19 U.S.C. § 1673 ........................................................................................5

19 U.S.C. § 1673d(a)(1) .............................................................................6

19 U.S.C. § 1673d(b)(1) .............................................................................6

19 U.S.C. § 1673d(c)(2) .............................................................................6

19 U.S.C. § 1673d(c)(5) .....................................................................passim

19 U.S.C. § 1675(a)(2)(A) ..........................................................................5

19 U.S.C. § 1675(a)(2)(C) ..........................................................................5

19 U.S.C. § 1677b(c) .................................................................................5

19 U.S.C. § 1677b(c) .................................................................................8

19 U.S.C. § 1677f-1(c)(2) ....................................................................6, 61

19 U.S.C. § 1677m(e)(2) ............................................................................7

19 U.S.C. § 1677m(i) .................................................................................6

19 U.S.C. § 1677m(g) ...............................................................................39

28 U.S.C. § 1295(a)(5) ...............................................................................1

28 U.S.C. § 1581(c) ...................................................................................1

28 U.S.C. § 2639(a)(1) .............................................................................37

## REGULATIONS

19 C.F.R. § 351.104(a)..................................................................40

19 C.F.R. § 351.104(a)(2)(i) ........................................................ 40

19 C.F.R. § 351.207 .......................................................................6

19 C.F.R. § 351.205(a)...................................................................6

19 C.F.R. § 351.210(a) ...................................................................6

19 C.F.R. § 351.224(e)..................................................................20

19 C.F.R. § 351.224(f) .............................................................. 21, 22

19 C.F.R. § 351.301(c)............................................................. 39, 40

19 C.F.R. § 351.301(c)(5)..............................................................40

19 C.F.R. § 351.302(d) ............................................................. 24, 40

19 C.F.R. § 351.303(e)..................................................... 25, 28, 31, 46

19 C.F.R. § 351.307 .....................................................................6, 7

19 C.F.R. § 351.307(d) ...................................................................7

19 C.F.R. § 351.309(c)(1)..............................................................40

19 C.F.R. § 351.301(c)(1) ..............................................................40

19 C.F.R. §§ 351.301(c)(1)(i)-(ii)3 .................................................9

## OTHER AUTHORITIES

*Honey from the People's Republic of China*,
    71 Fed. Reg. 34,893 (Dep't of Commerce June 16, 2006)............................10

*Drill Pipe from the People's Republic of China*,
     76 Fed. Reg. 1,966 (Dep't of Commerce Jan. 11, 2011)................................9

*Xanthan Gum from the People's Republic of China,*
     80 Fed. Reg. 29,615 (Dep't of Commerce May 22, 2015).............................9

*Certain Hardwood Plywood Products from China*,
     82 Fed. Reg. 53,460 (Dep't of Commerce Nov. 16, 2017) ...........................4

H.R. Rep. No. 103-316 (1994) *as reprinted in* 1994 U.S.C.C.A.N. 4040 .............12

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, defendant-appellant's counsel states that she is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. Counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by the Court's decision in this appeal.

## STATEMENT OF JURISDICTON

Pursuant to Rule 28(a)(5) of the Rules of this Court, counsel for defendant-appellant states that this Court's jurisdiction rests upon the following bases:

(a) The Court of International Trade possessed jurisdiction to entertain this action pursuant to 28 U.S.C. § 1581(c).

(b) The statutory basis for this Court's jurisdiction to entertain this appeal is 28 U.S.C. § 1295(a)(5).

(c) The trial court entered its final judgment in this case on October 10, 2023.  Our appeal was timely filed on December 8, 2023, pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B).

Defendant-appellant has preserved its appellate rights because the administrative determination finally sustained by the trial court was issued at the direction of the trial court, on remand, and undertaken under protest.

# INTRODUCTION

The Court of International Trade (trial court) overstepped the limited bounds of its judicial authority in multiple respects.  The court intruded on the Department of Commerce's (Commerce) ability to enforce its own procedures and substituted its judgment for Commerce's, remanding Commerce's determinations five separate times until, without the ability to exercise discretion or judgment of its own, Commerce reached the court's preferred result.

It is axiomatic that Commerce has broad authority in how it conducts its own administrative proceedings.  In particular, Commerce has discretion to fashion and enforce its administrative procedures, as well as the responsibility to make findings of fact and assign weight to those facts in rendering its determinations.  The trial court, on the other hand, is limited in the scope of its review; its review is limited to the record before the agency, and its role is not to substitute its own judgment for Commerce's, particularly with regard to the weight or quality of the evidence.

The trial court violated the restrictions on the evidence it may consider by relying on unsupported and untimely allegations made by respondent Linyi Chengen Import and Export Co., Ltd. (Chengen), and exceeded its authority when it ordered Commerce to reopen the record to accept documentation that Chengen had failed to timely place on the record of the proceeding.  The court also usurped Commerce's role as fact-finder when it rejected as unlawful Commerce's

2

assessment of whether a lack of corroborating information justified its methodological selection, and improperly reweighed the evidence considered by Commerce in determining the dumping margin to be applied to non-investigated respondents. This Court should reverse.

## STATEMENT OF THE ISSUES

1.      Whether the trial court exceeded its authority and improperly substituted its judgment for Commerce's when it considered new information that Commerce had lawfully declined to put on the record during the administrative proceeding, and ordered Commerce to reopen the record to accept such information, deeming it "complete and accurate."

2.      Whether the trial court committed reversible error in holding unlawful Commerce's reasonable methodological choice, made within its authority, to apply the intermediate input methodology due to its inability to determine the accuracy of mandatory respondent Chengen's log consumption data.

3.      Whether the trial court erred in rejecting Commerce's calculation of the antidumping duty margin for respondents not selected for individual investigation (the separate rate), despite Commerce's thorough reasoning and citations to substantial record evidence, and indirectly compelling Commerce to assess a zero percent margin as the separate rate even though the court agreed that a zero percent rate would not be representative of the separate rate companies'

dumping activities.

## STATEMENT OF THE CASE

1.    Nature Of The Case

This appeal concerns the final results of the antidumping duty investigation of certain hardwood plywood products from the People's Republic of China. *See Certain Hardwood Plywood Products from China*, 82 Fed. Reg. 53,460 (Dep't of Commerce Nov. 16, 2017) (final determination), and accompanying Issues and Decision Memorandum (IDM). Appx8517-8566. The United States appeals the final judgment of the Court of International Trade in *Linyi Chengen Import and Export Co., Ltd. v. United States*, Consol. Ct. No. 18-00002 (Ct. Int'l Trade). The trial court's decisions under review are: *Linyi Chengen Import and Export Co., Ltd. v. United States*, 391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) (*Linyi Chengen I*), Appx83-112; *Linyi Chengen Import and Export Co., Ltd. v. United States*, 433 F. Supp. 3d 1278 (Ct. Int'l Trade 2020) (*Linyi Chengen II*), Appx113-127; *Linyi Chengen Import and Export Co., Ltd. v. United States*, 487 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) (*Linyi Chengen III*), Appx128-144; *Linyi Chengen Import and Export Co., Ltd. v. United States*, 539 F. Supp. 3d 1269 (Ct. Int'l Trade 2021) (*Linyi Chengen IV*), Appx145-163; *Linyi Chengen Import and Export Co., Ltd. v. United States*, 609 F. Supp. 3d 1392 (Ct. Int'l Trade 2022) (*Linyi Chengen V*),

Appx164-192; *Linyi Chengen Import and Export Co., Ltd. v. United States*, 658 F.

Supp. 3d 1347 (Ct. Int'l Trade 2023) (*Linyi Chengen VI*), Appx193-230.

II.    Legal Framework For Antidumping Duty Proceedings

    A.    Commerce's Investigation May Lead To The Issuance Of An
           Antidumping Duty Order

The Tariff Act of 1930, as amended, establishes a remedial regime to

combat unfair trade practices.  If Commerce "determines that a class or kind of

foreign merchandise is being, or is likely to be, sold in the United States at less

than fair value," it will impose an antidumping duty on the merchandise in the

amount that "the normal value exceeds the export price."  19 U.S.C. § 1673.  Thus,

in an antidumping investigation, Commerce determines whether subject

merchandise is being, or is likely to be, sold at less than fair value in the United

States by comparing the export price (the price of the goods sold in the United

States) and the "normal value" of the merchandise.  *See* 19 U.S.C. §§ 1673,

1675(a)(2)(A), (C), 1677b(a).  If Commerce finds that a foreign producer or

importer is selling its goods for less than normal value, it makes an affirmative

determination of dumping.

If Commerce makes a final determination that "the subject merchandise is

being, or is likely to be, sold in the United States at less than its fair value," and if

the International Trade Commission makes a final determination that a United

States industry has suffered injury or is threatened with material injury, Commerce

5

issues an antidumping duty order.  19 U.S.C. § 1673d(a)(1), (b)(1), (c)(2); *see also*

19 C.F.R. § 351.207; 19 C.F.R. §§ 351.205(a), 351.210(a).  Such an order makes

the merchandise subject to a duty equal to the amount by which the normal value

exceeds the export price (or the constructed export price).

In conducting its investigations, Commerce has broad authority to limit the

number of respondents it investigates where it is not practicable to examine all

known producers and/or exporters of the subject merchandise.  *See* 19 U.S.C.

§ 1677f-1(c)(2).  Commerce's most common practice is to limit the investigated

respondents by selecting the exporters and producers accounting for the largest

volume.  *Id.*  These individually-investigated companies are referred to as

mandatory respondents.  To conduct a dumping analysis for the mandatory

respondents, Commerce must obtain from respondents the information necessary

to determine the United States prices and the normal value information.

Commerce does this by issuing extensive initial questionnaires, as well as

supplemental questionnaires if necessary.

B.     Commerce's Verification Process

Commerce conducts a verification of the information submitted by

mandatory respondents, reviewing that information for accuracy and

completeness.  *See* 19 U.S.C. § 1677m(i); 19 C.F.R. § 351.307.  For the

investigation, Commerce shall verify all information relied upon in making its

determinations. *Id.* Verification often involves a team of Commerce analysts and other officials visiting the location of a respondent's books, records, and factory. *See* 19 C.F.R. § 351.307(d). The verifiers undertake a review to determine whether the sales, production and cost information, explanations, and data already submitted are complete and accurate, as substantiated by a review of the respondent's accounting records of its actual sales, production, and cost experience. *Id.* Commerce is not required to use information that cannot be verified. *See* 19 U.S.C. § 1677m(e)(2).

Importantly, verification is considered a "spot check," *i.e.*, a selective examination meant to test information already provided by a party for accuracy and completeness. *See Goodluck India Ltd. v. United* States, 11 F.4th 1335, 1344 (Fed. Cir. 2021); *see also Micron Tech., Inc. v. U.S.*, 117 F.3d 1386, 1396 (Fed. Circ. 1997). As Commerce consistently relays to respondents in advance, verification ***is not*** an opportunity for respondents to submit new factual new information. Appx6940; *see also Ghigi 1870 S.p.A. v. United States*, 547 F. Supp. 3d 1332, 1346 (Ct. Int'l Trade 2021); *Ozdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1242 (Ct. Int'l Trade 2017) ("The purpose of verification is not to 'continue the information-gathering stage of [Commerce's] investigation.'") (quoting *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v.*

*United States*, 61 F. Supp. 3d 1306, 1349 (Ct. Int'l Trade 2015) (brackets in original)).

C.    Commerce's Use Of The Intermediate Input Methodology

When calculating normal value in a proceeding involving a non-market economy country, Commerce will identify one or more market economy countries to serve as a surrogate for the non-market economy country.  *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 456 F. Supp. 3d 1272, 1279 (Ct. Int'l Trade 2020).  Normal value is generally determined on the basis of factors of production—the inputs used in the production process to produce the output subject merchandise—obtained from the respondent and valued using publicly available data from the surrogate country.  *Id.*; *see also* 19 U.S.C. § 1677b(c).

Commerce also requests information about respondents' factors of production to determine the actual cost of inputs.  "The statute 'accords Commerce wide discretion in the valuation of factors of production . . .'; indeed, {the Court of International Trade} has 'specifically held that Commerce may depart from surrogate values when there are other methods of determining the 'best available information' regarding the values of the factors of production.'" *Zhengzhou Harmoni Spice Co. v. United States*, 33 Ct. Int'l Trade 453, 459-460, 617 F. Supp. 2d 1281, 1290 (2009) (quoting *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001)).

8

When calculating normal value for a product subject to a non-market economy investigation, Commerce typically starts with valuing the actual inputs consumed by a respondent. However, Commerce sometimes departs from this methodology and instead calculates normal value by applying a surrogate value directly to the intermediate input rather than the factors of production used to yield the intermediate input. *See, e.g., Shenzhen Xinboda*, 456 F. Supp. 3d at 1280; *Xanthan Gum from the People's Republic of China,* 80 Fed. Reg. 29,615 (Dep't of Commerce May 22, 2015), and accompanying IDM at Cmt. 1 (citing *Drill Pipe from the People's Republic of China*, 76 Fed. Reg. 1,966 (Dep't of Commerce Jan. 11, 2011), and accompanying IDM at Cmt. 12).

When employing its intermediate input methodology, Commerce begins constructing the value of the product at a midway point in the respondent's production process. To illustrate, the subject merchandise at issue in the underlying investigation is hardwood plywood, which is a panel produced from multiple layers of thinly sliced wood that are glued together and pressed. Appx8519. A respondent's production process starts with its log input. The respondent then, through additional processing, slices the log into thin sheets of wood, *i.e.*, veneers. The veneer is deemed an intermediate input because it is an input between the start of the processing of the original input—logs—and the final completed subject merchandise—hardwood plywood.

9

Commerce applies the intermediate input methodology in various

circumstances, including: (1) when a respondent reports factors used to produce an

intermediate input that accounts for an insignificant share of the total output, (2)

when the burden associated with calculating each factor outweighs the potential

increase of calculation accuracy, or (3) when valuing the factors of production

associated with producing the intermediate input would result in inaccurate

calculations because a significant element of cost would not be adequately

accounted for in the overall normal value buildup.  Appx8539; *see also Xanthan*

*Gum* IDM at Cmt. 1.  With regard to the third scenario, Commerce has determined

that valuing the intermediate input yields higher accuracy than valuing the

individual factors of production when it finds that a respondent has not accurately

recorded and substantiated the complete factor information associated with

producing the subject merchandise.  *See Garlic from the People's Republic of*

*China*, 71 Fed. Reg. 26,329 (Dep't of Commerce May 4, 2006), and accompanying

IDM at Cmt. 1; *Honey from the People's Republic of China*, 71 Fed. Reg. 34,893

(Dep't of Commerce June 16, 2006), and accompanying IDM at Cmt. 9.

    D.    Commerce's Separate Rate Methodology

In proceedings involving non-market economies like China, Commerce

maintains a rebuttable presumption that all companies within that country are

subject to government control and should be assessed a single weighted-average

dumping margin.  Commerce's policy is to assign the non-investigated respondents a single rate (here, the China-wide rate) unless they can affirmatively demonstrate the absence of government control, in which case Commerce will assign them what is called a separate rate—a rate calculated in the proceeding based on the rates of the mandatory respondents.  *See, e.g., Zhejiang Machinery Import & Export Corp. v. United States*, 65 F.4th 1364, 1371 (Fed. Cir. 2023) (citing *Sigma Corp. v. United States*, 117 F. 3d 1401, 1405-06 (Fed. Cir. 1997)).

The statute is silent as to how Commerce establishes the separate rate.  *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1374 (Fed. Cir. 2013).  In filling this gap, Commerce generally follows the method prescribed in 19 U.S.C. § 1673d(c)(5) for determining the rate to assign to respondents not selected for individual examination in market economy investigations (*i.e.*, the all-others rate).  *See id.* at 1373.

Pursuant to section 1673d(c)(5)(A), Commerce calculates the all-others rate by weight-averaging the dumping margins assigned to the mandatory respondents, excluding any margins that are zero, *de minimis*, or determined entirely on the basis of facts available.  If, however, all the margins for the individually examined respondents are zero, *de minimis*, or determined based entirely on the basis of facts available, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not

individually investigated, including averaging the estimated weighted average dumping margins determined for exporters and producers individually investigated." *Id.*

The Statement of Administration Action (SAA) accompanying the Uruguay Round Agreements Act provides that, when the dumping margins for all mandatory respondents are zero, *de minimis*, or determined entirely on the basis of facts available, "{t}he expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available," unless it "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers{.}" H.R. Rep. No. 103-316, 873 (1994) *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4201.

## III.    Administrative Proceedings

### A.    Commerce's Initial Proceedings And Preliminary Determination

In 2016, Commerce initiated an antidumping duty investigation into certain hardwood plywood products from China.  Appx1348-1354.  Commerce selected Chengen[1] and Shandong Dongfang Bayley Wood Co., Ltd. (Bayley)[2] as mandatory

---

[1]  Commerce selected Chengen as a replacement mandatory respondent. Appx1921-1922.

[2]  Commerce's determinations concerning Bayley are relevant only insofar as Bayley's margin (which is also the China-wide rate) affects the calculation of

respondents.  Appx1376-1386, Appx1920-1923.

After Chengen submitted its initial questionnaire response, the petitioner (and defendant-appellant in this case) the Coalition for Fair Trade of Hardwood Plywood (Coalition) filed comments urging Commerce to apply its intermediate input methodology and calculate normal value based on Chengen's consumption of veneers (the intermediate input), rather than apply the standard methodology and basing normal value on Chengen's log factors of production (the upstream input) for its veneer production.  Appx3425-3430.  The Coalition alleged that Chengen's log consumption records were imprecise; it also argued that Chengen's methodology for calculating log consumption was questionable and did not accurately capture all costs of production.  *Id.*

In response to the Coalition's comments, Chengen submitted additional documentation and argument to support its contention that Commerce should not apply the intermediate input methodology.  Appx3478-3600.  But, despite the Coalition's express questioning of the accuracy of Chengen's log consumption methodology, Chengen never revealed that the source of its log consumption calculations was a conversion table and formula that Commerce (unprompted by Chengen) later discovered at verification, much less submit documentation

---

the separate rate for non-investigated respondents.

supporting the formula.  Nor did Chengen identify this information or provide

related documentation in the course of responding to at least three different

questionnaires focusing on its production processes and factors of production.

Appx314, Appx2788-2856, Appx5067-5309, Appx5821-6112.

Chengen also failed to inform Commerce that it had no invoices from

suppliers of its most significant input—poplar logs—and no other means of

corroborating its poplar log consumption volume.  Rather, Chengen identified

"material purchase invoices" as a category of document it relied on and claimed

that "accountants record purchases according to the warehouse in-tickets and

invoices in the normal business at a given month in the normal course of

accounting," failing to explain that these "invoices" were not provided by suppliers

but were rather self-generated by Chengen and not corroborated by any

independent source.  Appx314, Appx2797-2798, Appx5079.

For its preliminary determination, Commerce determined to use its standard

methodology of valuing Chengen's log factors of production; with this

methodology, Chengen preliminarily received a *de minimis* margin.  Appx6861,

Appx6870-6871.  In electing not to apply the intermediate input methodology,

Commerce explained that, based on its questionnaire responses, Chengen had not

***at that time*** met the exceptions for applying the intermediate input methodology.

Appx6870-6871.  However, Commerce cautioned that this determination was

14

subject to change, explaining that it would continue to evaluate whether to apply

the intermediate input methodology.

B.    Commerce Discovers Information At Verification Calling Into
       Question Chengen's Log Data

After issuing its preliminary determination, Commerce undertook an onsite

verification of Chengen.  Appx6939.  In the agenda given to Chengen in advance,

Commerce emphasized that:

> {V}erification is not intended to be an opportunity for
> submission of new factual information.  New information
> will be accepted at verification only when: (1) the need
> for that information was not evident previously; (2) the
> information makes minor corrections to information
> already on the record; or (3) the information
> corroborates, supports, or clarifies information already on
> the record.

Appx6940.

At verification, Commerce observed multiple issues that called into question

the accuracy of Chengen's log purchase and consumption records, as well as its

ability to substantiate such records.  Appx8540.  For instance, Commerce

discovered, for the first time, that the logs used by Chengen were measured using

the log diameter from the smaller end of the log, even though the logs were not

uniform in size; this caused Commerce to question how the entire volume of the

log could be accurately captured.  Appx8386.  Commerce also observed, while

touring Chengen's veneer production factory, what appeared to be a conversion

table and formula for measuring log quantity (consisting of just two pages).

Commerce learned that Chengen derived its log quantity from that volume

formula, which takes into account the log length and the diameter of the small end

of the log.  Appx372, Appx8387, Appx8450.

Commerce, considering the conversion table and formula to be information

corroborating, supporting, or clarifying information already on the record (*i.e.*, the

log volumes reported by Chengen), requested copies.  Appx327, Appx372.

However, when Chengen officials presented Commerce with the copies, they

added a significant number of additional pages of documentation to the two pages

Commerce had requested, including a cover sheet that was not part of the

document originally discovered by Commerce.  Appx372.  The verifiers did not

review the additional pages and, understanding the newly-provided cover sheet and

other additional pages to be untimely new factual information, declined to accept

them, taking only the two pages the verifiers had originally seen and requested.

Appx373.

Commerce also discovered for the first time that, contrary to the

representations made in Chengen's questionnaire responses, Chengen did not

actually have supplier-provided invoices for its purchases of poplar logs—by far its

most prominent input.  Appx316, Appx8540.  Rather, as company officials

explained, Chengen's log purchases were recorded on warehouse in-tickets and journals self-generated by Chengen.  Appx8387.

C.    Post-Verification Administrative Proceedings

1.    Chengen's Case Briefing

Subsequent to verification, the interested parties submitted administrative case briefs and rebuttal briefs.  While Chengen claimed in its rebuttal brief that its method of relying on the small end of the log for measuring log volume accorded with the Chinese National Standard,[3] Appx8478, it never suggested, either in its case briefs or at any other point between the verification and the issuance of the final determination, that the Commerce verifiers had refused to accept additional documentation related to log measurement or that they had ripped off certain pages of documents and discarded the rest.  In addition, Chengen admitted that it had *no* seller-generated invoices for its purchases of poplar logs, but claimed that its internally-generated "invoices"[4] were "verified and were concorded with

---

[3]  Chengen attempted, in its rebuttal brief, to argue that the table and formula it used constituted the Chinese National Standard.  Appx8453-8454.  Commerce rejected this information as untimely new factual information and had Chengen refile the case brief with that information redacted.  Appx8455.

[4]  Chengen claims that it provided "invoices" to its sellers, but invoices are typically an accounting of goods/services and prices provided by the *seller* to the *buyer*.  *See, e.g.*, Shipping Documents, A.J. Hodgson (1925) (defining invoice as a "written account of the particulars of goods sent or shipped to a purchaser . . . with the value or prices or charges annexed.").

17

Chengen's accounting records and materials ledgers." Appx8480.

> 2.    Final Determination

Commerce issued its final determination on November 16, 2017.
Appx8990-9001.  In the final determination, Commerce found that, because
Chengen did not show that it had accurately recorded and substantiated the log
factors of production associated with producing veneers, Commerce would apply
the intermediate input methodology and directly value the veneers instead.
Appx8539.  After explaining the circumstances that would warrant the application
of the intermediate input methodology, Commerce explained that multiple
observations made at verification called into question the accuracy of Chengen's
log purchase and consumption records, as well as its ability to substantiate such
records.  Appx8540.  Most significantly, Commerce discovered for the first time at
verification that: (1) Chengen and its suppliers measured log volume using the
diameter of the smaller end of each log, (2) Chengen derived its log quantity
measures from a conversion table and formula relying on the diameter of the
smaller end of the log, and (3) Chengen did not have supplier-provided invoices
for its purchases of poplar logs.  Appx8540-8541.  These discoveries caused
Commerce to doubt the accuracy of Chengen's actual log volumes, as well as its
stated poplar log purchase quantities.  *Id.*

18

Commerce found that, because Chengen—using the conversion table and formula—relied only on the smaller end of the log, its log quantity calculations were imprecise. Appx8541. Specifically, Commerce explained that, given the irregularity in log shapes, Chengen's method for measuring log volume would not accurately account for the volume difference between the smaller end and the larger end. *Id.* Commerce noted Chengen's claim that the conversion table and formula constituted the Chinese National Standard, but found that no evidence on the record supported the arguments that the formula elicited the ***actual volume*** of the log[5] or that the formula was actually the Chinese National Standard; Commerce also explained that no information on the record showed how the log volume formula was derived. *Id.* In addition, Commerce expressed concern that it could not verify Chengen's consumption of its most significant input—poplar logs—because Chengen had provided no third-party documentation, such as supplier invoices. *Id.*

Using the intermediate input methodology resulted in a change to Chengen's margin from the preliminary determination, increasing Chengen's rate to 183.36 percent. Because Commerce had applied total adverse facts available to Bayley

---

[5] As Commerce stated, whether measuring the smaller end of the log "was pursuant to industry standard or not is immaterial to whether it accurately calculates Chengen's actual consumption of logs." Appx8542.

and deemed it part of the China-wide entity, it used Chengen's final dumping

margin—now calculated using Chengen's own information—as the margin for the

separate rate companies.  Appx8523-8524.

> 3.     Chengen's Belated Attempts To Submit More Untimely
>        Information

After publication of the final determination, Chengen submitted an

"allegation of ministerial errors" pursuant to 19 C.F.R. § 351.224(e).  Appx9002-

9010.  In this filing, Chengen again claimed that the conversion table and formula

it had relied upon was the Chinese National Standard—information Commerce had

already rejected as untimely filed new factual information.  Appx9005.  Chengen

also alleged for the first time that, during verification, it had attempted to provide

Commerce the full text of the standard, including a page identifying the formula as

the Chinese National Standard, but that "the verifiers elected instead to {} extract

pages of such standard demonstrating the formula and resulting cubic meter

volumes based on the formula."  Appx9004.  In addition, Chengen claimed—again

for the first time—that the Commerce verifiers "clearly knew and understood" at

the time of verification that the conversion formula was the Chinese National

Standard.  *Id.*  Finally, Chengen argued that, not only did its poplar log suppliers

provide delivery sheets with listed volumes, but certain value-added tax (VAT)

invoices supported Chengen's log quantities; it also claimed that the amounts on

the VAT invoices were provided to and confirmed by the suppliers.  Appx9007.

Commerce concluded that Chengen's allegations related to methodological determinations and were not ministerial errors within the meaning of 19 C.F.R. § 351.224(f). Appx9047-9048. Commerce remarked that the record lacked evidence that the log volume formula and conversion table accurately calculated log volume or constituted the Chinese National Standard. Appx9047-9048. Commerce also found that Chengen's belated allegations concerning the Commerce verifiers' actions and knowledge were not supported by record evidence. Appx9048. Finally, Commerce rejected the argument that its finding that Chengen's log volumes could not be corroborated by independent sources constituted a ministerial error, explaining that Commerce had considered the record evidence and Chengen could not support its assertion that the "unilaterally dictated" so-called invoices were confirmed by its suppliers. *Id.*

Chengen, a few days after the submission of its "ministerial error allegation," and subsequent to publication of the final determination, also attempted to file a request for Commerce to rescind the entire investigation. Appx9042. Commerce, explaining that Chengen's submission proffered arguments that could have been raised during administrative case briefing and also contained untimely filed new factual information, rejected the request and removed it from the record. *Id.*

21

IV.  Trial Court Proceedings

Chengen and other interested parties appealed the final determination to the

Court of International Trade.  Appx233-288.  The court consolidated the cases.

Appx288.  Following briefing, the trial court held oral argument.  Appx290.

During the argument, Chengen's counsel made several unsworn factual statements

and arguments, not based on any record evidence, regarding events that allegedly

occurred at verification.  These statements were not presented to Commerce during

the administrative proceeding, and included, in part:

- "{W}e handed them a . . . partially translated 12-page log standard, and they turned out tearing off the cover page . . . They tore it off the top and then they tore off the pages."  Appx9687.

- "Commerce is saying that this 11-character Chinese standard on one line at the top of the page is not translated because we tore the translation off at the top of the page, the cover page of the standard." *Id.*

- "{W}e also handed them the EU standard, and they rejected that as well."  Appx9688.

Chengen's counsel then offered the trial court copies of the cover page and

other pages that Chengen had purportedly offered Commerce at verification.[6]

---

[6]  Chengen's counsel also handed the trial court other exhibits, but it is not clear from the hearing transcript which of those exhibits were allegedly offered to Commerce during verification, which were exhibits created for litigation, and which were already in the record. Appx9695.

22

Appx9690.  The trial court accepted these extra-record pages over the objection of the United States.  Appx9719-9720, Appx9751.

A.    First Remand Order And Remand Results

In June 2019, the trial court remanded Commerce's determination with regard to Chengen.[7]  Appx83-112.  The court held that Commerce had failed to sufficiently explain how the record supported the conclusion that Chengen's log consumption calculations were unreliable.  Appx97.  In doing so, the court, relying on unsupported statements made in Chengen's trial court brief and at oral argument, noted that it was "troubled by the varying accounts of events at verification presented by the Parties," and highlighted the "perceived inconsistencies on the record."  Appx98.  The court also held that Commerce had not explained why the warehouse in-tickets or Chengen's self-generated "invoices" were insufficient to accurately calculate Chengen's consumption of poplar logs. Appx98.  The court reserved ruling on whether Commerce had appropriately applied the intermediate input methodology.

On remand, Commerce further explained why it found Chengen's log consumption calculations insufficiently reliable, and provided additional context regarding the events at verification.  Appx310-373.  Commerce also explained the verifiers' decision to only take the conversion table and formula, and not also the

---

[7]  The court sustained Commerce's determination regarding Bayley.

additional pages later offered by Chengen.  Commerce noted that Chengen had

been given multiple opportunities to submit any documentation it possessed

regarding the conversion table and formula during the earlier stages of the

proceeding, but chose not to, despite the accuracy of Chengen's factors of

production records being squarely at issue.  Appx313-314, Appx325, Appx349.

As such, and given the events at verification, Commerce determined that it had the

authority to reject the untimely submitted new factual information.  Appx326

(citing 19 C.F.R. § 351.302(d)).

In addressing the trial court's concerns about the conflicting accounts of

verification, Commerce explained that the record did not contain a statement of

how events unfolded at verification because Chengen failed to raise the issue of

additional pages to the conversion table and formula until ***after the investigation***

***had concluded***, at which point Commerce concluded that Chengen's assertions

were not ministerial errors and, in any event, were not supported by the record.

Appx317-321, Appx9048.

Commerce then explained, based in part on a declaration it put on the record

from an analyst who attended the verification, that it had only learned Chengen

used a log volume formula when the verifiers glimpsed the table and formula while

touring Chengen's facilities.  Appx322, Appx372.  Because the table and formula

corroborated, supported, or clarified the log consumption data already on the

record, the verifiers requested copies of the two-page document.  Appx322, Appx327.  In contrast, the additional pages offered by Chengen were never solicited by Commerce, were not part of the documents Commerce saw on its factory tour, and were understood by the verifiers to be new factual information not within the scope of information already on the record.  Appx323, Appx329-330, Appx352, Appx372-373.  Accordingly, the verifiers took only the pages they had requested.  Appx323, Appx326.  Commerce also noted that the pages the verifiers had declined to take were not translated, citing the regulation requiring all documents presented at verification to be translated the first time they are offered to Commerce.  Appx 327 (citing 19 C.F.R. § 351.303(e)).

With regard to the reliability of Chengen's calculations, Commerce pointed out that, contrary to Chengen's claims, the reliability of the formula was not self-evident and the record did not explain how the formula could accurately calculate an irregularly shaped object using the diameter of the small end.  Appx331.  Commerce also noted that, even assuming the formula was the Chinese National Standard, that did not mean it was accurate or widely adopted, and Chengen had deprived Commerce of the opportunity to test the reliability of the formula by not timely submitting the relevant information.  Appx331, Appx367-368.

Turning to Chengen's poplar log purchase quantities, Commerce explained the importance of independent substantiation, stating that "documentation wholly

generated by and under the control of the respondent may be subject to manipulation or alteration." Appx335. Commerce found that, without independent confirmation, it could not determine whether Chengen's reported log consumption was accurate. Appx340. Commerce explained that, until finding out otherwise at verification, it had understood Chengen's use of the term "material purchase invoices" to mean that Chengen could corroborate its poplar log consumption with supplier invoices. Appx314. Commerce then explained that the documents purportedly supporting Chengen's poplar log purchases were all generated by and under the control of Chengen. Appx334. Commerce also observed that, while Chengen claimed that its suppliers confirmed the amounts through VAT invoices generated by Chengen, the record contained no indicia of such confirmation. Appx334-335. Commerce next addressed Chengen's allegation that its suppliers provided it with delivery sheets stating the purchase volume, finding that the record did not contain any such supplier-generated sheets. Appx335-336. Commerce clarified that the warehouse in-tickets referenced by the court appeared to be distinct from delivery sheets, and that, in any event, Chengen had provided *no* non-self-generated information supporting its log purchases. Appx336-340.

B.    Second Remand Order And Remand Results

In February 2020, the trial court issued a second opinion.  The court not only remanded to Commerce to reconsider its determination with regard to Chengen, but required Commerce to reopen the record to accept documentation regarding the conversion table and formula—documentation that Commerce had already rejected as untimely new factual information and that Chengen's counsel had submitted to the court at oral argument over objection.  Appx113-127.  The court, relying on statements made by Chengen's counsel at oral argument, Appx122 (quoting Appx9687), held that Commerce had acted unreasonably in only taking the two-page conversion table and formula, rather than the entirety of the purported Chinese National Standard offered by Chengen at verification and then at oral argument.  Appx122-123.

The court held that Commerce should construe the additional documentation as "information corroborating, supporting, or clarifying information already on the record . . . that should be accepted" because the extra pages "provide{d} context" for the formula.  Appx123.  The court directed Commerce to accept for the record "the previously-rejected documents that Linyi Chengen presented at verification representing the complete and accurate Chinese National Standard" and explicitly stated that "Commerce should reconsider modifying Linyi Chengen's margin and the rate assigned to the Separate Rate Plaintiffs."  Appx124, Appx126.

27

The court also held that Commerce's determination to not accept the accuracy of Chengen's reported poplar log volumes without corroborating evidence "lack{ed} a basis in law and fact." Appx125.  The court began by stating that Commerce did not appear to have a legal basis for requiring independent confirmation of Chengen's log consumption. *Id.*  The court then found that the record evidence did not support a conclusion that Chengen could manipulate or alter its self-generated documents, including the VAT invoices, because the VAT invoices were generated on pre-approved government forms provided by the Chinese tax authority. *Id.*  The court stated that Commerce did not have a basis for doubting the accuracy of the VAT invoices because a third party had audited Chengen's financial statements. *Id.*  The court concluded that, because Commerce had not found specific discrepancies, it could not continue to find Chengen's documentation unreliable for lack of confirmation.  Appx126.

On remand, Commerce, under protest, reopened and placed on the record the additional pages.  Appx375.  Considering the court's directives to accept the documentation, construe it as information "corroborating, supporting, or clarifying information already on the record," and reconsider modifying Chengen's margin, Commerce withdrew its application of the intermediate input methodology and valued the log factors of production directly.  Appx376.

In explaining its redetermination further, Commerce pointed out that, because the trial court had held that the contested documentation was "complete and accurate," and that Commerce had no reason to doubt the accuracy or reliability of the VAT invoices, it had to accept Chengen's reported log volume as accurate; consequently, Commerce found that the exceptions for applying the intermediate input methodology were no longer met.  Appx383.  While recognizing concerns voiced by the Coalition about the accuracy and reliability of the formula and the VAT invoices, Commerce explained that, in light of the specific language of the remand order, it could not question the documents further and instead had to accept the log volumes reported by Chengen as accurate. Appx393.

Because Commerce had assigned Chengen a recalculated dumping margin of zero percent, Commerce also revised the separate rate, averaging the 114.72 percent rate applied to the China-wide entity (including Bayley) and the zero percent rate applied to Chengen for a 57.36 percent margin.  Appx376-377, Appx388.  Commerce determined that, because the only rate for an individually-investigated respondent outside of the China-wide entity was zero percent, and applying that rate to the separate rate respondents would not be reasonably reflective of their potential dumping margins, it would average the two rates as a reasonable method for establishing the separate rate.  Appx388, Appx417.

29

Commerce explained that, because it had examined two mandatory respondents and found the information for one of them—Bayley—to be so deficient as to warrant finding Bayley part of the China-wide entity, it could not presume that Chengen's zero percent rate would be reasonably reflective. Appx421-422. As further support, Commerce cited record evidence indicating that affirmative dumping potentially existed, citing the dumping margins of 104.06 percent and 114.72 percent that had been alleged in the petition. Appx422.

C.     Third Remand Order And Remand Results

In December 2020, the trial court issued another opinion, sustaining Commerce's application of the standard factors of production methodology to Chengen and the calculation of the zero percent rate. Appx137-138. The court, however, remanded Commerce's calculation of the separate rate, holding that Commerce had not adequately explained its determination that Chengen's zero percent margin would not be reasonably reflective of the dumping activity of the separate rate respondents, and observing that Commerce had not "tethered" the margins alleged in the petition (which formed the basis for the China-wide rate) to the separate rate respondents' dumping margins. Appx141-143.

On remand, Commerce further explained its determination to average the zero percent and 114.72 percent rates in calculating the separate rate, citing record

evidence as support.[8]  Appx429-492.  Commerce first observed that the separate rate could not be "tethered" to the actual dumping margins of the separate rate respondents because the framework did not afford Commerce the opportunity to examine what the actual dumping margins would be for those respondents. Appx445.  Commerce then explained that the record evidence supported its determination that the dumping margins alleged in the petition were representative of the selling behavior of the separate rate respondents.  Appx445.  Specifically, evidence of actual commercial transactions by the same petition separate rate applicant (SRA) exporter from whom the price quotes in the petition were obtained indicated that the petition SRA exporter would have had a transaction-specific dumping margin in the range of the petition rates.  Appx446.  Thus, Commerce found that the prices forming the basis for the petition margins were supported by the actual prices at which plywood was sold by a cooperating separate rate respondent.  *Id.*

Commerce also thoroughly analyzed the record evidence in determining that Chengen's selling behavior was distinguishable from that of the separate rate respondents.  Appx445.  Commerce cited information showing that the prices at which a separate rate respondent sold subject merchandise were significantly lower

---

[8]  Commerce also stated its disagreement with the trial court's characterization of its findings regarding Chengen in its second remand redetermination.  Appx439-441.

than the prices at which Chengen sold the same product, indicating that Chengen's margin would not be representative of the separate rate respondents' activity. Appx446-447. Commerce also explained that Chengen exclusively sold plywood that was produced by an affiliate, but that 25 of the 40 exporters under consideration sold plywood produced by unaffiliated manufacturers, meaning that Chengen would have a different cost structure than the majority of the exporters. Appx447-448. Commerce then found that, of 15 separate rate plaintiffs who Commerce had examined more closely, at least three had sales of plywood lower than Chengen's lowest selling price, nine had sales of plywood at prices lower than the average price of the product accounting for the vast majority of Chengen's sales, and six sold products not even sold by Chengen. Appx450. Commerce also discussed, more broadly, how a significant number of separate rate respondents sold products not sold by Chengen, had sales lower than Chengen's lowest price, and sold plywood at prices lower than Chengen's average price. Appx451. Commerce concluded that these facts indicated that the likelihood the separate rate respondents were selling at dumped prices was significantly greater than that of Chengen's. Appx452.

> D.   Fourth Remand Order And Remand Results

In September 2021, the trial court issued a fourth opinion, again remanding Commerce's calculation of the separate rate. Appx145-163. The court first held

that Commerce had sufficiently supported its determination that Chengen's zero percent dumping margin would not be reasonably reflective of the potential dumping activity of the separate rate respondents and, thus, sustained Commerce's departure from the expected method. Appx156-159. The court, however, found that the commercial invoice Commerce had cited to support its selection of the 57.36 percent rate did not constitute substantial evidence, and remanded to Commerce for reconsideration. Appx161-163.

On remand, Commerce continued to rely on a 57.36 percent separate rate, weighing its options but determining that, given the record information and the alternatives, the 57.36 percent was the most reasonable rate it could use for the separate rate. Appx494.

Commerce began its analysis by reiterating its conclusion that Chengen's zero percent rate would not be reasonably reflective, and noting that the trial court had sustained this finding. Appx 499-500. Commerce then observed that the only rates on the record of the proceeding, other than Chengen's, were the China-wide entity rate of 114.72 percent (one of the petition rates) and 104.06 percent (the other petition rate). Appx502. Commerce explained that, because the petition rates were based on pricing established by the petition SRA exporter—also a separate rate respondent—they were, to an extent, representative of the dumping behavior of separate rate respondents and had probative value. Appx503-504,

33

Appx523.  Commerce also delved further into the petition SRA exporter's selling

behavior, finding that its own invoices, as well as its affiliate's VAT invoices,

demonstrated that the petition SRA exporter sold plywood to the United States at

even lower rates than the prices identified in the petition.  Appx524-525.  While

acknowledging that the process is inherently imperfect and the information

necessarily limited, Appx519, Commerce concluded that, given Chengen's rate,

the China-wide rate based on the petition, and the record information showing

variable selling behavior, the most reasonable option was to average the two rates

to calculate the separate rate.  Appx504-505.

     E.    <u>Fifth Remand Order And Remand Results</u>

In December 2022, the trial court issued a fifth opinion, again remanding

Commerce's selection of the separate rate.  Appx164-192.  The court, in

determining that the 57.36 percent rate was not reasonable, relied primarily on this

Court's decision in *Bestpak*.  Appx183-186.  It held that assigning a separate rate

that was half of the China-wide rate seemed unfair and unduly punitive.  Appx187-

188.  The court also stated that Commerce had failed to review potentially

contradictory record evidence.  Appx189.  Finally, the court "advised" Commerce

not to submit the 57.36 percent rate again on remand.  Appx191.

On remand, Commerce heeded the court's directive and found that, although

both Commerce and the court agreed that Chengen's zero percent rate would not

be reasonably reflective, that rate was the only remaining alternative on the record of the proceeding in light of the court's most recent remand order.  Appx557-558. Commerce explained that no other margin on the record could serve as the basis for a lower separate rate and also accord with its practice and the law.  Appx557. As such, Commerce, under protest, found that it had no option but to assign Chengen's zero percent margin as the separate rate.  Appx558.  While the Coalition had suggested potential alternatives for calculating a separate rate between zero percent and 57.36 percent, Commerce found that those methodologies would not be appropriate or result in a more accurate margin than the 57.36 percent rate it had tried to apply.  Appx563-564.

F.    Final Opinion And Judgment

In October 2023, the trial court sustained Commerce's remand redetermination.  Appx193-230.  The court held that Commerce had articulated its reasoning for rejecting the Coalition's proposed methodologies.  Appx215-218. The court noted its prior instruction that Commerce not reapply the 57.36 percent rate, and stated that Commerce had sufficiently explained why the zero percent rate was the only remaining option.  Appx218-219.

The court entered judgment and this appeal followed.  Appx308-309.

## <u>SUMMARY OF THE ARGUMENT</u>

The trial court's judgment should be reversed because the court erred in numerous respects.  First, the court improperly relied on extra-record information in rejecting Commerce's final determination.  In doing so, the court disregarded Commerce's authority to set its own procedures for the acceptance of documentation and substituted its judgment for that of Commerce; it also ignored that Chengen could have, and should have, submitted that information earlier in the proceeding, and that Chengen's claims as to the events at verification were untimely raised.  The court's error was compounded by its directive to Commerce to reopen the record and place on it the documentation Commerce had already lawfully declined to take.

Second, the court usurped Commerce's role as fact-finder when it rejected Commerce's determination to apply the intermediate input methodology based, in part, on Commerce's inability to corroborate Chengen's reported poplar log volumes.  Because all the documents purporting to support the quantity of Chengen's log purchases were in Chengen's sole control, Commerce reasonably determined that, without confirmation by an independent source, the documents could be subject to manipulation or alteration and were not reliable for purposes of which methodology to apply.

Third, the court erred in sustaining Commerce's assignment of a separate rate only after Commerce brought that rate down to zero under protest, despite agreeing with Commerce that such a rate would not be reasonably reflective of the non-examined respondents' dumping behavior. Commerce thoroughly analyzed the record evidence and explained why the 57.36 percent rate was the best option; the court misapplied the substantial evidence standard by reweighing the evidence and supplanting Commerce's judgment.

## ARGUMENT

### I.    Standard Of Review

To determine whether the Court of International Trade correctly applied the standard of review in reaching its decision, this Court "must apply anew the statute's express standard of review to the agency's determination." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (citations omitted). Therefore, in reviewing Commerce's determinations, the Court "must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Id.*, 88 F.3d at 1038 (quoting 19 U.S.C. § 1516a(b)(1)(B)(I)). A determination by Commerce "is presumed to be correct." 28 U.S.C. § 2639(a)(1).

II.     **The Trial Court Erroneously Considered Extra-Record Information And Exceeded Its Authority By Requiring Commerce To Put The Information On The Record**

The trial court committed reversible error in relying on extra-record evidence, including unsworn, unsupported statements made by Chengen's counsel at oral argument and the documentation Chengen submitted to the court at the same time—documentation Commerce had already lawfully declined to accept. During the investigation, Chengen had every opportunity to submit relevant information in a timely manner, and Commerce acted within its discretion in declining to accept Chengen's untimely filed information. The court also contravened this Court's precedent when it required Commerce to reopen the record and consider Chengen's untimely submitted documentation, exceeding its limited judicial role and supplanting Commerce's authority to set and enforce its own procedures. In addition, the court impinged on Commerce's role as fact-finder when it instructed Commerce to find the documentation "complete and accurate," and told it to reconsider modifying Chengen's margin. As a result of the trial court's actions, Commerce—under protest—had no realistic option but to deem Chengen's log factors of production information reliable and accurate, and, despite its justifiable misgivings, find that the criteria for applying the intermediate input methodology were not met.

A.     Commerce's Procedures For Collecting Factual Information And
         Submission Of Argument

Commerce's administrative procedures for the collection of factual

information in its investigations are governed by statute and regulation. The

statutory provision regarding the "Conduct of Investigations and Administrative

Reviews" establishes the requirement that:

> Information that is submitted on a timely basis to
> {Commerce} during the course of a proceeding under
> this title shall be subject to comment by other parties to
> the proceeding within such reasonable time as
> {Commerce} shall provide. {Commerce}, before making
> a final determination . . . shall cease collecting
> information and shall provide the parties with a final
> opportunity to comment on the information obtained by
> {Commerce} (as the case may be) upon which the parties
> have not previously had an opportunity to comment.

*See* 19 U.S.C. § 1677m(g).

Commerce's regulations further elucidate this process. 19 C.F.R.

§ 351.102(b)(21)(i) defines certain factual information ("Evidence . . . submitted

either in response to initial and supplemental questionnaires"), and 19 C.F.R.

§ 351.301(c) lays out the relevant time limits for submission of specific types of

factual information.  Initial questionnaire responses are due 30 days from the

receipt of the initial questionnaire, and supplemental questionnaire responses are

due the date Commerce specifies.  19 C.F.R. §§ 351.301(c)(1)(i)-(ii).  Parties are

allowed to timely submit factual information on rebuttal.  19 C.F.R.

§ 351.301(c)(1)(v).  Commerce also sets forth a deadline of the earlier of 30 days

before the scheduled date of the preliminary determination or 14 days before

verification for the submission of categories of factual information not otherwise

covered by Commerce's regulations.  19 C.F.R. § 351.301(c)(5).  Importantly,

Commerce's regulations provide that it will reject untimely filed factual

information.  *See* 19 C.F.R. §§ 351.301(c)(1), 351.302(d), 351.104(a)(2)(i).

Commerce's procedures also provide for the ability of parties to submit

argument, subsequent to the issuance of the preliminary determination.  Any

interested party may submit a case brief in an antidumping duty investigation.  19

C.F.R. § 351.309(c)(1).  Parties may also submit rebuttal briefs responding to

arguments raised in case briefs.  *Id*. § 351.309(d)(1)-(2).  Arguments not raised in

administrative case briefs are generally deemed waived for failure to exhaust

administrative remedies.  *See, e.g., Sandvik Steel Co. v. United States*, 164 F.3d

596, 599 (Fed. Cir. 1998).

B.     The Trial Court Should Not Have Accepted Extra-Record, Untimely
       Submitted Information That Commerce Had Lawfully Declined To
       Consider

The trial court erred by relying on extra-record information in rendering its

decisions.  It is axiomatic that the court's review is limited to the record before

Commerce.  *See* 19 U.S.C. § 1516a(b)(2)(A); 19 C.F.R. § 351.104(a); *see also*

*QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324-25 (Fed. Cir. 2011).

Moreover, as detailed above, Commerce's regulations set forth deadlines and procedures for the submission of new factual information in administrative proceedings, and provide that Commerce will reject untimely filed new factual information.

The court violated the restrictions on the evidence it may consider by relying on the statements made by Chengen's counsel during oral argument, particularly the unsubstantiated allegations that Chengen had provided Commerce a partially translated full version of the log volume formula document, and that Commerce had torn off the cover page, which counsel claimed contained the full translation, refusing to take the information that would later allegedly confirm that the log volume formula was the national standard.  Appx98, Appx122.  The court also improperly considered the documentation that Commerce had appropriately declined to accept at verification.  The court's error is especially troubling because Chengen did not allege that Commerce had torn off, or otherwise improperly rejected, the additional pages until *after* Commerce had completed its investigation.  The court should not have countenanced Chengen's allegations or considered the documentation offered by Chengen, given that Commerce had already found that the allegations were belated and unsupported by the record.

As detailed above, Chengen had multiple opportunities, prior to verification, to timely submit information relevant to the log volume formula.  Commerce's

initial Section D questionnaire, which is titled "Factors of Production Questionnaire," required Chengen to submit information relating to its factors of production for its log inputs. Appx1443-1453. In particular, the initial questionnaire asks respondents to provide a list of ***all*** documents relied on in the normal course of business during each stage of the production of the merchandise, including with regard to costs and quantities. Appx1445. Chengen responded with a list of document categories, including "material purchase invoices," "warehouse journals," and "cost of production worksheets." Appx2798. It did ***not*** list the log volume formula anywhere in its initial questionnaire response, or explain that it even used a formula.

Chengen also had multiple other opportunities to submit the documentation it belatedly offered Commerce, and later the court. Chengen submitted at least two supplemental Section D questionnaire responses in which it could have raised the log volume formula, as well as voluminous argument and factual information in response to the Coalition's request that Commerce use the intermediate input methodology—a request that put the quantity of the log inputs squarely at issue. Appx313-314. None of Chengen's submissions identified a volume formula, much less noted that Chengen relied on the purported Chinese National Standard in measuring its log quantity by the small end of the log.

As a result of Chengen's omissions, Commerce did not know prior to

42

verification that Chengen relied on a volume calculation formula. And, even at

verification, it was ***Commerce verifiers*** who happened to observe the two-page

formula and conversion table on a desk in Chengen's factory and requested those

two pages, not Chengen who initially offered to produce the pages. Appx372.

Accordingly, and given Commerce's practice of not accepting new documents at

verification except in limited circumstances, Commerce verifiers reasonably

declined to take the significant amount of additional documentation Chengen tried

to present when giving Commerce copies of the two-page document that the

verifiers had requested.[9] Appx372-373.

Notably, Chengen never claimed in its case briefs that Commerce verifiers

had declined to take the additional documentation it had offered, much less that the

verifiers had "torn off" pages, as later alleged by Chengen's counsel; nor did

Chengen allege in its case briefs that Commerce verifiers were clearly aware that

the formula was the Chinese National Standard. Chengen only made these

arguments in a "ministerial error allegation" ***after*** the issuance of Commerce's

final determination. Commerce appropriately declined to consider the claims, as

---

[9] The accounting of events as told by Chengen's counsel implies that the
cover page (and other additional pages) were part of the original formula and table.
But record evidence demonstrates that Commerce verifiers saw only the two-page
formula during its tour of the facilities, and the additional pages were added
unsolicited by Chengen after Commerce asked for copies of the formula.
Appx372.

they were clearly not allegations of ministerial error; Appx9047-9048; rather, they constituted substantive arguments that should have been raised in the case briefing and factual information that Chengen should have submitted prior to the preliminary determination.

Nonetheless, when Chengen again raised these allegations in its trial court briefs and at oral argument, the trial court not only considered them but accepted them. The court encroached on Commerce's discretion by disregarding its practices and procedures, as well as its reasoned explanation for declining the additional pages as untimely new factual information. By accepting as true Chengen's unsupported, untimely, extra-record statements as to what occurred at verification, as well as its assertions as to the provenance of the contested documentation, the trial court overstepped its authority.

Commerce, of course, has broad discretion to accept or reject information in an administrative proceeding. *See Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006). In particular, Commerce has discretion to establish and enforce time limits for submitting information in an administrative proceeding. *See, e.g., M S Int'l, Inc. v. United States*, 32 F.4th 1145, 1153 (Fed. Cir. 2022) ("Commerce may set such deadlines where the statute is silent, and must be permitted to enforce them in order to administer the trade remedy laws") (citation omitted); *Reiner Brach GmbH & Co. KG v. United States*, 206 F. Supp. 2d 1323,

1334 (Ct. Int'l Trade 2002) ("Commerce clearly cannot complete its own work

unless it is able at some point to freeze the record and make calculations and

findings based on that fixed and certain body of information." (cleaned up)).

This Court has recognized that Commerce's discretion is not without limits.

*See Goodluck India*, 11 F.4th at 1342.  Commerce abuses its discretion, for

instance, if it departs from a consistent practice without reasonable explanation.

*Id.* (citing *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir.

2003)).  The Court has also found that Commerce can also abuse its discretion by

"refusing to accept updated data when there [i]s plenty of time for Commerce to

***verify*** or consider it."  *Id.* (quoting *Papierfabrik August Koehler SE v. United

State*s, 843 F.3d 1373, 1384 (Fed. Cir. 2016) (emphasis added)).  In addition,

Commerce may abuse its discretion if it rejects information where it did not put the

respondent on notice that the information might be relevant.  *See Shelter Forest

Int'l Acquisition v. United States*, 497 F. Supp. 3d 1388, 1400 (Ct. Int'l Trade

2021).

As this Court has observed, when a party submits untimely information,

"Commerce must determine whether the need for finality outweighs the need for

accuracy, or vice versa."  *Goodluck India*, 11 F.4th at 1342.  To that end,

Commerce typically accepts corrective information at verification only in very

limited circumstances, such as minor corrections to information already on the

record or information corroborating, supporting, or clarifying information already on the record. *Id.* at 1342-43; *see also TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1354 n.34 (Ct. Int'l Trade 2016).[10]   Commerce's practice strikes an appropriate balance between finality and accuracy. *Goodluck India*, 11 F.4th at 1343.   And it is within Commerce's discretion to decide which interest outweighs the other. *Id.* (citing *Micron Tech.*, 117 F.3d at 1396 ("Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc."); *Am. Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) ("[T]he statute[s] give[ ] Commerce wide latitude in its verification procedures.")).

Here, Commerce acted within its discretion by not accepting the additional pages at verification.   The trial court improperly substituted its judgment for Commerce's when it held that Commerce had unreasonably elected not to take those pages.   None of the situations limiting Commerce's discretion apply here. Commerce acted consistently with its practice in limiting the type of information it would accept at the late stage of verification, and Chengen certainly should have been on notice that its log volume calculations were relevant to Commerce's consideration of whether to apply the intermediate input methodology.   Chengen

---

[10]   Commerce also requires all documents presented during verification to be translated on the first occasion presented; Chengen was aware of that requirement and did not meet it.  Appx6942; 19 C.F.R. § 351.303(e).

had every opportunity to timely submit information, and failed to do so.

Commerce was entitled to enforce its own procedures and the trial court committed

reversible error by entertaining evidence and arguments that Commerce had

decline to accept under those lawful procedures.

C.    The Court Erred By Ordering Commerce To Reopen The Record And
      Deeming The New Record Information Complete And Accurate

The trial court's error in considering the untimely-submitted information that

Commerce had declined to take was compounded by two further actions: (1)

ordering Commerce to reopen the record and place the contested documentation on

the record, and (2) deeming that documentation to be the "complete and accurate

Chinese National Standard used for volume conversion." Appx126.

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012), makes

clear the trial court's error in forcing Commerce to reopen the record to accept the

additional documentation. In *Essar Steel*, the respondent had belatedly admitted

certain factual information regarding a manufacturing facility. *Id.* at 1276. During

litigation, the trial court became aware that documents supporting the respondent's

arguments existed, due to a subsequent administrative review where the respondent

had timely put the documents on the record. *Id.* The court ordered Commerce to

reopen the administrative record, place the documents on the record, and consider

them in its assessment because the court believed that those documents impugned,

or even outright refuted, Commerce's determination. *Id.* at 1277.

On appeal, this Court held that the trial court exceeded its authority by ordering Commerce to reopen the record and place specific documents on it. *Id.* The Court began by emphasizing the respondent's burden to create an accurate record and noting that Commerce must consider all ***timely filed*** information. *Id.* (citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) and 19 C.F.R. § 351.301(c)(3)(ii)). The Court then pointed out that the trial court's review is limited to the record before the agency, and that the record did not include the information the respondent now sought to include. *Id.*

The Court explained that very limited exceptions exist allowing the court to order supplementation of the record: (1) when the original record was tainted by fraud, and (2) when the underlying agency decision was based on inaccurate data that the agency generating the data indicates were incorrect. *Id.* After determining that neither exception applied, the Court concluded that "{i}t was improper . . . for the trial court to remand and ***require*** that Commerce reopen and supplement the record." *Id.* at 1278 (emphasis in original). The Court found that "the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance." *Id.*

As with *Essar Steel*, Chengen did not timely disclose the existence of the conversion table and formula. Only ***after*** Commerce issued its final determination

48

and applied the intermediate input methodology did Chengen claim that Commerce had improperly declined to take additional documentation supporting its claim that the formula was the Chinese National Standard.  And, like *Essar Steel*, none of the limited exceptions allowing a court to order Commerce to reopen the record apply. Nor does the trial court's reasoning that the documentation offered by Chengen was "readily available and highly relevant," Appx124, warrant its "usurp{ation} of agency power." *Essar Steel*, 678 F.3d at 1278.

Commerce acted within its discretion by not allowing Chengen to submit the untimely information; "in light of this, the trial court exceeded its authority when it ordered the agency to" "reopen the record and admit the evidence in this case." *Essar Steel*, 678 F.3d at 1278; *see also PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 759-761 (Fed. Cir. 2012) (the trial court "improperly intruded upon Commerce's power to apply its own procedures for the timely resolution of antidumping" proceedings when it "ordered Commerce to submit the {document} into the record{.}").  "{A} court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered."  *PSC VSMPO-Avisma*, 688 F.3d at 761.  This is exactly what the trial court did, and its order requiring Commerce to reopen the record should be reversed.

The trial court also exceeded its authority when it ordered Commerce to accept the additional documentation as "representing the complete and accurate Chinese National Standard." Appx126. This directive, in conjunction with its instruction that "Commerce {} reconsider modifying Linyi Chengen's margin," Appx124, deprived Commerce of its right, as fact-finder, to probe the information further and determine for itself whether it was accurate and reliable. Appx383, Appx393; *see also Matsushita Elec. Indus. Co., Ltd v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). Because of the trial court's instructions, Commerce determined it had no choice but to deem the log volumes reported by Chengen accurate and stop applying the intermediate input methodology.[11] The court's incursion into Commerce's authority to evaluate factual information in the first instance is especially troubling because the court did not explain why the documentation should be deemed "complete and accurate."

Commerce made a reasoned determination, based on Chengen's failure to accurately record and substantiate its consumption of its upstream input of logs, to apply the intermediate input methodology. *See Garlic from China* IDM at Cmt. 1.

---

[11]  To the extent Chengen argues that Commerce's decision to stop using the intermediate input methodology, as well as the eventual application of a zero percent rate, shows that its initial determination was incorrect, that argument is undermined by the fact that Commerce found it could not question the reliability and accuracy of the new information, or Chengen's log volume quantities, subsequent to the second remand order. Moreover, the outcome should not weigh in determining whether the trial court exceeded its authority.

The trial court unlawfully curtailed Commerce's authority by considering information Commerce had declined, ordering Commerce to reopen the record to accept the information, and proclaiming the information "complete and accurate." This Court should reverse.

III.    **The Trial Court Erred In Holding Unlawful Commerce's Reasonable Methodological Choice To Apply The Intermediate Input Methodology Based, In Part, On The Inability To Corroborate Poplar Log Purchases**

The trial court also erred in finding unlawful Commerce's determination to apply the intermediate input methodology based, in part, on the fact that it could not corroborate Chengen's reported volumes for the input accounting for the vast majority of its purchases—poplar logs. Commerce's determination was lawful, supported by the record, and well within Commerce's discretion; accordingly, this Court should reverse.[12]

Prior to verification, Commerce had understood Chengen's identification of "material purchase invoices" to mean that Chengen's suppliers had provided invoices for its purchased poplar logs. Appx314, Appx333, Appx2798. At verification, Commerce discovered this was not the case, and only Chengen's own documentation supported its poplar log purchase quantities. Appx316, Appx334. Because the only documents supporting Chengen's poplar log purchase quantities

---

[12] This Court can, and should, reverse even if it sustains the trial court's holding with regard to the first issue.

51

were generated, maintained, and otherwise in its sole control, Commerce

reasonably determined that the reported quantities could be subject to manipulation

or alteration.  Commerce concluded that, without the ability to confirm the poplar

log purchase quantities with a third-party source, and in conjunction with the issues

discussed above, it could not deem Chengen's reporting and substantiation of its

log factors of production accurate or reliable.

The trial court held Commerce's determination unlawful because Commerce

did not cite legal authority that required third-party corroboration.  But simply

because no statute or regulation provides Commerce the specific authority to

require independent corroboration for purposes of determining which methodology

to apply does not mean that Commerce cannot do so.  Indeed, where Congress has

not directed a specific test or methodology for Commerce to apply in administering

the antidumping duty statute, Commerce "may perform its duties in the way it

believes most suitable." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363

(Fed. Cir. 2015) (citation omitted).

Moreover, Commerce, as the finder of fact in "these complex

investigations," is charged with assessing the record and making determinations.

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d

1317, 1349 n.152 (Ct. Int'l Trade 2014).  "{F}actual determinations supporting

anti-dumping margins are best left to the agency's expertise{,} and those

52

determinations are entitled to "great deference." *F. Ili De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). The court should "not substitute or displace Commerce's judgment with regard to the weight or credibility of the evidence." *Fine Furniture (Shanghai) Ltd. v. United States*, 865 F. Supp. 2d 1254, 1263 (Ct. Int'l Trade 2012).

But that is exactly what the trial court did. The court held that Commerce, in assessing the accuracy of factual information, could not require independent confirmation of certain factual representations in the absence of explicit authority. As an initial matter, Commerce did not actually ***require*** Chengen to provide independent corroboration of its log purchase quantities or, for instance, risk an adverse inference; rather, based on the lack of independent confirmation, as well as the other concerns regarding Chengen's methodology for measuring log volume, Commerce found Chengen's log consumption data unreliable enough to warrant using the intermediate input methodology. Appx318. This methodological choice was reasonable, not contrary to law, and well within Commerce's discretion; the trial court committed clear error in deeming it contrary to law.

The trial court also erred in holding that Commerce's decision was not supported by the record. While Chengen claimed below that its VAT invoices— filled out by Chengen itself—were confirmed by its suppliers and were reliable because the invoices were generated on forms provided by the Chinese tax

authority, Commerce found that the record did not support the claim that the information on these tax invoices was actually confirmed by Chengen's suppliers. Appx334-335. Nor did Commerce ever observe, or receive, any information confirming the amounts recorded on the tax invoices.

Without disputing these factual findings, the court held that, because the invoices are generated on pre-approved government forms, Commerce unreasonably concluded that Chengen could manipulate or alter the documents. Appx125. However, the court failed to explain how the fact that the blank forms originate from the government guards against Chengen's ability to manipulate or alter the amounts *it* lists on the invoices, given that Chengen is the party filling out the invoices (and no evidence supports that its suppliers confirmed the accuracy of the information).

Even if the information on the invoices matched the information in Chengen's own accounting records, this does not mean that the information was corroborated by an independent source, such as a supplier or the Chinese government; nor does it mean Chengen could not have altered or manipulated its own records. The court also failed to explain its statement that Commerce had no basis to doubt the accuracy[13] of the VAT invoices because Chengen's financial

---

[13] Especially given Commerce's discretion to carry out its duties as it deems suitable, the court should not have required Commerce to affirmatively demonstrate that there were ***actual*** inaccuracies in Chengen's log consumption

statements had been audited and Commerce had not observed discrepancies during verification. Appx125. But, again, Chengen's self-generated documents being internally consistent with each other does not require a conclusion that Chengen was unable to manipulate or alter the documents. Commerce reasonably found that, without a third-party source, it could not substantiate the poplar log quantities. And, because Commerce questioned the accuracy and reliability of Chengen's log consumption,[14] it applied the intermediate input methodology rather than valuing the logs directly. Commerce's decision was lawful and within its discretion to select the appropriate methodology for calculating the value of Chengen's inputs, and was also supported by the record.

## IV. Commerce's Calculation Of The 57.36 Percent Separate Rate Was Lawful And Supported By Substantial Evidence

Even if this Court affirms the trial court's erroneous holdings with regard to Chengen, it should reverse the court's rejection of Commerce's decision, in its third remand redetermination, to assign the separate rate respondents a 57.36 percent margin—the average of the zero percent rate calculated for Chengen and

---

reporting. Commerce's point was that it could not actually determine, without third-party sources, whether the information was reliable and accurate for the purposes of deciding whether to value the upstream or the intermediate input.

[14] Commerce had particular cause to question the reliability and accuracy of Chengen's information, given Chengen's failure to disclose the basis of its log volume calculations until verification.

the 114.72 percent rate assigned for Bayley (and the China-wide entity).
Commerce's calculation of the separate rate was lawful, supported by substantial
evidence, and the only reasonable option given the record. The trial court erred in
declining to sustain it, and eventually giving Commerce no option but to assign the
separate rate respondents Chengen's zero percent margin—a rate that the court
itself agreed ***would not be reasonably reflective of the separate rates respondents'
dumping behavior***.

The court may not supplant Commerce's judgment, but must affirm
Commerce's determination if it is reasonable and supported by the record as a
whole, even if some evidence detracts from Commerce's conclusion. *See
Goodluck India*, 11 F.4th at 1344-45. Here, the court substituted its judgment for
Commerce's and improperly reweighed the evidence. Commerce explained its
reasoning for employing a simple average of the zero percent margin and the
China-wide margin, explaining that the record contained a limited number of rates
it could rely on and citing record evidence to demonstrate that the 57.36 percent
rate was reflective of the potential dumping activity of the non-investigated
respondents.

In its third remand redetermination, Commerce considered actual
commercial transactions by the same petition SRA exporter from whom the price

quotes in the petition[15] were obtained, as well as commercial invoices for sales of

subject merchandise during the period of investigation for each of the separate rate

respondents who were parties to the litigation, and sales of subject merchandise for

the broader pool of separate rate respondents.  Appx446-447, Appx449-451.

Looking at an actual U.S. sale from the period of investigation by the

petition SRA exporter, Commerce found that the price was almost identical to one

of the price quotes for the petition SRA exporter in the petition; accordingly,

Commerce reasonably inferred that the sale would have had a transaction-specific

margin in the range of the two petition rates (104.06 percent and 114.72 percent).

Appx446-447, Appx952, Appx2182-2186.  Commerce thus determined that the

prices forming the basis for the petition margins were not untethered to the

separate rate respondents' behavior, but rather supported by the actual prices at

which the product was sold.  Appx446.  Commerce also examined Chengen's sale

of the same product, explaining that, because Chengen's price was almost 20

percent higher than the petitioner SRA exporter's price, the likelihood that the

petitioner SRA exporter's products were being dumped was significantly greater

than that of Chengen's products.  Appx446-447, Appx479, Appx8375.

---

[15]  Commerce conducted comparisons to the petition rates because the higher
petition rate served as the basis for the 114.72 percent China-wide AFA rate
assigned to Bayley.

In addition, Commerce analyzed the commercial invoices for sales of merchandise from all 40 separate rate plaintiffs, finding that their sales invoices demonstrated that Chengen's behavior and rate was not reflective of the potential dumping activity of the separate rate plaintiffs.  Appx449-452; *see supra* at 31-32.  For example, Chengen exclusively sold plywood produced by its affiliate, whereas the majority of the separate rate plaintiffs purchased from unaffiliated manufacturers.  Appx447-448, Appx462, Appx477-478.  As Commerce explained, this difference results in completely different cost structures between companies who sell products produced by affiliates and those who use unaffiliated manufacturers.  *Id.*  Commerce also identified other distinctions between Chengen and the separate rate plaintiffs, most notably that, with respect to the highest-volume product sold by Chengen, the majority of the separate rate plaintiffs sold plywood at prices lower than Chengen's, meaning that the likelihood of dumping was higher.  Appx450-452, Appx462.

Commerce further analyzed the record during the fourth remand redetermination.  It identified an additional submission from the petition SRA exporter in which the petition SRA exporter informed Commerce that one of its sales channels involved unaffiliated suppliers who sold plywood to the exporter's affiliate, who then in turn resold the merchandise to the exporter, who then sold the merchandise in the United States.  Appx523-524, Appx6597.  Commerce found

58

that this chain would have resulted in an additional level of price markup as compared with sales where the petition SRA exporter purchased directly from suppliers, and yet the petition SRA exporter still sold plywood through this sales channel to the United States at prices lower than those set forth in the petition. Appx523-525.

Commerce also explained how multiple VAT invoices submitted by the petition SRA exporter demonstrated that the exporter made sales of identical plywood, in significant quantities and with similar sales terms, at the same or lower prices than those identified in the petition. *Id.*, Appx926, Appx952, Appx2179-2186, Appx6621-6669. Commerce reasonably concluded that these additional invoices, in conjunction with the record evidence it had already analyzed, supported a finding that the separate rate respondents had potential dumping activity within the range alleged in the petition. Appx525.

In all, Commerce identified and analyzed multiple pieces of record evidence both "tethering" the petition rates to the potential dumping margins of the separate rate respondents ***and*** demonstrating that Chengen's margin would not be reasonably reflective of the separate rate respondents' dumping activity. Commerce's findings were clearly supported by substantial record evidence, and supported its decision to average Chengen's zero percent rate and the 114.72 percent rate; *i.e.*, Commerce provided "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

The trial court faulted Commerce for insufficiently considering contradictory evidence, Appx189, but in doing so, it misapplied the standard of review. The trial court was required to affirm Commerce's determination if it is supported by substantial evidence, ***even if some evidence detracts from Commerce's conclusion***. *Am. Silicon Techs.*, 261 F.3d at 1376. While purporting not to reweigh the evidence, Appx190, the court did just that, pointing to slivers of potentially contradictory evidence and finding that Commerce improperly relied more heavily on the evidence supporting its conclusion than evidence that might detract from it. The court ignored the fact that Commerce had: (1) analyzed in exhaustive detail multiple pieces of evidence supporting its conclusion, and (2) not simply applied the highest petition rate as the separate rate but averaged that rate with Chengen's concededly unrepresentative zero percent rate. The court's intrusion into Commerce's domain is made especially clear by the fact that it did not simply remand for Commerce to further consider its decision by explaining whether the potentially contradictory evidence outweighed the supportive evidence; rather, the court instructed Commerce not to submit the 57.36 percent rate again.

The trial court's direction to Commerce to assign a rate lower than 57.36 percent, which resulted in Commerce having to assign a zero percent rate, was especially unsound given its agreement that a zero percent rate ***would not be reasonably reflective*** of the potential dumping activity of the separate rate respondents. Appx156-159. And, indeed, the court did not explain in any meaningful way why, in light of its prior holding, a zero percent separate rate was reasonable or supported by substantial evidence. Moreover, the court's action rendered superfluous the direction given by the SAA, which has been held to be the authoritative expression concerning the interpretation of the statutory scheme.

The court also failed to more than cursorily acknowledge Commerce's explanations as to why averaging Chengen's rate and the highest petition rate represented the best choice among the limited options on the record. Instead, the court blamed Commerce for creating its own scarcity of evidence[16] and held Commerce to a more exacting standard than the statutory framework requires. This should not be countenanced. Because Commerce has statutory authority to limit its individual examination of respondents, it does not collect information from each separate rate respondent to determine their actual dumping margins. Appx444; 19 U.S.C. § 1677f-1(c)(2). Nor can Commerce estimate with any

---

[16] We disagree that the record was too scarce for Commerce to make a supported determination. While Commerce admitted that the record evidence was limited, multiple pieces of evidence support its conclusion.

precision what those dumping margins would be.  Notwithstanding this, Commerce examined the record and reasonably determined that: (1) Chengen's rate would not be reflective of the separate rate respondents' potential dumping, (2) the petition rates were representative of the dumping behavior of the separate rate recipients, and (3) the separate rate plaintiffs' actual sales demonstrated the likelihood of their dumping in greater amounts than Chengen.  Appx502-504, Appx520-523.  Particularly given the limited universe of information on the record, which was ***not*** a product of Commerce's error but rather contemplated by the statutory framework, Commerce selected the best available option supported by the record.

Finally, the trial court's outsized dependence on *Bestpak* was unwarranted. *Bestpak* was limited to its facts and does not dictate a similar outcome here.  In *Bestpak*, Commerce investigated narrow woven ribbons from China, individually examining two mandatory respondents.  *Bestpak*, 716 F.3d at 1375.  Commerce assessed a *de minimis* margin to one mandatory respondent and a 247.65 percent, AFA-based, margin to the other; it then calculated its separate rate by taking a simple average of the two rates, resulting in a 123.83 percent rate.  *Id.*  This Court held that, while Commerce may, as a matter of law, average a zero percent and AFA rate in calculating the separate rate, the action as applied ***to that specific investigation*** was not reasonable because Commerce had only relied on average

unit values (AUVs) in determining that the 123.83 percent rate was reflective of the separate rate respondents' potential dumping margins, and the rate was so high as to risk being unduly punitive.  *Id.* at 1378-79.  *Bestpak* explicitly sanctioned Commerce's ability to use a simple average of a zero percent and AFA rate in calculating the separate rate, holding only that the methodology was unreasonable on the facts of that given case.  *Id.* at 1378; *see also Bosun Tools Co., Ltd. v. United States*, No. 2021-1929, 2022 WL 94172, at *4 (Fed. Cir. 2022) (in *Bestpak*, the Court "simply found that Commerce's methodology was unreasonable 'as applied,' given the lack of data.").

The facts of this case, by contrast, support Commerce's use of a simple average.  First, the trial court ***agreed*** that Chengen's zero percent margin was not reasonably reflective of the separate rate respondents' dumping margins.  Appx158.  Second, unlike in *Bestpak*, the record in this investigation was not "so thin that Commerce could neither have reached a valid decision nor reasonably have found evidence to support {its} determination{.}"  *Bestpak*, 716 F.3d at 1379.  In *Bestpak*, Commerce had cited only one evidentiary finding involving estimated average unit values AUVs, which the Court did not deem representative.  *Id.* at 1378-79.  Here, Commerce did not rely on AUVs but rather on actual sales from the petition SRA exporter and the separate rate respondents, *i.e.,* the "commercial activity" that was missing in *Bestpak*.  *Id.* at 1380.  Moreover, Commerce did not

only rely on one piece of evidence but multiple, conducting comparisons to both the petition prices and Chengen's sales. Indeed, Bestpak argued that Commerce should have considered information derived from the sample invoice appended to its separate rate application, *id.* at 1380, which is exactly what Commerce did here. Appx446, Appx449-451, Appx523-525 (all examining commercial invoices). Finally, the separate rate selected here—57.36 percent—is less than half the one calculated in *Bestpak*—123.83 percent. *Id.* at 1379. Accordingly, the trial court was unjustified, particularly in light of the record evidence, in finding that rate unfair and unduly punitive.

Because Commerce's application of the 57.36 percent rate was reasonable and supported by substantial evidence, this Court should reverse the trial court's determination to sustain Commerce's application of the zero percent rate, made under protest.

## CONCLUSION

For these reasons, we respectfully request that the Court reverse the judgment of the Court of International Trade.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
SAVANNAH MAXWELL            Commercial Litigation Branch
Attorney                    Civil Division
Office of the Chief Counsel United States Department of Justice
  for Trade Enforcement and Compliance   P.O. Box 480
U.S. Department of Commerce Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-7568
Facsimile: (202) 514-8624

May 10, 2024                Attorneys for Defendant-Appellant

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b), the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 13,787 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14-point font, proportionally spaced typeface.

/s/ Sosun Bae
SOSUN BAE