---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**LINYI CHENGEN IMPORT AND EXPORT CO., LTD., CELTIC CO., LTD., JIAXING GSUN IMPORT & EXPORT CO., LTD., SUQIAN HOPEWAY INTERNATIONAL TRADE CO., LTD., ANHUI HODA WOOD CO., LTD., SHANGHAI FUTUWOOD TRADING CO., LTD., LINYI EVERGREEN WOOD CO., LTD., XUZHOU JIANGYANG WOOD INDUSTRIES CO., LTD., XUZHOU TIMBER INTERNATIONAL TRADE CO. LTD., LINYI SANFORTUNE WOOD CO., LTD., LINYI MINGZHU WOOD CO., LTD., XUZHOU ANDEFU WOOD CO., LTD., SUINING PENGXIANG WOOD CO., LTD., XUZHOU SHENGPING IMPORT AND EXPORT CO., LTD., XUZHOU PINLIN INTERNATIONAL TRADE CO. LTD., LINYI GLARY PLYWOOD CO., LTD., LINYI LINHAI WOOD CO., LTD., LINYI HENGSHENG WOOD INDUSTRY CO., LTD.,**
*Plaintiffs-Appellees*
*(Case caption continued on next page)*

---

Appeal from the United States Court of International Trade in Nos. 1:18-cv-00002-JCG, 1:18-cv-00011-JCG, 1:18-cv-00017-JCG, 1:18-cv-00018-JCG, 1:18-cv-00019- JCG, Judge Jennifer Choe-Groves

---

**RESPONSE BRIEF OF PLAINTIFFS-APPELLEES RICHMOND INTERNATIONAL FOREST PRODUCTS, LLC AND TARACA PACIFIC, INC.**

July 17, 2024

Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
Mowry & Grimson, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
jsg@mowrygrimson.com
202-688-3610 (ph)
*Counsel to Richmond International Forest Products, LLC and Taraca Pacific, Inc.*

**SHANDONG QISHAN INTERNATIONAL TRADING CO., LTD., SUZHOU ORIENTAL DRAGON IMPORT AND EXPORT CO., LTD., LINYI HUASHENG YONGBIN WOOD CO., LTD., QINGDAO GOOD FAITH IMPORT AND EXPORT CO., LTD., LINYI JIAHE WOOD INDUSTRY CO., LTD., JIAXING HENGTONG WOOD CO., LTD., XUZHOU LONGYUAN WOOD INDUSTRY CO., LTD., FAR EAST AMERICAN, INC., ZHEJIANG DEHUA TB IMPORT & EXPORT CO., LTD., TARACA PACIFIC, INC., RICHMOND INTERNATIONAL FOREST PRODUCTS, LLC,**
*Plaintiffs-Appellees*

**HIGHLAND INDUSTRIES INC., JIASHAN DALIN WOOD INDUSTRY CO., LTD., HAPPY WOOD INDUSTRIAL GROUP CO., LTD., JIANGSU HIGH HOPE ARSER CO., LTD., SUQIAN YAORUN TRADE CO., LTD., YANGZHOU HANOV INTERNATIONAL CO., LTD., G.D. ENTERPRISE LTD., PIZHOU JIN SHENG YUAN INTERNATIONAL TRADE CO., LTD., XUZHOU SHUIWANGXING TRADING CO., LTD., COSCO STAR INTERNATIONAL CO., LTD., DEQING CHINA-AFRICA FOREIGN TRADE PORT CO., LTD., LINYI CITY DONGFANG JINXIN ECONOMIC & TRADE CO., LTD., FABUWOOD CABINETRY CORP., LINYI CITY SHENRUI INTERNATIONAL TRADE CO., LTD., JIANGSU QIANJIUREN INTERNATIONAL TRADING CO., LTD., QINGDAO TOP P&Q INTERNATIONAL CORP., CANUSA WOOD PRODUCTS LTD., HOLLAND SOUTHWEST INTERNATIONAL INC., LIBERTY WOODS INTERNATIONAL, INC., NORTHWEST HARDWOODS, INC., USPLY LLC, SHANDONG DONGFANG BAYLEY WOOD CO., LTD., CONCANNON CORP.,**
*Plaintiffs*

**v.**

**UNITED STATES, COALITION FOR FAIR TRADE OF HARDWOOD PLYWOOD,**
*Defendants-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 24-1258-1259 |
| **Short Case Caption** | Linyi Chengen Import and Export Co., Ltd. v. US |
| **Filing Party/Entity** | Richmond International Forest Products, LLC and Taraca Pacific, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/17/2024

Signature: /s/ Jeffrey S. Grimson

Name: Jeffrey S. Grimson

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Richmond International Forest Products, LLC | | Forest City Trading Group |
| Taraca Pacific, Inc. | | Kinkosha Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable                 ☐  Additional pages attached

| | | |
|---|---|---|
| Yuzhe PengLing<br>Akin Gump Strauss Hauer & Feld LLP | James C. Beaty<br>Curtis, Mallet-Prevost, Colt & Mosle LLP | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable                 ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................. iii

STATEMENT OF RELATED CASES ............................................1

SUMMARY OF THE ARGUMENT.................................................1

ARGUMENT ...............................................................................5

I.   STANDARD OF REVIEW...................................................5

II.   COMMERCE'S CALCULATION OF A ZERO PERCENT DUMPING MARGIN FOR
LINYI CHENGEN WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND
OTHERWISE IN ACCORDANCE WITH LAW ...........................................6

III.   COMMERCE'S CALCULATION OF A ZERO PERCENT DUMPING MARGIN
FOR THE SEPARATE RATE RESPONDENTS WAS SUPPORTED BY SUBSTANTIAL
EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW...................................7

A.   The Trade Correct Correctly Held That Commerce Unlawfully Relied on a
Sparce Record To Apply an Unduly Punitive Margin of 57.36 Percent to the
Separate Rate Respondents ......................................................12

B.   Commerce Failed To Support with Substantial Evidence Its Conclusion that
a 57.36 Percent Dumping Margin Reasonably Reflected the Potential Dumping
Margins of the Separate Rate Respondents .........................................26

CONCLUSION ...........................................................................41

## CONFIDENTIAL MATERIALS OMITTED

Pursuant to Federal Circuit Rule 25.l(e)(l)(B), this brief contains confidential material that has been omitted at pages 31, 32, 35, 37 and 38.  The materials redacted from page 31, 32 and 35 relate to the percentage of sales of subject merchandise.  Further, the materials redacted from page 31 pertain to the confidential name of an exporter of subject merchandise and a calculation to determine that exporter's share of the market.  Finally, the materials redacted from pages 37 and 38 concern a particular number of exporters, the unit average price, and other prices for the sales of subject merchandise.

## Cases

Atl. Sugar, Ltd. v. United States,
  744 F.2d 1556 (Fed. Cir. 1984) ...........................................................27

Bosun Tools Co. v. United States,
  Ct. Nos. 2021-1929, 2021-1930, 2022 U.S. App. LEXIS 624 (Fed. Cir. Jan. 10,
  2022) ...................................................................................................25

Changzhou Hawd Flooring Co. v. United States,
  848 F.3d 1006 (Fed. Cir. 2017) ............................................... 10, 18, 24

Changzhou Trina Solar Energy Co. v. United States,
  975 F.3d 1318 (Fed. Cir. 2020) .................................................... 5, 6, 37

Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,
  701 F.3d 1367 (Fed. Cir. 2012) ...............................................................8

Consol. Edison Co. v. NLRB,
  305 U.S. 197 (1938)..................................................................................5

F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States,
  216 F.3d 1027 (Fed. Cir. 2000) .............................................................15

Gallant Ocean (Thailand) Co. v. United States,
  602 F.3d 1319 (Fed. Cir. 2010) .............................................................22

Huayin Foreign Trade Corp. v. United States,
  322 F.3d 1369 (Fed. Cir. 2003) ........................................................5, 31

Koyo Seiko Co. v. United States,
  36 F.3d 1565 (Fed. Cir. 1994) ...............................................................23

Linyi Chengen Imp. & Exp. Co. v. United States,
  539 F. Supp. 3d 1269 (2021) ........................................................ passim

Linyi Chengen Imp. & Exp. Co., Ltd. v. United States,
    487 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) ........................................ 1, 8, 11, 13

Linyi Chengen Imp. & Exp. Co., Ltd. v. United States,
    658 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ............................................... 3, 4, 27

Mueller Comercial De Mexico v. United States,
    753 F.3d 1227 (Fed. Cir. 2014) ...............................................................9

Nan Ya Plastics Corp. v. United States,
    810 F.3d 1333 (Fed. Cir. 2016) ...........................................................5, 27

Nippon Steel Corp. v. United States,
    458 F.3d 1345 (Fed. Cir. 2006) .................................................................6

NMB Sing. Ltd. v. United States,
    557 F.3d 1316 (Fed. Cir. 2009) .................................................................6

Rhone Poulenc, Inc. v. United States,
    899 F.3d 1185 (Fed. Cir. 1990) ...................................................... 11, 23

Seah Steel Vina Corp. v. United States,
    950 F.3d 833 (Fed. Cir. 2020) .................................................................27

SNR Roulements v. United States,
    402 F.3d 1358 (Fed. Cir. 2005) ...............................................................14

SolarWorld Ams., Inc. v. United States,
    910 F.3d 1216 (Fed. Cir. 2018) .................................................................6

Suramerica de Aleaciones Laminadas, C.A. v. United States,
    44 F.3d 978 (Fed. Cir. 1994) .............................................................6, 33

Tung Mung Dev. Co., Ltd. v. United States,
    354 F.3d 1371 (Fed. Cir. 2004) .................................................................5

U.S. Steel Grp. v. United States,

225 F.3d 1284 (Fed. Cir. 2000) ............................................................23

Universal Camera Corp. v. NLRB,
  340 U.S. 474 (1951)...........................................................................27

Yangzhou Bestpak Gifts & Crafts Co. v. United States,
  783 F. Supp. 2d 1343 (Ct Int'l Trade 2011) ......................................14

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................5

19 U.S.C. § 1677e(d)(3).........................................................................23

**Other Authorities**

Certain Hardwood Plywood Products From the People's Republic of China: Final
  Determination of Sales at Less Than Fair Value, and Final Affirmative
  Determination of Critical Circumstances, in Part, 82 Fed. Reg. 53,460 (Dep't of
  Commerce Nov. 16, 2017)...................................................................19

Certain Hardwood Plywood Products From the People's Republic of China:
  Preliminary Affirmative Determination of Sales at Less Than Fair Value,
  Preliminary Affirmative Determination of Critical Circumstances, in Part, 82
  Fed. Reg. 28,629 (Dep't of Commerce June 23, 2017).......................20

Uruguay Round Trade Agreements, Texts of Agreements, Implementing Bill,
  Statement of Administrative Action and Required Supporting Documents, H.R.
  Rep. No. 103-316 (1994) .......................................................... 9, 10, 23

Pursuant to Federal Circuit Rule 47.5(a), Plaintiffs–Appellees Richmond International Forest Products, LLC ("Richmond") and Taraca Pacific, Inc. ("Taraca") state that no other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.[1]

## SUMMARY OF THE ARGUMENT

The U.S. Court of International Trade ("Trade Court") properly held in <u>Linyi Chengen Imp. & Exp. Co., Ltd. v. United States</u>, 487 F. Supp. 3d 1349, 1359 (Ct. Int'l Trade 2020) ("<u>Linyi Chengen III</u>"), Appx30-40, that Commerce's second remand redetermination calculating a zero percent antidumping duty margin for mandatory respondent Linyi Chengen Import and Export Co., Ltd. ("Linyi Chengen") was supported by substantial evidence and otherwise in accordance with law. Defendant-Appellant the United States unconvincingly argues that the Trade Court exceeded its authority by instructing the U.S. Department of Commerce ("Commerce") to accept certain factual information submitted during verification by the sole remaining mandatory respondent, Linyi Chengen, in its antidumping duty investigation into hardwood plywood products from China. <u>See</u> Corrected Opening

---

[1] As required by Federal Circuit Rule 28(b), Richmond and Taraca do not include "statements of jurisdiction, the issues, the case and facts" other than to state relevant facts in the argument section to the extent they disagree with the facts articulated in Appellants' briefs.

Br. for Def.-Appellant United States at 3 (May 22, 2024), ECF No. 31 ("United States' Br."). The United States maintains that the Trade Court committed "reversible error" and "improperly substituted its judgment for Commerce's when it considered new information that Commerce had lawfully declined to put on the record during the administrative proceeding, and ordered Commerce to reopen the record to accept such information, deeming it 'complete and accurate.'" Id. Further, the United States also argues that the Trade Court committed "reversible error in holding unlawful Commerce's . . . choice . . . to apply the intermediate input methodology" in calculating the dumping margin for Linyi Chengen. Similarly, the Defendant-Appellant the Coalition for Fair Trade in Hardwood Plywood (the "Coalition") asserts that Commerce's original determination using the intermediate input methodology instead of Linyi Chengen's own data to calculate Lingyi Chengen's dumping margin was correct and should be reinstated. See Corrected Opening Br. of Def.-Appellant Coalition for Fair Trade in Hardwood Plywood at 15 (May 10, 2024) (Nonconfidential Version), ECF No. 33 ("Coalition's Br.").[2] Richmond and Taraca adopt and incorporate the arguments of Linyi Chengen et al. in their response briefs showing that Commerce's fifth remand redetermination

---

[2] Richmond and Taraca's citations are to the nonconfidential versions of the parties' briefs and any record documents unless otherwise noted.

using Linyi Chengen's own information rather than the intermediate input methodology was reasonable and otherwise in accordance with law.

The Trade Court also properly held in <u>Linyi Chengen Imp. & Exp. Co., Ltd. v. United States</u>, 658 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ("<u>Linyi Chengen VI</u>"), Appx65-82, that Commerce's fifth remand redetermination of a zero percent separate rate was supported by substantial evidence and otherwise in accordance with law. Both the United States and the Coalition incorrectly argue that the Trade Court erred in remanding Commerce's second, third and fourth remand redeterminations in which Commerce calculated an antidumping duty margin of 57.36 percent for the respondents not selected for individual investigation ("separate rate respondents") using a simple average of the zero percent margin calculated for Linyi Chengen and the China-wide entity rate. <u>See</u> United States' Br. at 3; Coalition's Br. at 2. Commerce's determination in the fifth remand redetermination revising its calculation methodology and instead assigning the separate rate respondents the zero percent dumping margin calculated for Linyi Chengen was supported by substantial evidence and otherwise in accordance with law.

The Trade Court properly applied the binding legal principles outlined by the Court in <u>Yangzhou Bestpak Gifts & Crafts Co. v. United States</u>, 716 F.3d 1370 (Fed. Cir. 2013) ("<u>Bestpak</u>") in holding that the 57.36 percent margin did not reasonably reflect the potential dumping margins of the separate rate respondents. Here, in its

original investigation and in the second, third and fourth remand redeterminations, Commerce unlawfully relied on mere conjecture and an unreasonable reading of the record in applying a 57.36 percent separate rate.

Contrary to the arguments of the United States and the Coalition, as in <u>Bestpak</u>, the record here was too thin to support the margin Commerce assigned to the separate rate respondents in the second, third and fourth remand redeterminations. Based on the limited record, in the second, third and fourth remands, Commerce unreasonably determined that the only other dumping margins on the record that could be used to determine the potential dumping margins of the separate rate respondents were the 114.72 and 104.06 percent rates alleged in the Petition. <u>See</u> <u>Linyi Chengen VI</u>, 658 F. Supp. 3d at 1353-55, Appx71-73. To support its finding that the potential dumping margins of the separate respondents were more closely aligned with the Petition rates than the zero percent margin calculated for Linyi Chengen, Commerce cited to various unpersuasive information on the record. The Trade Court examined the record in detail and properly found that Commerce failed to support the reasonableness of its calculation of the 57.36 percent margin for the separate rate respondents in the second, third and fourth remand redeterminations and the only reasonable reading of the record was to assign the separate respondents the zero percent margin calculated for Linyi Chengen. This Court must not be persuaded by the arguments of the United States and the Coalition that Commerce's

separate rate of 57.36 percent in the second, third and fourth remands was lawful as it did not reasonably reflect the potential dumping margins of the separate rate respondents.

## ARGUMENT

### I. STANDARD OF REVIEW

The Court applies the same standard of review as the Trade Court.  See Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1341 (Fed. Cir. 2016).  Under that standard, the Court sustains Commerce's administrative determination "unless it is arbitrary and capricious or unsupported by substantial evidence on the record, or otherwise not in accordance with law."  Tung Mung Dev. Co., Ltd. v. United States, 354 F.3d 1371, 1378 (Fed. Cir. 2004) (citation omitted); see also 19 U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful any determination, finding, or conclusion found . . .  to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.").

Substantial evidence requires "more than a mere scintilla," see, e.g., Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318, 1326 (Fed. Cir. 2020) (citation omitted), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence supporting an agency

determination must be based on the whole record, and the Court shall consider not only the information that supports the agency's decision but also whatever in the record that "fairly detracts from the substantiality of the evidence." Changzhou Trina, 975 F.3d at 1326 (quoting SolarWorld Ams., Inc. v. United States, 910 F.3d 1216, 1222 (Fed. Cir. 2018)). Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable." NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citations omitted).

In conducting its review, this Court cannot "ignore the informed opinion of the {Trade Court}." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed. Cir. 1994); see also Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

## II. COMMERCE'S CALCULATION OF A ZERO PERCENT DUMPING MARGIN FOR LINYI CHENGEN WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

In the interests of judicial economy, Richmond and Taraca adopt and incorporate the arguments of Linyi Chengen Import and Export Co., Ltd. et al. that the Trade Court did not exceed its authority or improperly substitute its judgment when it ordered Commerce to reopen the record and accept new factual information submitted during verification and, based on this information, Commerce's decision to use Linyi Chengen's own information rather than an intermediate input

methodology and the resulting zero percent dumping margin was supported by substantial evidence and otherwise in accordance with law. This Court, therefore, should sustain the Trade Court's second remand redetermination with respect to this issue.

## III. COMMERCE'S CALCULATION OF A ZERO PERCENT DUMPING MARGIN FOR THE SEPARATE RATE RESPONDENTS WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

Commerce's determination in the fifth remand redetermination to assign the separate rate respondents the zero percent margin calculated for Linyi Chengen was supported by substantial evidence and otherwise in accordance with law because the zero percent margin represented the only reasonable method available given the limited record resulting from Commerce's procedural choices in its investigation. Nothing in the briefs of the United States or the Coalition overcomes the deficiency in Commerce's original calculation of a separate rate of 57.36 percent in the second remand redetermination or its subsequent attempts in the third and fourth remands to perpetuate an overly punitive and unlawful separate rate. Commerce's statutory framework establishes a general rule for Commerce's separate rate calculations during its investigation and then an exception to that rule. Under 19 U.S.C. § 1673d(c)(5), the general rule is that the separate rate "shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero

and <u>de minimis</u> margins, and any margins determined entirely under {adverse facts available}." <u>Id.</u> at § 1673d(c)(5)(A) (emphasis added).[3] "If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or <u>de minimis</u> margins or determined {pursuant to facts otherwise available or adverse facts available}," an exception applies whereby Commerce may use "any <u>reasonable method</u> to establish the estimated all-others rate." <u>Id.</u> § 1673d(c)(5)(B) (emphasis added).

The reasonableness requirement under the exception to Commerce's general rule for calculating its separate rate "imposes a duty on Commerce to select a method appropriate for the circumstances." <u>Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States</u>, 701 F.3d 1367, 1378-79 (Fed. Cir. 2012); <u>see also</u> <u>Bestpak</u>, 716 F.3d at 1378 (holding that while Commerce's chosen methodology may "{w}hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case." (citation omitted)). In meeting its duty to select a method appropriate for the circumstances, Commerce's "primary objective" must be "accuracy and fairness." <u>Albemarle</u>, 821 F.3d at 1354; <u>see also</u> <u>Wujin</u>, 701 F.3d at 1378 (holding that "fairness or accuracy,

---

[3] "The exception in 19 U.S.C. § 1673d(c)(5)(B) applies expressly to market economy proceedings but has been extended to non-market economy proceedings as well." <u>Linyi Chengen III</u>, 487 F. Supp. 3d at 1356-57, Appx37-38 (citing <u>Albemarle Corp. v. United States</u>, 821 F.3d 1345, 1352 n.6 (Fed. Cir. 2016)).

is the 'overriding purpose' of the antidumping statue when calculating a rate for a cooperating party"); Bestpak, 716 F.3d at 1379 ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible."); Mueller Com. De Mexico v. United States, 753 F.3d 1227, 1235 (Fed. Cir. 2014) ("Commerce must have as its primary objective the calculation of an accurate rate.").

The Statement of Administrative Action ("SAA") provides guidance as to how Commerce should select a method appropriate for the circumstances and directs that "{t}he expected method {for Commerce to use in calculating the separate rate} in such cases will be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." Uruguay Round Trade Agreements, Texts of Agreements, Implementing Bill, Statement of Administrative Action and Required Supporting Documents, H.R. Rep. No. 103-316, at 873 (1994) ("SAA"). If Commerce seeks to depart from the expected method, it must support with substantial evidence any conclusion that the expected method "would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers." Id.; see also Linyi Chengen Imp. & Exp. Co., Ltd. v. United States, 539 F. Supp. 3d 1269, 1275 (Ct. Int'l Trade 2021) ("Linyi Chengen IV"), Appx47 (citing Albemarle, 821 F.3d at 1352-53 and

<u>Changzhou Hawd Flooring Co. v. United States</u>, 848 F.3d 1006, 1012 (Fed. Cir. 2017)).

Here, albeit under protest, Commerce departed from the expected method[4] and lawfully assigned the separate rate responds the zero percent margin calculated for Linyi Chengen. <u>See</u> Final Results of Redetermination Pursuant to Court Remand at 2 (Mar. 17, 2023), ECF No. 221-1 ("Fifth Remand Redetermination"), Appx550. This Court must reject the arguments by the United States and the Coalition that Commerce's determination in its second, third and fourth remands in which it

---

[4] The Coalition is factually incorrect when it asserts that the "separate rate of 57.36%" was "consistent with the statute and the SAA's 'expected method.'" Coalition's Br. at 16. Commerce did not rely on the expected method because it used a <u>simple</u> average of the zero percent dumping margin calculated for Linyi Chengen with the China-wide entity rate. <u>See, e.g.</u>, Final Results of Redetermination Pursuant to Court Remand at 4 n. 13 (June 18, 2020), ECF No. 114-1 ("Second Remand Redetermination"), Appx377 ("The separate rate is the <u>simple</u> average of the rates determined for Chengen and the China-wide entity." (emphasis added)). In contrast, the SAA provides that the expected method requires a "weight-average." SAA at 873. Commerce itself acknowledged in its third remand redetermination that the Trade Court instructed it to "either provide more evidence supporting its departure from the expected method in calculating the rate applied to separate rate respondents, or to change its determination." Final Results of Redetermination Pursuant to Court Remand at 4 (Mar. 22, 2021), ECF No. 144-1 ("Third Remand Redetermination"), Appx432; <u>see also</u> United States' Br. at 33 (noting that the Trade Court "sustained Commerce's departure from the expected method"). This Court, therefore, must dismiss the arguments by the Coalition that the 57.36 percent separate rate comports with the expected method because, as Commerce itself acknowledges, Commerce departed from the expected method in its separate rate calculation by using a simple average of Linyi Chengen's zero percent margin and the China-wide entity rate.

calculated a separate rate of 57.36 percent using a simple average of the zero percent margin calculated for Linyi Chengen and the China-wide entity rate of 114.72 percent was supported by substantial evidence and otherwise in accordance with law. See United States' Br. at 55-64; Coalition's Br. at 28-37; see also Second Remand Redetermination at 4, Appx337; Third Remand Redetermination at 5, Appx433; Final Results of Redetermination Pursuant to Court Remand at 14 (Nov. 10, 2021), ECF No. 206-1 ("Fourth Remand Redetermination"), Appx506. Instead, this Court must sustain the Trade Court's holdings on three separate occasions that Commerce failed to support with substantial evidence its determination that the 57.36 percent separate rate reasonably reflected the potential dumping margins of the separate rate respondents. See Linyi Chengen III, 487 F.3d at 1359, Appx40 (holding that Commerce's did not support with substantial evidence its departure from the expected method); Linyi Chengen IV, 539 F. Supp. 3d at 1277-78, Appx49-50 (holding that Commerce did not support with substantial evidence "its application of a 57.36% all-others separate rate" and Commerce did not comply with its obligation to "assign dumping margins as accurately as possible" (citing Rhone Poulenc, Inc. v. United States, 899 F.3d 1185, 1191 (Fed. Cir. 1990)); Linyi Chengen Imp. & Exp. Co., Ltd. v. United States, 609 F. Supp. 3d 1392, 1404 (Ct. Int'l Trade 2022) ("Linyi Chengen V"), Appx63 (holding that the 57.36 percent separate rate was "unreasonable as applied because it is unfair and unduly punitive").

**A. The Trade Correct Correctly Held That Commerce Unlawfully Relied on a Sparce Record To Apply an Unduly Punitive Margin of 57.36 Percent to the Separate Rate Respondents**

The United States' and Coalition's arguments that Commerce lawfully calculated a margin of 57.36 percent for the separate rate respondents do not pass muster because Commerce failed to support this margin with substantial evidence. As the Trade Court correctly held, Commerce unlawfully relied on "mere conjecture or supposition" based on a limited record of its own making in unlawfully applying an unduly punitive margin of 57.36 percent to the fully cooperative separate rate respondents. Bestpak, 716 F.3d at 1378; see also Linyi Chengen V, 609 F. Supp. 3d at 1404, Appx63.

Commerce cannot lawfully hide behind a limited record to shirk its duty to support the reasonableness of its separate rate calculation with substantial evidence. In attempting to claim that its calculation was reasonable as applied, Commerce cited "procedural difficulties that were at least in part a creature of its own making." Bestpak, 716 F.3d at 1378. The Trade Court correctly held that Bestpak was "instructive" in its conclusion that Commerce's calculation of 57.36 percent separate rate was not supported by substantial evidence and otherwise not in accordance with law. Linyi Chengen V, 609 F. Supp. 3d at 1401, Appx60; see also Linyi Chengen IV, 539 F. Supp. 3d at 1277, Appx49 (relying on Bestpak to remand Commerce's calculation of a 57.36% dumping margin for the separate rate respondents); Linyi

Chengen III, 487 F. Supp. 3d at 1358, Appx39 (same). In Bestpak, Commerce departed from the expected method and instead used a simple average of an adverse facts available ("AFA") margin and a de minimis margin. See Bestpak, 716 F.3d at 1375-76. The Trade Court summarized the agency proceeding underlying Bestpak as follows:

> Commerce selected the two largest exporters, Ningbo Jintian Import & Export Co., Ltd. ("Jintian") and Yama Ribbons & Bows Co., Ltd. ("Yama"), as mandatory respondents for individual investigation. Id. Commerce received responses from Yama, but not from Jintian. Id. No other exporter requested voluntary investigation, and Commerce did not select a replacement mandatory respondent for Jintian, despite Commerce's past practice of selecting a replacement respondent when a mandatory respondent did not comply. Id. Thus, Commerce's investigation only involved one participant. Commerce assigned a de minimis dumping margin to Yama, and an AFA Chinawide entity rate of 247.65% to Jintian due to its failure to cooperate in the investigation. Id. Commerce calculated Bestpak's all-others separate rate using the simple average of Yama's de minimis rate and Jintian's AFA China-wide entity rate, resulting in a 123.83% all-others separate rate margin.

Linyi Chengen V, F. Supp. 3d at 1401, Appx60 (citing Bestpak, 716 F.3d at 1372). On appeal, the Court in Bestpak held that the "circumstances of {the agency proceeding underlying Bestpak} renders a simple average of a de minimis and AFA China-wide rate unreasonable as applied." Bestpak, 716 F.3d at 1378. The Court reasoned that "Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin" and that the "the administrative record reveal{ed} a lack of substantial evidence showing that {Commerce's} determination reflects economic reality." Id. at 1378-80.

The Court in Bestpak faulted Commerce's separate rate calculation for two main reasons relevant to this appeal. First, in holding that the record lacked substantial evidence to support Commerce's calculation of its separate rate, the Court noted that "Commerce put itself in a precarious situation when it selected only two mandatory respondents." Id. at 1379 (quoting Yangzhou Bestpak Gifts & Crafts Co. v. United States, 783 F. Supp. 2d 1343, 1351 (Ct Int'l Trade 2011)). As a result of Commerce's decision to only select two mandatory respondents, given that one of the two respondents failed to cooperate, the Court concluded that "{t}his record simply does not supply enough data for Commerce to calculate its separate rate determination based on only one individually investigated respondent." Id. The Court noted that "Commerce argues in its Final Remand Results that it was the best it could do because of the limited record" but the Court concluded that there was "no support in {the} court's precedents or the statute's plain text for the proposition that limited resources or statutory time constraints can override fairness or accuracy." Id. at 1380 (SNR Roulements v. United States, 402 F.3d 1358, 1363 (Fed. Cir. 2005) ("Antidumping laws intend to calculate antidumping duties on a fair and equitable basis")). In other words, Commerce cannot lawfully justify its separate rate calculation as the best option when the supposed limits of the record resulted from Commerce's own procedural choices during its investigation.

Second, beyond the lack of evidence on the record, the Court in Bestpak noted that the "rate assigned to Bestpak is far in excess of the de minimis rate assigned to the only cooperating, non-government controlled, and mandatory respondent" despite Bestpak "successfully prov{ing} that it was {also} independent of government control." Id. The Court concluded that "{a}ssigning a non-mandatory, separate rate respondent a margin equal to over 120% of the only full investigated respondent with no other information is unjustifiably high and may amount to being punitive, which is not permitted by the statute." Id. (citing F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).  In reaching this conclusion, the Court noted that "similar to {the mandatory respondent that received a de minimis margin in that case}, Bestpak successfully proved that it was independent of government control. However, Commerce ultimately assigned Bestpak a margin that was exactly half of the China-wide rate—a rate for those presumed to be under foreign government control." Id. at 1379. Put simply, Commerce cannot lawfully apply an overly punitive margin against cooperating separate rate respondents when the record lacks evidence to support such a margin.

Applying the principles of Bestpak confirms the unlawfulness of Commerce's second, third and fourth remand redeterminations and the Trade Court's remand of those determinations.  Concerning the first point, as the Trade Court correctly emphasized, Commerce failed to support the reasonableness of calculating a 57.36

separate rate with substantial evidence given that "Commerce created its own problem when it selected only two mandatory respondents, which resulted in sparse information on the record to support its assertions regarding the potential dumping margins of the separate rate respondents." <u>Linyi Chengen V</u>, 609 F. Supp. 3d at 1403, Appx62. Commerce repeatedly admitted in its third and fourth remands that the record lacked substantial evidence to support its chosen methodology as illustrated in the following examples:

- "As an initial matter, the record provides <u>no opportunity</u> for Commerce to know or to calculate the 'actual' dumping margins of the Separate Rate Plaintiffs, and, thus, it is <u>not possible</u> for us to determine whether any particular rate is 'tethered' (the metric employed by the Court) to the 'actual' dumping margins of the Separate Rate Plaintiffs." Third Remand Redetermination at 16, Appx444 (emphasis added).

- "{W}e reiterate that the record provides <u>no opportunity</u> for Commerce to know or to calculate the actual dumping margins of the Separate Rate Plaintiffs and, thus, it is <u>not possible for us to determine with certainty</u> whether any particular rate is an accurate estimate of the actual dumping margins of the Separate Rate Plaintiffs." Fourth Remand Redetermination at 10-11, Appx502-503 (emphasis added).

- "We are mindful that any selected rate needs to be based on evidence on the record, and the <u>only alternative rates</u> in this case are limited to the rates listed in the Petition. These rates are 104.06 percent and 114.72 percent, or a derivative thereof. As required by the Court, we have considered each of these alternatives." <u>Id.</u> at 11, Appx503 (emphasis added).

Commerce unlawfully relied on "mere conjecture or supposition" to support its conclusion given that it repeatedly acknowledged that there was "no opportunity" or it was "not possible for {it} to determine with certainty" that its chosen methodology to take a simple average of the zero percent margin assigned to Linyi Chengen and the China-Wide entity rate reasonably reflects the potential dumping margins of the separate rate respondents. <u>Bestpak</u>, 716 F.3d at 1378; Fourth Remand Redetermination at 11, Appx503. Consistent with <u>Bestpak</u> where the Court found that the rate was not supported by substantial evidence where the record was too thin to support Commerce's conclusion, here, Commerce's 57.36 percent separate rate was not supported by substantial evidence given that Commerce failed to support the reasonableness of its calculation with record evidence.

The United States incorrectly maintains that the Trade Court "held Commerce to a more exacting standard than the statutory framework requires" because it "blamed Commerce for creating its own scarcity of evidence." United States' Br. at 61. Contrary to the United States' argument, the Court has repeatedly held that

the burden is on Commerce to support the reasonableness of its chosen calculation methodology when it departs from the expected methodology. See Albemarle, 821 F.3d at 1353 ("The burden is not on the separate respondents to show that their dumping is the same as that of the individually examined respondents. Rather, Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different."); see also Changzhou Hawd, 848 F.3d at 1012 ("And, recognizing that the presumption of representativeness may be overcome, Albemarle holds that, in order to depart from the expected method, 'Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different.'" (quoting Albemarle, 821 F.3d at 1353)). The Trade Court correctly applied the principles in Bestpak in rejecting Commerce's separate rate of 57.36 percent as unreasonable as applied and not supported by substantial evidence when the limited record resulted from Commerce's procedural choices such as only selecting two mandatory respondents or not seeking further information from the separate rate respondents before calculating the separate rate. See Linyi Chengen V, 609 F. Supp.3d at 1403, Appx62; see also Fourth Remand Redetermination at 2, Appx494 ("After weighing all options, we continue to find that the rate of 57.36 percent is the most reasonable rate to assign to the parties in question, given the available record information and the alternatives on the record.").

Applying the second principle the Court relied on in <u>Bestpak</u> in finding that Commerce's simple-average methodology was unreasonable as applied, here too a simple-average methodology resulted in a rate that was "unjustifiability high" and "punitive" given that Commerce included the China-wide entity rate in its calculation even though the separate rate respondents demonstrated that they were not controlled by the Chinese government. <u>Bestpak</u>, 716 F.3d at 1380. The Court in <u>Bestpak</u> explained the process by which a respondent qualifies for a rate separate from the China-wide entity rate as follows:

> In order to secure a separate rate from the countrywide rate, respondents in a nonmarket economy must establish an absence of *de jure* and *de facto* government control . . . . The mandatory respondents' antidumping questionnaire allows a respondent to assert independence from the country-wide entity. All other respondents seeking eligibility for a separate rate must complete a separate rate application that is about thirty pages of responses and attached exhibits.

<u>Id.</u> at 1373-74. Commerce applied AFA against the other mandatory respondent, Shandong Dongfang Bayley Wood Co., Ltd. ("Bayley"), because it found that Bayley failed to cooperate by "not disclosing the full extent of its affiliations as required by the questionnaire." <u>Certain Hardwood Plywood Products From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part</u>, 82 Fed. Reg. 53,460 (Dep't of Commerce Nov. 16, 2017), and accompanying Issues and Dec. Mem. at 13 ("Final I&D Mem."), Appx8529. By contrast, the separate rate

respondents demonstrated their independence from government control through their submission of separate rate applications to Commerce. <u>See</u> <u>Certain Hardwood Plywood Products From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part</u>, 82 Fed. Reg. 28,629 (Dep't of Commerce June 23, 2017), accompanying Dec. Mem. at 17-19, Appx6871-6873 (listing the companies that Commerce found to be "eligible to receive a separate rate" because they demonstrated a lack of government control). Commerce itself implicitly acknowledged that the separate rate respondents are different from companies given an AFA rate when it rejected use of Bayley's data to calculate an individual dumping margin for the separate rate respondents given the "application of total AFA to this company… and particularly considering the basis for total AFA was the determination that Bayley failed to provide complete and accurate information in its questionnaire responses." Fourth Remand Redetermination at 38, Appx530.[5] The record clearly establishes that the actions from separate rate

---

[5] The Coalition wrongly asserts that "Bayley's failure to rebut the presumption of government control does not invalidate Commerce's separate rate determination" because Bayley would have received the same rate if it had "been found uncooperative but independent from government control." Coalition's Br. at 36. The Coalition's assertion creates a false equivalency between a rate assigned using AFA where a mandatory respondent failed to fully cooperate, such as by not submitting a timely questionnaire response, and Commerce's relyiance on AFA to find that a mandatory respondent is a part of the China-wide entity as it did with respect to Bayley. Here, under the latter scenario, Commerce made different factual findings

respondents are distinguishable from Bayley and these respondents should not be punished by averaging the China-wide entity rate with the zero percent rate calculated for Linyi Chengen.

In its fifth remand redetermination, Commerce lawfully reversed course from its prior remands where it calculated a 57.36 percent dumping margin for the separate rate respondents given that such a margin unlawfully punished the fully cooperative separate rate respondents whose actions are distinguishable from an uncooperative mandatory respondent. See Fifth Remand Redetermination at 10, Appx558. Although the Trade Court sustained Commerce's decision to not solely apply Linyi Chengen's zero rate to the separate rate respondents, it did not sanction use of the AFA rate to these companies. See Linyi Chengen IV, 539 F. Supp.3d at 1276-78, Appx48-50. The separate rate companies provided significant information on the record demonstrating their independence from the Chinese government along with actual pricing data that Commerce analyzed elsewhere in the Fourth Remand Redetermination. By contrast, the China-wide entity companies did not prove their independence from the Chinese government and did not provide the significant information required by Commerce to prove separate rate eligibility. It was unreasonable for Commerce to assign fully cooperative separate rate respondents,

---

with respect to Bayley as compared to the separate rate respondents regardless of the ultimate rate that Commerce assigned to Bayley.

who had submitted a quantity and value questionnaire, completed a separate rate application and responded to any supplemental questionnaires, a dumping margin that included in its average the punitive China-wide entity rate assigned to a mandatory respondent that did not fully cooperate with Commerce's investigation. Because Commerce's own procedural choices led to a limited record that does not support a 57.36 percent separate rate, consistent with the holding in <u>Bestpak</u>, this Court must affirm the Trade Court's holdings remanding the second fourth and fifth remand redeterminations because "Commerce's determination to assign to fully cooperating separate rate respondents an all-others separate rate margin almost 60 times higher than the only investigated respondent, and half of the AFA rate for uncooperative respondents, is unreasonable as applied because it is unfair and unduly punitive." <u>Linyi Chengen V</u>, 609 F. Supp. 3d at 1404, Appx63.

The arguments by United States and the Coalition that the Trade Court's "dependence on <u>Bestpak</u> was unwarranted" are unconvincing. United States' Br. at 62; <u>see also</u> Coalition's Br. at 34-36. The Coalition is mistaken in its assertion that "{t}he legal calculus underpinning <u>Bestpak</u> has been meaningfully altered by {recent} developments." Coalition's Br. at 35. As an initial matter, the Coalition is wrong in its assertion that the Court in <u>Bestpak</u> relied on the holding in <u>Gallant Ocean (Thailand) Co. v. United States</u>, 602 F.3d 1319, 1323-25 (Fed. Cir. 2010), where "the {Federal Circuit explained} that adverse rates must 'reflect commercial

reality' and constitute a 'reasonably accurate estimate' of the actual dumping rates of the companies to which the adverse rates are imputed." Coalition's Br. at 35 (quoting <u>Bestpak</u>, 716 F.3d at 1379-80). The Coalition argues that since the Federal Circuit decided <u>Gallant Ocean</u>, Congress amended the statutory provision regarding adverse inferences to remove the obligation that Commerce ensure that an adverse rate reflects the "commercial reality" of the respondent. <u>See</u> Coalition's Br. at 35 (citing 19 U.S.C. § 1677e(d)(3)). This statutory provision (19 U.S.C. § 1677e(d)(3)), however, pertains to Commerce's application of AFA and not its separate rate calculation. <u>Compare</u> 19 U.S.C. § 1677e(d)(3), <u>with</u> 19 U.S.C. § 1673d(c)(5). By contrast, the SAA clearly establishes that when Commerce departs from the expected method, as it did in the agency proceeding underlying this appeal, Commerce must support with substantial evidence that its chosen calculation methodology is "reasonably reflective of potential dumping margins for non-investigated exporters or producers." SAA at 873. Further, under <u>Albemarle</u>, which was decided after <u>Bestpak</u>, the Court held that in selecting a method to calculate a separate rate that is appropriate for the circumstances, Commerce's "primary objective" must be "{a}ccuracy and fairness." <u>Albemarle</u>, 821 F.3d at 1354; <u>see also</u> <u>U.S. Steel Grp. v. United States</u>, 225 F.3d 1284, 1290 (Fed. Cir. 2000) ("Antidumping laws strive 'to calculate antidumping duties on a fair and equitable basis'" (quoting <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565, 1573 (Fed. Cir. 1994))); <u>Rhone Poulenc</u>, 899

F.2d at 1191 (noting that the purpose of Commerce's statutory framework is to "determin{e} current margins as accurately as possible").  Nothing on the statutory provision cited by the Coalition therefore undermines the principle that accuracy and fairness are always the central tenant to any determination by Commerce even if Commerce no longer has to demonstrate the commercial reality of an AFA Rate. Commerce had an obligation to calculate a fair and accurate rate that reasonably reflected the potential dumping margins of the separate rate respondents.

Second, the Coalition also argues that "after Bestpak was decided, this Court issued opinions in which it clarified that the mandatory respondents are presumed under the statute, representative of the non-investigated companies."  Coalition's Br. at 34 (citing Changzhou Hawd, 848 F.3d 1006; Albemarle, 821 F.3d 1345).  The Coalition, however, ignores that although the Court held in Albemarle that the data for the mandatory respondents can be "viewed as representative of all exporters," Albemarle, 821 F.3d at 1353, the Court later clarified in Changzhou Hawd that Albemarle nonetheless establishes that the "presumption of representativeness may be overcome."  Changzhou Hawd, 848 F.3d at 1012.  Not only may the presumption of representatives be overcome, but the "{t}he burden is not on the separate respondents to show that their dumping is the same as that of the individually examined respondents."  Albemarle, 821 F.3d at 1353.  The fact that the separate rate respondents demonstrated that they are not controlled by the Chinese government

rebuts any presumption that their potential dumping margins are reasonably reflected by the China-wide entity rate assigned to Bayley. The principles outlined in Bestpak, thus, remain good law and the Trade Court properly applied them below to find that Commerce's calculation of a 57.36 percent margin for the separate rate respondents was not supported by substantial evidence and otherwise not in accordance with law.

The United States and the Coalition are also mistaken that that Bestpak's holding is narrow based on the Court's later interpretation of that case in Bosun Tools Co. v. United States, Ct. Nos. 2021-1929, 2021-1930, 2022 U.S. App. LEXIS 624 (Fed. Cir. Jan. 10, 2022) ("Bosun"). See United States' Br. at 63; Coalition's Br at 34. The Court in Bosun merely concluded that Bestpak "did not create a categorical rule against relying on an AFA rate," but acknowledged that the Court held in Bestpak that "Commerce's methodology was unreasonable 'as applied,' given the lack of data." Bosun, 2022 U.S. App. LEXIS 624, at *11. The Court's holding in Bosun does not support a finding that Commerce's "use of the simple average of the two mandatory respondents' margins was reasonable and supported by substantial evidence." Coalition's Br. at 32. In Bosun, the Court held that "Commerce confirmed the reasonableness of the separate rate in view of historical dumping trends." Bosun, 2022 U.S. App. LEXIS 624, at *11; see also id. at *15 (holding that Commerce "reasonably determined that the {rate it assigned Bosun}

was reflective of Bosun's historical dumping rates"). Here, no such historical dumping trends existed on the record given that the agency proceeding underlying this appeal was an initial investigation and not an administrative review as was the case in Bosun. See, e.g., Linyi Chengen V, 609 F. Supp. 3d at 1392, Appx51. The facts underlying this appeal, therefore, are distinguishable from Bosun, and the Court's holding in that case does not support the legality of Commerce's initial determination to assign the separate rate respondents a dumping margin of 57.36 percent or its second, third and fourth remand redeterminations.

In sum, the Trade Court properly held in Linyi Chengen III, Linyi Chengen IV and Linyi Chengen V that Commerce failed to support the reasonableness of its decision to calculating the separate rate using a simple average of the zero percent dumping margin calculated for Linyi Chengen and the China-wide entity rate. Consistent with the holding in Bestpak, this Court must reject the arguments by the United States and the Coalition that Commerce lawfully calculated a 57.36 percent dumping margin for the separate rate respondents in the second, third and fourth remands because the limited record developed by Commerce does not support such an unduly punitive margin for the fully cooperative separate rate respondents.

**B. Commerce Failed To Support with Substantial Evidence Its Conclusion that a 57.36 Percent Dumping Margin Reasonably Reflected the Potential Dumping Margins of the Separate Rate Respondents**

The Trade Court properly sustained Commerce's fifth remand redetermination in which Commerce applied the zero percent dumping margin assigned to Linyi Chengen to the separate rate respondents. See Linyi Chengen VI, 658 F. Supp. 3d at 1364, Appx82. The United States maintains that the Trade Court "substituted its judgment for Commerce's and improperly reweighed the evidence." United States' Br. at 56. To the contrary, neither the statute nor court precedent allow Commerce to ignore record evidence. In fact, Commerce must consider the record as a whole, including information that supports and detracts from its conclusions. See Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984); Seah Steel Vina Corp. v. United States, 950 F.3d 833, 847 (Fed. Cir. 2020) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). The Trade Court did not reweigh the evidence but instead found that 57.36 percent separate rate was not supported by substantial evidence because Commerce "selectively analyzed {the record evidence} while ignoring potentially contrary record evidence." Linyi Chengen V, 609 F. Supp. 3d at 1404, Appx63. Ironically, the United States and the Coalition now seek to have this Court to "ignore the informed opinion" of the Trade Court. Suramerica, 44 F.3d at 983; see also Nan Ya, 810 F.3d at 1341 ("Although we review the decisions of the {Trade Court} de novo, we give great weight to the informed opinion of the {Trade Court} and it is

nearly always the starting point of our analysis."). This argument is without merit given that Commerce failed to support with substantial evidence its conclusion that a 57.36 percent margin reasonably reflected the potential dumping margins of the separate rate respondents.

Commerce's application of a zero percent dumping margin to the separate rate respondents in its fifth remand redetermination was supported by substantial evidence and otherwise in accordance with law because it represented the only reasonable option to calculate the separate rate. Cf. Fifth Remand Redetermination at 2, Appx550 ("After weighing all options and considering the views of the Court, we find, under protest, that assigning the rate calculated for Linyi Chengen Import and Export Co., Ltd. (Chengen), i.e., zero percent, is the only remaining alternative on the record."). The Trade Court acknowledged that Commerce supported its departure from the expected method by demonstrating that "Linyi Chengen's dumping margin would not be reasonably reflective of the Separate Rate Plaintiffs' potential dumping margins." Linyi Chengen IV, 539 F. Supp. 3d at 1276, Appx48. Ultimately, however, the Trade Court found that Commerce lawfully rejected all other proposed alternatives as the "separate rate of 57.36% assigned to the voluntary, fully cooperating Separate Rate Plaintiffs was unreasonable as applied pursuant to {Bestpak}." Linyi Chengen VI, 658 F. Supp. 3d at 1358, Appx76. Both the United States and the Coalition fail to contend with the fact that the only calculated rate on

the record was the zero percent margin for mandatory respondent Linyi Chengen. See Second Remand Redetermination at 3, Appx376. Commerce engaged in an in-depth investigation of Linyi Chengen's consumption data, which, together with Linyi Chengen's pricing data, resulted in the zero percent margin. See id. Meanwhile, no other evidence on the record produced a reasonable, accurate and fair separate rate in accordance with the statute and court precedent. Indeed, Commerce itself found that "{b}ecause no other rates are supported by the record . . . we are left with no viable alternative but to assign Chengen's zero percent rate to the Separate Rate {respondents}." Fifth Remand Redetermination at 10, Appx558. Given that the only fully calculated margin on the record was the margin calculated for Linyi Chengen, the Trade Court lawfully found that Commerce "articulated its reasoning sufficiently" for assigning an antidumping duty margin of zero percent to the separate rate respondents. Linyi Chengen VI, 658 F.Supp.3d at 1359, Appx77.

The United States and the Coalition wrongly contend that, unlike in Bestpak where the record did not support Commerce's calculation methodology, here Commerce supported the reasonableness of the 57.36 percent separate rate by highlighting record information allegedly supporting a higher separate rate than Linyi Chengen's zero percent margin. See United States' Br. at 63-64; Coalition's Br. at 30-32. In examining the record in the fourth remand redetermination, Commerce found that the record "provid{ed} no opportunity for Commerce to know

or to calculate the actual dumping margins of the Separate Rate Plaintiffs." Fourth Remand Redetermination at 11, Appx503 (emphasis added). Instead, Commerce found that only alternative rates were the Petition rates of 114.72 percent (the China-wide entity rate) and 104.06 percent. See id.; see also United States' Br. at 33 (noting that the Petition rates are 114.72 percent and 104.06 percent). Commerce cited to three pieces of evidence to reach its unsubstantiated conclusion in the third remand redetermination that the "dumping margins alleged in the Petition are representative of the actual selling behavior of the separate rate {respondents}" and that "{Linyi} Chengen's rate alone cannot be presumed to be reflective of the estimated weighted-average dumping margins for {the separate rate respondents}." Third Remand Redetermination at 17, Appx445. Specifically, in attempting to support its earlier 57.36 percent separate rate, Commerce cited to 1) a commercial invoice submitted by the same separate rate respondent examined in the Petition ("Petition SRA Exporter") in its separate rate application, 2) commercial invoices submitted by the separate rate respondents and 3) other information that distinguished the selling patterns, and as a result, cost structures, of the separate rate respondents from Linyi Chengen. See id. at 17-25, Appx455-453; see also Fourth Remand Redetermination at 11-14, Appx503-506. Commerce failed, however, to demonstrate that a "reasonable mind might accept {these three pieces of evidence} as adequate to support {its} conclusion" that the China-wide entity rate reasonably reflected the

potential dumping margins of the separate rate respondents such that Commerce's determination to take a simple average of the China-wide rate and Linyi Chengen's zero percent margin was reasonable as applied.  See generally Huayin, 322 F.3d at 1374.

Before even examining the evidence that Commerce relied on to connect the Petition rates to the potential dumping margins of the separate rate respondents, it is important to note that Commerce's reliance on the Petition rates rate was fundamentally flawed for two reasons.  First, the Petition SRA Exporter was [ market share ] exporter, representing [ sales percentage ] percent of all sales of subject merchandise during the period of investigation.  See Mem. from Amanda Brings to Gary Taverman re: Respondent Selection at Attach. (Jan. 9, 2017) (Proprietary Document) ("Respondent Selection Mem."), Appx1384-1386 (showing total quantity and value of sales for each company).[6]  Such a [ market share ] exporter can hardly be deemed representative of the entire Chinese plywood industry but somehow not be representative of Linyi Chengen.  Second, the normal value in the Petition was also unreliable. The Petition margin used Thailand as the surrogate country.  See Letter on Behalf of Coalition to Commerce re: Petitions for the Imposition of Antidumping

---

[6] [ exporter's name ] was the separate rate exporter examined in the initial Petition.  See Second Remand Redetermination at 49 (Proprietary Document), Appx422. [ exporter's name ] share of the market by value is calculated as follows: [ calculation of market share ].  See Respondent Selection Mem. at Attach. (Proprietary Document), Appx1384-1386.

and Countervailing Duties, Vol. II at 9-21 (Public Version), Appx932-944. In the final determination, by contrast, Commerce <u>expressly rejected</u> Thailand as an appropriate surrogate country on the basis that the Romanian data were more specific than those available for Thailand and because of the lack of availability of a Thai contemporaneous financial statement from an integrated producer. <u>See</u> Final I&D Mem. at 30, Appx8546.

Commerce claimed in its fourth remand redetermination that arguments regarding the unsuitability of the Petition rates based on its use of Thailand as the surrogate do not "detract from the relevance of the Petition rates" because Thailand was also a potential surrogate. Fourth Remand Redetermination at 35, Appx527. To the contrary, relying on a Petition dumping rates calculated using Thai data shows the inaccuracy of Commerce's chosen rate, especially when the single calculated dumping rate using the Romanian surrogate values (i.e., Linyi Chengen's rate) yielded a zero percent margin. No reasonable mind could find that the Petition rates were reflective of the separate rate respondents' dumping margins given that the Petition SRA Exporter represented a [ market share ] portion of all sales of hardwood plywood during the period of investigation and the Petition rates were calculated based on an entirely different methodology. .

Putting aside the impropriety of Commerce's reliance on the Petition rates in the first instance, as the Trade Court properly held, Commerce failed to support its

finding that the Petition rates reasonably reflected the potential dumping margins of the separate rate respondents given that Commerce "ignore{ed} potentially contrary evidence on the record." <u>Linyi Chengen V</u>, 609 F. Supp. 3d at 1404, Appx63. The Trade Court "reviewed the record in considerable detail" and "its opinion deserves due respect." <u>Suramerica</u>, 44 F.3d at 983. Addressing the commercial invoice relied on by Commerce, Commerce itself recognized in its third remand redetermination that the "Petition rates are based on price quotes, which represent offers for sale and not actual commercial transactions," but nevertheless found that a single commercial invoice could "serve as a <u>proxy for estimating</u> what the selling behavior of the Separate Rate Plaintiffs was during the {period of investigation}." Third Remand Redetermination at 17-18, Appx445-446 (emphasis added). Commerce found that although it did "<u>not have the necessary information</u> to determine the transaction-specific dumping margin" for the sale in the commercial invoice, it was "<u>reasonable to infer</u>" that this "sale would have had a transaction-specific dumping margin in the range of the Petition rates" given that the price contained in the commercial invoice was almost identical to "one of the price quotes for the Petition SRA Exporter that is detailed in the Petition." <u>Id.</u> at 18, Appx446 (emphasis added). Compared to the actual margin calculated for Linyi Chengen, Commerce's inference is "mere conjecture or supposition" and does not constitute substantial evidence supporting Commerce's reliance on the Petition rates of 114.72 percent and 104.06 percent as

a reasonable reflection of the potential dumping margins of the separate rate respondents. Bestpak, 716 F.3d at 1378. The Trade Court, thus, properly found that such a speculative finding did not constitute substantial evidence.

Even taking Commerce's inference that the potential dumping margin of the Petition SRA Exporter was consistent with the prices listed in its commercial invoice, Commerce's conclusion that the separate rate respondents' potential dumping margins were likely higher than Linyi Chengen's because "Chengen sold the very same product that was the subject of one of the price quotes detailed in the Petition but sold its plywood at significantly higher price than the Petition SRA Exporter" was not supported by substantial evidence. Third Remand Redetermination at 18, Appx446. The United States and the Coalition briefly summarize Commerce's analysis that the Petition SRA Exporter is representative of all separate rate respondents without examining any of the contradictory evidence that detracts from the weight of Commerce's conclusion. See United States' Br. at 63-64; Coalition's Br. at 31-32. After examining the record in detail, remanding Commerce's third remand redetermination, the Trade Court found that a single commercial invoice could not constitute substantial evidence to support Commerce's determination. See Linyi Chengen IV, 539 F. Supp. 3d at 1278, Appx50. Indeed, no reasonable mind could find that a single commercial invoice is indicative of all of the sales of the Petition SRA Exporter given that Commerce

arbitrarily disregarded the opposite equally possible conclusion, namely, that the separate rate respondents' normal values, had they been investigated, would have been even lower than the 20 percent difference suggested by the pricing information in the Petition. In its fourth remand redetermination, Commerce cited to additional invoices submitted by the Petition SRA Exporter in response to a supplemental questionnaire that allegedly demonstrated that the Petition SRA Exporter allegedly "sold plywood . . . at even lower rates than the prices identified in the Petition." Fourth Remand Redetermination at 32, Appx524; <u>see also</u> United States Br. at 34. The additional invoices that Commerce examined, however, do not change the fact that a single [ market share ] exporter cannot be reasonably be presumed to be representative of all separate rate respondents. Indeed, Commerce itself recognized that it could not reasonably make such a presumption given that "information available with respect to each separate rate company that is party to this litigation is limited in nature." Third Remand Redetermination at 35, Appx463. The Trade Court, therefore, properly found that Commerce's calculation of a separate rate of 57.36 percent in the investigation and second to fourth remand redeterminations was not supported by substantial evidence because Commerce hid behind a limited record to support its conclusion. <u>See</u> <u>id.</u>

Turning to the second piece of evidence cited by Commerce – i.e., commercial invoices from all the separate rate respondent – Commerce ignored "potentially

contrary evidence on the record" concerning these invoices.  See Linyi Chengen V, 609 F. Supp. 3d at 1404, Appx63.  In its third remand redetermination, Commerce concluded that the commercial invoices submitted by the separate rate respondents during the investigation demonstrated that the "separate rate companies had sales of plywood at prices lower than average price of the product that accounted for the vast majority of Chengen's sales during the {period of investigation}."  Third Remand Redetermination at 22, Appx450; see also id. at 22-24, Appx450-452.  The United States and the Coalition point to this purported analysis to bolster their arguments that the record supported 57.36 percent separate rate.  See United States' Br. at 63-64; Coalition's Br. at 32.  Both parties, however, ignore the fact that Commerce failed to explain why it presumed that the invoice prices are representative of all types of plywood sold by the separate rate respondents or the pricing of those companies.  Nor could it have given any reasonable explanation given that Commerce's separate rate application asked only for the "first sale by invoice date of merchandise under consideration to an unaffiliated customer in the United States during the POR/POI for a commercial transaction" and not for averaging pricing or any specific type of product.  See generally Letter on Behalf of Chengen to Commerce re: Separate Rate App. at 6 (Jan. 13, 2017) (emphasis added), Appx2032.  No reasonable mind could find that that such a restricted sample of the separate rate respondents' sales supported Commerce's conclusion that these invoices

demonstrate that the separate rate respondents' potential dumping margins are higher than the zero percent margin assigned to Linyi Chengen as Commerce improperly concluded in the second, third and fourth remand redeterminations.

Further, Commerce unlawfully ignored record evidence that fairly detracted from the weight of its preferred conclusion that the Petition rates reasonably reflected the potential dumping margins of the separate rate respondents. See Changzhou Trina, 975 F.3d at 1326 (holding that Commerce must consider information in the record "fairly detracts from the substantiality of the evidence."). As the Trade Court explained in Linyi Chengen V, some of the commercial invoices on the record demonstrated that the separate rate plaintiffs sold plywood at a price higher than Linyi Chengen. See Linyi Chengen V, 609 F. Supp. 3d at 1404, Appx63. Indeed, in Attachment I to its third remand redetermination, Commerce listed sales prices from the commercial invoices for 40 separate rate respondents. See Third Remand Redetermination at Attach. I (Proprietary Document), Appx477-478. Of those exporters, [ number of exporters ], had sale prices higher than Chengen's unit price average of [ unit price ]. See id.; see also id. at Attach. II (showing [ exporter's unit price ]). Commerce ignored this uncontroverted evidence in calculating the separate rate of 57.36 percent. As a further flaw in its representativeness analysis, Commerce relied solely on [ price ] prices reported by each of the separate rate respondents as a measure of

pricing during the investigation rather than, at the very least, using an average of the prices reported by each of the separate rate respondents (where the commercial invoice showed multiple products on the invoice). See id. at 22-23, Attach. I, Appx450-451, Appx477-478. Commerce, therefore, could not reasonably find that these invoices demonstrated a "pattern{}" that the separate rate respondents sold plywood at lower prices than Linyi Chengen given that [ number of exporters ] of the separate rate respondents made sales at higher prices than Linyi Chengen and Commerce's underlying analysis likely led to distortive results. Id. at 24, Appx452. Commerce's selective, myopic reading of the record rendered its calculation of the 57.36 percent rate unsupported by substantial evidence.

In an effort to substantiate this rate, Commerce claimed that it accounted for the fact that certain separate rate respondents' "dumping behavior may be more similar to that of {Linyi} Chengen's" by taking an average of Linyi Chengen's zero percent rate with the China-wide entity rate." Fourth Remand Redetermination at 31, Appx523; see also id. at 38-39, Appx530-531. Again, this logic ignores that the sales reflected by these invoices represent a small portion of the total sales by the separate rate respondents, and Commerce's reliance on such a small data pool to support the separate rate amounted to nothing more than "mere conjecture" that no reasonable mind might accept as supportive of Commerce's conclusion that the

separate rate respondents' potential dumping margins aligned with the high Petition rates.  Bestpak, 716 F.3d at 1378.

Addressing the third piece of evidence, Commerce unreasonably concluded that the record indicated that the separate rate respondents had different sales, and as a result, cost structures, than Linyi Chengen.  See Third Remand Redetermination at 19-20, Appx447-448.    Much like Commerce did in the administrative proceedings, the United States and the Coalition merely reference Commerce's discussion of how Chengen's "cost structure{}" differs from the separate rate respondents without discussing the substantial evidence that detracted from Commerce's conclusion.  See generally United States' Br. at 58; see also Coalition's Br. at 32 (noting that Commerce determined that the separate rate respondents "sold similar products to Chengen but a lower prices").  Commerce noted in the third remand that Linyi Chengen "exclusively sold plywood that was produced by its affiliated company" whereas "only 15 out of the 40 exporters self-produced the plywood they sold to the United States during the POI."    Third Remand Redetermination at 19, Appx447.  Commerce then reasoned that "{t}here are too many possible, unknown variables in the cost structure of a trader/reseller to definitively state the extent of the operational differences between these 25 separate companies {that sold merchandise manufactured by other companies} involved in this litigation and Chengen."  Id. at 20, Appx448.

Even accepting the premise that the cost structure of a company that sells merchandise produced by other companies is different from that of a company that self-produces its exported merchandise, in recognizing that 15 out of the 40 separate rate litigants did self-produce merchandise, Commerce implicitly acknowledged then that 15 out of the 40 separate rate litigants do have a cost structure like Chengen's. See id. at 19-20, Appx447-448. Commerce cannot logically have the same concerns about "unknown variables in the cost structure" for those 15 producers, especially those who sold at higher prices than Chengen. See generally id. at 23, Appx451(establishing that there were separate rate litigants who sold at prices higher than Linyi Chengen). Instead of addressing these arguments in its remand redeterminations, Commerce merely reiterated that its general conclusion regarding the separate rate respondents' cost structures is a function of the limited record. See Third Remand Redetermination at 35, Appx463 (noting that arguments challenging the relevance of different selling structures ignores Commerce's "acknowledgement that we have limited data to analyze and we have reasonably drawn those conclusions we are able to draw based on the available data"). As discussed above, Commerce cannot lawfully hide behind a lack of evidence based on its own procedural choices. The Trade Court, therefore, properly found in three separate opinions that the 57.36 percent separate rate was not supported by substantial evidence because Commerce "ignored potentially contrary evidence on

the record" given that Commerce hid behind a limited record to support its preferred conclusion.  See, e.g., Linyi Chengen V, 609 F.3d at 1404, Appx63.

## CONCLUSION

For these reasons, the Trade Court correctly held that Commerce failed to support with substantial evidence its conclusion that a 57.36 percent rate reasonably reflected the potential dumping margins of the separate rate respondents.  In its second, third and fourth remands, Commerce either ignored record evidence that detracted from the weight of its conclusion or bent the evidence in such a way that no reasonable mind might accept.  This Court, therefore, must reject the claims by the United States and the Coalition to find that the separate rate of 57.36 percent was supported by evidence and otherwise in accordance with law and instead must affirm the Trade Court's holding sustaining Commerce's fifth remand redetermination calculating a separate rate of zero percent.

Respectfully submitted,

July 17, 2024

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel to Richmond International Forest Products, LLC and Taraca Pacific, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>24-1258-1259</u>

**Short Case Caption:** <u>Linyi Chengen Import and Export Co., Ltd. v. US</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>9812</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>07/17/2024</u>

Signature: <u>/s/ Jeffrey S. Grimson</u>

Name: <u>Jeffrey S. Grimson</u>