In The

# United States Court of Appeals for the Federal Circuit

LINYI CHENGEN IMPORT AND EXPORT CO., LTD., ET AL.*,
                                        Plaintiffs-Appellees,
HIGHLAND INDUSTRIES INC., ET AL.**,
                                        Plaintiffs,

v.

UNITED STATES, COALITION FOR FAIR TRADE OF HARDWOOD PLYWOOD
                                        Defendants-Appellants,

Appeal from the United States Court of International Trade in
Consolidated case No. 1:18-cv-00002, Judge Jennifer Choe-Groves

**NON-CONFIDENTIAL RESPONSE BRIEF OF PLAINTIFFS-APPELLEES LINYI CHENGEN IMPORT AND EXPORT CO., LTD, CELTIC CO., LTD., ANHUI HODA WOOD CO., LTD., FAR EAST AMERICAN, INC., JIAXING GSUN IMPORT AND EXPORT CO., LTD., JIAXING HENGTONG WOOD CO., LTD., LINYI EVERGREEN WOOD CO., LTD., LINYI GLARY PLYWOOD CO., LTD., LINYI JIAHE WOOD INDUSTRY CO., LTD., LINYI LINHAI WOOD CO., LTD., LINYI HENGSHENG WOOD INDUSTRY CO., LTD., LINYI HUASHENG YONGBIN WOOD CO., LTD., LINYI MINGZHU WOOD CO., LTD., LINYI SANFORTUNE WOOD CO., LTD., QINGDAO GOOD FAITH IMPORT AND EXPORT CO., LTD., SHANGHAI FUTUWOOD TRADING CO., LTD., SHANDONG QISHAN INTERNATIONAL TRADING CO., LTD., SUINING PENGXIANG WOOD CO., LTD., SUQIAN HOPEWAY INTERNATIONAL TRADE CO., LTD., SUZHOU ORIENTAL DRAGON IMPORT AND EXPORT CO., LTD., XUZHOU ANDEFU WOOD CO., LTD., XUZHOU JIANGYANG WOOD INDUSTRIES CO., LTD., XUZHOU LONGYUAN WOOD INDUSTRY CO., LTD., XUZHOU PINLIN INTERNATIONAL TRADE CO., LTD., XUZHOU SHENGPING IMPORT AND EXPORT CO., LTD., AND XUZHOU TIMBER INTERNATIONAL TRADE CO., LTD.**

Gregory S. Menegaz
Alexandra H. Salzman
J. Kevin Horgan
**DeKieffer & Horgan, PLLC**
1156 Fifteenth Street, NW, Ste 1101
Washington, DC 20005
(202) 783-6900
*Counsel to Plaintiffs-Appellees
Chengen, et al.*

July 17, 2024

\* CELTIC CO., LTD., JIAXING GSUN IMPORT & EXPORT CO., LTD., SUQIAN HOPEWAY INTERNATIONAL TRADE CO., LTD., ANHUI HODA WOOD CO., LTD., SHANGHAI FUTUWOOD TRADING CO., LTD., LINYI EVERGREEN WOOD CO., LTD., XUZHOU JIANGYANG WOOD INDUSTRIES CO., LTD., XUZHOU TIMBER INTERNATIONAL TRADE CO. LTD., LINYI SANFORTUNE WOOD CO., LTD., LINYI MINGZHU WOOD CO., LTD., XUZHOU ANDEFU WOOD CO., LTD., SUINING PENGXIANG WOOD CO., LTD., XUZHOU SHENGPING IMPORT AND EXPORT CO., LTD., XUZHOU PINLIN INTERNATIONAL TRADE CO. LTD., LINYI GLARY PLYWOOD CO., LTD., LINYI LINHAI WOOD CO., LTD., LINYI HENGSHENG WOOD INDUSTRY CO., LTD., SHANDONG QISHAN INTERNATIONAL TRADING CO., LTD., SUZHOU ORIENTAL DRAGON IMPORT AND EXPORT CO., LTD., LINYI HUASHENG YONGBIN WOOD CO., LTD., QINGDAO GOOD FAITH IMPORT AND EXPORT CO., LTD., LINYI JIAHE WOOD INDUSTRY CO., LTD., JIAXING HENGTONG WOOD CO., LTD., XUZHOU LONGYUAN WOOD INDUSTRY CO., LTD., FAR EAST AMERICAN, INC., ZHEJIANG DEHUA TB IMPORT & EXPORT CO., LTD., TARACA PACIFIC, INC., RICHMOND INTERNATIONAL FOREST PRODUCTS, LLC

\*\* JIASHAN DALIN WOOD INDUSTRY CO., LTD., HAPPY WOOD INDUSTRIAL GROUP CO., LTD., JIANGSU HIGH HOPE ARSER CO., LTD., SUQIAN YAORUN TRADE CO., LTD., YANGZHOU HANOV INTERNATIONAL CO., LTD., G.D. ENTERPRISE LTD., PIZHOU JIN SHENG YUAN INTERNATIONAL TRADE CO., LTD., XUZHOU SHUIWANGXING TRADING CO., LTD., COSCO STAR INTERNATIONAL CO., LTD., DEQING CHINA-AFRICA FOREIGN TRADE PORT CO., LTD., LINYI CITY DONGFANG JINXIN ECONOMIC & TRADE CO., LTD., FABUWOOD CABINETRY CORP., LINYI CITY SHENRUI INTERNATIONAL TRADE CO., LTD., JIANGSU QIANJIUREN INTERNATIONAL TRADING CO., LTD., QINGDAO TOP P&Q INTERNATIONAL CORP., CANUSA WOOD PRODUCTS LTD., HOLLAND SOUTHWEST INTERNATIONAL INC., LIBERTY WOODS INTERNATIONAL, INC., NORTHWEST HARDWOODS, INC., USPLY LLC, SHANDONG DONGFANG BAYLEY WOOD CO., LTD., CONCANNON CORP.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1258-1259 |
| **Short Case Caption** | Linyi Chengen Import and Export Co., Ltd. v. US |
| **Filing Party/Entity** | Linyi Chengen Import and Export Co., Ltd ., et al. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 7/17/2024        Signature:  /s/ Gregory S. Menegaz

                       Name:       Gregory S. Menegaz

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Linyi Chengen Import and Export Co., Ltd . | | |
| Celtic Co., Ltd. | | |
| Anhui Hoda Wood Co., Ltd. | | |
| Far East American, Inc. | | |
| Jiaxing Gsun Import and Export Co., Ltd. | | |
| Jiaxing Hengtong Wood Co., Ltd. | | |
| Linyi Evergreen Wood Co., Ltd. | | |
| Linyi Glary Plywood Co., Ltd. | | |
| Linyi Jiahe Wood Industry Co., Ltd. | | |
| Linyi Linhai Wood Co., Ltd. | | |
| Linyi Hengsheng Wood Industry Co., Ltd. | | |

☑ Additional pages attached

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Linyi Huasheng Yongbin Wood Co., Ltd. | | |
| Linyi Mingzhu Wood Co., Ltd. | | |
| Linyi Sanfortune Wood Co., Ltd. | | |
| Qingdao Good Faith Import and Export Co., Ltd. | | |
| Shanghai Futuwood Trading Co., Ltd. | | |
| Shandong Qishan International Trading Co., Ltd. | | |
| Suining Pengxiang Wood Co., Ltd. | | |
| Suqian Hopeway International Trade Co., Ltd. | | |
| Suzhou Oriental Dragon Import and Export Co., Ltd. | | |
| Xuzhou Andefu wood Co., Ltd. | | |
| Xuzhou Jiangyang Wood Industries Co., Ltd. | | |

☑　Additional pages attached

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Xuzhou Longyuan Wood Industry Co., Ltd. | | |
| Xuzhou Pinlin International Trade Co., Ltd. | | |
| Xuzhou Shengping Import and Export Co., Ltd. | | |
| Xuzhou Timber International Trade Co., Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| John J. Kenkel | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☐   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES.......................................................1

STATEMENT OF THE CASE...............................................................1

SUMMARY OF THE ARGUMENT .......................................................11

ARGUMENT.........................................................................................15

I.  Standards of Review .........................................................................15

II.  The Lower Court Did Not Exceed its Authority in Requiring
Commerce to Place Complete Information on the Record .............18

   a.  Commerce Always Accepts a Substantial Amount of New
Information at Verification .......................................................19

   b.  The New Information the Court Ordered Commerce to
Accept was Merely Clarifying the Information that
Commerce took at Verification.................................................20

   c.  Commerce Regularly Observes the use of Conversion Tables
at Verification for the first Time and Accepts such
Information at Verification .......................................................25

III.  The Lower Court Properly Held Commerce's Application of the
Intermediate Methodology was Unsupported by Substantial
Evidence and Not in Accordance with the Law...............................29

   a.  Chengen's log purchase volume is corroborated ...................30

   b.  Commerce has no Basis to Doubt the Accuracy of the Chinese
National standard for Log Volume...........................................33

   c.  The Intermediate Methodology is Less Accurate...................37

IV.  Commerce's Exclusion of Certain Companies from the Order is in
Accordance with the Law.................................................................43

V.  The Zero Percent Separate Rate Was Supported by Substantial
Evidence and in Accordance with the Law ......................................49

**a.** **The 57.36 percent Margin is Not Reasonably Reflective of the Separate Rate Companies' Potential Dumping**......................52

**b.** **Chengen's Margin is Reasonably Reflective of the Cooperating Separate Rate Companies' Potential Dumping**59

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT**.................63

## CONFIDENTIAL MATERIAL OMMITTED

The material omitted on pages 48 and 55-58 describe the confidential sales prices of Plaintiffs-Appellees as well as other companies' sales prices from the investigation.   This information on pages 48 and 55-58 contains business proprietary information released by the U.S. Department of Commerce to parties under administrative protective order ("APO").   The APO provides that such information cannot be shared with any party not approved under the APO.

# TABLE OF AUTHORITIES

## CASES

*Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333 (2006) .............................17

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ....... 17-18, 59

*Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781 (Fed. Cir. 2020) (non precedential) ...................................................................................46

*Changzhou Hawd Flooring Co. v. United States*, 324 F. Supp. 3d 1317 (Ct. Int'l Trade 2018) ...................................................................2, 14-15, 43-48

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003).............16, 22

*Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197 (1938) ....................................17

*Consol. Fibers, Inc. v. United States*, 535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008). ...................................................................................................16

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983) ..........................................................................................19, 62

*Everett Plywood & Door Corp. v. United States*, 190 Ct. Cl. 80 (1969) ...............36

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) .............................................................................15

*Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)........18, 59

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) ....................................................................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). .................................................................................... 16-17

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.*, 422 F. 3d 782 (9th Cir. 2005) ................................................................................ 22-23

*Ningbo Dafa Chem. Fiber Co., Ltd. v. United States*, 580 F. 3d 1247 (Fed. Cir. 2009) ....................................................................................15

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ............... 16-17, 29

*State v. Rathbone*, 144 La. 835, 841 (Supreme Court Louisiana 1919) .................36

*Timken US Corp. v. United States*, 318 F. Supp. 2d 1271 (Ct. Int'l Trade 2006)...43

*TMK IPSCO v. United States*, 179 F. Supp. 3d 1328 (Ct. Int'l Trade 2016) ....19, 22

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...........................17, 37, 62

*USX Corp. v. United States*, 655 F. Supp. 487 (Ct. Int'l Trade 1987) ........18, 42, 55

*Wuhu Fenlian Co., Ltd. v. United States*, 899 F. Supp. 2d 1355 (Ct. Int'l Trade 2013) ................................................................................................................24

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ........................................................................................................... 58-61

## STATUTES & REGULATIONS

19 U.S.C. § 1516 a(b)(1).................................................................................. 15-17

19 U.S.C. § 1673d(c)(5)..........................................................................................49

## ADMINISTRATIVE DECISIONS

*1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 10545 (March 11, 2009) ..............................................................................................................52

*Certain Preserved Mushrooms Final Results of First New Shipper Review and First Antidumping Duty Administrative Review*, 66 Fed. Reg. 31,204 (June 11, 2001) ....................................................................................................................34

*Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (August 9, 2018) .........34

*Chlorinated Isocyanurates Preliminary Results of Antidumping Duty Administrative Review; 2013-2014*, 80 Fed. Reg. 39,060 (July 8, 2015)................34

*Circular Welded Non-Alloy Steel Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 35,248 (June 12, 2013)..........................................................................................................33

*Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 2013-2014, 80 Fed. Reg. 69,942 (November 2005) ................................................................................................52

**OTHER AUTHORITIES**

*Statement of Administrative Action*, accompanying H.R. Rep. No. 103-826(I) (1994), reprinted in 1994 U.S.C.C.A.N. 4040 .................................................. 50-51

U.S. CIT Rule 11b...................................................................................................8

## STATEMENT OF RELATED CASES

In response to Federal Circuit Rule 47.5(a), Plaintiffs-Appellees are not aware of any other appeal in or from the same civil action or proceeding in the trial court that was previously before this court or any other appellate court other than the two actions consolidated in herein, Court No. 24-1258 and 24-1259.

## STATEMENT OF THE CASE

This appeal arises from the final judgment in *Linyi Chengen Import and Export Co., Ltd., et al. v United States* in the appeal of the antidumping investigation of *Hardwood Plywood from China*.   This final judgment was the sixth opinion at the lower Court affirming the fifth remand results.   The first three opinions and two remands primarily addressed the rate applicable to Plaintiff-Appellee Linyi Chengen Import and Export Co., Ltd. ("Chengen").   In the Preliminary Results of the original investigation, Commerce applies its normal methodology for calculating normal value and assigned Chengen a zero percent margin.   In the Final Results, Commerce departed from its normal practice and applied the intermediate methodology, which resulted in a 183.36 percent margin. Due to this extremely high margin that barred any ability for any Chinese manufacturers or exporters to participate in the U.S. plywood market, many exporters appealed and have remained in this litigation through seven years and

five remands.

After two remands on Chengen's margin, Commerce, under protest, applied its normal methodology and again assigned Chengen a zero percent margin. The following three opinions and three remands addressed what rate would be applicable to the non-individually investigated separate rate companies. Starting in the second remand, Commerce applied a 57.36 percent margin to the cooperating separate rate companies--- an average of Chengen's zero percent margin and the total adverse facts available ("AFA") PRC-entity rate applied to the other mandatory Respondent. In the fifth remand after multiple opinions from the lower Court finding Commerce had not justified how this rate was reasonably reflective of the cooperating separate rate companies' potential dumping, Commerce also assigned the separate rate companies Chengen's zero margin. Consistent with *Changzhou Hawd Flooring Co. v. United States*, 324 F. Supp. 3d 1317, 1326-1328 (Ct. Int'l Trade 2018), Commerce also excluded certain companies from the Order.

Defendants-Appellants already addressed the details of the long history of this case. *See generally* Defendant-Appellant United States Opening Brief, ECF 31 (hereinafter the "United Sates" or "U.S. Br."); Defendant-Appellant Coalition for Fair Trade in Hardwood Plywood Opening Brief, ECF 33 (hereinafter the

"Petitioner" or "Pet. Br.") (collectively "Defendants-Appellants"). However, Defendants-Appellants have made seriously misleading statements of fact regarding two key aspects of the original proceeding and the lower Court's overturning of Commerce's original determination: the log invoices and the conversion formula.

First, Defendants-Appellants misleadingly state that Chengen failed to inform Commerce of the nature of the documentation it relied on for its log consumption. *See*, *e.g.*, U.S. Br. at 14 ("Chengen also failed to inform Commerce that it had no invoices from suppliers…") at 16 ("Commerce also discovered for the first time that, contrary to the representations made in Chengen's questionnaire responses, Chengen did not actually have supplier-provided invoices…"); Pet. Br. at 8 ("Only at verification did it learn that there were no such invoices for poplar logs…").

Chengen never misrepresented the documentation it relied on for its log purchases. Chengen stated among the documents it keeps for its records, that it keeps "material purchase invoices." Chengen's SDQR at 4-5, Appx2797-2798. Chengen also stated that the "accountants record purchases according to warehouse-in tickets and invoices in the normal business at a given month in the normal course of accounting." Chengen's SuppD at 7, Appx5079. These

statements are all true.   Chengen did rely on invoices for its log purchases.

Commerce did not specifically request the warehouse-in tickets or invoices until verification.   At verification, Chengen provided all documents that Commerce requested at verification, including the warehouse-in tickets and invoices for the log purchases.   Appx8387-8388.   The verification report stated "Company officials explained that the log purchases are reported on warehouse-in tickets.   We reviewed the warehouse-in ticket books in the office, and noted that the name of the individual supplier/farmers is reported on the warehouse-in ticket, as well as the quantity in cubic meters."   Appx8387.   It also stated that "Company officials explained that whereas the poplar suppliers/farmers do not provide an invoice to Dongfangjuxin[1], the birch and eucalyptus log suppliers do provide an invoice to Dongfangjuxin."   Appx8389.   Rather, as seen in the verification exhibits, the invoices that Chengen relied on for poplar purchases were taxation invoices.   Appx7670, Appx7700-7722.

Commerce examined and took twenty-two of these taxation invoices as verification exhibits.   *Id*.   The invoices were official tax documents titled "Shandong VAT invoices" with the stamp of "State Taxation Bureau".   Those

---

[1] Dongfangjuxin is Chengen's affiliated company that manufactured the subject merchandise while Chengen exported the subject merchandise.

Taxation invoices contain two copies, one for the supplier, and the other for the buyer's accounting purposes. *See* Appx7701-7722 where "copy two: for buyer accounting purpose" is noted vertically in Chinese on the right end of such invoices. *See id*. This means that they are tracked by the Chinese Government with respect to both the buyer and the seller's representations of cost and income. Absent from the report was Chengen's explanation that these simple farmers did not have adequate status to own their own official serial numbered tax invoice booklets and thus could not issue their own invoices. Nonetheless, nothing in Chengen's statements before verification about its reliance on invoices was contradicted at verification. Indeed, when there is a discrepancy between a questionnaire response and Commerce's finding at verification, Commerce will note it as a discrepancy or issue. *See generally* Appx 8376–8403 (verification report). Commerce made no such note of any discrepancy or issue in its verification report regarding Chengen's poplar log purchases.

Defendants-Appellants statements that Chengen misled Commerce concerning its documentation or even that Commerce discovered anything contradictory at verification is not supported by the record whatsoever. As the lower Court found, Chengen's records were accurately explained and Chengen's records are an accurate basis for its log purchases.

Second, and even more blatantly, Defendants-Appellants make several incorrect statements about the log conversion standard used and presented by Chengen and about Chengen's Counsel's statements at Court and before Commerce regarding this document.   As already explained in Defendants-Appellants' opening briefs, Commerce did take two pages of a conversion chart that Chengen's production manager used to calculate and confirm the volume of the delivered logs in cubic meters.   *See also* Appx8387.   Then, throughout each Defendant-Appellant's brief, there are numerous misleading statements concerning the fact that this conversion chart is the Chinese national standard.   Petitioner stated that the document "purported" to be Chinese national standard.   Pet. Br. at 11.   The United States faults Chengen's Counsel with not raising prior to its rebuttal brief in the original investigation that this conversion chart was in fact the Chinese national standard and continually faulted Counsel with not stating earlier on the record that Commerce verifiers had not taken the translated cover page of the conversion chart which stated it was the Chinese national standard.   U.S. Br. at 17 (it never suggested, either in its case brief or at any other point between the verification and the issuance of the final determination" that Commerce verifiers had ripped of certain pages of the document), at 41 ("Chengen did not allege that Commerce had torn off, or otherwise improperly rejected, the additional pages

until after Commerce had completed its investigation,"), at 43 ("Chengen only made these arguments… after the issuance of Commerce's final determination"). Of course, there was no opportunity after the verification when Chengen could have raised this concern. The United States utterly fails to understand the posture of information and argumentation allowed before the agency. Parties are not allowed to submit comments about verification or submit additional documentation. The only opportunity Chengen had to address that the conversion chart was the Chinese national standard was in the briefing, when the lack of the cover page surprisingly became determinative of Commerce's final results, and Chengen did raise this and Commerce rejected it as new information. Appx8453–8456. Then Chengen raised it again in a ministerial error comment because that was the only remaining deadline available to Chengen under established procedures. Appx9002–9017.

We also note that until Petitioner's case brief and then Commerce's Final Determination, Chengen had no reason to see an issue with Commerce not including the fact that the "conversion chart" or "industry standard" noted in the verification report was in fact the Chinese national standard. Chengen knew the verifiers were aware of this fact as the entire standard was presented to them at verification and no issues were raised in the verification report that the log volumes

on the invoices would be called into question.   Counsel could only surmise that

Commerce kept the meat of the standard for conversion and concluded that the

covering pages were superfluous.   Notably, the Chinese name and Chinese

Standard number was printed on the pages taken by Commerce, merely a 10-

second Google search away from confirmation or a mere turning to the translator at

the verification table, if necessary.   It was only in Petitioner's case brief and then

the Final Determination, that the facts of the verification became twisted.

Then, the United States goes further to surmise that Chengen's counsel's

statements at Court about verification may not be true.   U.S. Br. at 22 ("During

the argument, Chengen's counsel made several unsworn factual statements and

arguments, not based on any record evidence, regarding events that allegedly

occurred at verification.").   The United States then lists a few statements of

Counsel regarding verification.   Counsel is a U.S. barred attorney that has

obligations before the bar and Court to not make false statements.   U.S. CIT Rule

11b.   Chengen's Counsel stated truthfully the events that occurred at verification.

Chengen's Counsel was also present at the verification in question, unlike Counsel

to U.S.   Appx8403.   Chengen's Chinese Counsel and Chengen's production

manager present at verification also put sworn declarations on the record

concerning these events.   Appx9127-9139, Appx9426-9430.

Further, as the lower Court instructed Commerce to open the record for the full document, it is a proven fact that the two page conversion chart taken by Commerce was an excerpt from the Chinese national standard for log volume. Appx 9436–9448.   Indeed, this is also stated at the top of the two page excerpt that Commerce took in VE-26, but only in Chinese.   It is also evident from those two pages that it is a Chinese standard because it says "GB 4814-84." Appx7671-7672. Commerce not only had a Chinese translator at its disposal *in the room* for the entire verification should Commerce have not known the title of the document it was taking, but Commerce also knows from its extensive experience in Commerce with China that "GB-" stands for GuoBiao, meaning national standard for China. Commerce has seen this designator in numerous other cases.   Appx8403 (listing Commerce's translator among attendees at verification).   It is contrary to these basic facts, as well as normal verification procedures, that Commerce would have taken this document as a verification exhibit without knowing what it was or having been unable to explain its significance to supervisors in Washington, D.C.

The United States also writes that "Chengen never revealed that the source of its log consumption calculation was a conversion table and formula" that Commerce later "discovered at verification…".   U.S. Br. at 13; *Id*. at 19 (stating further doubt that the document was the Chinese national standard or could elicit

"actual volume of the log"); Pet. Br. at 22 (Yet it chose not to disclose or describe its use of a formula/table to calculate the volume of logs used in its production operations, leaving it for Commerce to discover the issue at verification…"). The supposed surprise that Chengen used a conversion to confirm its log purchases is also misleading. Anyone with a basic understanding of the wood industry or any commercial understanding must know that a calculation was made to report logs in cubic meters. Logs are not uniform; the only way a conversion/calculation would not be needed is if they used the unwieldy water displacement method. That is simply an impractical and non-commercial approach. Commerce, as the Department of Commerce, afterall, with experience in numerous wood cases before this investigation of plywood, including the 2013 investigation of plywood, is necessarily well aware of this fact. The verification report gave no indication that the use of the conversion chart was a surprise or discrepancy. Rather, the document was taken as a part of Commerce's verification package on Chengen's poplar log costs. As elaborated below, Commerce frequently finds at verification that a conversion was used, without finding this undermines the earlier reporting or should have been disclosed earlier. *See infra* page 26-29.

Chengen cooperated fully in this extensive investigation. Chengen answered numerous lengthy questionnaires and went through a seven day

verification (longer than the normal five day verification).   At no point through the issuance of the verification report did Commerce identify any discrepancy or issue in Chengen's reporting, including for its poplar log purchases.   It was only in the Final Determination that Commerce changed its position on Chengen's reporting and against all substantial evidence on the record, including the verification report, resorted to the less accurate intermediate methodology.   The lower Court properly found that Commerce's Final Determination was contrary to law and remanded to Commerce.   The lower Court properly upheld Commerce's later remand results where Commerce followed its normal methodology and accurately calculated Chengen's margin.

## SUMMARY OF THE ARGUMENT

The Court should uphold Commerce's final remand results assigning Chengen a zero percent margin based on the normal methodology, assigning Chengen's zero margin to the separate rate companies, and excluding certain companies from the Order.

The lower Court properly ordered Commerce to clarify the excerpted document taken at verification, supplementing the record with the full document that confirms it is the Chinese national standard for log volume.   The lower Court also properly found that Chengen's documentation on its log purchase volume was

reliable.   Chengen accurately described the documentation it kept on its log purchases.   At verification, as is ordinary and expected, more specific details about the process and documentation were pursued and observed by Commerce. Nothing at verification contradicted Chengen's statements about its log purchases prior to verification, as evidenced by the verification report that indicated no such discrepancies.

The Chinese national standard observed at verification was used by the production manager to confirm the poplar log volume reported and delivered by the farmers.   The use of such standards or conversions is common and expected, particularly for logs or other non-uniform objects which cannot realistically be measured for actual volume.   Chengen had no reason to report the use of this standard in advance of verification, as it is not a production document. Likewise, finding the use of such a conversion or standard at verification is also common. Commerce understood at verification that the conversion table Chengen's used was the Chinese national standard, it was discussed, the cover page said this in English, the pages taken by Commerce, said the name of the standard at the top in Chinese. When Commerce later in the Final Determination claimed not to know this document taken by Commerce as a verification exhibit was the Chinse national standard, the lower Court was correct to order Commerce to clarify the record.

Chengen's log purchase documentation is accurate and reliable.   While Chengen itself may generate the warehouse-in slips and invoices for its poplar log purchases, the documents are corroborated by third-parties.   First, the farmers who deliver the logs bring their own delivery slips with the volume; Chengen then confirms the volume and creates a warehouse-in slip.   The warehouse-in slip is then used by Chengen to fill out the official Chinese VAT invoices, one copy is given to the farmer and one is kept by Chengen.   The Chinese VAT invoices are used by both the farmer and Chengen as an official record with the Chinese government for the sale/purchase.   Thus the farmer and the government corroborate these purchases.   The farmer would not accept payment for a volume different than the volume it delivered.   Likewise, both the farmer and Chengen would not falsely report payment, which is based on the volume, to the Chinese Government.   The records also all flow in Chengen's accounting, which is then audited by a third-party.   The lower Court properly found these documents are reliable and that Commerce had failed to cite any precedent or evidence to the contrary.

Accordingly, as Chengen's log purchase documents are reliable, Commerce has no reason to depart from its normal and most accurate methodology and instead rely on the intermediate methodology.   Commerce's final remand results

relying on the normal methodology are the most accurate. The intermediate methodology is only relied upon in rare circumstances where collecting factors of production from earlier production stages would be impractical and imprecise, such as the stages of growing agricultural products. Such circumstances do not apply here. Further, relying on the intermediate methodology in this case would actually introduce more inaccuracies.

The lower Court properly upheld Commerce's application of Chengen's 0% margin to the separate rate companies. In earlier remand results, Commerce had not supported its determination that a separate rate of 57.36% was reasonably reflective of the cooperating separate rate companies' potential dumping. Commerce's support for the 57.36% rate was based on cherry-picked evidence, and ignored substantial evidence demonstrating not only that these companies' potential dumping margin would not be that high, but also that their potential dumping would be similar to Chengen because of evidence of sales prices on the record as well as their cooperation in the proceeding.

Lastly, the lower Court properly upheld Commerce's decision to exclude companies that had filed voluntary respondent questionnaires in the original investigation. Following the logic of *Changzhou Hawd*, Commerce determined that the same factual and legal situation occurred in this investigation and lengthy

appeal, and determined to follow *Changzhou Hawd* and exclude such companies from the Order.

## ARGUMENT

## I.    Standards of Review

The Court applies the same standard of review as the trial court, upholding Commerce determinations that are supported by "substantial evidence on the record," and is otherwise "in accordance with law." 19 U.S.C. § 1516 a(b)(1)(B)(i). Although the decisions of the trial court are review *de novo*, the Court "gives[s] great weight to the informed opinion of the [trial court]…, [and] it is nearly always the starting point in [this Court's] analysis."    *Ningbo Dafa Chem. Fiber Co., Ltd. v. United States*, 580 F. 3d 1247, 1253 (Fed. Cir. 2009) (citations omitted); *see also F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000) ("This court reviews *de novo* the trial court's answers to all questions of law, including statutory interpretation questions; evidentiary decisions, including waiver for failure to timely present evidence or raise an issue, are reviewed for abuse of discretion. Findings of fact by the trial court are reviewed for clear error.")(citation omitted).    There are different standards of review applicable to the issues in this case.

This Court will hold as unlawful any administrative decision that is

arbitrary, capricious, or an abuse of discretion[2]. *See* 19 U.S.C. § 1516a(b)(l)(A). Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Moreover, Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration, quotation marks and citation omitted). An agency "must

---

[2] The court has clarified:
The "arbitrary, capricious, [or] abuse of discretion standard" combines two "roughly equivalent" word formulas, 'arbitrary [or] capricious' and 'abuse of discretion.' 3 Charles H. Koch, Jr., Administrative Law and Practice § 10.6 [1] (2d ed. 1997 & Supp. 2006).
*Consol. Fibers, Inc. v. United States*, 535 F. Supp. 2d 1345, 1353 (Ct. Int'l Trade 2008).

cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48 (citations omitted). Indeed, a "principal justification for the administrative state is that in 'area[s] of limitless factual variations, like cases will be treated alike.'" *Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333, 1339 (2006) (internal citation omitted) ("Courts will therefore not defer to an agency regulation or adjudicative decision when they produce results which are arbitrary, capricious, or manifestly contrary to the statutory scheme.").

This Court also invalidates determinations, findings or conclusions of Commerce that were "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *See* 19 U.S.C. § 1516a(b)(l)(B). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)). Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, "it is appropriate to set aside the ITA's decision when the court

'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).

Moreover, Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987). The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (*quoting Universal Camera*, 340 U.S. at 487).

## II.    The Lower Court Did Not Exceed its Authority in Requiring Commerce to Place Complete Information on the Record.

Defendants-Appellants argue that the lower Court erred in ordering Commerce to accept the complete Chinese national standard, rather than the mere two pages that Commerce took at verification. U.S. Br. at 15-27, 38-50; Pet. Br. at 17-15. Defendants-Appellants cite to Commerce's authority to determine its own record and examples of the lower Court being found to have exceeded its

authority when ordering Commerce to accept new information.   However, this misunderstands the posture of the supposedly "new" information the lower Court ordered Commerce to accept.   The new information was information relevant to verification and the information was only clarifying information already on the record.

### A.   Commerce Always Accepts a Substantial Amount of New Information at Verification.

As the lower Court explained, "Commerce has developed a practice of accepting new facts at verification when: "(1) the need for that information was not evident previously, (2) the information makes minor corrections to information already on the record, or (3) *the information corroborates, supports, or clarifies information already on the record*."   Slip. Op. 20-22 at 10, Appx112, *citing TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1354 n.34 (2016) (citation omitted) (emphasis added by lower Court).   Indeed, apart from "minor corrections", almost all information collected at verification is technically new information—i.e., hundreds or thousands of pages of information heretofore absent from the record but deemed appropriate to understand more completely and verify the data and summaries of data contained in the U.S. sales and FOP consumption databases. The standard verification outline contains page after page of single-spaced request for new documents, reconciliations, and sales and material input traces.   A cursory

examination of the verification exhibit list in this investigation shows the variety of documents taken by Commerce that were not previously on the record, or previously requested by Commerce to be on the record. Appx8401-8402. Among these documents are raw material purchase documents, including poplar purchase documents. A standard or formula or conversion table and any information about such is not atypical or different than the other information collected by Commerce in this or other verifications to serve as corroboration. In fact, Commerce did take a conversion standard in this verification as it took two-pages from the standard. Defendants-Appellants statements about the Chinese national standard being new information are misplaced, as Commerce did take pages from the Chinese national standard as a verification exhibit in accordance with its normal verification procedures. The issue became that Commerce stripped out from the tendered document the top pages that included the translation of the name of the document Commerce took.

**B.** **The New Information the Court Ordered Commerce to Accept was Merely Clarifying the Information that Commerce took at Verification.**

Defendants-Appellants' statements and precedent about regulatory deadlines to submit information to the record are inapposite. The United States relies heavily on *Essar Steel* for the proposition that the Court overstepped its authority.

In *Essar Steel*, Essar denied that it had a plant at a particular location. On appeal at the lower Court, Essar then tried to submit documents to the record that it had applied for and was denied government subsidies at that location. The lower Court ordered Commerce to accept these documents and this Court found that exceeded authority. The facts of *Essar Steel* are very different than the case at hand, as are all of the cases cited by Defendant-Appellants. This is not a situation where a party was trying to submit a new document it should have submitted earlier to the record. This is not a situation where the Court ordered Commerce to reopen the record for a brand new document. No agency discretion or decision making is usurped here because the record already had pages from the Chinese national standard on the record as a verification exhibit. *See* U.S. Br. at 44-46 (discussing agency discretion to determine the record); *see also id*. at 50 (citing to *Matsushita v United States* and arguing that Commerce was denied its right to probe that the information was accurate and reliable). Indeed, Commerce had taken those pages itself on the record. Rather, the lower Court only found that it was unreasonable for Commerce not to include the additional pages from the standard that explained what the document Commerce accepted was—particularly as the entire standard was timely tendered in the context of the verification and it was Commerce's doing that the cover page was removed.

Afterall, the lower Court reasoned, the point of the verification exhibit was to "corroborate, support, or clarify the log volumes." Slip. Op. 20-22 at 11, Appx123, *citing TMK IPSCO*. By not including the name of the document pages Commerce took, Commerce unreasonably contravened the purpose of verification and taking the document. The lower Court also found support in *Mid Continent*, where this Court contemplated that Commerce can act unreasonably in refusing to take information. In discussing Commerce's refusal to consider subsidy information for a surrogate financial, this Court found "Practical considerations might play a role in the reasonableness of Commerce's choice. It might be reasonable to avoid methods that demand information that cannot practically be obtained in reliable form. On the other hand, it can be unreasonable for an agency to refuse to obtain readily available, highly relevant information." *Id*. at 11-12 quoting from *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 544-545. Indeed, we submit that to take a document and then deny the name of the document is not only unreasonable and contrary to purpose of verification and accurate margins, but an abuse of Commerce's discretion. *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) ("An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an

unreasonable judgment in weighing relevant factors."); *Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv*., 422 F. 3d 782, 798 (9th Cir. 2005) ("An abuse of discretion is 'a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found.'").

The lower Court here ordered Commerce to complete the record with the clarifying information of the full document, rather than the mere two pages Commerce took.   We also submit, that while the lower Court did not exceed its authority in requiring Commerce to include the document in its entirety, the only actual information truly relevant in the additional pages taken on remand is the translated title of the document.   The other newly included pages did not become support to Commerce' determination that Chengen's log records were accurate in the second remand nor were the other pages part of the Court's reasoning in finding the conversion was reliable.   The only relevant "new" fact is that the two pages Commerce took for the record were from the Chinese national standard.   As explained above, the two pages that Commerce took also said they were the Chinese national standard at the top, but only in Chinese.   We also submit, as explained above, Commerce knew full well what the document was such that it can hardly be considered "new" information.   Commerce knew what the two page

document was because it was 1) explained at verification; 2) the cover page with translation was provided at verification, though not taken; 3) Commerce would not take a document without knowing what the document was; 4) Commerce had a translator at the verification table; and 5) the two pages stated the known indicator for a Chinese national standard "GB."

Lastly, we also submit that judicial notice of the fact that these two pages were the Chinese national standard would also have been appropriate. A simple ten second google translation of the header on the page or googling GB 4814-84 proves the public, undisputed fact that the document is the Chinese national standard. *See* Fed. R. Evid. 201(b) (As a general matter, the Federal Rules of Evidence permit courts to take judicial notice, matter is "not subject to reasonable dispute because it: (1) it is generally known within the trial court's territorial jurisdiction; or (2) cannot reasonably be questioned."); *Wuhu Fenlian Co., Ltd. v. United States*, 899 F. Supp. 2d 1355, 1362 (Ct. Int'l Trade 2013) (citing Black's Legal dictionary) (As this Court has explained, taking judicial notice means exercising the Court's inherent power to "accept, for purposes of convenience and without requiring a party's proof, of a well-known and indisputable fact; the court's power to accept such a fact."). A national standard widely available on the internet is not reasonably subject to question.

**C.** **Commerce Regularly Observes the use of Conversion Tables at Verification for the first Time and Accepts such Information at Verification.**

Lastly, to the extent that Defendants-Appellants also insinuate that Chengen should have submitted the Chinese national standard prior to verification in a questionnaire response, this misconstrues the use of the document and Commerce's verification procedures. Commerce's section D questionnaire requests a list of documents used in production and how long the company maintains such documents, listing material purchase invoices, warehouse sub-ledgers, consumption worksheets, etc. as examples. In response, Chengen listed the general documents that it obtains or generates for purchases and production, including its warehouse journals and material purchase invoices. Appx2797-2798. Indeed, those are the documents that Chengen maintains related to its purchases of logs. When a supplier delivers logs, the delivery sheets contain the volumes and the logs are marked with the diameter. Chengen regularly spot checks the diameters (the length is uniform) and uses the diameter to confirm the volume on the delivery notes by calculating the cubic meters for the quantity based on the Chinese national standard for log volume, which uses log length and log diameter in an algorithm. Appx8386, Appx9131-9133. After confirming the volume, the producer manager issues the warehouse-in tickets which are used as

the basis of the purchase VAT invoices.  *Id*.   The Chinese standard is not a

document that Chengen maintains for purchases or production as requested in the

questionnaire, but is used to spot check and confirm the volume of the delivery is

consistent with the volumes on the delivery notes.

Further, it is common practice that such conversion documents are

"discovered" at verification and taken at verification because nobody is certain of

how the lead verifier will conduct the verification or where questions and facts

presented will lead the verifiers in their follow up questioning.   This is an organic

process.   In an affidavit submitted by the lead Chinese lawyer that was at

Chengen's verification, who also participated in over 100 other Commerce

verifications, Mr. Lan, provided several examples of this practice with excerpts

from relevant public verification reports.   In *1,1,1,2-Tetrafluoroethane (R-134a)*

*from China*, the verifier reviewed how the respondent reported per-unit

consumption for material inputs in producing subject merchandise, and

specifically, the verifier stated:

> **We requested that company officials provide the applicable
> industry standards for sulfuric acid**. Company officials provided
> **PRC National Standard GB/T 534-2002**, "Sulfuric Acid for
> Industrial Use," issued by the General Administration of Quality
> Supervision, Inspection, and Quarantine of the PRC ("**GB/T
> Standard**").… **We reviewed attachment A and observed the
> percentage of "dissociate" sulfur trioxide specified for 105 oleum.**

*See* L.X. Decl. Attachment 4 at 17. {emphasis supplied}. Appx9155-9156,

Appx9172.

In *Cold-Drawn Mechanical Tubing from Korea* , the verifier asked the

respondent "how it determines the grade of the final merchandise, since the cold

drawing process changes the grade of raw material used." *See* L.X. Decl.

Attachment 5, pg 14 Appx9179-9180, Appx9193. The respondent explained that

there are internal mill tests, and the verifier:

> reviewed the ASTM codes and grade chart from Yulchon's responses
> and compared them to the chemical compositions listed in Yulchon's
> internal mill tests confirming that they fell within the range of the
> reported grade for the final merchandise.

The verifier also requested to examine the conversion ratio for how the respondent

calculated theoretical weight for the sales, and the report states:

> Specifically, the theoretical weight calculation is: 1) theoretical weight
> per meter calculated by nominal outside diameter (NODH) minus
> nominal wall thickness (NWTH) multiplied by NWTH **multiplied by
> 0.02466 which is an industry standard**, i.e. (NODH-NWTH ) *
> NWTH * 0.02466); 2) total length (meter) calculated by number of
> pieces (PIECEH) * nominal length per piece (NLPH); and 3) quantity
> in metric tons is calculated by theoretical weight in meter divided by
> total length (meter) and then multiplied by 1000. **Company officials
> provided a copy of the ASTM standard that had 0.02466 as the
> conversion ratio for theoretical weight used in the calculation and
> reviewed this ASTM standard**. We reviewed the calculation and tied
> the theoretical weight for this sale.

*Id.* at 16. {emphasis supplied} Appx9195. This report confirms that Commerce

regularly requests additional standards or conversions for examination as part of its routine verification duties. Commerce does not regularly remove the cover pages and then pretend it has no idea what it collected and verified.

Similarly, during the verification of *Steel Wire Garment Hangers from China*, Commerce took the Chinese National Standard for Hot Rolled Low Carbon Steel Wire Rods as it was observing the company's production process. *See* L.X. Decl. Attachment 6 at 12, Appx9218-9219, Appx9230 During the verification of *Welded Stainless Pressure Pipe from India*, the verifier accepted an industry standard that the respondent used in calculating theoretical quantities from the monthly production report. *See* L.X. Decl. Attachment 7 at 13, Appx9261-9262, Appx9274. Likewise, in *Certain Stainless Steel Flanges from India*, the verifier allowed company officials to rely on "industry standard specification tables" to identify the pressure rating for the subject merchandise. *See* L.X. Decl. Attachment 8 at 10-11 Appx9287-9288, Appx9297-9298. In *Utility Scale Wind Towers from China*, Commerce accepted over 60 pages of EU standards on hot rolled products of structural steels as a verification exhibit. *See* L.X. Decl. Attachment 9, Appx9310-9311, Appx9316-9399.

Respondents regularly rely on a standard for making conversions in Commerce proceedings. Respondents regularly do not include this in an earlier

questionnaire response because the questionnaires do not specifically request such documentation. Commerce regularly sees the use of such standards or conversions at verification, and takes such documents as verification exhibits without finding the Respondent should have disclosed such a document earlier in the proceeding. This also further demonstrates that Commerce's decision that the full standard, much less just the name of the standard that was missing, was new information it could not take at verification, was arbitrary. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.")

In sum, given the particular circumstances of this case, the lower Court did not exceed its authority in ordering Commerce to complete the record with the full Chinese national standard with translation, rather than the excerpt without a translated title.

## III. The Lower Court Properly Held Commerce's Application of the Intermediate Methodology was Unsupported by Substantial Evidence and Not in Accordance with the Law.

Defendants-Appellants also argue that the lower Court erred in finding that Commerce's decision to resort to the intermediate methodology was unsupported by substantial evidence. U.S. Br. at 51-54; *see also* Pet. Br. at 24-28.

Defendants-Appellants maintain that Chengen's log purchase documentation was not reliable because it is not corroborated by third-party documentation. Defendants-Appellants also insinuate potential inaccuracies in the Chinese national log standard. The lower Court properly found that each of these arguments fail in light of a full examination of the record. Further, reliance on the intermediate methodology is in fact *less* accurate.

## A. Chengen's log purchase volume is corroborated.

Because the invoices that Chengen relied upon for its log purchase volume were issued by Chengen, Defendants-Appellants claim the volume is unreliable because it lacks a third-party corroboration. This misconstrues the parties and documents involved with the purchase of the logs. While the farmers delivering the poplar logs do not provide invoices themselves, because individuals do not have such rights under the country scheme broadly, the farmers act to corroborate the volume of their delivery as do the official VAT invoices which are reported to the government.

The farmers deliver the logs with a uniform length and mark the diameter themselves, the accuracy of which was verified by Commerce. Appx8386. Those dimensions are the basis of the volume calculation on the farmer's delivery notes and the warehouse-in ticket that Chengen creates. The warehouse-in ticket

is the basis of Chengen's records as well as the basis by which the farmers are paid. The farmer's acceptance of the warehouse-in ticket as a basis for its payment is corroboration from a third-party. No supplier would deliver a raw material to a factory without any knowledge of the amount they sold. A supplier would certainly not accept payment for an inaccurate amount of materials. As logs were sold in cubic meters (and priced per cubic meters), the accuracy of the volume is critical for these farmers, as well as for Chengen.

Moreover, in addition to the confirmed warehouse-in tickets, the company provided the farmers with taxation invoices stating the volumes, prices, and values. *See* Appx 7674, Appx7674-7722. The invoices are official tax documents: they were titled "Shandong VAT invoices" with the stamp of "State Taxation Bureau". Those Taxation invoices contain two copies, one for the supplier, and the other for the buyer's accounting purposes. *See* VE 26: invoices where "copy two: for buyer accounting purpose" is noted vertically on the right end of such invoices. Appx7701-7722. This means that they are tracked by the Chinese Government with respect to both the buyer and the seller's representations of cost and income. These quantities are recorded in official government tax documents.

Further, the log purchase document flows through the rest of Chengen's books and records, verified as accurate, and ultimately reconciled to a financial

statement audited by a third-party.   The record evidence does not support

Defendants-Appellants' positions that Chengen could essentially misreport

purchases as it saw fit, in defiance of the farmer getting paid, the government, and

the auditor. Nothing on the record supports this radical surmise; and, indeed, it is

commercially unreasonable.

The lower Court likewise agreed, finding:

First, Commerce cites no authority to specifically support its imposition
of the third-party confirmation requirement. There does not appear to
be a legal basis for requiring that Linyi Chengen must confirm its log
consumption by an independent third-party source, and thus the court
concludes that Commerce's requirement on this issue is contrary to the
law.
Second, the evidence on the record does not support Commerce's
conclusion that Linyi Chengen could "manipulat[e] or alter[]"
documents under its control, such as the VAT invoices, because the
invoices are generated on pre-approved Chinese government forms
provided by the Chinese tax authority. Id. at 25–26, 49–51. Commerce
identified no record evidence questioning the accuracy and
completeness of the VAT invoices when Linyi Chengen maintained the
invoices as part of its regular course of business. See Verification
Report at 8, 20–21, PR 834. Commerce has cited no evidence on the
record as a basis to doubt the accuracy of the VAT invoices when a
third party audited Linyi Chengen's financial statements.

Slip. Op. 20-22 at 13, App125.   Chengen's documentation of its log purchase

quantity is reliable.

**B.      Commerce has no Basis to Doubt the Accuracy of the Chinese
National standard for Log Volume.**

Defendants-Appellants at various places also infer that the Chinese national

standard may not be accurate, primarily raising that it relies on the smaller end of the log as a starting place for the calculation. The Petitioner primarily takes up this argument, also claiming that the standard has flaws. Notably, the vast majority of the United States' brief attacks the lower Court's reopening of the record, seemingly acknowledging that if it must admit that the conversion table is a national standard for log volume, as Commerce had to acknowledge in the second remand results, then there is an inherent accuracy in using this conversion.

Indeed, Commerce cannot doubt an industry standard *per se*. Commerce made no actual factual findings to support any inaccuracy in the standard. Commerce accepts standard formulas for weight conversion in other cases and other aspects of its antidumping calculations. For example, in the *Circular Welded Pipe from Korea* reviews, Commerce frequently relies on an industry standard formula to determine the weight of subject merchandise in the U.S. Sales databases. *Circular Welded Non-Alloy Steel Pipe Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 35,248 (June 12, 2013) and accompanying IDM at 35 ("According to Husteel, the theoretical metric tons reported in the sales files were calculated using the following standard industry formula: (actual outside diameter – theoretical wall thickness) * theoretical wall thickness * density * length/1000."). Likewise for by-product offsets, Commerce

also frequently uses a formula calculation to determine the quantity of the by-product when the company does not quantify the by-product in its normal business. *See Chlorinated Isocyanurates Preliminary Results of Antidumping Duty Administrative Review; 2013-2014*, 80 Fed. Reg. 39,060 (July 8, 2015) and accompanying Prelim. Decision Memo at 17 (unchanged in final) (Noting that the company does not record the chlorine gas and hydrogen gas that is discharged in the production process, Commerce accepted using a conversion ratio derived from the chemical formula for hydrochloric acid to determine the quantity of the discharge for the by-product offset). Commerce uses a standard formula to reliably derive weight for non-uniform inputs in its normal practice in other cases. *See Certain Preserved Mushrooms Final Results of First New Shipper Review and First Antidumping Duty Administrative Review*, 66 Fed. Reg. 31,204 (June 11, 2001) and accompanying IDM at Cmt. 8 (Commerce adjusted an input factor for brined mushrooms to a fresh mushroom equivalent by applying an industry standard ratio.); *Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (August 9, 2018) and accompanying IDM at 135-136 (Applying a single recovery ratio for converting board foot scaled logs to cubic meters).

Defendants-Appellants general insinuation that this standard, whether it is

the Chinese National Standard or not, is inaccurate because the small end of the log is used is unsupported and unreasonable.   While the smaller end of the diameter is used as the starting place (along with length) to reference the table, any cursory reading of the long complex conversion formula set forth on top of the table makes clear this is not a simple cylinder mathematical formula such that the using the smaller end diameter would result in a smaller under-reported volume. The complex algorithm would not be necessary if a national standard were so reckless as to calculate the volume of a cylinder, which would over-state or under-state volume.

As Commerce conducts numerous wood and log investigations/reviews, Commerce cannot pretend it does not know it is a common industry practice to measure log volume using the smaller end. Also, there were no other documents of record of any kind that in any way suggest that the logs would not be appropriately measured at the smaller end of diameter or that those conversion formulas are not correct.   The logs measurements should be recognized as accurate *per se* in the absence of reasonably contradictory *evidence*.   The Chinese national standard uses this method, the European standard allows for this method, and it is the most common method in the United States.   *See*, *e.g.*, *Everett Plywood & Door Corp. v. United States*, 190 Ct. Cl. 80, 112 (1969) (discussing the Scribner decimal rule and

Puget Sound official Log Scaling and Grading rules using the diameter at the small end to calculate volume of logs and trees); *State v. Rathbone*, 144 La. 835, 841 (Supreme Court Louisiana 1919) (applying the Doyle rule formula, adopted by statute in the state, to the smaller diameter of logs to determine volume.). Defendants-Appellants cannot conclude without any evidence that an industry standard, indeed a methodology widely used even in the U.S., is an imprecise form of measurement when in fact it is a pervasive national and international standard.

Further, Defendants-Appellants assertion that if the use of the standard was raised earlier, it would have allowed inspection of the reliability of the standard is also nonsensical and contrary to practice. Pet. Br. at 25-26; *see also* U.S. Br. at 19 & 25. It is a national standard for one of the most significant industries in the world-- there is inherent reliability in that. As discussed above, Commerce regularly relies on standards and conversions without examining how the formula was derived or questioning it's accuracy. Further, when Commerce requested the document be placed on the record, under protest on remand, Commerce also could have provided additional information or tested its accuracy. Instead, Commerce found given the document was the Chinese standard and the Court's decision that the VAT invoices were reliable, that therefore Chengen's log volumes were reliable.

The use of this standard to confirm Chengen's log volumes upon delivery is reliable. Nothing on the record undermines this established standard. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) ("[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

### C. The Intermediate Methodology is Less Accurate.

Defendants-Appellants argue that Commerce's original final determination (a reversal of its preliminary determination) that it was more accurate to rely on the intermediate methodology and value Chengen's FOPs starting with its veneer inputs was supported by the record. U.S. Br. at 51-55; Pet. Br. at 24-28. As explained in their opening briefs in more detail, Commerce has a normal methodology for calculating normal value, namely accepting and valuing the inputs as purchased and consumed by the respondent. In this case, Chengen purchased and consumed logs, so relying on logs as the starting raw material would be following the normal methodology. Commerce finds the normal methodology is the most accurate methodology because it follows the respondents' own valuing of the actual inputs acquired and the actual level of production experienced by the respondent to process acquired inputs.

The so-called intermediate methodology is a rare exception to this normal

practice, where instead of using the actual inputs, Commerce determines to start with a later intermediate input in the production continuum. Commerce has explained that it recognizes two exceptions to its standard practice where it will use the intermediate input methodology to calculate normal value: (1) when a respondent reports factors used to produce an intermediate input that accounts for an insignificant share of the total output and the burden associated with calculating each factor outweighs the potential increase of calculation accuracy, or (2) when valuing the factors of production associated with producing the intermediate input would result in inaccurate calculations because a significant element of cost would not be adequately accounted for in the overall normal value buildup. Appx8539. As logs are the primary driver of normal value, the last exception was the only potentially relevant exception to Commerce's normal methodology.

This exception has only been raised in agricultural cases, namely, *Honey*, *Garlic*, and *Fish Fillets*, or a few cases where there were major costs missing from the surrogate financial ratios. No such concerns about differences with the surrogate financial ratios were raised in this case, and indeed are not present here. Likewise, the circumstances and record facts of Chengen's log purchases for the production of veneer do not correspond to the difficulties in valuing the factors of production for planting, growing, and harvesting garlic, the bees' production of

honey, or the birth and growth of fish stock.    For example, in *Fresh Garlic from China*, Commerce concluded that it had fundamental difficulties in determining and verifying the "growing" FOPs for the garlic.    Commerce complained that it was difficult to measure the hectares under cultivation, which involved consideration of the placement of boundry stones in vast fields.    Commerce found that it could not reliably measure or verify inputs for water and fertilizer due to the nature of the inputs and due to the extremely poor records kept by individual farmers.    These cases involve procedures over long periods of time with numerous inputs and labor hours that are difficult to measure and document. Comparing the procedures of growing fish and calculating the costs of oxygen, vitamins, river water, and the labor of tracking all of these items over a long period of time, or tracking the costs of bees and pollen and bee keeping hours over time, is *completely different than* the relatively brief, straight forward procedure of purchasing logs and converting them into veneer based on marked verified diameters.    A more comparable situation might be if Chengen was also a tree plantation owner and would try to value the cost of creating a sapling, tending to the sapling during the years of growth, and then cutting the trees for the logs – but this is not the situation here.

      Nor is there some other inherent difficulty in accurately reporting log

consumption in veneer production.   In *Wood Flooring from China*, when the

respondent had very similarly started from logs (before turning them into plywood

and then completing them with veneer into finished pieces of flooring),

Commerce started from the logs without difficulty.   For example, in the

Investigation of *Wood Flooring from China*, like Chengen, the respondent had logs

delivered with measured dimensions, then the "warehouse staff calculates the total

cubic meters delivered" using the measured dimensions.   Chengen Cmts (March

27, 2017) at Exhibit 1; Appx3478, Appx3490, Appx3503.   Commerce observed at

verification and found no issues in Layo Wood's calculated log quantity ("i.e.,

cubic meters based on the log's specific dimensions") used to produce face

veneers.   *Id*.

In sum, the application of the intermediate methodology in this case at hand

stood in stark contrast to other circumstances when Commerce has resorted to this

methodology.   None of the complicated circumstances from garlic or fish to

warrant resorting to a less precise measurement, the intermediate methodology, are

present in the production of products from purchased logs.   Further there are

specific facts on this record that demonstrate relying on the veneer inputs is not

more accurate, but is in fact less accurate.

Relying on veneer inputs, as an intermediate input instead of the actual

starting place, logs, is not more accurate based on the books and records of Chengen.    The logs were measured theoretically, based on a formula taking into account actual diameter and actual length and theoretical taper.    However, veneers are measured and recorded into that stage of production on a very similar theoretical but much more hypothetical basis.    Chengen used standard or nominal rather than actual measurements of the thickness times the theoretical area of the veneer to impute a theoretical volume into inventory.    *See* Supplemental Section C Response (March 29, 2017) at 3 and Exhibit SQ4-4, Appx3605, Appx3648-3650; *see also* Supplemental Section D Response (April 17, 2017) at 10-11, Appx5067, Appx5082-5083.    This nominal thickness or theoretical area of the veneers as produced by the company were imputed or designated by the company and are <u>not</u> the actual area and thickness.    Because Chengen recorded the volume using the same nominal figure in the production and consumption of veneers entering into the plywood production, any effect of using a nominal thickness, rather than actual, is neutralized.    However, that is not the case when valuing the veneers themselves under the intermediate methodology and disregarding actual log volume purchased and consumed.

Commerce's method in reliance on the consumption of veneers does not improve in any material way the accuracy of the wood input, as both are based on

theoretical volume.    The decision was arbitrary and capricious in that Commerce

rejected the theoretical method of measuring log volume in favor of a theoretical

measure of veneer volume.    Further, there are no third-party cross-check sources

to confirm the reliability of the veneers volumes which consist only of internal

accounting.    In contrast, as explained above, the poplar log purchase quantities

are confirmed by third-party farmers and put in official taxation invoices.

Similarly, the birch and eucalyptus logs also used in the production of subject

merchandise for *face/back* veneers did have third-party invoices confirming the

purchase volume. *See* Ver. Rep. at 13.

Defendants-Appellants fail to allege any reasoned basis why Chengen's log

purchase volumes are not reliable.    The volumes are corroborated by other parties

involved in the transactions.    The volumes are corroborated by a national standard

for calculated log volume, following the same small end methodology followed by

numerous other standards, including in the U.S.    Nothing on the record

undermines the accuracy of Chengen's records other than unsubstantiated claims to

the contrary.    *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade

1987) (Commerce's determination cannot be based on "isolated tidbits of data

which suggest a result contrary to the clear weight of the evidence.").

Accordingly, the lower Court properly found Commerce had no basis to depart

from its normal methodology.    Further, reliance on the intermediate methodology

would introduce other inaccuracies.    *Timken US Corp. v. United States*, 318 F.

Supp. 2d 1271, 1275 (March 5, 2004) (It is well established that "[t] he

antidumping duty statute requires Commerce to calculate dumping margins as

accurately as possible. . . .").

## IV.    Commerce's Exclusion of Certain Companies from the Order is in Accordance with the Law.

Commerce determined to exclude Jiangyang Wood and Dehua TB from the

Order after assigning them a *de minimis* margin, stating this was consistent with

*Changzhou Hawd*.    Remand Results at 10, Appx549, Appx558.    Petitioner

alleges this decision was in error.    Pet. Br. at 37-39.    While *Changzhou Hawd*

does not necessarily require Commerce to take this approach, this case presents the

same posture of *Changzhou Hawd* such that Commerce properly found that the

Court's reasoning in *Changzhou Hawd* applies to this case.    Thus, Commerce

properly determined to follow the Court's instructions in that case here.

In this investigation, Commerce determined not to select "any voluntary

respondents because selecting any additional company for individual examination

would be unduly burdensome and will inhibit the timely completion of this

investigation."    *See* Dep't Voluntary Resp. Memo (April 4, 2017) at 2;

Appx4015-4016.    Indeed, Commerce essentially has a policy of almost never

accepting voluntary respondents.    Commerce continually selects limited

respondents and refuses to accept voluntary respondents even after companies

supply extensive questionnaire data.    Then, in a circumstance such as this case,

where one of these limited respondents receives a *de minimis* margin and the other

receives total AFA, the separate rate companies are penalized by the inclusion of

this AFA rate either in their own margin or in requiring the companies to remain

subject to the Order despite no actual evidence of dumping or non-cooperation.

These same facts were present in *Changzhou Hawd*.    Recognizing the

unfairness of Commerce "reject[ing] all voluntary examination requests,

foreclosing any path to exclusion for respondents seeking an individual weighted

average margin," in the appeal of the investigation of *Multilayered Wood Flooring*

*from China* the Court ordered Commerce to exclude all companies that requested

voluntary treatment from the Order when properly assigned the cooperating

respondents' zero margin.    *Changzhou Hawd Flooring Co. v. United States*, 324

F. Supp. 3d 1317, 1326-1328 (Ct. Int'l Trade 2018).

The Court first addressed that it was appropriate to consider their exclusion

from the Order:

> the Voluntary Applicants may nevertheless challenge Commerce's
> separate and distinct decision denying them exclusion from the Order.
> That determination (like many Commerce determinations), just
> happens to comprise numerous other decisions Commerce made

through the course of the proceeding: mandatory respondent selection, treatment of voluntary examination requests, the calculation of each of the mandatory respondents' margins, and the calculation of the separate rate, among others. Commerce's determination that resource constraints precluded voluntary examinations may itself have been reasonable. Having made that decision, Commerce's subsequent decision to refuse to exclude Voluntary Applicants assigned a zero percent margin is not.

*Changzhou Hawd*, 324 F. Supp. 3d at 1327.   The Court then concluded that

Commerce acted unreasonably and arbitrarily:

> The court believes Commerce's application of its exclusion regulation to the Voluntary Applicants it assigned "representative" zero percent margins has two insurmountable problems. The first is Commerce's refusal to conduct any voluntary examinations, preventing the Voluntary Applicants from demonstrating directly their own evidence of fair trading. The second is Commerce's continuing assumption or inference that Voluntary Applicants denied individual examination and ultimately assigned a "representative" zero percent margin were nevertheless unfairly trading, precluding exclusion. The court questions how a reasonable mind could maintain such an assumption or inference against the Voluntary Applicants.
> …
> the court believes the proper remedy is entry of judgment declaring Commerce's failure to exclude the Voluntary Applicants arbitrary, and directing Commerce to exclude them from the Order ab initio.

*Id*. at 1327-1328.

Commerce did <u>not</u> challenge and appeal the Court's opinion that Commerce

must exclude the voluntary applicants.    Petitioner challenged this decision to this

Court; however, this Court found "no reversible error in the Trade Court's

conclusion that Commerce did not provide an adequate justification for including

the voluntary-review firms in the antidumping duty order in this case."
*Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781, 794 (Fed. Cir. 2020) (non precedential).    While this Court left open that Commerce could address "any justification Commerce might yet articulate for deciding to include voluntary-review firms in an antidumping-duty order," the instant case raises the same serious unfairness, unreasonableness, and arbitrary nature of not excluding voluntary applicants as raised by the lower Court and quoted above.    Further, like *Changzhou Hawd*, the Plaintiff-Appellee Jiangyang Wood has gone through some seven years of litigation and is past the point where the zero cash deposit rate has any impact and the only actual equitable relief available is exclusion from the Order.    Commerce's decision to exclude Jiangyang Wood is justified, as *Changzhou Hawd* found, by the limited respondent selection and refusal to accept any voluntary respondents.

In this case, Commerce limited themselves to only two mandatory respondents, despite Jiangyang Wood requesting to be a voluntary respondent and submitting complete questionnaire responses to the record.    Even when Commerce determined to apply AFA to Bayley, a fact that became evident prior to the Preliminary Determination, Commerce continued to refuse to select an additional respondent.    Throughout the now five remands, Jiangyang Wood has

46

also continued to demonstrate from its data that it is similar to Chengen and continued to reiterate their desire to be a voluntary respondent and have Commerce test their data within the framework of the antidumping duty calculation methodology.

Petitioner draws from one case, PVLT Tires from Vietnam, where Commerce discussed and declined to exclude the companies that submitted voluntary questionnaire responses.    Pet. Br. at 38.    In that case, Commerce did not find that the filing of voluntary responses itself indicated that their dumping behavior mirrors the mandatory respondent.    But the posture of this case is very different.    First, that decision was in the investigation itself, rather than after years of litigation where throughout the years the voluntary respondents reiterated their cooperation and willingness to have their margin calculated from their own books and records.    We also submit that the PVLT Tires decision does not appropriately consider the significant amount of work it is for a company to submit the initial questionnaire responses.    The three initial questionnaires involve extensive information on the company, its production, and its sales.    Complicated and extremely-time consuming databases on the factors of productions and sales, including reconciliations and supporting worksheets on consumption, labor, etc. It is wholly unreasonable that a company would undertake this enormous effort

unless they anticipated that Commerce's consideration of their own data would result in a lower tariff for the company.

Second, the case did not involve a situation where Commerce severely limited its respondent selection such that it knew early on before the Preliminary Results that it only had one cooperating mandatory – i.e. that Bayley would get AFA and it had serious reasons to accept one of the voluntary respondents as a mandatory respondent. Both of these facts is what led the Court in *Changzhou Hawd* to find it was only reasonable to find the voluntary respondents were truly like the mandatory cooperating respondent and that it was only equitable to then exclude them from the Order, like the mandatory respondent.

Further, Jiangyang Wood has also reiterated from its own data that it is like Chengen. Jiangyang Wood provided full questionnaires on the record, including a sales database with [[ price ]] sales. Chengen's sales prices ranged from [[ price range ]] USD/M3, with a weighted-average price of [[ price ]] USD/M3. *See* Chengen Supp. Qre (May 5, 2017) at Exhibit SQ6-1 (revised U.S. Sales Database); Appx5821, Appx5859-5864. Jiangyang Wood's sales prices ranged from [[ price range ]] USD/M3, with a weighted-average U.S. price of [[ price ]] USD/M3. Jiangyang Wood Section C Qre at Exhibit C-1; Appx2857, Appx2920-2931. Jiangyang Wood actually had a higher weighted average sales price than Chengen.

Jiangyang Wood's efforts in the original investigation, Jiangyang Wood own data, and Jiangyang Wood's continued cooperation and desire to be reviewed through years of litigation and remand all demonstrate that Jiangyang Wood should be afforded the same relief as Chengen—a zero margin and exclusion from the Order.

Commerce properly made this determination within its agency discretion and as supported by *Changzhou Hawd*.

## V. The Zero Percent Separate Rate Was Supported by Substantial Evidence and in Accordance with the Law

The general rule in the market economy investigation statute directs Commerce to establish the all-others rate by averaging the margins calculated for exporters and producers individually investigated, excluding any margins that are zero, *de minimis*, or based entirely upon facts available. 19 U.S.C. § 1673d(c)(5)(A).   If all margins are zero, *de minimis*, or based entirely upon facts available, the statute provides an exception that permits Commerce to use "any reasonable method to establish the estimated the all-others rate…"   19 U.S.C. § 1673d(c)(5)(B).   After Chengen's margin was accurately calculated, the margin was *de minimis*.   The other mandatory respondent's margin was based entirely upon facts available.   Accordingly, Commerce's calculation of the separate rate[3]

---

[3]  As this case involves an NME country, rather than all other exporters receiving an all-others rate, only the companies that file a separate rate application and proved their separateness from the government receive a non-AFA rate so named

in this investigation was subject to the exception and "any reasonable method."

The Statement of Administrative Action ("SAA")[4] provides additional guidance with respect to the "exception," in the way the "all others" rate should be assigned. Specifically, the SAA explains that even under the exception, the "expected method" would be to average the margins determined for the individually investigated respondents, provided that "volume data is available." But, the SAA includes an important exception to this:

> However, if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods.

SAA at 873 (1994), *reprinted in* 1994 U.S.C.A.A.N. 4040, 4201.10.

After assigning Chengen a zero margin in the second remand, Commerce followed the expected method and calculated a separate rate of 57.36 percent—an average of Chengen's zero margin and the other respondents' 114.72 percent AFA margin. Appx374, Appx377. However, parties then argued and the Court agreed, this was not a reasonable method to calculate the separate rate because the 57.36 percent was not reasonably reflective of potential dumping margins of the

---

the "separate rate" rather than the "all-others rate."

[4] *Statement of Administrative Action*, accompanying H.R. Rep. No. 103-826(I) (1994), reprinted in 1994 U.S.C.C.A.N. 4040.

separate rate companies.   Over the course of three rounds of remands, the lower Court and separate rate appellants maintained that Commerce had not demonstrated how the 57.36 percent rate was reasonably reflective of the separate rate companies' potential dumping.   Each of Commerce's attempts to justify this rate cherry-picked record evidence and ignored other record evidence, including the fact that the separate rate companies are cooperating companies like Chengen. The lower Court in three remand opinions kept instructing Commerce to find support or calculate an alternative rate.   Finally, in the fifth remand, Commerce determined it had no choice but to assign Chengen's margin as the separate rate.

Now on appeal, Defendants-Appellants raise the same arguments that failed at the lower Court.   Defendants-Appellants have not shown from substantial evidence on the record that Chengen's zero margin is not reasonably reflective of the separate rate companies' potential dumping.   Likewise, Defendants-Appellants have not shown how the 57.36 percent is reasonably reflective.   This Court should uphold Commerce's application of the zero percent margin to the separate rate companies.

**A.** **The 57.36 percent Margin is Not Reasonably Reflective of the Separate Rate Companies' Potential Dumping.**

The total adverse rate applied to the non-cooperating respondent, 114.72 percent was derived from the Petition rate. The Petition rate is based entirely on information provided by the petitioner, unlike information from the course of the review where data is subject to verification and other parties can submit alternative, corrective, and clarifying information. The Petition rate is derived from the two price quotes from a single Chinese exporter and an estimated normal value cost developed solely by petitioner. Price quotes are generally considered unreliable by Commerce because they are unverified and are not actual sale prices. *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 10545 (March 11, 2009) and accompanying IDM at Cmt 3 ("The Department typically does not use price quotes as the basis of surrogate values because price quotes are not publicly available and do not reflect numerous transactions."); *Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 2013-2014, 80 Fed. Reg. 69,942 (November 2005) and accompanying IDM at Comment 5 (The Department notes that certain freight rates "were based on a price quote and not actual expenses, which renders their data unreliable as surrogates…[T]he Department often does not know the conditions

under which price quotes were solicited and whether or not these were self-selected from a broader range of quotes."). These price quotes were then compared to normal value that petitioner calculated from information from a U.S. manufacturer, which are all estimated costs rather than actual costs. Parties had also highlighted significant differences between U.S. and Chinese manufacturing in the plywood industry. Appx404-405.

In contrast, Chengen's margin is based on actual verified sales data from hundreds of sales and verified production data directly linked to those sales. While this type of estimated cost and price quote calculation is ordinary for the Petition, the Petition rate is only used as a basis to start an investigation or for adverse rates. It is very different to use this Petition information, as Commerce attempts to do here, to argue it is reflective of the separate rate companies' dumping behavior.

Defendants-Appellants attempt to argue this, by "tethering" the two Petition price quotes to actual transactions of the separate rate companies. U.S. Br. at 56-58. Specifically, the two price quotes in the Petition come from a company that went on to file a separate rate application. The separate rate application requires a single sales package. Defendants-Appellants then compared the single commercial invoice in the separate rate application to the Petition price quotes and

found them to be almost identical, thus justifying that the Petition rate is reasonable for all of the separate rate companies.   This comparison is flawed in several respects.   First, this only addresses one side of Petition rate.   This does nothing to address petitioner's normal value calculation in the Petition.   The underlying factor data is based on mere estimates rather than the actual factor data collected and verified in the course of the investigation.   The data is also based on surrogate date from an entirely different country than Commerce actually relied upon in the investigation.

Second, this comparison is still for only one commercial invoice price from one company—that is hardly a basis to find the Petition rate is reasonably reflective of all of the separate rate companies and their numerous transactions during the period of investigation.   Moreover, the presence of a single sale with a lower price than Chengen's lowest sales price does not indicate the company would be dumping overall, especially at 57.36%.

The United States also attempts to further corroborate the Petition rate as a reasonable estimate of dumping by looking at additional invoices in a supplemental SRA questionnaire from the Petition SRA Exporter.   U.S. Br. at 59.   However, these invoices were for the company's own purchases of plywood in China from its own suppliers, and not additional sales of subject merchandise to the United States.

*See*, e.g., Appx6587, Appx6620-6627.    These also do not corroborate that the

Petition rate is reasonably reflective of potential dumping in the United States.

Critically, the information Defendant-Appellants have argued supports the

Petition rate as reflective is only a small portion of data on the record.    *USX Corp.*

*v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987) (Moreover,

Commerce's determination cannot be based on "isolated tidbits of data which

suggest a result contrary to the clear weight of the evidence.").    The information

from the other separate rate applications and from Jiangyang Wood, a company

that was assigned the separate rate but also filed full voluntary questionnaire

responses on their sales and production, demonstrates that the Petition rate is not

reasonably reflective of the separate rate companies' dumping.    The full record of

information supports that Chengen's rate is actually reasonably reflective of their

dumping.

In making these comparisons, it is also important to understand a fact that

both Defendant-Appellants ignore in their analysis—Chengen's margin was not

actually zero but was a steeply negative margin.    Chengen margin is merely

reported at, i.e., netted to zero by convention. Chengen's margin is actually much

lower at [[ margin ]]%.    Second Remand Results Analysis Memorandum (June 18,

2020); Appx9462.    For the sake of public record, Chengen's margin is

approximately negative 50%.   For this reason, the Defendants-Appellants additional arguments comparing the SRA exporter prices to Chengen must also fail.   In the same vein of arguing the Petition is tethered to separate rate companies' dumping, Defendants-Appellants submit that SRA exporter is evidence that separate rate companies are dumping because the Petition price quote (and SRA commercial invoice) is 20 percent lower than Chengen's prices for a similar product that Chengen sold.   However, even adjusting Chengen's sales prices to be 20% lower, the margin would still be steeply negative when the actual normal values assigned by Commerce are considered, at approximately -40%.   Therefore, regardless of the information the Department cites to supposedly corroborate the Petition SRA Exporter's price quotation in the Petition (only 20% lower than Chengen's price), it does not support the application of the 57.36% margin to SRA companies.   Rather, Commerce's supposed reflective rate is inflated by almost 100 absolute margin points.

Chengen's sales prices ranged from [[ price        ]] USD/M3, with a weighted-average price of [[ price ]] USD/M3.   Appx5859-5864.   Even looking at the data from the separate rate companies that Commerce itself compiled in the third remand, shows that numerous SRA companies had sales prices in the range of or higher than Chengen's sales prices.   *See* Dep't Third Remand Results (March 22,

2021) at Attachment 1, Appx429, Appx477-478. For example, for birch plywood (same material as Chengen's plywood) sales invoices in the SRA companies' applications, the prices ranged from [[ price range ]] USD/M3 compared to Chengen's lowest selling price of [[ price ]] USD/M3. *See* Third Remand Results at 20, Appx448. Taking only the companies with sales prices' lower than Chengen, the prices are not so much lower as to justify the increase from-50% to 57.36%. Further, the Petition SRA Exporter, the basis of the Department initial pricing comparisons, actually had two sales of birch plywood in its sales package in the separate rate application. The first had a price of [[ price ]] USD/M3 and the second had a price of [[ price ]] USD/M3. Petition SRA Exporter SRA at Exhibit 1; Appx2155, Appx2179, Appx2182, Appx2191. Thus a fuller analysis even of the limited information from this single company does not support Commerce's position.

The record also contains more detailed information from one separate rate company, Jiangyang Wood. Notably, before the lower Court when Jiangyang Wood raised that its own data could be used to corroborate a separate rate or as the separate rate, Commerce rejected the comparison because there was no "further inquiry in the form of a supplemental questionnaire" and the data was unvetted. Third Remand Results, Appx471-472. Of course, the Petition rate was not

subject to further inquiry and was not vetted or verified; and Jiangyang's data was only "unvetted" because Commerce refused to accept a replacement voluntary mandatory respondent.    *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Discussing Commerce's limiting the number of respondents and cautioning that the resulting lack of information was "a creature of its own making.").    Jiangyang Wood provided full questionnaires on the record, including a contemporaneous sales database with over 200 sales.    Jiangyang Wood's sales prices ranged from [[ price rnage ]] USD/M3, with a weighted-average price of [[ price ]] USD/M3.    Jiangyang Wood Section C Qre at Exhibit C-1; Appx2857, Appx2920-2931.    Jiangyang Wood, also an SRA Plaintiff, actually had a higher weighted average sales price than Chengen.    What is most significant, in the reasoning of the lower court in *Changzhou Hawd*, is that Jiangyang's data was submitted with the expectation of verification and thus is deserving of credence in light of Commerce's reticence in not selecting a broader sample of exporters for the investigation.

Defendant-Appellants' conclusion that the SRA companies' pricing is different than Chengen's pricing or that these companies are dumping at such materially higher levels than Chengen is not supported by the record at all.    This evidence from the entire record that Commerce is obligated to consider does not

support the Department's conclusion that the SRA Plaintiff margin must be higher than 0%. Even if some companies had a lower sales price than Chengen on one sale, this does not entail that the margin of 57.36 percent is reasonably reflective of their potential dumping rather than Chengen's margin, particularly in light of the fact that Chengen's margin is actually steeply negative, at -50%.

When considering the record as a whole, the determination that a 57.36% margin is representative of the SRA Plaintiffs potential dumping is not supported by substantial evidence. Instead, the Department has ignored record evidence. "[S]ubstantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (*quoting Universal Camera*, 340 U.S. at 487).

### B. Chengen's Margin is Reasonably Reflective of the Cooperating Separate Rate Companies' Potential Dumping.

As demonstrated above, a comparison of the information on the record from the other separate rate companies corroborates that their pricing was similar to

Chengen. Even for those examples where sales prices were lower than Chengen's, they were not so much lower than Chengen's as to possibly find that a 57.36% margin is reasonably reflective of any potential dumping when Chengen's margin was -50%. Further, Defendant-Appellants also do not adequately address the overarching issue that applying a total AFA margin to the cooperating SRA Plaintiffs is unreasonable and not reflective of their potential dumping *per se*.

The *Bestpak* Court held that it was unreasonable to ascribe to cooperating exporters found to be separate from the Chinese State any rate assigned to such a state-controlled entity. The Department is averaging a total adverse facts rate and a *de minimis* rate for fully cooperating respondents in contravention of the clear holding of *Bestpak*. *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) ("Although Commerce may be permitted to use a simple average methodology to calculate the separate rate, the circumstances of this case renders a simple average of a *de minimis* and AFA China wide rate unreasonable as applied. Similarly, a review of the administrative record reveals a lack of substantial evidence showing that such a determination reflects economic reality."). The *Bestpak* panel found the evidentiary support for the Department's methodology—attributing the theoretical adverse AD rate of the PRC Entity to the cooperating separate rate exporters—severely lacking:

This court does not find Commerce's late attempt to backfill with these AUV estimates, untethered to the three respondents' actual dumping margins, as amounting to substantial evidence. Commerce only received detailed information from one mandatory respondent: Yama. Jintian's estimated AUV, with little connection to its calculated dumping margin, is not enough. In other words, Commerce really only had one substantiated and calculated basis for dumping margins and that information came from Yama. Commerce cannot base a determination of economic reality on such slim findings. There must be more.

*Bestpak* at 1379.

In *Changzhou Hawd*, drawing on *Albemarle*, the Court observed that the record not only contained no information to suggest the separate rate firms were not similar to the cooperating respondents, but in fact, the only reasonable way to construe the record was to support a finding that cooperating respondents *are* similar to the cooperating respondent. *Changzhou Hawd*, 848 F.3d at 1012 (Indeed, under Commerce's reasoning, the separate-rate firms' decisions to respond to the questionnaires might suggest that they are more similar to other firms, like the mandatory respondents, that responded.").   The separate rate companies have responded to all inquiries made by the Department.   They have established they are separate from the Chinese Government.   They have fully cooperated. Following court precedents and the premise of the statutory provision for limiting individual review, the Department must assume that these separate rate companies' pricing behavior is similar to the pricing behavior of the cooperating respondent,

Chengen.  The specific record information on this appeal discussed above (i.e. the other pricing data on the record) also only supports this conclusion.

United States criticizes the lower Court for reweighing the evidence, and failing to affirm Commerce's determination as supported by substantial evidence, even if some evidence detracts from Commerce's conclusion.  U.S. Br. at 60. However, it was not that "some evidence detracts," it was the full weight of the evidence that a reasonable mind could not find supports Commerce's earlier decision.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

For the above reasons, Plaintiffs-Appellees submit that this Court should

affirm the lower Court's ruling affirming the Remand Redetermination.

Respectfully submitted,

**/s/ Gregory S. Menegaz**

Gregory S. Menegaz
Alexandra H. Salzman
J. Kevin Horgan
DeKieffer & Horgan, PLLC
1156 Fifteenth Street, NW
Suite 1101
Washington, DC 20005
(202) 783-6900
July 17, 2024                              *Counsel for Plaintiffs-Appellees*
                                           *Chengen, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2024-1258-1259

**Short Case Caption:**  Linyi Chengen Import and Export Co., Ltd. v. US

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑     the filing has been prepared using a proportionally-spaced typeface and includes  13589  words.

☐     the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐     the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/17/2024

Signature:  /s/ Gregory S. Menegaz

Name:  Gregory S. Menegaz

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2024-1258-1259

**Short Case Caption:** Linyi Chengen Import and Export Co., Ltd. v. US

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains <u>10</u> number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 07/17/2024

Signature: /s/ Gregory S. Menegaz

Name: Gregory S. Menegaz