## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LINYI CHENGEN IMPORT AND EXPORT CO., LTD., CELTIC CO., LTD., JIAXING GSUN IMPORT & EXPORT CO., LTD., SUQIAN HOPEWAY INTERNATIONAL TRADE CO., LTD., ANHUI HODA WOOD CO., LTD., SHANGHAI FUTUWOOD TRADING CO., LTD., LINYI EVERGREEN WOOD CO., LTD., XUZHOU JIANGYANG WOOD INDUSTRIES CO., LTD., XUZHOU TIMBER INTERNATIONAL TRADE CO. LTD., LINYI SANFORTUNE WOOD CO., LTD., LINYI MINGZHU WOOD CO., LTD.,

*Plaintiffs – Appellees*
*(Case caption continued on next page)*

Appeal from the United States Court of International Trade in
Case No. 1:18-CV-00002
Judge Jennifer Choe-Groves

## REPLY BRIEF OF DEFENDANT-APPELLANT
## COALITION FOR FAIR TRADE IN HARDWOOD PLYWOOD

Timothy C. Brightbill, Esq.
Maureen E. Thorson, Esq.
Jeffrey O. Frank, Esq.
Stephanie M. Bell, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

Dated: August 30, 2024

*(Case caption continued)*

XUZHOU ANDEFU WOOD CO., LTD., SUINING PENGXIANG WOOD CO., LTD., XUZHOU SHENGPING IMPORT AND EXPORT CO., LTD., XUZHOU PINLIN INTERNATIONAL TRADE CO. LTD., LINYI GLARY PLYWOOD CO., LTD., LINYI LINHAI WOOD CO., LTD.,

LINYI HENGSHENG WOOD INDUSTRY CO., LTD., SHANDONG QISHAN INTERNATIONAL TRADING CO., LTD., SUZHOU ORIENTAL DRAGON IMPORT AND EXPORT CO., LTD., LINYI HUASHENG YONGBIN WOOD CO., LTD., QINGDAO GOOD FAITH IMPORT AND EXPORT CO., LTD., LINYI JIAHE WOOD INDUSTRY CO., LTD., JIAXING HENGTONG WOOD CO., LTD., XUZHOU LONGYUAN WOOD INDUSTRY CO., LTD., FAR EAST AMERICAN, INC., ZHEJIANG DEHUA TB IMPORT & EXPORT CO., LTD., TARACA PACIFIC, INC., RICHMOND INTERNATIONAL FOREST PRODUCTS, LLC,

*Plaintiffs – Appellees*

HIGHLAND INDUSTRIES INC., JIASHAN DALIN WOOD INDUSTRY CO., LTD., HAPPY WOOD INDUSTRIAL GROUP CO., LTD., JIANGSU HIGH HOPE ARSER CO., LTD., SUQIAN YAORUN TRADE CO., LTD., YANGZHOU HANOV INTERNATIONAL CO., LTD., G.D. ENTERPRISE LTD., PIZHOU JIN SHENG YUAN INTERNATIONAL TRADE CO., LTD., XUZHOU SHUIWANGXING TRADING CO., LTD., COSCO STAR INTERNATIONAL CO., LTD., DEQING CHINA-AFRICA FOREIGN TRADE PORT CO., LTD., LINYI CITY DONGFANG JINXIN ECONOMIC & TRADE CO., LTD., FABUWOOD CABINETRY CORP., LINYI CITY SHENRUI INTERNATIONAL TRADE CO., LTD., JIANGSU QIANJIUREN INTERNATIONAL TRADING CO., LTD., QINGDAO TOP P&Q INTERNATIONAL CORP., CANUSA WOOD PRODUCTS LTD., HOLLAND SOUTHWEST INTERNATIONAL INC., LIBERTY WOODS INTERNATIONAL, INC., NORTHWEST HARDWOODS, INC., USPLY LLC, SHANDONG DONGFANG BAYLEY WOOD CO., LTD., CONCANNON CORP.,

*Plaintiffs*

v.

UNITED STATES, COALITION FOR FAIR TRADE OF HARDWOOD PLYWOOD,

*Defendants – Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-1258-1259 |
| **Short Case Caption** | Linyi Chengen Import and Export Co., Ltd. v. US |
| **Filing Party/Entity** | Coalition for Fair Trade of Hardwood Plywood - Defendant-Appellant |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/28/2023

Signature: /s/ Timothy C. Brightbill

Name: Timothy C. Brightbill

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Coalition for Fair Trade of Hardwood Plywood | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable               ☐    Additional pages attached

| | | |
|---|---|---|
| Adam M. Teslik | Jeffrey O. Frank | Usha Neelakantan |
| Derick G. Holt | Laura El-Sabaawi | |
| Elizabeth S. Lee | Cynthia C. Galvez | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable               ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................1

II.    BACKGROUND ...........................................................1

III.   ARGUMENT.................................................................4

       A.      Substantial Evidence Supports Commerce's Conclusion that Chengen Failed to Substantiate Log Volumes. ..............................4

            1.       It is irrelevant whether the formula is the Chinese National Standard.......................................................5

            2.       Nothing in the record establishes the accuracy of the formula. ..................................................................8

            3.       The Record Supports Commerce's Conclusion Regarding Third-Party Substantiation of Chengen's Log Volumes....................................................9

       B.      Commerce's Decision to Use the Intermediate Input Methodology Is Supported by Substantial Evidence .........................12

       C.      Commerce's Calculation of the Separate Rate Is Supported by Substantial Evidence and Should Be Reinstated ..................................................................15

            1.       The Court must decline Appellees' invitation to reweigh evidence...................................................16

            2.       Appellees' reliance on Bestpak is misplaced............................24

       D.      Commerce Failed to Adequately Explain the Exclusion of Certain Separate Rate Respondents from the Order. ..........................30

IV.    CONCLUSION.............................................................30

## <u>STATEMENT OF CONFIDENTIAL MATERIALS OMITTED</u>

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted from page 18 describes the size of one of the separate rate applicants.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beker Indus. Corp. v. United States,*
   7 CIT 313 (1984) ...........................................................................9

*Bosun Tools Co. v. United States,*
   No. 21-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022).....................28, 29, 30

*Changzhou Wujin Fine Chem. Factory Co. v. United States,*
   701 F.3d 1367 (Fed. Cir. 2012) .........................................................23

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966)................................................................*passim*

*In re Davis,*
   960 F.3d 346 (6th Cir. 2020) ............................................................27

*Downhole Pipe & Equip., L.P. v. United States,*
   776 F.3d 1369 (Fed. Cir. 2015) ...............................................*passim*

*Fla. Tomato Exch. v. United States,*
   973 F. Supp. 2d 1334 (Ct. Int'l Trade 2014) .......................................9

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ...........................................................9

*Gallant Ocean (Thailand) Co. v. United States,*
   602 F.3d 1319 (Fed. Cir. 2010) ..........................................26, 27, 28

*Gov't of Quebec v. United States,*
   105 F.4th 1359 (Fed. Cir. 2024) .........................................................8

*Nan Ya Plastics Corp. v. United States,*
   810 F.3d 1333 (Fed. Cir. 2016) ....................................................3, 28

*SeAH Steel VINA Corp. v. United States,*
   950 F.3d 833 (Fed. Cir. 2020) .......................................2, 12, 15, 20

*St. Joseph Stock Yards Co. v. United States,*
   298 U.S. 38 (1936)..........................................................................21

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
716 F.3d 1370 (Fed. Cir. 2013) ....................................................*passim*

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) .............................................................5

19 U.S.C. § 1673d..........................................................................29

19 U.S.C. § 1673d(c)(5)(B) ...........................................................26

19 U.S.C. § 1677e(d)(3)..................................................................26

**Administrative Materials**

*1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's
Republic of China*, 74 Fed. Reg. 10,545 (Dep't Commerce Mar.
11, 2009) .....................................................................................19

*Fresh Garlic from the People's Republic of China*, 71 Fed. Reg.
26,329 (Dep't Commerce May 4, 2006).......................................13

*Steel Wire Garment Hangers from the People's Republic of China*, 80
Fed. Reg. 69,942 (Dep't Commerce Nov. 12, 2015)......................19

## I.    INTRODUCTION

The Coalition hereby replies to the response briefs filed on July 17, 2024 by
Plaintiff-Appellees Chengen, Richmond International Forest Products, LLC and
Taraca Pacific, Inc. (collectively, "R&T"), and Zhejiang Dehua TB Import & Export
Co., Ltd. ("Zhejiang") (collectively "Appellees"). *See* Resp. Br. of Chengen (July
17, 2024), ECF No. 42 ("Chengen Opp."); Resp. Br. of R&T (July 17, 2024), ECF
No. 40 ("R&T Opp."); Resp. Br. of Zhejiang (July 17, 2024), ECF No. 38 ("Zhejiang
Opp.").[1]

## II.    BACKGROUND

This appeal arises from the CIT's results-oriented review of an antidumping
investigation into Chinese hardwood plywood. The investigation's purpose was to
counteract Chinese companies' sales of plywood in the U.S. market at unfairly low
prices.  "Commerce selected two Chinese plywood manufacturers, Bayley and
Chengen, for individual examination. Appx6856. Bayley's adverse dumping margin
of 114.72% is not under appeal.  Appx6875, Appx6879-6885; Appx8529-8532; *see
also* Appx15-19.

---

[1]    Defined terms retain their meanings from the Coalition's opening brief.
Unless otherwise noted, all emphasis in this brief has been added, and all internal
quotations, citations, and alterations have been omitted.

Commerce's investigation into Chengen centered on the appropriate methodology for calculating Chengen's margin. *See* Appx9075; Appx8540. Commerce repeatedly considered—and rejected—Chengen's argument that calculating dumping margins based on raw materials—including logs—would yield more accurate results than using intermediate inputs—in this case, veneers. Appx8540-8544; Appx9047-9048; Appx330-333; Appx369. Because Commerce found that it could not verify the quantities of logs Chengen used to produce hardwood plywood, the agency determined that a veneer-based calculation ensured a more accurate result. Appx8992; Appx9047-9048; Appx369. Commerce applied the resulting 183.36% margin to Chengen and all separate rate applicants. Appx8992.

Dissatisfied with Commerce's decision, the CIT essentially instructed the agency to accept Chengen's log volume calculations as accurate. *See* Appx122-125. In so doing, the CIT committed legal error, overstepping the bounds of its authority by second-guessing Commerce's choice and imposing its own standard on Commerce's investigation. *See SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 837 (Fed. Cir. 2020).

The CIT compounded this error in its third, fourth, and fifth remand orders. Those decisions focused on the appropriate margin for the separate rate applicants. *See* Appx138-143; Appx153-163; Appx173-191. Upon a careful review of the

record, Commerce averaged Bayley's China-wide margin—which was based on the original petition rates—and Chengen's zero margin—which was calculated under protest. Commerce explained the statutory and evidentiary rationale for this approach *four* times. Appx387-389, Appx416-424; Appx432-435; Appx501-506. Each time, Commerce referenced record evidence demonstrating that the separate rate applicants were likely engaged in dumping behavior and that their dumping margins were likely as high as the China-wide rate. Appx387-389, Appx416-424; Appx432-435; Appx501-506. Nevertheless, the CIT persistently substituted its own interpretation of the record for Commerce's reasoned, expert view. *See* Appx138-143; Appx153-163; Appx173-191.

As this Court has explained, allowing the CIT to replace the agency's reasoned decision-making with what it "perceives to be the best or correct result would render judicial review totally unpredictable." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1345 (Fed. Cir. 2016). The CIT's remand decisions should be reversed, and Commerce's original decision should be reinstated. In the event this Court disagrees with Commerce's original and first remand decisions, this Court should at a minimum reinstate Commerce's decision to calculate the separate rate as an average of Bayley's and Chengen's rates.

## III.  ARGUMENT

The Court should reinstate Commerce's original decision to calculate Chengen's margin based on intermediate inputs (veneers). Commerce applied this method after finding that Chengen failed to demonstrate that it accurately recorded its log volumes—a finding that is supported by substantial evidence. If the Court instead upholds Commerce's subsequent decision—made under protest—to calculate Chengen's rates using primary inputs, the Court should at least reinstate Commerce's decision to set the separate rate as an average of Bayley's and Chengen's margins.  If the Court declines to do so, it should nonetheless remand Commerce's final remand determination excluding certain separate rate applicants from the Order.

### A.  Substantial Evidence Supports Commerce's Conclusion that Chengen Failed to Substantiate Log Volumes.

Appellees argue that the record supports a finding that Chengen accurately recorded the volume of logs it used in producing plywood.  *See* Chengen Opp. at 30-37.[2]  But like the CIT, Appellees turn the relevant judicial inquiry on its head.  The question is not whether the record theoretically permits the conclusion that Chengen accurately records log quantities.  The question is whether substantial evidence supports Commerce's original (and repeated) finding that Chengen failed to

---

[2]    Appellees R&T and Zhejiang join Chengen's arguments regarding Chengen's margin.  Zhejiang Opp. at 5; R&T Opp. at 6-7.

substantiate the accuracy of its log volume calculations. *See Downhole Pipe &*
*Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015). The answer to
this question is yes—and, thus, Commerce's original determination must be
reinstated. *See* 19 U.S.C. § 1516a(b)(1)(B).

The thrust of Appellees' counterargument is that Chengen accurately
determined and recorded its log quantities because it used a formula—purportedly
the Chinese National Standard—to calculate log volumes. Chengen Opp. at 33-37.
As a threshold matter, Appellees contend that it was appropriate for the CIT to order
Commerce to admit the entirety of this so-called National Standard into the record—
even though Commerce only discovered the document by happenstance during a
visit to Chengen's facilities at verification. *Id.* 19-29. Appellees then argue that
Chengen's log volume calculations are accurate because the standard is *per se*
reliable. *Id.* 33-37. Finally, Appellees assert that the accuracy of Chengen's log
volumes are corroborated by third parties. *Id.* 30-32. These arguments fly wide of
the mark.

### 1. It is irrelevant whether the formula is the Chinese National Standard.

Appellees argue that the CIT did not err in ordering Commerce to accept the
entirety of a document purporting to be the Chinese National Standard for
determining log volumes into the administrative record, on the basis that it was a

national standard. *Id.* 19-29. This argument is a canard.[3] As Commerce explained, whether the formula Chengen used to calculate log volumes derives from the Chinese National Standard is irrelevant to Commerce's finding that Chengen has not established the reliability of its log volume records. *See* Appx331 (noting lack of explanation for "relevance of the{} variables {used in the standard} to calculating the volume of an irregularly shaped organic object"); Appx331-332 ("{E}ven if this formula were the Chinese National Standard, there is nothing on the record to suggest that it is a widely adopted standard, how many other competing standards or measurement methodologies exist, or the degree of accuracy of any of those methodologies or standards.").

Rather, the critical issue is whether the formula ensures accurate results. Substantial evidence supports Commerce's repeated conclusions that it does not. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966) (substantial evidence is "such relevant evidence" that "a reasonable mind might accept as adequate"). Commerce noted that the formula "relies only on the diameter of the smaller end of the log and its length," leading to a "derivation of log quantity" that

---

[3]    For the reasons explained in the DOJ and the Coalition's opening briefs, it was legal error for the CIT to order Commerce to accept the entirety of the alleged Chinese National Standard into the record. *See* Coalition Opening Br. (May 10, 2024), ECF No. 27 at 22-24; DOJ Opening Br. (May 10, 2024), ECF No. 28 at 38-50. But more fundamentally, admitting the entirety of the document does not alter Commerce's findings regarding the imprecision of Chengen's log volume calculations.

is "inherently imprecise." Appx8541. The formula is mathematically problematic because "if one were to consider a tapered cylinder and only measure the volume of a straight cylinder from the narrower end, the difference between the volume of the tapered cylinder and the straight cylinder would be completely unaccounted for . . . {T}his effect may be even more pronounced in this case because logs are not a perfect form but, rather, irregularly shaped, organic objects . . . ." *Id.*

On remand, Commerce reiterated that "{t}he formula considers only two variables," namely "length and small-end diameter." Appx331, Appx9081. The formula derives volume "based on 0.7854 times the length of the log, 0.005 times the length of the log squared, 0.0000125 times the length of the log, 14 minus the length of the log squared, and diameter of the log minus 10 squared." Appx331, Appx9081. There is no explanation for the use of these variables in calculating the volume of an irregularly shaped organic object. And nothing in the record, or the formula itself, demonstrates that it accurately calculates log volumes. Appx331. A reasonable mind might accept this evidence—based on the record and mathematics—as adequate to support Commerce's determination that Chengen failed to demonstrate that the formula "yield{s} accurate log volumes." Appx333; *see Consolo*, 383 U.S. at 620.

## 2. Nothing in the record establishes the accuracy of the formula.

Appellees also argue that Commerce should have accepted the formula—and any calculations derived therefrom—as accurate *per se* because (1) "Commerce uses a standard formula to reliably derive weight for non-uniform inputs in its normal practice;" (2) "Commerce conducts numerous wood and log investigations/reviews" and thus knows "it is a common industry practice to measure log volume using the smaller end;" and (3) "the European standard allows for this method, and it is the most common method in the United States." Chengen Opp. 34-35. These arguments are insufficient to overcome Commerce's reasoned conclusion that the formula is of dubious reliability.

*First*, Commerce is not required to accept the accuracy of the formula Chengen allegedly uses to determine log volumes in this case simply because it has relied on other formulas to determine volumes of other products in unrelated cases. *See Gov't of Quebec v. United States*, 105 F.4th 1359, 1371 (Fed. Cir. 2024) (rejecting argument that Commerce must provide compelling evidence to disregard auditor's findings in one case because it relied on auditor's findings in an unrelated case).

*Second*, Appellees assert that Commerce's conclusion regarding the formula's reliability should be ignored because Commerce knows the industry. Chengen Opp. at 34. The opposite is true. Congress requires the court to defer to Commerce's

factual determinations precisely because Commerce conducts "numerous wood and log investigations/reviews" and is familiar with common industry practices. *Id.*; *see also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

*Finally*, Appellees reference to European and U.S. standards is a backdoor attempt to belatedly supplement the record. "{J}udicial review" of the Department's decisions "is confined to the administrative record." *Fla. Tomato Exch. v. United States*, 973 F. Supp. 2d 1334, 1338 (Ct. Int'l Trade 2014) (citing cases). Accordingly, this Court may not consider evidence regarding the alleged similarities between the Chinese National Standard and the methods supposedly used in Europe and the United States to determine log volume. *See Beker Indus. Corp. v. United States*, 7 CIT 313, 316 (1984) ("the formal record{} is the only information upon which the factual findings and legal conclusions underlying the challenged determination could have been based"). The Court should ignore Appellees' references to extraneous proceedings and standards. *See id.* at 317.

### 3. The Record Supports Commerce's Conclusion Regarding Third-Party Substantiation of Chengen's Log Volumes.

Appellees' last argument likewise ignores the standard of review. Appellees argue that Chengen's log purchase volumes are corroborated by suppliers, the Chinese government, and Chengen's auditors. Chengen Opp. at 30-32. Consequently, Appellees assert that "Chengen's documentation of its log purchase quantity is reliable." *Id.* at 32.

As an initial matter, the lack of third-party verification was ancillary to Commerce's determination that Chengen could not substantiate its log volume calculations. Rather, Commerce focused on the fact that—contrary to mathematical principles—"Chengen's consumption calculation relies only on the diameter of the smaller end of the log and its length." Appx8541. Commerce merely noted that the inherent inaccuracy in Chengen's calculation methodology was compounded by Commerce's inability to "cross-check Chengen's reported consumption . . . against any third-party sources." *Id.*

More fundamentally, Appellees' arguments amount to nothing more than an attempt to reweigh the evidence. Commerce explained that "the quantity of delivered logs is calculated and recorded by Chengen. . . . {T}he log suppliers who deliver the logs to Chengen mark the diameter of the small end of the logs," and Chengen's production manager "spot checks the diameter" upon delivery. The manager "then calculates the volume of logs" based on the formula and "records those calculated quantities on warehouse in-tickets." Appx316. From there, Chengen "generated {its} VAT invoices itself based on the warehouse-in tickets and accounting vouchers, which contained volumes Chengen also calculated on its own using the conversion table and formula." Appx340. At no point in the process did any third party check the accuracy of Chengen's calculations. *See id.*

Appellees do not dispute the basic fact underlying Commerce's determination, *i.e.*, that Chengen alone computes and records the volume of logs it receives. Instead, Appellees argue that the record supports an alternative interpretation of the facts. Appellees assert that a supplier's "acceptance of the warehouse-in ticket" reflecting Chengen's volume calculation can be viewed as "corroboration from a third party" because "{n}o supplier would deliver a raw material . . . without any knowledge of the amount they sold." Chengen Opp. at 31. But, as Commerce explained, accepting the tickets is not tantamount to confirming Chengen's volume calculations because it is impossible to tell "whether the seller was concerned with the quantity identified on Chengen's warehouse-in tickets" or just "the total value of the transaction." Appx360.

Appellees also assert that the Chinese Government corroborates log volumes by tracking VAT invoices that Chengen prepares. Chengen Op. 31. But tracking these invoices does not make the government "privy to how the volumes underlying the invoices were generated and if they were indeed accurate." Appx360.

Finally, Appellees allege that log purchase documents are "ultimately reconciled to a financial statement audited by a third-party." Chengen Op. 31-32. However, these statements "summarize the financial position of the company and have no component for quantity." Appx360. Commerce thus reasonably concluded that "it is unclear how Chengen's auditors and the tax authority would validate the

quantities reported to Commerce or against what information they would compare those quantities." *Id.* The Court should decline Appellee's invitation to reweigh this evidence. *Consolo*, 383 U.S. at 620.

**B.      Commerce's Decision to Use the Intermediate Input Methodology Is Supported by Substantial Evidence**

Commerce's determination that "it is appropriate to apply the intermediate input methodology" to calculate Chengen's dumping margin resulted from Chengen's inability "to accurately record and substantiate the major inputs used to produce veneers." Appx8541 (original determination); Appx341 (first remand); Appx 440 (third remand) (explaining Commerce "continue{s} to maintain" that the "decision to apply the intermediate input methodology" was "warranted").   As explained above, Commerce's conclusion is based on substantial evidence and, thus, must be upheld. *SeAh Steel*, 950 F.3d at 842-43 ("{W}here Commerce is confronted with two alternatives (both of which have their good and bad qualities), and Commerce has a preferred alternative, substantial evidence review means that we will not second-guess Commerce's choice."). Appellees nevertheless ask the Court to second-guess Commerce's choice to use the intermediate methodology because: (1) this case is inapposite to agricultural cases in which Commerce has applied the intermediate methodology previously; (2) Commerce used log quantities rather than veneers to determine margins in a case involving wood flooring; and (3) Chengen's

veneer measurements are "much more hypothetical" than the hypothetical log measurements. Chengen Opp. at 38-41. These arguments are unavailing.

*First*, although Appellees contend Commerce has previously applied the intermediate methodology only in agricultural cases with facts "*completely different than*" those here, this case is like those agricultural cases in a key respect. *Id.* at 39. All involve circumstances where Commerce concluded it could not adequately account for a significant element of cost in the primary inputs. *See Fresh Garlic from the People's Republic of China*, 71 Fed. Reg. 26,329, 26,331 (Dep't Commerce May 4, 2006) (final results and partial recission). As Commerce explained, "{t}his case d{oes} not involve the straight-forward, perfunctory purchase of a measurable product in which the respondent could immediately and accurately report the quantity of such purchase. Rather, the purchase of logs in this case was unusual {and imprecise} in many respects." Appx8541. The measurements are taken by hand and only spot checked for accuracy. Using such measurements to determine the volume of unpredictable, non-uniform, organic materials is inherently imprecise. And the formula that Chengen then applies to these measurements is obtuse and untested. Appx8542, Appx8544. It is also irrelevant that prior cases applying the intermediate input methodology involved agricultural goods, rather than wood product. Because Commerce's decision to use the intermediate methodology in this case was "well supported and fully explained" it must be upheld. *Downhole Pipe*, 776 F.3d at 1378.

*Second*, the facts of this case are distinct from the hardwood flooring case in which Commerce used log measurements to determine margins. Appx8543. The respondents in the flooring case did not use "a standard conversion table and formula" to "calculate the volume of logs." *Id.* In addition, Commerce observed a greater "level of precision in log quantity consumption tracking" in that case. *Id.* Finally, there, companies "purchased logs, sawn lumber, and veneers," whereas here Chengen's "entire production is based on self-produced veneers." *Id.* Commerce explained that since "the production of self-produced veneers is 100 percent in this case the intermediate input methodology will result in a more accurate . . . calculation." *Id.* Commerce's reasoned choice in this regard must stand. *Downhole Pipe*, 776 F.3d at 1378.

*Finally*, Commerce considered—and rejected—Appellees' argument that veneer measurements are "much more hypothetical" than logs. Chengen Opp. at 41. Commerce concluded that the "nominal measurements" for veneers "are based on the settings of a mechanical process . . . designed to produce consistent and reliable measurement results." Appx8544. The log volume measurements, in contrast, are reported using "measurements of the unpredictable growth of organic materials, measured only at the smallest end, and subjected to calculations{.}" *Id.* Commerce thus concluded that "nominal measurements of veneers, which are rectangular and uniformly shaped products of standard dimensions from machines designed to

produce consistent results, are inherently more accurate than the imprecise and approximate measurements of varying and irregularly shaped logs." *Id.* The Court should not second-guess Commerce's choice and should reinstate Commerce's original determination to use the intermediate input methodology. *SeAH Steel*, 950 F.3d 843.

## C. Commerce's Calculation of the Separate Rate Is Supported by Substantial Evidence and Should Be Reinstated

Should Commerce's original determination not be reinstated, the Court should nonetheless reinstate the 57.63% separate rate calculated in the second-fourth remand redeterminations because it is supported by substantial evidence. Appellees concede that Commerce's calculation of the separate rate is "supported by substantial evidence and otherwise in accordance with law" so long as it reflects "the only reasonable option to calculate the separate rate." R&T Opp. at 28. By Appellees' own logic, Commerce's application of Chengen's zero percent margin to the separate rate applicants—made under protest—cannot be sustained. Both Commerce and the CIT recognized that the zero percent margin was not reasonably reflective of the separate rate respondents' dumping behavior. Appx156-159. The zero percent margin is thus not a reasonable option.

In contrast, as Commerce repeatedly explained, the 57.36% separate rate that Commerce calculated by averaging Bayley's China-wide rate and Chengen's zero rate is reasonable, and it comports with congressional expectations. Appellees

counterarguments do nothing more than reweigh the evidence Commerce relied upon in reaching its second through fourth decisions; and Appellees rely extensively on the logic of a single case, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) to support their assertions. *Bestpak* is inapposite and cannot sustain the weight Appellees place upon it.

### 1. The Court must decline Appellees' invitation to reweigh evidence.

As Commerce explained in the second remand determination, "applying the 0.00 percent rate to the separate rate respondents" is "not appropriate" because it "would not be reasonably reflective of potential dumping margins" for the separate rate respondents. Appx388. Accordingly, Commerce opted to "take a simple average" of Chengen's zero rate and Bayley's rate, *i.e.*, "the highest petition rate . . . of 114.72 percent{.}" *Id.* Commerce explained that the dumping margins in the petition were based on "actual price quotes for subject merchandise" from China sold by one of the most significant exporters of plywood—an exporter that is also a separate rate recipient. Appx422. Those price quotes, in turn, supported margins "far in excess of the zero percent rate calculated for Chengen." *Id.*[4]

---

[4] Commerce's finding answers Chengen's argument that "Chengen's margin was not actually zero" but "steeply negative." Chengen Opp. at 55. Commerce pointed to numerous pieces of evidence demonstrating that the separate rate respondents sold their products at prices reflecting margins at least as high as the 114.72 % margin calculated in the petition. Appx422. In other words, neither a zero

On third remand, Commerce reiterated that the record "contains some information that can serve as a proxy for estimating . . . the selling behavior of the Separate Rate Plaintiffs," as well as an invoice that provided "evidence of actual commercial transactions" by one of the separate rate applicants. Appx445-446. That invoice indicated "an actual sale" of products "very similar" to those sold by Chengen at a price "almost identical" to those quoted in the Petition. Appx446. Commerce found it "reasonable to infer, given the actual . . . price, that this sale would have had a transaction-specific dumping margin in the range of the Petition rates." *Id.* Accordingly, "the prices that formed the basis for the dumping margins in the Petition are . . . supported by actual prices at which plywood was sold." *Id.*

Commerce also highlighted numerous "fact patterns" supporting the use of the Petition rates in setting the dumping margin for separate rate applicants. Commerce found that, like Chengen, 15 separate rate companies produced their own plywood. Of these, nine had sales at prices lower than Chengen's average sale prices, suggesting sales "at dumped prices." Appx450. More than half of the separate rate plaintiffs sold plywood at lower prices than Chengen—even though they purchased product through third parties—reinforcing the likelihood of dumping. Appx451-452. Commerce also analyzed invoices representing "a broad sampling . . . from a large

---

rate nor a negative rate is reflective of the dumping behavior evidenced by the separate rate applicants.

number of exporters," that allowed Commerce to "make observations from a consistent and uniform snapshot in time, *i.e.*, each exporter's first sale to an unaffiliated party in the United States." These, too, suggested dumping. Appx462-463.

On fourth remand, Commerce noted that further documentation provided by one of the separate rate applicants reflected "additional sales of identical plywood, in substantial quantities . . .at the same or even lower prices than the prices identified in the Petition." Appx524. Moreover, "the record includes multiple commercial invoices indicating" that the separate rate petitioner "made sales . . . at the same, or lower, prices than the price quote upon which the Petition rate is based." Appx525.

Appellees do not contest that Commerce considered the record evidence—but instead ask the Court to reweigh it. *First*, Appellees assert that the Petition rate cannot be "representative of the entire Chinese plywood industry" since it was based on data from [ size description ] exporter. R&T Opp. at 31. To the contrary, Commerce explained that the Petition rates were based on "actual price quotes" from an exporter that "was among the *significant exporters of plywood*." Appx422. Appellees further contend that price quotes are "generally considered unreliable." Chengen Opp. at 52. Appellees reference final determinations from two investigations into unrelated products. *Id.* In these cases, Commerce noted that price quotes are unreliable to "value factors of production." Issues and Decision Memorandum accompanying

*Steel Wire Garment Hangers from the People's Republic of China*, 80 Fed. Reg. 69,942 (Dep't Commerce Nov. 12, 2015) (final results of antidumping duty admin. rev.) at cmt. 5; Issues and Decision Memorandum accompanying *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China*, 74 Fed. Reg. 10,545 (Dep't Commerce Mar. 11, 2009) (final deter. of sales at less than fair value) at cmt 3 (price quotes generally not used for surrogate values). The factors of production are raw materials used to produce goods. In determining the costs of these production factors, Commerce prefers to use evidence of actual expenses. In contrast, here, Commerce considered a price quote provided by one of the separate rate respondents as a reasonable proxy for the price at which the respondent sold its plywood. *See* Appx521-522. The price quote was, moreover, supported by information on an invoice issued by the same separate rate respondent. *Id.* In any event, Commerce did not look solely at a price quote from one exporter, but highlighted multiple fact patterns that indicated the likelihood of sales at dumped prices by the separate rate applicants. Appx450.

*Second*, Appellees argue that the Petition rate is "unreliable" because the Petition used Thailand as a surrogate country, whereas Commerce used Romanian data in its final determination. R&T Opp. at 31-32; Chengen Opp. at 54; Zhejiang Opp. at 17. But Commerce explained that there is no "material difference between" the Thai and Romanian data. Appx464.

*Third*, Appellees critique Commerce's use of a commercial invoice to corroborate the accuracy of price quotes used to determine the Petition rate. R&T Opp. at 33; Zhejiang Opp. at 18-29. Commerce "infer{red}" that those price quotes reflected actual sales prices because they were almost identical to the price on a commercial invoice submitted by one of the separate rate respondents. Appx446. Appellees assert that this inference "is 'mere conjecture or supposition' and does not constitute substantial evidence." R&T Opp. at 33. But this Court has long held that substantial evidence includes "reasonable inferences from the record." *SeAh Steel*, 950 F.3d at 845.

*Fourth*, Appellees assert that Commerce "arbitrarily disregarded the opposite equally possible conclusion" that could be drawn from the record—namely that separate rate respondents' sales prices were lower than Chengen's because they had lower production costs. R&T Opp. at 34-35. But "the possibility of drawing two inconsistent conclusions from the evidence does not prevent" Commerce's "finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620.

*Fifth*, Appellees argue that "Commerce unlawfully ignored record evidence" suggesting the existence of sales at higher prices than Chengen's. R&T Opp. at 37; Zhejiang Opp. at 17-20. This is false. Commerce explicitly considered this evidence. Appx531. What Appellees really mean is that they wish Commerce had weighed the evidence of higher priced sales differently than the evidence of lower priced sales.

*See* R&T Opp. at 38; Chengen Opp. at 55; Zhejiang Opp. at 18. This Court cannot reweigh the evidence in the manner requested. *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 51 (1936) ("{T}he question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority.").

*Sixth*, Appellees assert that the commercial invoices Commerce reviewed to confirm the reasonableness of the separate rate methodology are not "representative of all types of plywood sold by the separate rate respondents or the pricing of those companies." R&T Opp. at 36; *See also* Zhejiang Opp. at 20-21. Appellees assume that Commerce "should parse out the separate rate companies into various groups," and assess "different levels of estimated dumping" depending on pricing structure or products sold. *See* Appx465. But Commerce's longstanding practice—consistent with 19 U.S.C. § 1673dI(5)(A)—is to determine a "single rate for those entities that were not individually examined." Appx465-466. Moreover, as Commerce explained, it analyzed invoices that "represented a broad sampling that is from a large number of exporters (*i.e.*, all of the separate rate companies that are party to this litigation.)" Appx462. And, while "the data for each exporter was limited, as a whole, Commerce was able to make observations from a consistent and uniform snapshot in time, *i.e.*, each exporter's first sale to an unaffiliated party in the United States{.}" Appx463. This "consistent and uniform snapshot" from "a large number

of exporters," Appx462-463, is "adequate to support" Commerce's conclusion, *see Consolo*, 383 U.S. at 619-20.

*Seventh*, and relatedly, Appellees cast Commerce's conclusion that "the separate rate respondents had different sales, and as a result, cost structures, than" Chengen as unreasonable. R&T Opp. at 39. Commerce found that whereas Chengen self-produced its plywood, the majority of the separate rate respondents were resellers. Appx447-448. Appellees dispute that resellers have a different cost structure than self-producers. R&T Opp. at 40. Appellees further assert that the minority of separate rate applicants that self-produce must have a cost structure like Chengen and, thus, are entitled to Chengen's rate. *Id.* Appellees ignore that Commerce specifically compared the sale prices of these separate rate self-producers to Chengen's sale prices and discovered "fact patterns" indicating a "likelihood of . . . sales being made at dumped prices." Appx450. More fundamentally, Appellee's argument again assumes that Commerce should apply different margins to different separate rate applicants—contrary to Commerce's practice and the plain language of the Tariff Act. *See* Appx465. To the contrary, as Commerce explained, by taking an average of Chengen's zero margin and the China-wide rate, Commerce accounted for potential "variation{s} between" these two data points. Appx531. The Court should decline Appellees' "invitation to reweight the evidence in order to

reject Commerce's conclusions, which were well supported and fully explained." *Downhole Pipe*, 776 F.3d 1378.

*Finally*, Appellees argue that applying an adverse facts available ("AFA") rate to cooperating separate rate companies "undercuts the cooperation-promoting goal of the AFA statute." Zhejiang Opp. at 15 (quoting *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1378 (Fed. Cir. 2012)). *Changzhou* is inapposite. That case concerned Commerce's decision to construct a hypothetical AFA rate in determining a cooperating respondent's separate rate. *Changzhou*, 701 F.3d at 1376. The sole purpose of that constructed AFA rate was "to serve as a value in the recalculation of the separate rate." *Id.* at 1376-77. It was not assigned to any individually investigated entity, it only affected cooperating respondents, and its entire purpose was to deter noncompliance. *Id.* at 1377-78. The court concluded that this method of calculating a separate rate was arbitrary and capricious because Commerce cherry-picked data to ensure "the most adverse margin possible." *Id.* at 1378. Here, in contrast, Commerce (1) applied the AFA rate to Bayley as a result of Bayley's noncooperation with the investigation; and (2) used the AFA rate in the determination of the separate rate after identifying substantial evidence confirming that the separate rate applicants likely engaged in dumping at rates as high as Bayley's. The approach was not results-driven and intended to deter, but reasonably tied to the separate rate applicants' pricing behavior as set out in their commercial

invoices. And, crucially, in averaging Chengen's zero margin with Bayley's rate, Commerce acted consistently with 19 U.S.C. § 1673d(c)(5)(B) and the SAA. *See, e.g.*, Coalition's Corrected Opening Brief (May 23, 2024), ECF No. 33 at 30.

### 2. Appellees' reliance on *Bestpak* is misplaced.

Appellees rely extensively on the Court's decision in *Bestpak* to argue that Commerce "unlawfully relied . . . on a limited record of its own making" in setting the dumping margin for separate rate applicants. R&T Opp. at 12-26. This reliance is misplaced.

As an initial matter, Appellees cite *Bestpak* for the proposition that Commerce cannot "apply an overly punitive margin" to separate rate respondents "when the record lacks evidence to support such a margin." *Id.* 15; Zhejiang Opp. at 8. In *Bestpak*, the Court concluded that Commerce had selected "*unreasonably high rates having no relationship* to the respondent's actual dumping margin." 716 F.3d at 1378. Here, the margin was neither unreasonably high nor unrelated to the respondent's dumping behavior. To the contrary, Commerce confirmed that "record evidence demonstrate{d} that potential dumping by the separate rate companies existed during the {period of investigation} *far in excess* of the zero percent rate calculated for Chengen." Appx422. Commerce specifically concluded that "the dumping margins alleged in the Petition are representative of the actual selling behavior of separate rate recipients," and that the separate rate respondents' had sales

that "would have had a transaction-specific dumping margin in the range of the Petition rates." Appx446. In addition, the Petition rates "beg{a}n with the pricing established by" one of the separate rate recipients "and, therefore, each of these rates is, to some extent, representative of the dumping behavior of the Separate Rate Plaintiffs." Appx503-504.

Appellees also rely on *Bestpak* to assert that Commerce is hiding behind a limited record of its own making to "shirk its duty" to support the reasonableness of its separate rate determination. R&T Opp. at 12, 15; Zhejiang Opp. at 12. Again, the facts in *Bestpak* are distinct. There, Commerce pointed "to only one evidentiary finding." 716 F.3d at 1379. Here, as discussed above and elaborated in Commerce's second, third, and fourth remand redeterminations, Commerce pointed to numerous evidentiary touchpoints to corroborate the reasonableness of the separate rate.

Moreover, in *Bestpak*, one of the two mandatory respondents never responded to Commerce's requests for information. *Id.* at 1374. Even though it was "clear that a mandatory company would not participate", Commerce failed to choose a replacement. *Id.* The court refused to allow Commerce to "explain the absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making." *Id.* at 1378. In this case, however, the second mandatory respondent "continued to actively argue its case until the *Final Determination*." Appx503. In any event, this case does not suffer the same evidentiary deficiencies

25

as *Bestpak*, in part because Commerce fulfilled its investigatory mandate including by sending "numerous supplemental questionnaires" to "84 separate rate applicants." *Id.*

Beyond these factual differences, the legal foundation underpinning the court's decision in *Bestpak* has shifted. *Bestpak* adopted the reasoning of *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010), a case concerning Commerce's use of AFA rates to determine dumping margins for an uncooperative respondent under 19 U.S.C. § 1677e. The court in *Gallant Ocean* reasoned that the "AFA rate assigned was required to reflect commercial reality," and could not be an "unreasonably high rate{} having no relationship to the respondent's actual dumping margin." *Bestpak*, 716 F.3d at 1380 (citing *Gallant Ocean*, 602 F.3d at 1323-24). The court in *Bestpak* found this reasoning persuasive and concluded that "rate determinations for nonmandatory, cooperating separate rate respondents" must "likewise" have "some relationship to their actual dumping margins." *Id.*

Congress has since amended section 1677e to clarify that Commerce "is not required . . . *for any* {} *purpose* . . . to demonstrate" that the adverse rate reflects "commercial reality." 19 U.S.C. § 1677e(d)(3). Congress left unchanged the statutory provision authorizing Commerce to impute an adverse rate to separate rate companies after an antidumping investigation. *Id.* § 1673d(c)(5)(B). These

provisions reflect Congress' intent that Commerce (1) determine AFA rates without regard to "commercial reality"—irrespective of the purpose for which the AFA rate will be used; and (2) continue using AFA rates to determine margins for separate rate entities when the exception to the expected method applies.

Appellees dispute that the legal landscape has shifted on several grounds, all of which lack merit. *First*, they allege that the court in *Bestpak* did not rely on *Gallant Ocean*. R&T Opp. at 22. The *Bestpak* opinion belies this, stating "{t}he reasoning of *Gallant Ocean* is applicable here." 716 F.3d at 1380. *Second*, they assert that the statutory amendment to section 1677e is irrelevant to interpreting section 1673d. R&T Opp. at 22; Zhejiang Opp. at 12. Not so. When "Congress amends a statutory provision, a significant change in language is presumed to entail a change in meaning." *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020). By amending section 1677e, Congress changed the meaning of the statute. Congress clarified that Commerce does not need to ensure that any AFA rate reflect commercial reality "*for any purpose*" including, necessarily, the purpose of calculating the separate rate under section 1673d. Continuing to impose an obligation that the AFA rate reflect commercial reality for the purpose of determining margins for separate rate applicants would deprive the amended statute of its intended effect.

*Finally*, Appellees argue that *Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016), which was "decided after *Bestpak*," requires Commerce to develop

an accurate and fair separate rate. R&T Opp. at 23; Zhejiang Opp. at 10. While *Albemarle* post-dates *Bestpak*, it pertained to an investigation that predates Congress' amendment to Section 1677e. Thus, to the extent *Albemarle* indicated that a separate rate must reflect commercial reality, it is no longer applicable. *See* 821 F.3d at 1354 (quoting, *inter alia*, *Gallant Ocean*, 602 F.3d at 1323). That said, the court in *Albemarle* also confirmed that a separate rate is "accurate" and "fair" if it is "supported by substantial evidence." *Id.* (quoting *Nan Ya*, 810 F.3d at 1344-45). To the extent *Albemarle* requires only that a separate rate be supported by substantial evidence, its logic remains sound. And, as demonstrated above, Commerce's second, third, and fourth separate rate determinations comply with this requirement.

Since Congress amended the Tariff Act, this Court has reaffirmed that "Commerce may calculate the separate rate by averaging the de minimis, zero, or AFA rates." *Bosun Tools Co. v. United States*, No. 21-1929, 2022 WL 94172, at *2 (Fed. Cir. Jan. 10, 2022). In *Bosun*, as here, Commerce calculated the separate rate by averaging one respondent's zero rate with another's AFA rate. *Id.* at *3. In upholding that determination, this court distinguished *Bestpak*, emphasizing that the record there "was so thin that Commerce could not have reasonably found evidence to support its determination." *Id.* at *4. In contrast, in *Bosun*, Commerce "confirmed the reasonableness of the separate rate in view of historical dumping trends." *Id.* The Court determined that these trends provided substantial evidence for

28

Commerce's decision even though those trends were not based on Bosun's individual data. *Id.* The Court also emphasized that "although Bosun argue{d} that Commerce's {separate rate} was unreasonable, its proposed alternative rate—0%—was not realistic." *Id.* at *6.

So too here, Appellees' proposed alternative rate of zero is unrealistic. Record evidence shows "that potential dumping by the separate rate companies existed . . . far in excess of the zero percent rate,"—possibly as high as the 114.72% rate assigned to Bayley. Appx388, Appx422. And, as in *Bosun*, while this evidence is not entirely predicated on data specific to each separate rate applicant, it is based on "information that can serve as a proxy for estimating . . . the selling behavior of the . . . separate rate recipients." Appx445.

Appellees attempt to distinguish *Bosun* on grounds that this case concerns an initial investigation and, thus, there are no historical dumping trends. R&T Opp. at 23, Zhejiang Opp. at 11. But if historical trends were a prerequisite to using an AFA rate in determining dumping margins for separate rate applicants, Commerce could *never* calculate the separate rate by averaging zero and AFA rates in an initial investigation. This argument thus runs afoul of the statute, which expressly authorizes Commerce to factor an AFA rate into the separate rate in initial investigations. *See* 19 U.S.C. § 1673d.

Appellees' "arguments amount to nothing more than a request for {this Court} to reweigh the evidence." *Bosun*, 2022 WL 94172, at * 7. The court must decline this request. *See Downhole Pipe*, 776 F.3d 1378.

**D.** **Commerce Failed to Adequately Explain the Exclusion of Certain Separate Rate Respondents from the Order.**

Chengen asserts that it would be unfair, arbitrary, and unreasonable for Commerce to include Jiangyang and Dehua in the Order. Chengen Opp. at 43-49. Chengen fails to address the fundamental problem with Commerce's decision—*i.e.*, the agency's failure to provide any substantive basis for excluding these companies. *See id.* Commerce's failure to do so is particularly troubling since it found on three separate occasions that the separate rate companies—including Jaingyang and Dehua—were engaged in dumping at rates as high as 114%. *See* Appx557-558, Appx564. If the Court declines to reinstate Commerce's original determination or Commerce's second, third, or fourth determination, the Court must at a minimum remand these exclusions for further consideration.

**IV.** **CONCLUSION**

For the reasons set forth above, this Court should reinstate Commerce's original determination of the antidumping margin for Chengen and the separate rate respondents. In the alternative, the Court should remand Commerce's second remand redetermination for further consideration of whether the intermediate methodology remains most appropriate for determining the dumping margin. In the

event the Court declines to do either, the Court should reinstate the agency's determination of the separate rate as the simple average of Chengen's and Bayley's margins. If the Court leaves intact the second and the fifth remand determinations, the Court should remand Commerce's decision to exclude two voluntary respondents from the Order.

Respectfully Submitted,

*/s/ Timothy C. Brightbill*

Timothy C. Brightbill, Esq.
Maureen E. Thorson, Esq.
Jeffrey O. Frank, Esq.
Stephanie M. Bell, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition for Fair Trade in Hardwood Plywood*

Dated: August 30, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1258, 2024-1259

**Short Case Caption:** Linyi Chengen Import and Export Co., Ltd. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes 6,839 words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/30/2024

Signature: /s/ Timothy C. Brightbill

Name: Timothy C. Brightbill