IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

Nos. 2024-1258, 2024-1259

LINYI CHENGEN IMPORT AND EXPORT CO., LTD., et al.,*
Plaintiffs-Appellees,

HIGHLAND INDUSTRIES INC., et al.,**
Plaintiffs,

v.

UNITED STATES, COALITION FOR
FAIR TRADE OF HARDWOOD PLYWOOD
Defendants-Appellants.

Appeals from the United States Court of International Trade in Nos. 1:18-cv-
00002-JCG, 1:18-cv-00011-JCG, 1:18-cv-00017-JCG, 1:18-cv-00018-JCG, 1:18-
cv-00019-JCG, Judge Jennifer Choe-Groves

NON-CONFIDENTIAL REPLY BRIEF FOR
DEFENDANT-APPELLANT UNITED STATES

OF COUNSEL:

SAVANNAH MAXWELL
Attorney
Office of the Chief Counsel
  for Trade Enforcement and
Compliance

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 305-7568

Attorneys for Defendant-Appellant
United States

August 30, 2024

*CELTIC CO., LTD., JIAXING GSUN IMPORT & EXPORT CO., LTD., SUQIAN HOPEWAY INTERNATIONAL TRADE CO., LTD., ANHUI HODA WOOD CO., LTD., SHANGHAI FUTUWOOD TRADING CO., LTD., LINYI EVERGREEN WOOD CO., LTD., XUZHOU JIANGYANG WOOD INDUSTRIES CO., LTD., XUZHOU TIMBER INTERNATIONAL TRADE CO. LTD., LINYI SANFORTUNE WOOD CO., LTD., LINYI MINGZHU WOOD CO., LTD., XUZHOU ANDEFU WOOD CO., LTD., SUINING PENGXIANG WOOD CO., LTD., XUZHOU SHENGPING IMPORT AND EXPORT CO., LTD., XUZHOU PINLIN INTERNATIONAL TRADE CO. LTD., LINYI GLARY PLYWOOD CO., LTD., LINYI LINHAI WOOD CO., LTD., LINYI HENGSHENG WOOD INDUSTRY CO., LTD., SHANDONG QISHAN INTERNATIONAL TRADING CO., LTD., SUZHOU ORIENTAL DRAGON IMPORT AND EXPORT CO., LTD., LINYI HUASHENG YONGBIN WOOD CO., LTD., QINGDAO GOOD FAITH IMPORT AND EXPORT CO., LTD., LINYI JIAHE WOOD INDUSTRY CO., LTD., JIAXING HENGTONG WOOD CO., LTD., XUZHOU LONGYUAN WOOD INDUSTRY CO., LTD., FAR EAST AMERICAN, INC., ZHEJIANG DEHUA TB IMPORT & EXPORT CO., LTD., TARACA PACIFIC, INC., RICHMOND INTERNATIONAL FOREST PRODUCTS, LLC

**JIASHAN DALIN WOOD INDUSTRY CO., LTD., HAPPY WOOD INDUSTRIAL GROUP CO., LTD., JIANGSU HIGH HOPE ARSER CO., LTD., SUQIAN YAORUN TRADE CO., LTD., YANGZHOU HANOV INTERNATIONAL CO., LTD., G.D. ENTERPRISE LTD., PIZHOU JIN SHENG YUAN INTERNATIONAL TRADE CO., LTD., XUZHOU SHUIWANGXING TRADING CO., LTD., COSCO STAR INTERNATIONAL CO., LTD., DEQING CHINA-AFRICA FOREIGN TRADE PORT CO., LTD., LINYI CITY DONGFANG JINXIN ECONOMIC & TRADE CO., LTD., FABUWOOD CABINETRY CORP., LINYI CITY SHENRUI INTERNATIONAL TRADE CO., LTD., JIANGSU QIANJIUREN INTERNATIONAL TRADING CO., LTD., QINGDAO TOP P&Q INTERNATIONAL CORP., CANUSA WOOD PRODUCTS LTD., HOLLAND SOUTHWEST INTERNATIONAL INC., LIBERTY WOODS INTERNATIONAL, INC., NORTHWEST HARDWOODS, INC., USPLY LLC, SHANDONG DONGFANG BAYLEY WOOD CO., LTD., CONCANNON CORP.,

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................. iii

CONFIDENTIAL MATERIAL OMITTED ............................................. v

INTRODUCTION .............................................................................. 1

ARGUMENT .................................................................................... 2

I.    The Trial Court Exceeded Its Authority By Considering Untimely-Raised Information And Requiring Commerce To Place Such Information On The Record And Deem It Accurate ........................... 2

    A.    Chengen Should Not Be Rewarded For Failing To Timely Submit Relevant Documents And Allegations ......................... 2

    B.    This Court's Case Law Supports Our Position, Not Chengen's ................................................................................... 6

    C.    The Trial Court Could Not Have Taken Judicial Notice ........... 9

    D.    This Court Should Ignore Chengen's Unsupported Statements ................................................................................. 10

II.    Chengen Cannot Establish That Its Poplar Log Purchases Were Independently Corroborated ............................................................ 11

III.    Plaintiffs-Appellees Fail To Demonstrate That Commerce's Assignment Of A 57.36 Percent Separate Rate Was Unlawful Or Unsupported By Substantial Evidence ............................................. 16

    A.    Plaintiffs-Appellees Fundamentally Misunderstand The Nature Of A Separate Rate .............................................................. 16

    B.    Substantial Evidence Supports A 57.36 Percent Separate Rate ................................................................................... 19

i

C.    Plaintiffs-Appellees Fail To Demonstrate That *Bestpak* Directs An Outcome In Their Favor...................................................... 27

CONCLUSION ....................................................................................................... 31

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

*A.L. Patterson, Inc. v. United States,*
    585 F. App'x 778 (Fed. Cir. 2014) ...............................................................21

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    802 F.3d 1339 (Fed. Cir. 2015) .....................................................................26

*Albemarle Corp. & Subsidiaries v. United States,*
    821 F.3d 1345 (Fed. Cir. 2016) ............................................................ 16, 17

*Apple Inc. v. Qualcomm Inc.,*
    992 F.3d 1378 (Fed. Cir. 2021) .......................................................................9

*B.V.D. Licensing Corp. v. Body Action Design, Inc.,*
    846 F.2d 727 (Fed. Cir. 1988) ........................................................................9

*Changzhou Hawd Flooring Co., Ltd. v. United States,*
    848 F.3d 1006 (Fed. Cir. 2017) .....................................................................16

*Consol. Edison Co. of New York v. NLRB,*
    305 U.S. 197 (1938)......................................................................................21

*Essar Steel v. United States,*
    678 F.3d 1268 (Fed. Cir. 2012) ...................................................................6, 7

*Goodluck India Ltd. v. United States,*
    11 F. 4th 1335 (Fed. Cir. 2021) ....................................................................26

*Hyundai Elec. & Energy Sys. Co. v. United States,*
    15 F.4th 1078 (Fed. Cir. 2021) .......................................................................4

*Mid Continent Steel & Wire, Inc. v. United States,*
    941 F.3d 530 (Fed. Cir. 2019) .....................................................................8, 9

*PrimeSource Building Prods., Inc. v. United States,*
    --- F. 4th ----, 2024 WL3682552 (Fed. Cir. Aug. 7, 2024) ................... 17, 30

*Sandvik Steel Co. v. United States*,
    164 F.3d 596 (Fed. Cir. 1998) ..........................................................3

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ................................................. 27, 29

## STATUTES

19 U.S.C. § 1673d(c)(5)(B) .......................................................................17

19 U.S.C. § 1673d(c)(5)(A)-(B) ................................................................17

19 U.S.C. § 1677f-1(c)(2) ..........................................................................17

## RULES

Fed. R. App. P. 32(a)(5)..............................................................................32

Fed. R. App. P. 32(a)(7)..............................................................................32

## REGULATIONS

19 C.F.R. § 351.303(e)................................................................................11

19 C.F.R. § 351.309(d)(1)-(2)......................................................................3

## OTHER AUTHORITIES

*Certain Hardwood Plywood Products from China*,
    85 Fed. Reg. 77,157 (Dep't of Commerce Dec. 1, 2020) .............................12

H.R. Rep. No. 103-316, 873 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 .....17

## **CONFIDENTIAL MATERIAL OMITTED**

The brief contains confidential material at pages 18 and 23.  The material on page 18 describes characterizations of separate rates.  The material on page 23 describes, in order: 1) a characterization of size, 2) a percentage, 3) the name of a separate rate applicant exporter, 4) a characterization of size, 5) a quantity, 6) a price value, 7) a comparison, 8) a quantity, 9) a quantity, 10) a price value, 11) a price value, 12) a comparison.

# INTRODUCTION

In our opening brief, we established that the Court of International Trade (trial court) overstepped its authority in three separate ways, each requiring reversal. First, the court relied on unsupported and belated allegations by plaintiff-appellee Linyi Chengen Import and Export Co., Ltd. (Chengen) in ordering the Department of Commerce to reopen the record and accept as complete and accurate certain unsolicited and untimely documentation that Commerce had appropriately rejected during the underlying administrative proceeding. The court also erred in rejecting Commerce's application of the intermediate input methodology, even though Commerce had lawfully and reasonably found Chengen's log quantity data unreliable for lack of corroborating information. Finally, Commerce's decision to calculate a margin for non-individually-investigated respondents (the separate rate or all-others rate) was supported by substantial evidence, and the court supplanted Commerce's judgment for its own when it left Commerce with no option but to assign Chengen's zero percent dumping margin as the separate rate, even while agreeing that such a rate would not reasonably reflect the non-investigated respondents' dumping behavior.

Plaintiffs-appellees Chengen, Richmond International Forest Products, LLC and Taraca Pacific, Inc. (Richmond-Taraca), and Zhejiang Dehua TB Import & Export Co., Ltd. (Zhejian Dehua) lodge a number of arguments in support of the

trial court's unsound decisions, many of which miss the point and none of which successfully rebut our showing that the trial court erred. Accordingly, this Court should reverse the judgment of the Court of International Trade.

## **ARGUMENT**

I.  **The Trial Court Exceeded Its Authority By Considering Untimely-Raised Information And Requiring Commerce To Place Such Information On The Record And Deem It Accurate**

Chengen asserts sundry arguments in support of the trial court's erroneous actions, none of which excuse Chengen's own failures during the investigation or otherwise demonstrate that the trial court acted within the bounds of its limited authority.

A.  **Chengen Should Not Be Rewarded For Failing To Timely Submit Relevant Documents And Allegations**

In response to our observation that Chengen improperly waited until *after* the conclusion of the investigation to allege that Commerce verifiers had removed the contested pages, Government Opening Br. at 41, Chengen contends that it had no opportunity before the close of the investigation to raise the issue. Chengen Br. at 7. But Chengen could, and should, have raised such a claim during the administrative case briefing period, which took place after the verification; indeed, Chengen appears to concede it could have done so. *Id.* ("The only opportunity Chengen had to address that the conversion chart was the Chinese national standard was in the briefing"). Chengen, however, never claimed in its opening or

rebuttal case briefs that Commerce had removed the pages or otherwise acted improperly at verification, even though the accuracy of the conversion formula was directly raised in the Coalition's opening case brief. Appx8437; *see also* 19 C.F.R. § 351.309(d)(1)-(2). Chengen admits as much, claiming that "the facts of the verification became twisted" in the Coalition's case brief. Chengen Br. at 8. Accordingly, the trial court should not have considered this untimely-raised claim. *See Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (arguments not raised in administrative case briefs are generally deemed waived).

In particular, the trial court erred by countenancing the unsupported statements made by Chengen's counsel during oral argument. Chengen protests that its counsel is a barred attorney with the obligation not to make false statements in front of a court. Chengen Br. at 8. But counsel's ethical obligations to the trial court are beside the point. The trial court could not consider the statements because they constituted factual allegations not supported by the record and claims that Chengen had failed to exhaust before Commerce.

Chengen's failure to raise Commerce's allegedly improper handling of the documentation during case briefing is made worse by its dereliction of responsibility in not timely disclosing the conversion formula—as well as any information regarding its provenance—in the first place. Chengen could have, and should have, submitted the formula prior to verification, given that the Coalition

3

had put the accuracy of Chengen's log quantity data squarely at issue.[1]  *See* Govt.

Opening Br. at 13-14, 42.  Had Chengen done so, the purported issues surrounding

verification would likely never have occurred.

Chengen tries to excuse its failure to earlier submit the documentation by

claiming that Commerce often accepts a significant amount of new information at

verification, and in fact includes "page after page of single-spaced request{s} for

new documents, reconciliations, and sales and material input traces."  Chengen Br.

at 19.  But this argument ignores the distinction between information that

***Commerce*** affirmatively requests from respondents at verification to support

information that is already on the record of the proceeding, and unsolicited

documents that Commerce never asked for and which could have been timely

placed on the record prior to verification.  Verification is not an opportunity to

present information that could have been placed on the record earlier, especially

where—as here—the information does not corroborate existing record information.

*See Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir.

---

[1]  Chengen argues that it did not need to submit the conversion formula earlier because that document was not directly responsive to Commerce's questionnaire.  Chengen Br. at 25-26.  We disagree; Chengen clearly relies on the formula (even if only for a spot check, as it claims) in the normal course of business with regard to log quantities.  Appx1445.  Moreover, the Coalition placed the quantity of Chengen's log inputs at issue, and Chengen still failed to submit the formula in response to the Coalition's comments.  Appx3425-3430, Appx3478-3600.

2021) (describing the "limited circumstances" in which Commerce collects new factual information at verification).

Relatedly, Chengen asserts that Commerce regularly accepts conversion formulas at verification, citing various administrative determinations in support;[2] Chengen then claims that respondents "regularly do not include {conversion formulas} in an earlier questionnaire response{.}" Chengen Br. at 26-29. Chengen provides no support for this broad assertion. Simply because Commerce has accepted conversion formulas at verification in certain instances does not mean that respondents do not frequently submit conversion formulas in response to Commerce's questionnaires. To the contrary, Commerce's initial questionnaires seeks such formulas. Appx1443-1453. Moreover, none of the determinations cited by Chengen involve a situation similar to the verification below, where: 1) Commerce did not even know prior to verification that Chengen relied on a conversion formula or that it did not possess invoices; 2) the reliability of Chengen's log quantity data was explicitly put at issue early in the proceeding; 3)

---

[2] Chengen also surmises that Commerce cannot doubt conversion formulas *per se*, pointing out that Commerce has relied on conversion formulas in other determinations. Chengen Br. at 33. This contention has no merit. Commerce requires respondents to submit conversion ratios used to report data to Commerce in their questionnaire responses so that Commerce can probe the issue during the information-gathering phase of the proceeding. Given that respondents should have already submitted information regarding standards and formulas by the time of verification, it is not unusual that Commerce would examine such data at that point.

Commerce, upon seeing the formula and learning that Chengen relied on it, requested the formula at verification; and 4) the respondent appended additional pages that Commerce had ***not*** requested. If anything, the verification reports demonstrate that Commerce accepted conversion formulas that ***it had affirmatively requested***, just as it did during the verification below. Appx9172 ("We requested that company officials provide the applicable industry standards"), Appx9195 ("we requested to examine the conversion ratio").

B.    This Court's Case Law Supports Our Position, Not Chengen's

Chengen seeks to distinguish *Essar Steel v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) on the facts of that case. Chengen Br. at 21. In doing so, it misstates the factual posture of the underlying proceedings. Chengen claims that "{t}his is not a situation where a party was trying to submit a new document it should have submitted earlier to the record." *Id.* But that is exactly what happened here. Chengen also asserts that "{n}o agency discretion or decision making is usurped here{,} *id.*, but the trial court ***did*** usurp Commerce's discretion by ordering it to put on the record the pages that Commerce had lawfully rejected—pages which ***were not even part of the documentation Commerce verifiers saw and requested***, but were instead unilaterally appended to the pages Commerce had requested. *See* Govt. Opening Br. at 15-16, 43.

In any event, whatever factual differences exist do not detract from the core holdings of *Essar Steel*: (1) the trial court exceeds its authority by ordering Commerce to reopen the record and place specific documents on it; (2) judicial review is limited to the record before the agency; 3) only limited exceptions exist allowing the court to order supplementation of the record (none of which apply here); and 4) the court's actions undermined Commerce's ability to administer the antidumping duty laws, contradicted important principles of finality, and discouraged compliance. *Essar Steel*, 678 F.3d at 1277-78.

Chengen purports to excuse the trial court's error (and distinguish this case from *Essar Steel*) by observing that the court ordered Commerce to place the contested documentation on the record because those pages "corroborate, support, or clarify the log volumes," and therefore constituted the type of information Commerce may accept at verification. Chengen Br. at 22 (citing Appx123). This argument fails in numerous respects. First, Chengen's argument elides a crucial point—that *it* acted remiss by not timely placing the conversion formula on the record and then compounded its error by failing to timely raise the claim that Commerce verifiers removed the additional pages proffered by Chengen. The trial court could not, within its limited authority, consider such untimely raised information and argument, much less order Commerce to put the contested documentation on the record and deem it complete and accurate.

Second, the court's characterization of the information as corroborating or clarifying information on the record does not fall within either of the exceptions—discussed in *Essar Steel*—permitting the trial court to order supplementation of the record, or other enumerated situations limiting Commerce's discretion to accept untimely-submitted documents. *See* Govt. Br. at 45. Third, Commerce found—in a reasonable exercise of its discretion—that the additional pages did not constitute information that clarified or corroborated information already on the record prior to verification. Appx316, Appx327. The record demonstrates that the additional pages did not clarify or corroborate information that Chengen had already submitted to Commerce prior to verification, but instead were offered by Chengen to add context to information that Commerce verifiers had discovered ***for the first time*** during verification. Fourth, as discussed above, Commerce never requested the additional pages; rather, it only requested the two-page formula its verifiers had earlier observed.

Finally, the primary case Chengen and the trial court rely on for support—*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019)—does not even concern Commerce's ability to reject untimely filed factual information or a court's ability to consider information not on the record. Rather, *Mid Continent* centered around whether Commerce erred in refusing to consider an interested party's argument that subsidies were received by a potential surrogate

company.  *Id*. at 544-45.  Furthermore, the Court in *Mid Continent* did not reject Commerce's determination, but only remanded for Commerce to further explain its position.  *Id.*

C.       The Trial Court Could Not Have Taken Judicial Notice

In an attempt to rebut our argument that the trial court erred by ordering Commerce to construe the documentation as the "complete and accurate Chinese National Standard," thereby depriving Commerce of the opportunity to evaluate it in the first instance, Chengen asserts that the trial court could have taken judicial notice of the extra pages.[3]  Chengen Br. at 24.  But this documentation does not meet the standard for judicial notice.

"Courts may take judicial notice of facts of universal notoriety, which need not be proved, and of whatever is generally known within their jurisdictions." *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed. Cir. 1988).  Put another way, a court may take judicial notice of a fact only when it is either generally known, or accurately and readily discernible from sources whose accuracy cannot reasonably be questioned."  *Apple Inc. v. Qualcomm Inc.*, 992 F.3d 1378, 1384 (Fed. Cir. 2021) (citing Fed. R. Evid. 201(b)).  Neither the extra pages, which purport to demonstrate that the conversion formula is the Chinese

---

[3]  We assume Chengen, in making this argument, implies harmless error by the trial court.

National Standard, nor the formula itself come close to the level of "universal notoriety." Nor can one reasonably claim that the accuracy of the sources cannot reasonably be questioned; indeed, the Coalition—on remand—questioned the age of the standard and its accuracy, and pointed out "errors in the conversion table{.}" Appx391. Neither the formula nor the pages purporting to show it as the Chinese National Standard are of such unimpeachable provenance that Commerce could be lawfully deprived of the opportunity to test their accuracy and reliability before using Chengen's reported log consumption numbers.[4]

D.     This Court Should Ignore Chengen's Unsupported Statements

Finally, Chengen's brief is replete with statements that it fails to support with either the record or legal authority; accordingly, this Court should pay them no heed. For example, Chengen claims that Commerce "knows from its extensive experience in Commerce with China that 'GB-' stands for GuoBiao, meaning national standard for China{,}" but only cites for support a document showing that Commerce's translator attended verification.[5] Chengen Br. at 9. Chengen also

---

[4] Chengen contends that we acknowledge that, if we admit that the conversion formula is the Chinese National Standard, then we must also acknowledge its "inherent accuracy." While we do not directly contest the accuracy of the formula, or claim that it is not the Chinese National Standard, we also do not admit its accuracy; nor did Commerce in its remand results. Rather, Commerce deemed the formula accurate only at the trial court's explicit directive.

[5] The translator's presence did not relieve Chengen of the regulatory obligation to ensure that all documents presented during verification to be

asserts, without any support, that "{a}nyone with a basic understanding of the wood industry or any commercial understanding must know that a calculation was made to report logs in cubic meters. Logs are not uniform; the only way a conversion/calculation would not be needed is if they used the unwieldy water displacement method." Chengen Br. at 10. This Court should ignore these, and other, unsupported allegations raised by Chengen in its brief.

II. Chengen Cannot Establish That Its Poplar Log Purchases Were Independently Corroborated

Chengen does not appear to dispute that the trial court erred by holding that Commerce could not lawfully require a respondent to provide independent corroboration of its log purchase volumes. *See* Govt. Opening Br. at 52-53. Instead, Chengen contends that its log purchase amounts *were* in fact corroborated. The record does not support this contention.

As an initial matter, Chengen disputes that its early questionnaire responses inaccurately represented that it possessed "material purchase invoices" reflecting its purchase of poplar logs from suppliers. Chengen Br. at 3. But the point we made in our opening brief—and by Commerce below—is that these "material purchase invoices" are not truly invoices, *i.e.*, generated by Chengen's suppliers. They were instead either documents self-generated by Chengen and subject to

translated on the first occasion presented. 19 C.F.R. § 351.303(e). Accordingly, Commerce had the right to reject the untranslated pages.

manipulation or alteration, or value added tax (VAT) "invoices," which are blank

forms generated by the Chinese government and filled in by Chengen. *See* Govt.

Opening Br. at 14, 26.

Chengen claims that its poplar log suppliers "could not issue their own

invoices" because they did not have official tax status. Chengen Br. at 5. First,

Chengen cites no support for this statement. Second, even if the suppliers did not

have the status to own official tax invoice booklets, Chengen provides no reason

why the suppliers could not issue Chengen ***any*** type of proof of purchase from the

supplier end, such as an itemized receipt or a privately issued/informal invoice.

Interestingly, Chengen notes that it receives delivery notes from its suppliers that

list the volume calculation for the delivered logs, but does not explain why such

notes are not part of the record, even though they might have corroborated

Chengen's poplar log purchases.[6] Chengen Br. at 30.

Chengen maintains that, while its suppliers do not provide invoices, they still

"act to corroborate the volume of their delivery" by "accept{ing} the warehouse-in

ticket as a basis for its payment" and that the "warehouse-in ticket is . . . the basis

by which the farmers are paid." Chengen Br. at 30-31. First, as with so many of

---

[6] Chengen ***did*** provide these types of supplier delivery sheets in a
subsequent review. *See Certain Hardwood Plywood Products from China*, 85 Fed.
Reg 77,157 (Dep't of Commerce Dec. 1, 2020) and accompanying Issues and
Decision Memorandum at 14.

its claims, Chengen cites nothing in the record showing that the suppliers accepted the warehouse-in tickets, or that these tickets constitute the basis on which the suppliers are paid. All that is apparent from the record is that warehouse-in tickets, generated by Chengen itself, exist, and that Chengen lists the name of the supplier and the quantity of logs on those tickets. Appx8387. Without even an attestation from the supplier, Commerce has no way of knowing whether the warehouse-in tickets are provided to suppliers, or whether the amounts represented by the farmers to Chengen precisely represent the amounts Chengen lists on the tickets.

Chengen also claims that it provides its suppliers with VAT invoices on government-generated forms, and that those invoices state the volumes, prices, and values of the logs. Chengen Br. at 31. But, even assuming the correctness of Chengen's translation of the Chinese characters, the record does not indicate whether copies of the VAT invoices were actually given to the suppliers as filled out. Again, the record demonstrates that the VAT invoices were generated *by Chengen* as part of its own accounting process. Appx338. And, while Chengen states that the Chinese government tracks "both the buyer and the seller's representations of cost and income," *id.*, it is unclear what "seller's representations of cost and income" refers to, given that the record contains no representation by the seller of cost and income. Nothing in the warehouse-in tickets or VAT invoices establishes third-party corroboration.

Chengen repeats the trial court's statements that the record does not affirmatively support a finding that Chengen manipulated or altered its log purchase quantities. *Id.* at 32. But the question should not be whether actual evidence of manipulation or alteration exists;[7] rather, the question is whether Commerce can reasonably, and lawfully, require independent corroboration of a respondent's purchase quantities in order to deem that respondent's reporting of those quantities reliable for the purposes of valuing the logs. The answer, as demonstrated in our opening brief, is yes.

Importantly, Commerce was not punishing Chengen or applying AFA to it for its lack of third-party corroboration. Rather, in a reasonable application of its methodology and exercise of its discretion as fact-finder, Commerce found that it could not trust the reliability and accuracy of Chengen's log quantities, and deemed it appropriate to value the intermediate input—the veneer—instead of valuing the upstream product—the log.

Chengen claims that the intermediate input methodology is less accurate than the normal methodology of valuing the upstream factors of production. Chengen Br. at 38-42. To support its claim, Chengen contends that Commerce only uses the intermediate input methodology in agricultural cases or cases where

---

[7]  And without the ability to corroborate, Commerce would be hard pressed to find evidence of manipulation or alteration.

major costs were missing from the surrogate financial ratios. *Id.* at 38. While true that Commerce has mostly used the intermediate input methodology in agricultural cases, Commerce has never limited its ability to apply the methodology to the agricultural context. If Commerce finds that valuing the upstream factors of production would result in inaccurate calculations because a significant element of cost would not be adequately accounted for—for instance, in a situation where a respondent has not accurately recorded and substantiated its complete factor information—Commerce may find it appropriate to apply the methodology, regardless of the industry of the subject merchandise. *See* Govt. Opening Br. at 10. Here, Commerce, in accordance with its practice and based on substantial evidence, found that Chengen could not demonstrate it had accurately recorded and substantiated its log factors of production; accordingly, Commerce concluded that a significant element of cost was not sufficiently accounted for and determined to value the veneers instead. Chengen cannot establish that the intermediate input methodology led to a less accurate result than the normal methodology, given that the entire reason Commerce employed the intermediate input methodology was because it found a significant element of the normal methodology ***not*** to be reliable or accurate. While the intermediate input methodology led to a higher margin in this instance, its application does not constitute an inherently punitive, or less accurate, measure.

III.  Plaintiffs-Appellees Fail To Demonstrate That Commerce's Assignment Of A 57.36 Percent Separate Rate Was Unlawful Or Unsupported By Substantial Evidence

In our opening brief, we demonstrated that the trial court erred in rejecting Commerce's assignment of a 57.36 percent rate to non-individually-investigated respondents. Plaintiffs-appellees have failed to establish that Commerce's determination was unsupported by substantial evidence or otherwise unlawful. Accordingly, this Court must reverse.

A.  Plaintiffs-Appellees Fundamentally Misunderstand The Nature Of A Separate Rate

Plaintiffs-appellees' briefs illustrate their fundamental misunderstanding of the purpose of a separate rate (also termed the all-others rate). A separate rate is intended to capture the ***potential***, rather than actual, dumping behavior across the range of the non-investigated respondents. The rate assumes—absent contrary evidence—that the dumping behavior of mandatory respondents is reflective of all respondents. *See Changzhou Hawd Flooring Co., Ltd. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017) (the purpose of a separate rate is to "reasonably approximate the margins of all known exporters"); *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1353 (Fed. Cir. 2016).

The lack of record information about the "actual" dumping margins of the non-investigated respondents, as highlighted by the plaintiffs-appellees, does not, in any way, undermine Commerce's separate rate calculation. *See* Richmond-

16

Taraca Br. at 16. Commerce is not required to collect detailed information for the non-investigated respondents. Instead, in recognition that Commerce is an organization of finite resources, the statute allows Commerce to limit its investigation to a subset of exporters or producers, then apply an all-others rate to the non-individually-investigated respondents based on the dumping margins of the mandatory respondents. *See* 19 U.S.C. §§ 1677f-1(c)(2), 1673d(c)(5)(A)-(B).

Significantly, in certain circumstances met here, the all-others rate may incorporate dumping margins for mandatory respondents based on total AFA. *See* 19 U.S.C. § 1673d(c)(5)(B); H.R. Rep. No. 103-316, 873 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4201; *see also PrimeSource Building Prods., Inc. v. United States*, --- F. 4th ----, 2024 WL3682552, at *7 (Fed. Cir. Aug. 7, 2024). Moreover, mandatory respondents, even those receiving total AFA rates, are presumed to be representative of the non-selected respondents. *See Albemarle*, 821 F.3d at 1353; *PrimeSource*, 2024 WL 3682552, at *8 (rejecting argument that the presumption of representativeness should not apply where the mandatory respondents receive rates based on adverse facts available).

It is true that the SAA "expressly require{s} Commerce to factor in AFA rates when calculating the all-others rate using the expected method," *PrimeSource,* 2024 WL 3682552, at *9, and Commerce did not use the expected method when calculating the separate rate. But to find, as plaintiffs-appellees urge,

that AFA rates must be excluded from the calculation of a separate rate because Commerce did not apply the expected method would be myopic, ignoring both that AFA rates are generally expected to be part of an all-others rate calculation (assuming no positive calculated margins exist) and that the statute places no limitation on Commerce's ability to incorporate AFA rates even when it does not use the expected method.

Disallowing Commerce from relying on an AFA margin here would be especially egregious given that Commerce's calculation of the separate rate was "akin to the expected method in that we are averaging the rate determined in this investigation for the individually-investigated companies{.}" Appx423. As the Coalition noted, the expected method would have resulted in a separate rate [characterization] the 57.36 percent rate Commerce calculated using a simple average of Chengen's zero percent rate and Bayley's AFA rate. Coalition Br. at 30 n. 6. Additionally, as discussed in more detail below, Commerce, at the trial court's behest, evaluated the record and determined, based on substantial evidence, that the petition margin (*i.e.*, the AFA rate assigned to Bayley) was "tethered" to the potential dumping behavior of those respondents. Finally, plaintiffs-appellees have not demonstrated that the AFA margin assigned to Bayley is unrepresentative of the non-investigated respondents' dumping behavior.

Plaintiffs-appellees urge this Court to hold that, in the absence of complete record data for each separate rate respondent, those respondents should simply be assigned Chengen's zero percent rate, despite the fact that such a rate would not be representative of their dumping behavior and despite the statutory framework explicitly contemplating the inclusion of AFA rates. Such an approach would undermine Commerce's ability to examine a limited number of respondents and fundamentally misunderstands the nature of an all-others rate.

B.    Substantial Evidence Supports A 57.36 Percent Separate Rate

As established in our opening brief, Commerce's determination to assign a 57.36 percent separate rate is supported by substantial evidence. Throughout the course of three separate remands, Commerce cited ample record evidence demonstrating how the petition margin was "tethered" to the data on the record, and establishing that the 57.36 percent separate rate was a more reasonable reflection of the separate rate respondents' potential dumping behavior than Chengen's zero percent rate.

First, as Commerce explained, the dumping margins alleged in the petition were based on price quotes for subject merchandise from an actual exporter receiving a separate rate (petition SRA exporter), and with the same type of merchandise sold by Chengen, demonstrating that the petition SRA exporter likely dumped far in excess of Chengen's zero percent rate. Appx422. Second,

Commerce considered actual commercial sales from the petition SRA exporter, finding the price nearly identical to a price quote for the same exporter in the petition, and reasonably extrapolating that the petition margins were supported by the actual prices at which the product was sold. Appx446-447, Appx952, Appx2182-2186. Third, Commerce found that Chengen's price for the same product was almost 20 percent higher than that of the petition SRA exporter, meaning that the likelihood of dumping by the petition SRA exporter—and therefore likely other separate rate respondents—was significantly higher than for Chengen. Appx446-447, Appx479, Appx8375. Fourth, Commerce analyzed commercial invoices for sales from *all 40* separate rate plaintiffs and explained why these sales invoices demonstrated that Chengen's dumping behavior was dissimilar to the potential dumping behavior of the separate rate plaintiffs. Appx449-452. Fifth, Commerce looked at additional documentation from the petition SRA exporter, including VAT invoices and a written submission from the exporter, which further "tethered" the petition margin to the potential dumping behavior of an actual separate rate respondent. Appx523-525, Appx926, Appx952, Appx2179-2186, Appx6597, Appx6621-6669. To the extent Commerce was even

required to "tether" the petition margin to the record data and the potential dumping behavior of separate rate respondents,[8] it clearly did so.

Taken together, Commerce's record findings establish that its reliance on an average of the petition margin and Chengen's zero percent margin in calculating the separate rate was supported by substantial evidence, and that Chengen's zero percent rate alone would not have been—as conceded by the trial court—reflective of the separate rates respondents' potential dumping behavior. Certainly, a "reasonable mind" would accept such evidence as adequate to support Commerce's conclusion. *A.L. Patterson, Inc. v. United States*, 585 F. App'x 778, 781-82 (Fed. Cir. 2014) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)).

Plaintiffs-appellees' challenges to Commerce's findings lack merit. Chengen first contends that Commerce should not incorporate the petition rate into the separate rate because that rate was derived from price quotes, and Commerce allegedly considers price quotes unreliable. Chengen Br. at 52. But the administrative determinations Chengen cites as support deal with whether price

---

[8] The trial court's requirement to "tether" the petition margin to the dumping behavior of separate rate respondents, Appx142, appears to stem from a single reference in *Bestpak*, where the Court stated that it did not "find Commerce's late attempt to backfill with these AUV estimates, untethered to the three respondents' actual dumping margins, as amounting to substantial evidence." *Id.* at 1379. Such a passing reference can hardly amount to a legal requirement.

quotes should serve as surrogate values—an entirely different situation. Moreover, as Commerce explained, the price quotes undergirding the petition margin were "corroborated by multiple, actual sale prices by separate rate companies during the {period of investigation.}" Appx528. As such, Chengen's concerns regarding the reliability of price quotes are misplaced.

Chengen then claims that its zero percent dumping margin was not actually zero but was instead a "steeply negative margin" of approximately -50 percent, and thus Commerce erred in comparing its prices to the petition SRA exporter's prices. Chengen Br. at 55-56. Even if we were to accept this assertion as true, which we do not, Chengen's argument does not withstand scrutiny. A dumping margin depends on a comparison of normal value and U.S. prices. Chengen's argument rests on the unfounded premise that its normal value is the same as that of the petition SRA exporter's. Chengen offers no support for its position, nor can it, given that the petition SRA exporter's normal value is not on the record. Commerce acknowledged the distinction between normal value and dumping margins in its fourth remand redetermination, explaining that Commerce's comparison of the companies' prices was not to demonstrate that the 20 percent price difference would result in a commensurate 20 percent difference in the dumping margin. Appx505-506. Rather, absent normal value for the petition SRA exporter, the price comparison shows that separate rate exporters likely priced their

products at much lower levels than Chengen. Appx505. And, as Commerce observed, other record evidence demonstrates that the separate rate respondents' potential dumping margins could be as high as the 114.72 percent petition rate—a rate "rooted in the record and tied to actual selling behavior{.}" Appx506. Finally, as already explained, the differing cost structures between Chengen and the petition SRA exporter would not be accounted for by Chengen's normal value.

Richmond-Taraca contends that Commerce cannot reasonably rely on data from the petition SRA exporter because that exporter is too [ characterization ] to be representative, accounting for [percentage] of the market. Richmond-Taraca Br. at 31. But this assertion is misguided. While that exporter—[name of exporter ]—may have a relatively [ characterization ] share, its total quantity of [quantity ] and value of [price ] puts it well [comparison ] the other separate rate exporters, whose total quantities range from [quantity] to [quantity ], and total values from [price ] to [price ].[9] Appx1384-1386. Richmond-Taraca has not established any reason to doubt the representativeness of the petition SRA exporter, when its quantity and value data fall squarely [comparison ] the range of data for the separate rate respondents.

_____

[9] These numbers exclude the companies Commerce selected as mandatory respondents, as the question is whether the petition SRA exporter is representative of the other separate rate companies.

Plaintiffs-appellees also contend that the petition margin is not a reliable comparison point because that margin relied on Thailand as a surrogate country, and Commerce chose Romania, rather than Thailand, as the surrogate country for its final determination. Richmond-Taraca Br. at 32, Zhejian Dehua Br. at 17. That Commerce ultimately chose Romania does not mean that the Thai data are so flawed as to render the petition margin non-probative. As Commerce explained, while the Romanian data were eventually selected as more specific, Appx8546, Thailand is still a "market economy that was at a level of economic development comparable to that of China . . . and it was a significant producer of comparable merchandise." Appx527. Accordingly, the petition rate was "based on credible surrogate values from an economically-comparable surrogate country." *Id*. Moreover, regardless of the source of the surrogate country, Commerce, at the trial court's direction, "tethered" the petition margin to the data on the actual record.

Richmond-Taraca attempts to undermine Commerce's finding that the record demonstrated that the separate rate respondents had different cost structures than Chengen, Appx447-452, by pointing out that, while the majority of the separate rate respondents (25 out of 40) whose sales Commerce examined did not self-produce merchandise and are likely to have a different cost structure than Chengen, 15 of the 40 respondents did self-produce and therefore presumably have a cost structure more similar to Chengen's. Richmond-Taraca Br. at 39. But this

argument ignores that Commerce ***explicitly accounted for*** the fact that some separate rate respondents may have dumping behavior closer to Chengen's by averaging Chengen's zero percent margin with the petition margin (*i.e.*, the AFA rate applied to Bayley) rather than solely relying on the petition margin as the separate rate.[10] Appx523 ("By averaging . . . we account for those Separate Rate Plaintiffs whose dumping may more closely adhere to the levels of the Petition SRA Exporter as well as those whose dumping behavior may be more similar to that of Chengen's.").

Finally, plaintiffs-appellees repeat the trial court's statements—made in the fifth remand order—that Commerce had not addressed potentially contradictory record evidence and therefore the 57.36 percent rate was not supported by substantial evidence. As an initial matter, Commerce ***did*** address the majority of the evidence the trial court claimed as potentially contradictory. For instance, the court stated that plaintiffs had alleged that Jiangyang Wood, along with certain other unnamed separate respondents, showed certain prices higher than Chengen's. Appx189-190. But Commerce explained that those separate rate respondents

---

[10] Similarly, Zehjiang Dehua contends that the data Commerce relied on cannot "serve as a basis to conclude that all of the many separate rate companies were dumping{,}" and Chengen purports to show that some separate rate companies had sales prices close to or higher than Chengen's. Zehjiang Dehua Br. at 17, Chengen Br. at 56-57. But, again, Commerce accounted for the spectrum of dumping behavior—including respondents whose behavior is closer to Chengen's—by averaging the AFA rate and Chengen's rate.

whose behavior showed similar or less dumping than Chengen were accounted for by including Chengen's zero percent margin as part of the 57.36 percent separate rate. Appx523, Appx530-531. Moreover, Commerce noted that, because it had not subjected Jiangyang Woods's data to inquiry, it could not find that the data would have resulted in an accurate individual dumping margin. Appx529. The trial court also cited Bayley's sales database, but, as Commerce explained, it had already found Bayley's data unreliable enough to warrant the application of total AFA; accordingly, Commerce could not rely on it in determining the separate rate. Appx530.

Crucially, even to the extent the information cited by plaintiffs-appellees detracts from Commerce's determination to assign a 57.36 percent separate rate, this does not render the determination unsupported by substantial evidence. *See Goodluck India Ltd. v. United States*, 11 F. 4th 1335, 1344-45 (Fed. Cir. 2021) ("{A} reviewing court must affirm Commerce's determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from Commerce's conclusion.") (cleaned up); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015). The slivers of allegedly contradictory record evidence cited by the trial court, most of which Commerce ***did*** address, were insufficient grounds for the court to find Commerce's separate rate

determination unsupported by substantial evidence and direct Commerce not to assign a 57.36 percent separate rate.

C. Plaintiffs-Appellees Fail To Demonstrate That *Bestpak* Directs An Outcome In Their Favor

Like the trial court, plaintiffs-appellees place outsize significance on *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013). *Bestpak* was, by its own language, limited to the facts of that particular record and that case does not dictate, or even imply, a resolution in plaintiffs-appellees' favor.

As an initial matter, unlike in *Bestpak*, the record in this investigation was not "so thin that Commerce could neither have reached a valid decision nor reasonably have found evidence to support {its} determination{.}" *Id.* at 1379. As we have demonstrated, Commerce supported its determination with several evidentiary findings. Richmond-Taraca even appears to concede that more record evidence supported Commerce's calculation in the underlying proceeding than in *Bestpak*. *See* Richmond-Taraca Br. at 30; *see also Bestpak*, 716 F.3d at 1378-79.

Zhejiang Dehua, on the other hand, contends that the average unit value (AUV) data at issue in *Bestpak* is more comprehensive than the record evidence Commerce relied on below. Zhejiang Dehua Br. at 19. But this assertion is based on Zhejiang Dehua's inaccurate representation that Commerce "merely relied on one invoice" in rendering its determination. *Id.* at 20. Commerce relied on several

27

evidentiary findings based on the record, not simply one invoice. Moreover, AUVs are less representative of potential dumping behavior than actual sales data, which Commerce relied on here. AUVs reflect, without distinction, the average value of *all* products sold by a company, and therefore may encapsulate a very different selection of products than those at issue in a proceeding, which limits its probative value. Commerce noted as much in its final remand redetermination; in rejecting the Coalition's suggestion to base the separate rate on AUVs, Commerce explained that such data "provides a global average of a company's selling behavior, {but} it does so without regard to product mix, which can be significant in some cases." Appx563. Here, Commerce examined, among other things, *actual sales data* from a separate rate respondent for the same type of product sold by Chengen; unlike in *Bestpak*, that data—and the other evidence Commerce considered—demonstrates that averaging Chengen's zero percent rate and the AFA rate assigned to Bayley results in a rate reasonably reflective of non-individually-investigated respondents' potential dumping behavior.

Even if the record is limited by necessity, a limited record does not justify the application of a zero percent rate given that Commerce found, and the trial court agreed, that the record evidence demonstrated that such a rate would not be reasonably reflective of the non-examined respondents' potential dumping behavior. Appx158. Plaintiffs-appellees stress that Commerce's primary objective

should be "accuracy and fairness," *see* Zhejiang Dehua Br. at 6, Richmond-Taraca Br. at 23. Accuracy and fairness are not served by applying Chengen's unrepresentative zero percent separate rate, which would lead to an inaccurate result, and one potentially unfair to the domestic industry.

In addition, the Court in *Bestpak* held that Commerce acted unreasonably in not selecting another mandatory respondent, thereby causing a scarcity of data, and by including the uncooperative respondent's (Jintian) AFA-based rate in the separate rate because "Commerce was certainly aware of this situation when Jintian was being unresponsive early in the investigation and could have gathered more information." *Bestpak*, 716 F.3d at 1380. Here, Bayley—the mandatory respondent receiving a total AFA rate—participated fully in the investigation, submitting information and even contesting Commerce's application of AFA before the trial court.[11] Appx105-110. Accordingly, Commerce could not simply disregard Bayley as unresponsive early in the proceeding and select another mandatory respondent or gather more information.

Like the trial court, plaintiffs-appellees describe the 57.36 percent separate rate assigned by Commerce as "punitive," analogizing it to the 123.83 percent

---

[11] While Bayley participated in the investigation, Commerce could not rely on its submitted data in determining the all-others rate, given it had found Bayley's information so incomplete and unreliable as to justify the application of total AFA.

separate rate at issue in *Bestpak*. *See* Richmond-Taraca Br. at 15, Zhejiang Dehua Br. at 8. But the 123.83 percent rate in *Bestpak* was more than **twice as high** as the separate rate Commerce assigned in this proceeding. Plaintiffs-appellees' claims are especially dubious in light of the Court's recent rejection of the argument that a 78.17 percent rate for cooperating non-individually-examined respondents, based entirely on the AFA rate of mandatory respondents, is punitive. *PrimeSource*, 2024 WL 3682552, at *9 ("Receiving an AFA rate is not a punitive measure").

In *PrimeSource*, Commerce assigned a total AFA rate of 78.17 percent to both mandatory respondents and, ensuingly, calculated an all-others rate of 78.17 percent as well. *Id.* at 3. Despite the non-examined respondents' complaints that a rate based entirely on 78.17 would be punitive to cooperating parties, the Court upheld Commerce's decision to base the all-others rate entirely on the AFA rates assigned to the mandatory respondents, explaining that AFA rates are not punitive. *Id.* at 9. The all-others rate in *PrimeSource* was significantly higher than the 57.36 percent rate assigned below, and based entirely on the AFA rates assigned to mandatory respondents. Here, Commerce averaged the AFA rate assigned to Bayley with Chengen's zero percent rate, and "tethered" the petition margin (upon which the AFA rate was based) to the potential dumping behavior of separate rate respondents. Commerce's determination was reasonable and supported by substantial evidence, and the trial court erred in rejecting it.

## CONCLUSION

For these reasons, and those stated in our opening brief, we respectfully

request that the Court reverse the judgment of the trial court.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:

SAVANNAH MAXWELL
Senior Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-7568
Facsimile: (202) 514-8624

August 29, 2024

Attorneys for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b), the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 6,942 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14-point font, proportionally spaced typeface.

/s/ Sosun Bae
SOSUN BAE